## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ADIN GESS, NOACH NEWMAN, | ) | |
| MAYA PARIZER, NATALIE | ) | |
| SANANDAJI,  YONI DILLER, and | ) | |
| HAGAR ALMOG, LISHAY LAVI, | ) | |
| DAVID BROMBERG, ARIEL EIN-GAL, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Plaintiffs, | ) | Civil Action Case No. 2:24-cv-00134 |
| | ) | |
| v. | ) | |
| | ) | |
| BAM TRADING SERVICES INC. d/b/a | ) | |
| BINANCE.US, a Delaware corporation, | ) | |
| and BINANCE HOLDINGS, LTD. d/b/a | ) | |
| BINANCE, a foreign company, and | ) | |
| CHANGPENG ZHAO, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT FOR DAMAGES AND JURY DEMAND

COME NOW Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, Hagar Almog, Lishay Lavi, David Bromberg, and Ariel Ein-Gal (together "Plaintiffs"), by and through their attorneys working with the National Jewish Advocacy Center, Inc., and allege the following against Defendants Bam Trading Services Inc. d/b/a Binance.us, Binance Holdings, Ltd. d/b/a Binance, and Changpeng Zhao (collectively "Binance" or "Defendants"):

1

## INTRODUCTION

On October 7, 2023, the sovereign State of Israel was attacked by over 1,500 Hamas terrorists and many other supposed "civilians," from the Gaza Strip, in the early morning hours. Hamas is a radical Islamist designated Foreign Terrorist Organization ("FTO") that is committed to the globalization of Islam through violent holy war. After Hamas rained down rockets on Israel's civilian centers, they breached the security barrier that surrounded the Gaza Strip and invaded the State of Israel's borders. Women were raped and killed en masse, the elderly and children were murdered in cold blood, and hundreds of young innocent civilians dancing at a peace festival were slaughtered. When the dust settled, Hamas had killed more than 1,200 people, including 32 Americans, injured over 6,900 individuals and kidnapped some 239 innocent civilians from at least twenty-five different countries into Gaza.

The attack, which was spearheaded by Hamas but also involved smaller terrorist cells and organizations including Palestinian Islamic Jihad, was complex, well-planned and multipronged.  It involved multiple types of vehicles to storm checkpoints, preliminary missile bombardments, coordinated personnel movements, multiple rockets to breach defenses, paragliders to bypass high walls, maritime equipment to invade by sea, detailed maps of Israeli military and civilian targets, surveillance of Israeli troop positions and heavy and light weaponry and ammunition. For such an attack to be successful or even contemplated, significant

funding was necessary.

Defendants' contributions to the funding of this attack cannot be overstated. As has already been established via federal enforcement actions, Defendants knowingly facilitated transfers of money to Hamas over the course of more than five years and its Chief Executive Officer, Chief Compliance Officer, compliance personnel and rank-and-file employees knew that its operations were being used to fund Hamas, as well as other FTO's. In fact, the facilitation of payments to Hamas was so ingrained at Binance that even common banter among its employees demonstrates Defendants' knowledge, both actual and constructive, that its infrastructure was being used for illegal payments and remittances to FTO's.

Despite this knowledge, Defendants did not file a single suspicious activity report ("SAR") with the Financial Crimes Enforcement Network (FinCEN).  Filing a SAR under such circumstances is mandated by law and is the bare minimum required of a regulated financial institution after it has processed a payment or remittance that it has reason to suspect is possibly implicated in money-laundering, fraud, terrorism, or other crimes. In fact, according to the United States Department of Justice, a message from one of Binance's compliance employees sent in February 2019 joked that the crypto exchange should get a banner that says: "Is washing drug money too hard these days? Come to Binance, we got cake for you."

Virtual currency exchanges typically allow trading between the U.S. dollar,

other foreign currencies and other digital currencies. Many virtual-currency exchanges also act like banks and store their customers' digital currency. Because these exchanges act like banks, they are legally required to conduct due diligence of their customers and have anti-money laundering checks in place.

Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 et seq., and must collect identifying information of their customers and verify their clients' identities. SARs enable law enforcement agencies to uncover and prosecute significant money laundering and criminal financial schemes. Defendants' failure to generate even one SAR across trillions of dollars of transactions in effect collaterally covered Hamas' and Palestine Islamic Jihad's tracks in ways they would not themselves be able to achieve.

## BINANCE

Binance was founded in 2017 in China but moved its servers and headquarters out of the country in advance of the Chinese government's ban on cryptocurrency trading in September 2017. By January 2018, Binance had a market capitalization of $1.3 billion. Binance's co-founder, Changpeng Zhao, commonly known as CZ ("Zhao"), is a Chinese-born Canadian businessman who served as Biance's CEO until November of 2023 when he was forced to step down in the wake of a multi-agency investigation into Binance and what Treasury Department Secretary Janet

Yellen has described as "the largest enforcement action in Treasury's history," with the respective Financial Crimes Enforcement Network and Office of Foreign Assets Control fines alone adding up to $4.3 billion.

In March 2018, Binance announced its intentions to open an office in Malta after stricter regulations in Japan and China and subsequently signed a memorandum of understanding with the government of Bermuda and with the Malta Stock Exchange to develop a platform for trading security tokens. In August 2018, Binance along with other exchanges raised $32 million for a "stablecoin" project to address the volatility of cryptocurrencies.

Throughout 2019, Binance continued to serve "thousands of users" identified as being from sanctioned countries, including over 12,500 users who provided Iranian phone numbers. Three-quarters of the Iranian funds that passed through Binance were in a relatively low-profile cryptocurrency called Tron that gives users an option to conceal their identities. Iran has at all relevant times been the most significant sponsor of Hamas' terror operations and is on the list of sanctioned countries because payments and remittances to Iranian destinations have been used to underwrite the costs of maintaining terror networks and conducting terrorist activities such as was recently carried out by Hamas.

In a blog post in 2021, Nobitex, Iran's largest crypto exchange platform, openly instructed clients on how to use Tron -- a mid-tier token -- to trade

anonymously without "endangering assets due to sanctions." Following Nobitex's guidance, many Iranian customers used VPNs to conceal their locations and continued trading on Binance as they had been doing for some time. According to the U.S. Justice Department, Binance enabled nearly $900 million in transactions between US and Iranian users, noting that it had a "significant customer base" from some sanctioned jurisdictions and was aware that Iran represented "the majority of such customers."

From around January 2018 to May 2022, Binance processed 1.1 million crypto transactions worth at least $898.6 million between US customers and those who lived in Iran. In 2022, Reuters cited blockchain data as indicating that Binance has processed Iranian transactions with a value of $8 billion since 2018 despite US sanctions intended to cut Iran off from the global financial system. Almost all the funds, about $7.8 billion, flowed between Binance and Nobitex in violation of U.S. law.

Iran's ability to provide funds to Hamas is due in no small part to its payment platforms being used as conduits for platform-based crypto and digital remittances to Hamas from terrorist sympathizers and confederates throughout the world.

## ZHAO

Zhao was the CEO of all Binance entities between 2017 and mid-2023 when they processed numerous transactions to entities and accounts associated with

Hamas and other FTOs. Zhao in fact not only oversaw the platform but also coordinated and initiated a process whereby Binance customers could bypass Binance's internal controls and disregard U.S. regulatory law by engaging in conduct to actively conceal their locations as being in the U.S.

Zhao's complicity is a matter of judicial fact pursuant to the civil settlements with the Department of Justice and associated regulatory authorities which were announced in late 2023.

Those settlements stipulate that Binance, under the leadership and direction of Zhao, failed to place and utilize legally required internal tools and infrastructure and thereby enabled remittances to Hamas and other FTOs from the United States.

Zhao's actions and directions to customers and employees were designed to frustrate and undermine the enforcement of the Bank Secrecy Act ("BSA"), U.S. Anti-Money Laundering ("AML"), Know Your Customer ("KYC"), and other federal regulations in order to maximize profits while instructing his employees that the eventual FTO-based destinations of the funds sent via the Binance platform were not a Binance concern.

On November 21, 2023, Zhao pled guilty to willful violations of the Bank Secrecy Act. Zhao was also a named party with "control person" liability in regulatory settlements with Binance. Zhao is scheduled to be sentenced in April of 2024 and has been ordered to remain in the United States pending sentencing.

### BINANCE.US

In 2019, Binance was banned in the United States on regulatory grounds. In response, Binance and other investors opened Binance.us, a separate exchange designed to comply with all applicable US federal laws while keeping its original platform for the rest of the world. Binance.us is currently authorized to do business in over forty U.S. states, including Alabama. https://www.financemagnates.com/cryptocurrency/exchange/binance-us-expands-trading-services-into-alabama/

As would be later discovered upon investigation by the SEC, Zhao and Binance secretly controlled the Binance.us platform's operations behind the scenes and permitted U.S. customers to utilize its less regulated Binance platform in lieu of the Binance.us platform which was intended to be compliant with U.S. law. In fact, Binance continued and possibly still continues to allow some of its most important, high-volume U.S. users to remain on the unregistered Binance.com exchange.

At the direction of Zhao and other senior leaders at Binance, employees encouraged their high-volume U.S. users to conceal their U.S. connections, including by creating new accounts that obscured their locations." Zhao wrote privately to his employees that this was so Binance could continue to grow and that it was "better to ask for forgiveness than permission."

In June 2019, Binance announced a partnership with BAM Trading Services,

Inc. ("BAM") to facilitate trading in Alabama and throughout the United States, in advance of its launch of Binance.us.  https://www.binance.com/en/blog/all/binance-announces-partnership-with-bam-to-launch-us-exchange-346119082624540672.

In September 2019, Binance launched Binance USD ($BUSD), a fiat-collateralized stablecoin launched in collaboration between Binance and Paxos Trust Company, a New York-based financial institution and technology company and an issuer of regulated stablecoins. Until recently, $BUSD was the native token of the Binance exchange.

At all relevant times, Binance did not have protocols to flag or report transactions for money laundering risks, and its employees were well aware that such a compliance failure would invite criminals to the platform.

On October 28, 2020, Forbes Magazine staff released leaked documents showing that Binance and Changpeng Zhao created an elaborate corporate structure designed to intentionally deceive United States regulators and secretly profit from cryptocurrency investors located in the country. Binance officially blocks access from IP addresses located in the United States, but "potential customers would be taught how to evade geographic restrictions", Forbes claimed. Binance relied on U.S.-based entities and vendors and actively cultivated lucrative and commercially important "VIP" customers, including institutional customers, located in the United States.

At the same time, Binance, Zhao, and Binance's then-chief compliance officer Samuel Lim each knew that Binance's solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law. In order to avoid such requirements, Binance, Zhao, and Lim undermined Binance's own compliance program and assisted customers in bypassing Binance's own controls.

Binance and its officers, employees, and agents even instructed U.S. customers to use VPNs to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers to open Binance accounts under the name of newly incorporated shell companies to evade Binance's own compliance controls.

As stated in an action by the Commodities Future Trading Commission against Binance and related entities, "Binance's decision to prioritize commercial success over compliance with U.S. law has been, as Lim paraphrased Zhao's position on the matter, a 'biz decision.'" As a result of this "biz decision", Binance's own documents for the month of August 2020 show that the platform earned $63 million in fees from derivatives transactions and approximately 16% of its accounts were held by customers Binance identified as being located in the United States. By May 2021, Binance's monthly revenue earned from derivatives transactions

increased to $1.14 billion.

In fact, Binance.us is a smokescreen for Binance's other U.S.-based activities. On June 9, 2019, after the launch of Biance.us, Zhao and Binance conspired to retain U.S. customers on the Binance platform notwithstanding that Biannce.us had been launched. Binance's Chief Financial Officer stated during a meeting with senior management including Zhao:

> [S]ort of, the messaging, I think would develop it as we go along is rather than saying we're blocking the US, is that we're preparing to launch Binance US. So, we would never admit it publicly or privately anywhere that we serve US customers in the first place because we don't. So, it just so happens we have a website and people sign up and we have no control over [access by U.S. customers] . . . . [B]ut we will never admit that we openly serve US clients. That's why the PR messaging piece is very, very critical.

Zhao agreed that Binance's "PR messaging" was critical, explaining in a meeting the next day that "we need to, we need to finesse the message a little bit . . . . And the message is never about Binance blocking US users, because our public stance is we never had any US users. So, we never targeted the US. We never had US users."

However, during the June 9, 2019 meeting, Zhao himself stated that "20% to 30% of our traffic comes from the US," and Binance's "July [2019 Financial] Reporting Package," which was emailed directly to Zhao, attributes approximately 22% of Binance's revenue for June 2019 to U.S. customers.

The screenshot below from the federal case against Binance encapsulates the priority Binance placed upon retaining its U.S. customer base and Binance's

willingness to encourage its customers to violate U.S. law and its own safeguards to obscure their locations and conceal any nexus to the United States.

Binance.com Platform. And so Zhao and Binance engaged in widespread covert efforts to permit U.S. customers to continue to trade on the platform.

128.   *First*, Zhao directed Binance to implement a plan to encourage customers to circumvent Binance's geographic blocking of U.S.-based IP addresses by using a VPN service to conceal their U.S. location. *Second*, Zhao directed Binance to encourage certain U.S.-based VIP customers to circumvent the new KYC restrictions by submitting updated KYC information that omitted any U.S. nexus.

129.   As Zhao explained in a June 9, 2019 weekly meeting of senior Binance officials:

We don't want to lose all the VIPs which actually contribute to quite a large number of volume. So ideally we would help them facilitate registering companies or moving the trading volume offshore in some way—in a way that we can accept without them being labeled completely U.S. to us.

130.   Binance implemented Zhao's instructions. On or about June 13, 2019, a Binance employee who belonged to a team that managed VIP customers messaged Zhao and other senior Binance officials, "We contacted 16 US top clients so far, some [of] them already have offshore entity, they said they can underst[and] and they are happy that we can get ahead of that." A few days later, Binance's Chief Marketing Officer reported that the team had reached out to the top 22 U.S. VIP customers and that 19 had "already agreed to change KYC, or change their IP."

131.   With respect to its thousands of other VIP U.S. customers, Zhao explained in a

22 U.S. VIP customers and that 19 had "already agreed to change KYC, or change their IP."

131.    With respect to its thousands of other VIP U.S. customers, Zhao explained in a June 24, 2019 meeting with other Binance senior officials:

> We do need to let users know that they can change their KYC on Binance.com and continue to use it.  But the message, the message needs to be finessed very carefully because whatever we send will be public.  We cannot be held accountable for it.

132.    The following day, Zhao met with other senior Binance officials to discuss their

33

VIP U.S. customers, and Zhao provided further instructions on crafting the message to customers about changing IP addresses or KYC documentation.  During the meeting, the Binance CCO noted that Binance would engage in "the international circumvention of KYC," and Zhao affirmed that his "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."

In 2020, a Forbes Magazine report described how a "Tai Chi" document created by Harry Zhou, the co-founder of San Francisco-based exchange Koi Trading which is backed by Binance, was presented to senior Binance executives, explaining the steps Binance had taken a to evade regulators in the U.S.  Tai Chi is a Chinese martial art which relies on evading and deflecting direct force and was

13

used by Binance to describe methods of avoiding responsibility. The purpose of the Tai Chi document was to maintain a U.S. customer base while reducing or evading U.S. regulatory risk. Binance initially sued Forbes in November 2020 over the report but dropped the lawsuit in February 2021.

As such, a preponderance of the illegal activity perpetrated by Defendants took place or has a direct nexus to Defendants' activities and customers in the United States.

At all relevant times, Binance knowingly failed to register as a money service business, willfully violated the Bank Secrecy Act by failing to implement and maintain an effective anti-money laundering program and willfully caused violations of US economic sanctions.

At all relevant times, Zhao and Binance secretly controlled the Binance.US platform's operations.

In January 2021, BUSD reached a market cap of $1 billion. By September of 2022, a year and a half since the first billion, BUSD had a market cap of $20 billion- a 2000% growth in 20 months- and over 4 million account holders worldwide.

In May 2021, Binance was placed under investigation by both the Internal Revenue Service and the United States Department of Justice on allegations of money laundering and tax offenses. By 2022, $BUSD was third largest stablecoin by market capitalization following Tether (USDT) and USD Coin (USDC).

On March 1, 2023, U.S. Senators Elizabeth Warren, Chris Van Hollen, and Roger Marshall wrote a letter to Binance describing the exchange as "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders." The letter formally requested documents related to Binance's compliance with regulations.

On March 27, 2023, the Commodity Futures Trading Commission (CFTC) filed a lawsuit against Binance and Zhao in the United States District Court for the Northern District of Illinois, claiming willful evasion of U.S. law and the breaching of rules intended to thwart money laundering operations. In internal communications with the company's money laundering reporting officer an employee allegedly remarked that regarding transactions by the designated foreign terrorist organization Hamas, "we see the bad, but we close 2 eyes".

In June 2023, the U.S. Securities and Exchange Commission (SEC) said it was suing Binance and Zhao on 13 charges for alleged violations of US securities rules.

## HAMAS AND PALESTINIAN ISLAMIC JIHAD

Since October 1997, the US Department of Treasury has designated both Hamas and Palestinian Islamic Jihad (PIJ) as Foreign Terrorist Organizations. They have also been listed as Specially Designated Global Terrorists (SDGTs) since October 2001. Hamas and PIJ use a global financing network to funnel support for

their terrorist activities from charities and friendly nations such as Iran, including by using cryptocurrencies.

According to a Commodity Futures Trading Commission (CFTC) lawsuit filed in March of 2023 against Binance, remittances in support of Hamas via Binance date back to at least February of 2019, and Binance was found to have failed to report more than 100,000 suspicious transactions involving terrorist groups and organizations including, among others, Hamas, Al Qaeda, and the Islamic State of Iraq and Syria.

According to the CFTC complaint, upon being informed by colleagues of "HAMAS transactions" in a chat, Binance's then-chief compliance officer Samuel Lim explained to a colleague that terrorists often send "small sums" of money because "large sums constitute money laundering". The colleague responded that Hamas could "barely buy an AK47 with 600 bucks". The modest size of each remittance minimized Binance's risk of detection by U.S. enforcement agencies.

Such remittances provided the necessary material support, military and tactical enablement and acquisition capacity and assets necessary for Hamas to train for and to carry out terrorist activities, including the complex, multipronged and highly sophisticated attack against civilians in Israel on October 7, 2023.

According to the Treasury Department, "Binance enabled a range of illicit actors to transact freely on the platform," and specifically named Hamas, Al Qaeda,

Palestinian Islamic Jihad and the Islamic State of Iraq and Syria as terrorist organizations that received funds through the exchange.

In June 2023, Binance had 790 million US dollars in outflows after the SEC announced its lawsuit and Forbes reported that the company had 120 million users globally.

In October 2023, coinciding with the outbreak of the 2023 Israel–Hamas war, Binance and Tether were described as a source of terrorist funding by U.S. senator Cynthia Lummis and U.S. Representative French Hill, with a letter calling for the Department of Justice to crack down on the exchange.

On November 21, 2023, U.S. authorities convicted Binance on multiple charges -- including violations of the Bank Secrecy Act and vast money laundering schemes. Indeed, Binance pled guilty.  The multiyear investigation revealed that Binance allowed criminal elements onto the platform, thereby enabling transactions linked to child sex abuse, narcotics and terrorist financing. The Binance platform, which accounts for about half of all crypto activity, was charged with facilitating money laundering, aiding terrorist networks, including Hamas and others, and violating sanctions on countries such as Cuba, Iran, Russia, Syria, as well as playing a role in human and narcotics trafficking. The indictment accused Binance of conducting over $1 billion in transactions with sanctioned countries and criminal actors.

As part of Binance's deal to plead guilty, Changpeng Zhao stepped down as CEO with a $50 million fine. The US Department of Justice, Treasury, and the Commodity Futures Trading Commission have imposed a record $4.4 billion fine on Binance, finding that it enabled the laundering of substantial sums of illicit money worldwide. Binance further agreed to maintain an effective anti-money laundering program and has agreed to resign as part of his plea deal. The company has also agreed to enter into a number of anti-money laundering and sanctions compliance programs and retain an independent monitor for the next three years.

In its 2023 suit, the SEC asserted that an owner of another crypto exchange in the U.S. advised Binance on setting up its own entity in the region and suggested two approaches, including a moderate plan to establish a second 'Tai Chi' entity that would "reveal, retard, and resolve built-up enforcement tensions" while protecting the main exchange from liabilities.

Employees at Binance were engaged in a wide array of misconduct, and many were aware of the consequences of allowing millions of illegal transactions, according to the Justice Department and FinCEN.  Crypto wallets at Binance were found to interact with bitcoin wallets associated with groups designated as terrorist organizations by the US and several other countries, including the Islamic State and al-Qaeda as well as the armed wing of Iran-backed Hamas, and another Iran-funded militia, the Palestine Islamic Jihad (PIJ), the US said. According to US Treasury

18

Secretary Janet Yellen "Binance turned a blind eye to its legal obligations in the pursuit of profit. Its willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform" and its trading platform was used to facilitate money to terror groups like Hamas, Al Qaeda, and the Islamic State of Iraq and Syria (ISIS).

The Hamas transactions were first acknowledged in February 2019 by Binance's then-chief compliance officer Samuel Lim ("Lim"), according to a Commodity Futures Trading Commission lawsuit filed in March against the crypto exchange. The complaint, quoting the messages between Lim and his staff, noted that Lim was aware of the illegal transactions being made through its writing about certain customers on the platform: "Like come on. They are here for crime."

Financial exchanges in the U.S., including those that specialize in cryptocurrency, are required to follow strict "know your customer" laws to identify their users. The Treasury Department formally has said that Binance "willfully failed to report" more than 100,000 suspicious transactions involving a host of sanctioned groups, including Hamas' military arm, Qassam Brigades, Al Qaeda, the Islamic State terrorist group, a litany of criminal ransomware hackers and users in countries facing U.S. sanctions, including North Korea and Iran. https://home.treasury.gov/news/press-releases/jy1925.  According to a press release from the Justice Department, Binance's compliance employees internally noted that

the company didn't even have protocols to flag transactions that were money laundering risks.  The Hamas terrorist organization and its affiliates have received millions in cryptocurrency donations, according to a report by the Wall Street Journal based on data from forensics firm Elliptic and Tel Aviv software company BitOK.

Palestinian Islamic Jihad received $93 million in crypto between August 2021 and June 2023, Elliptic said.  Hamas received about $41 million in the same timeframe, the report read.

CoinDesk reported on June 8, 2021 that Hamas' militant wing, Izz ad-Din al-Qassam Brigades, had received up to $100,000 just in bitcoin (BTC) since the beginning of 2021 https://www.coindesk.com/policy/2021/06/08/hamas-tapped-binance-to-launder-bitcoin-donations-blockchain-data-suggests/ with a spike in donations in May, of 2023 when Israel and Hamas exchanged rocket attacks. Binance was at the center of the transactions, according to data from three blockchain analytics firms and CoinDesk's analysis. This figure does not include the other currencies remitted via Binance including Binance's own native digital currency $BUSD.

According to Treasury Secretary Janet Yellen, FinCEN, OFAC, and IRS Criminal Investigation's investigation has found that "Binance was allowing illicit actors to transact freely, supporting activities from child sexual abuse to illegal

narcotics to terrorism, across more than 100,000 transactions. That includes transactions associated with terrorist groups like Hamas' al-Qassam Brigades, Palestinian Islamic Jihad, al-Qaida, and ISIS. Binance processed these transactions, but it never filed a single suspicious activity report. And it also allowed over 1.5 million virtual currency trades that violated U.S. sanctions." Using the example of the Binance employee who stated that Hamas could "barely buy an AK47 with 600 bucks", an extremely low remittance amount, that average remittance across 1.5 million transactions would be $900 million to be divided between criminals and terrorists including Hamas.

As a result of the material support and aid knowingly provided by Defendants to Hamas and Palestine Islamic Jihad, Hamas and Palestine Islamic Jihad (aka Islamic Jihad) were able to carry out the violent terrorist attack in which Plaintiffs suffered severe injury.

## **NATURE OF THE ACTION**

1.      This is an action brought by Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, Hadar Almog, Lishay Lavi, David Bromberg, and Ariel Ein-Gal ("Plaintiffs") against BAM Trading Services Inc. d/b/a Binance.US, Binance Holdings, Ltd. d/b/a Binance, and Changpeng Zhao ("Defendants") for damages against Defendants pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"),

Pub. L. No. 114-222 (2016), as well as pursuant to 28 U.S.C. § 1350 (the "Alien Tort Statute"), for aiding, abetting, and knowingly providing support and resources to Hamas and Islamic Jihad, two radical Islamist designated Foreign Terrorist Organizations ("FTOs") that are committed to terror and violent "holy war" and under Alabama law.

2.     The ATA's civil remedies have served as an important means for enforcing the federal criminal antiterrorism provisions since the early 1990s.

3.     Congress enacted the ATA in October 1992, as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror, but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

4.     Following the bombing of the World Trade Center in New York by al-Qaeda in 1993, Congress again targeted terrorist resources by enacting 18 U.S.C. § 2339A in September 1994, making it a crime to provide material support or resources knowing or intending that they will be used in preparing or carrying out terrorist acts.

5.     In April 1996, Congress further expanded the effort to cut off resources to terrorists by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization.

6.    In the wake of the September 11, 2001 terror attacks carried out by al-Qaeda in the United States that killed nearly 3,000 Americans, Congress amended the "material support" statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence Reform and Terrorism Prevention Act of 2004, to impose greater criminal penalties for violating these statutes and to expand the definition of "material support or resources" prohibited thereby.

7.    In September 2016, Congress amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism. The Justice Against Sponsors of Terrorism Act ("JASTA"), Public Law No: 114-222 (09/28/2016) states in relevant part:

> Purpose. --The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States. (JASTA 2(b))

8.    The ATA's civil remedies serve to enforce existing federal criminal anti-terrorism provisions and as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

23

9.      The Alien Tort Statute provides the federal district courts with original jurisdiction of any civil action by a foreign citizen for a tort committed in violation of the law of nations or a treaty of the United States.

10.     The importance of reducing funding to illicit activities, including terrorism, has been recognized for many decades. For example, the Bank Secrecy Act, Title 31 U.S.C. Sections 5311 et seq. ("BSA"), was enacted in 1970 to address an increase in criminal money laundering though U.S. financial institutions.

11.     The BSA requires banks to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering and other financial crimes. The required programs include AML programs, and KYC programs to identify and prevent illegal financial transactions. Under the BSA, it is a crime for a financial institution to fail to implement or effectively supervise the AML and KYC program and Binance's knowing and ongoing failure to do so were predicate crimes which directly aided and abetted Hamas and Islamic Jihad in their terrorist activities and provided them with material support.

12.     Binance knowingly and illegally transferred funds to an FTO and hid this source of funding for Hamas and Islamic Jihad by failing to submit any Suspicious Activity Reports as required by law. These actions, undertaken with full knowledge of Hamas' and Islamic Jihad's activities and their need for such funds to recruit, train, equip, and deploy trained terrorists, were directly and proximately

responsible for the injuries suffered by Plaintiffs at the hands of Hamas and Islamic Jihad on October 7, 2023.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as well as other related federal and state statutes, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

14.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1350, as this is a civil action brought by foreign nationals who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs as a result of torts committed in violation of 18 U.S.C. § 1956, the law of nations or of a treaty of the United States and/or international law, including but not limited to the 2000 UN Convention against Transnational Organized Crime (a/k/a the "Palermo Convention").

15.     This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. Rule 4(k)(1)(C); Ala. R. Civ. P. Rule 4.2

16.     Pursuant to 18 U.S.C. § 2334(a) any civil action under section 2333 against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served or has

an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

17.    Pursuant to § 28 U.S.C. § 1350, the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

18.    Defendants are required to have a registered agent in Alabama in order to do business in the state and, indeed, have a registered agent in Montgomery, Alabama. Defendants solicit and conduct substantial business in the State of Alabama and in September of 2020 promoted their entry into the Alabama market. https://cointelegraph.com/news/binance-s-us-branch-lands-in-alabama    Moreover, Defendant Bam Trading Services, Inc. d/b/a Binance.us possesses a Money Transmission License (MT 814) issued by the Alabama Securities Commission. Upon information and belief, Binance.US has employees working out of Tuscaloosa and Huntsville, Alabama, including customer service representatives. They also do business in Alabama through third-party representatives and active solicitations. https://symlix.com/buy/bsc-binance-coin-bsc/cash/united-states/alabama/montgomery-1;https://symlix.com/sell/bnb-binance-coin/cash/united-states/alabama/tuscaloosa;https://symlix.com/buy/bnb-binance-coin/cash/united-states/alabama/huntsville.

## PARTIES

26

19.     Plaintiff Adin Gess, an American citizen who lived with his family in Kibbutz Holit, was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw his friends and community pleading for help before they were brutally murdered. Gess and the entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine.  As a result of the actions of the Hamas and PIJ terrorists that day, Gess and his family have suffered severe mental anguish, extreme trauma, emotional pain, and suffering.

20.     Plaintiff Noach Newman is an American and Israeli citizen. His brother David Yair Shalom Newman, also an American and Israeli citizen, attended the Nova Festival on October 7, 2023, and was there when Hamas terrorists swarmed the peaceful gathering. Hamas terrorists killed David as he saved his girlfriend and several other civilians. As a result, Plaintiff Noach Newman and his family have suffered and continue to suffer severe mental anguish, trauma and extreme emotional pain and suffering.

21.     Plaintiff Yoni Diller, an American and Israeli citizen, attended the Nova Festival on October 7. He was enjoying the festivities with his friends when the

27

morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, they sought refuge, aiding the wounded and enduring a journey fraught with horrendous life-threatening fear. Relief intertwined with sorrow as they counted the losses: four of their close friends gone amidst the hundreds of lives claimed by the merciless hands of Hamas terrorists. As a result, Yoni has suffered severe mental anguish, trauma, extreme emotional pain, and suffering.

22.     Plaintiff Natalie Sanandaji, an American citizen, who resides in New York, was visiting Israel in October 2024, when she made the fateful decision to attend the Nova Festival on October 7 with some Israeli friends. When the Hamas terror attack began at the festival, Sanandaji fled by car, and then by foot for several hours, witnessing the atrocities first-hand, and running through Hamas gunfire. After approximately four hours running on foot through fields in the South of Israel, Sanandaji was saved by a good Samaritan. As a result of the Hamas terror attack, Sanandaji has suffered severe mental anguish, trauma, extreme emotional pain, and suffering.

23.     Plaintiff Maya Parizer, an American and Israeli citizen, attended the Nova Festival on October 7 as part of her birthday celebration with her boyfriend and other friends. She was enjoying the festivities with his friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, Parizer escaped by driving with her boyfriend while dodging bullets on the road,

while passing vehicles on the side of the road that had been shot up by Hamas and dead Israeli bodies were strewn on the side of the road. Parizer ultimately found refuge in a nearby town. As a result, Parizer has suffered severe mental anguish, trauma, extreme emotional pain, and suffering.

24.   Plaintiff Hagar Almog is an Israeli citizen who lived with her family in Kibbutz Holit. She was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw her friends and community pleading for help before they were brutally murdered. Almog and the entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine.  As a result of the actions of the Hamas and PIJ terrorists that day, Almog has sought professional help to deal with the trauma, severe mental anguish, extreme emotional pain, and suffering that she and her family have endured.

25.   Plaintiff Lishay Lavi is an Israeli citizen.  Her husband, Omri Miran, was kidnapped by Hamas terrorists on October 7, 2023, after they broke into their home on Kibbutz Nachal Oz, in southern Israel.

https://www.youtube.com/watch?v=S7uGMF6y3Fg.  Hamas has been holding Omri

captive in Gaza to this day.  As a result, Plaintiff Lishay Lavi and her family have suffered and continue to suffer unbearable trauma, severe mental anguish, and extreme emotional pain and suffering.

https://www.youtube.com/watch?v=glAiEIWrahw.

26.  Plaintiff David Bromberg, an American citizen, attended the Nova Festival on October 7, 2023.  When Hamas terrorists attacked him and his friends, he ran for his life until he found shelter hiding in the bushes outside Kibbutz Be'eri. After 12 hours of unimaginable fear, he and several others were rescued by a citizen and escaped under heavy fire from the terrorists.  Some of his friends were killed, another was taken hostage by the terrorists and remains a hostage to this day.  As a result, Bromberg has endured severe trauma, mental anguish and extreme emotional pain and suffering.

27.  Plaintiff Ariel Ein-Gal is an Israeli citizen.  On the morning of October 7, 2023, he and his friends were asleep on Zikkim Beach.  They awoke to swarms of Hamas and other terrorists infiltrating the coast by boats.  Ariel fled from them under heavy fire and got to a shelter, where he hid for four hours.  When he tried to escape in a car, he was ambushed by four terrorists, who shot dozens of rounds into his vehicle from close range.  Finally, he miraculously escaped.  As a result of these events, Plaintiff Ariel Ein-Gal has suffered severe mental anguish, trauma, and extreme emotional pain and suffering.

28.     Defendant Binance, BAM TRADING SERVICES INC. d/b/a BINANCE.US, ("BAM Trading") is a Delaware company with its principal address in Miami, Florida. BAM Trading operates Binance.US, a spot digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, obtained through intercompany agreements, to operate. BAM Trading is directly or indirectly majority owned and controlled by Zhao. It has a Money Transmission License from the Alabama Securities Commission and openly announced it is open for business in Alabama and solicits and carries on business in Alabama, including within the Middle District of Alabama. Upon information and belief, Binance.US has employees and agents soliciting business in Alabama and working out of Alabama, including customer service representatives.

29.     Defendant BINANCE HOLDINGS, LTD. d/b/a BINANCE is incorporated in the Cayman Islands and holds intellectual property for Binance, including trademarks and domain names, and has personnel who operate or oversee the operation of the Binance platform.

30.     Defendant Zhao is Binance's primary founder, majority owner and CEO of Binance at all relevant times with full supervisory and operational authority and discretion. He is a Canadian citizen who, upon information and belief, resides in the United Arab Emirates.  Upon information and belief, he authorized Defendant to open in Alabama and to do business in Alabama.

31

31.     All Defendants are inextricably intertwined.

## RELEVANT FACTS

## HAMAS

32.     At all relevant times, Hamas, an acronym of its official name, the Islamic Resistance Movement, was and still is, designated by the United States State department as a designated FTO subject to all penalties and restrictions associated therewith.

33.     Hamas was founded in December 1987. Hamas is a United States-denominated terrorist entity formally committed to the destruction of the State of Israel and the elimination of the Jewish people, and to achieving its objectives by violent means, including acts of terrorism. The Hamas Charter states that, among other things including the extermination of world Jewry, Hamas's very purpose is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

34.     Hamas has two primary components: its political and social infrastructure; and its paramilitary and terrorist infrastructure known as the Izz al-Din al-Qassam Brigades. These two components, while officially separate, operate in tandem to further the objectives of Hamas.  Money sent to one or the other components is fungible within Hamas.

35.     Consistent with the findings of both Congress and the Executive

Branch, financial services and other material support provided to Hamas ultimately inures to the benefit of its criminal, terrorist functions – regardless of whether such support was ostensibly provided to support non-violent activities.

36.     Hamas utilizes, among other things, a network of financial platforms and cryptocurrency exchanges designed to evade United States and other nations' anti-money laundering and anti-terrorism enforcement mechanism to, among other things, recruit and train Izz al-Din al-Qassam Brigades cell members and provide salaries for Hamas's terrorist operatives and leadership and fund terrorist attacks and operations, including the October 7th 2023 terrorist attacks.

37.     Hamas also uses violence, principally suicide bombings, shootings and rocket attacks and other threats of violence to pressure Israel to cede territory to the Palestinian people.

38.     Hamas knowingly, willfully, and unlawfully combines, conspires, collaborates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder, terrorism financing, supporting, aiding and abetting, and conspiring with other terrorists and FTOs, and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to other designated FTOs in violation of the federal criminal code of the

United States.

39.     The Palestine Islamic Jihad is a Sunni Islamist militant group seeking to establish an Islamist Palestinian state that is committed to the destruction of Israel. It is the second-largest militant group in the Gaza Strip and the West Bank, founded in 1979 as an offshoot of the Muslim Brotherhood in Egypt. The group has drawn inspiration from the Iranian revolution and receives support from Iran, Syria, and Lebanese Hizballah. PIJ's military wing, al-Quds Brigades, has been responsible for and has participated in many attacks on Israeli targets since the 1990s. including the October 7th 2023 terrorist attacks.

## THE OCTOBER 7, 2023 TERRORIST ATTACK

40.     During the rocket attack on Israel, armed Hamas and Islamic Jihad militants ("Hamas Terrorists"), many on motorcycles, others in cars and trucks as well as paragliders, stormed the sovereign State of Israel (the "Terrorist Attack") and shot, stabbed, raped, brutalized, tortured, and killed the inhabitants of nearby kibbutzes and small towns as well as numerous participants in a local musical peace festival.

41.     At least 260 bodies were removed from the festival venue following the attack. Other festival attendees were abducted.

42.     Hamas and Islamic Jihad engaged in the wholesale slaughter, torture, and mutilation of Israeli citizens, sometimes entire families, including women,

children, and infants as well as the elderly, and went house to house, sometimes in stolen Israeli uniforms, to gain access to homes and settlements.

43.    As those under attack rushed to safe rooms and bomb shelters the Hamas Terrorists gleefully pursued them with knives, axes, grenades and rockets. They killed innocent Israeli citizens at random and gang raped women. Militants burst into houses, shooting residents begging for their lives and taking others -- including women, children, and the elderly -- hostage, driving the terrified captives back into Gaza at gunpoint.

## AIDING & ABETTING

44.    Access to outside funding is the lifeline for terrorist organizations, particularly when such organizations are designated as FTO's and therefore unable to raise money openly or through traditional means such as routine remittances, fundraisers, payments for goods and services and donations.

45.    Terrorist organizations are designated as FTO's based upon the well-established premise that such FTO's ability to terrorize their targets depends upon steady sources of revenue.

46.    Defendants not only knowingly provided Hamas and Islamic Jihad with a platform with which to illicitly accept funds from the United States in contravention of U.S. law, it also provided a means for them to accept funds from a worldwide network of remitters including from within Iran, the single largest

sponsor of Hamas.

47.    Defendants moreover discussed, planned and collaborated to continue processing transactions that they knew to be illegal, and even advised their customers as to how to avoid their own AML and U.S. regulations governing money laundering and terrorist financing.

48.    Such aid is not confined to the actual remittance of money to fund Hamas' and Islamic Jihad's activities. By subverting U.S. law, hiding its activities, suppressing the mandatory issuance of SAR's and repeatedly revising its services and infrastructure to evade regulatory authorities, Binance and the other Defendants in fact covered Hamas' and Islamic Jihad's financial tracks, thereby undermining the purpose of their designations as FTOs, making it harder for the U.S. government to cut off their finances and prevent future terrorist activity.

49.    The result of this critical logistical and financial aid was borne out in the sophisticated October 7, 2023 attack on civilians in Israel by Hamas and Islamic Jihad which required highly expensive land, seaborne and airborne equipment and weaponry, extensive recruitment, training, and tactical coordination.

50.    Hamas and Islamic Jihad are in fact, trained, well-equipped, well-provisioned and funded, murderous and ruthless terrorist organizations, thanks in no small part to the deliberate and knowing facilitation by Defendants of Hamas' and Islamic Jihad's network of funding.

## MATERIAL SUPPORT

51.    Defendants provided material support in its most straightforward form to Hamas and Islamic Jihad – cash and cash equivalents which could be converted to U.S. Dollars. The money transferred by Defendants to Hamas and Islamic Jihad supported their terrorist activities for years, enabled them to secure necessary materials and equipment, paid salaries, underwrote their infrastructure and provided the lifeblood necessary for them to maintain and grow their operations. This material support has already been unequivocally proven by successive regulatory investigations over several years as well as by the self-congratulatory correspondence from within and among Defendants' employees who were aware that they were vital cogs in Hamas', Islamic Jihad's as well as other terrorist and criminal networks.

52.    Defendants violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, Defendants are liable pursuant to 18 U.S.C. § 2333 to the Plaintiffs,

who were injured by reason of acts of international terrorism by those Defendants funded.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(A) AND (D)

53.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

54.     Hamas emerged in 1987 during the first Palestinian uprising, or intifada, as an outgrowth of the Muslim Brotherhood's Palestinian branch. The group is committed to armed resistance against Israel and the creation of an Islamic Palestinian state in Israel's place. Palestine Islamic Jihad seeks to establish an Islamist Palestinian state and is committed to the destruction of Israel. It was founded in 1979 and is the second-largest militant group in the Gaza Strip and the West Bank,

55.     Hamas has been the de facto governing body in the Gaza Strip since 2007, when it ousted the Palestinian Authority from power. Hamas and Islamic Jihad use improvised explosive devices, short- and long-range rockets and mortars, small arms, kidnapping operations, rocket-propelled grenades, man-portable air defense systems, antitank missiles, and unmanned aircraft systems in attacks against Israeli military forces and civilians, as well as against dissenting groups in Gaza. The groups also use cyber espionage and computer network exploitation operations as

well as a vast array of media vehicles for propaganda and messaging purposes.

56.    The US State Department designated Hamas as a foreign terrorist organization in October 1997 in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

57.    The US Department of State designated Islamic Jihad as a Foreign Terrorist Organization in 1997 and designated its Secretary General Ziyad al-Nakhalah as a Specially Designated Global Terrorist in 2014.

58.    Hamas and Islamic Jihad have committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

59.    These activities committed, planned, or authorized by Hamas and Islamic Jihad appear to have been, and were intended to: (a) intimidate or coerce the civilian populations of Israel, the United States, and other countries; (b) influence the policy of the Governments of Israel, the United States and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of Israel, the

United States and other countries by mass destruction, assassination, or kidnapping.

60.    These activities committed, planned, or authorized by Hamas and Islamic Jihad occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

61.    Plaintiffs have been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by Hamas and Islamic Jihad.

62.    Defendants knowingly provided substantial financial assistance to Hamas and Islamic Jihad, and thus aided and abetted them in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiffs.

63.    By aiding and abetting Hamas and Islamic Jihad in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## SECOND CLAIM FOR RELIEF

### LIABILITY FOR CONSPIRING IN FURTHERANCE OF
### ACTS OF INTERNATIONAL TERRORISM PURSUANT TO

40

## 18 U.S.C. § 2333(A) AND (D)

64.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

65.     By knowingly conspiring with Hamas and Islamic Jihad to facilitate its operations and in furtherance of their committing, planning, or authorizing acts of international terrorism, including acts that caused the Plaintiffs to be injured in his or her person and property, the Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## THIRD CLAIM FOR RELIEF

## PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

66.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

67.     Without the material support of the Defendants, Hamas and Islamic Jihad would have been far less able to recruit, train, equip and deploy their armed terrorist forces against civilians in Israel including Plaintiffs.

68.     By committing violations of 18 U.S.C. § 2339A that have caused the Plaintiffs to be injured in his or her person, business or property, Defendants are liable pursuant to 18 U.S.C. § 2333 for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including

attorney's fees.

## FOURTH CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

69.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

70.     Defendants' violation of 18 U.S.C. § 2339B proximately caused the damages to Plaintiffs described herein.

71.     By knowingly (or with willful blindness) providing material support to a designated FTOs, the Defendants are therefore civilly liable for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### LIABILITY UNDER  28 U.S.C. § 1350 FOR AIDING AND ABETTING AND PROVISION OF MATERIAL SUPPORT IN FURTHERANCE OF VIOLATIONS OF THE LAW OF NATIONS OR A TREATY OF THE UNITED STATES (ALIEN TORT STATUTE)

72.     Plaintiffs repeats and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

73.     Defendants' violations 18 U.S.C. § 2333(A) AND (D), 18 U.S.C. § 2339A, 18 U.S.C. § 2333, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2333(a)

constituted a violation of United States law as well as international treaties to which the United States is subject.

74.     As a consequence of such violation, Defendants have caused damage to the Plaintiffs and are therefore civilly liable to Plaintiffs for their injuries for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees, pursuant to the Alien Tort Statute.

## SIXTH CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

75.     Plaintiffs repeats and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

76.     Defendants engaged in negligent behavior by providing support and aid to Hamas.

77.     The acts of illicitly providing financial services to Hamas and Islamic Jihad constituted a willful violation of federal statutes, and thus amounted to a willful violation of a statutory standard.

78.     As a direct, foreseeable and proximate result of the conduct of the Defendants as alleged hereinabove, Plaintiffs have suffered severe emotional distress, and therefore the Defendants are liable to the Plaintiffs for Plaintiffs' severe emotional distress and related damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    Enter judgment against Defendants and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(b)    Enter judgment against the Defendants and in favor of each Plaintiff who is a United States citizen for treble damages pursuant to 18 U.S.C. § 2333;

(c)    Enter judgment against the Defendants and in favor of each Plaintiff who is a United States citizen for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

(d)    Enter an Order declaring that the Defendants have violated, and may be continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.;

(e)    Enter judgment against the Defendants and in favor of each Plaintiff who is a foreign-born citizen for treble damages pursuant to 28 U.S.C. § 1350;

(f)    Enter judgment against the Defendants and in favor of each Plaintiff who is a foreign-born citizen for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 28 U.S.C. § 1350, and

(g)    Grant such other and further relief as justice requires.

<u>Plaintiffs Demand a Trial by Jury on All Claims So Triable.</u>

Dated: February 26, 2024

Respectfully submitted,

/s/ David I. Schoen_____
David I. Schoen (ASB-0860-O42D)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(334) 395-6611
schoenlawfirm@gmail.com


Mark Goldfeder (pro hac vice forthcoming)
National Jewish Advocacy Center, Inc.
1718 General George Patton Drive
Brentwood, TN 37027
 (800) 269-9895
mark@jewishadvocacycenter.org

Ben Schlager (pro hac vice forthcoming)
Goldfeder and Terry, LLC
666 Harless Place
West Hempstead, NY  11552
(917) 495-5790
ben@goldfederterry.com

and the International Legal Forum

*Attorneys for Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and Hadar Almog, Lishay Lavi, David Bromberg, and Ariel Ein-Gal*