**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ADIN GESS, et al.,** | x | |
| | x | |
| **Plaintiffs,** | x | |
| | x | **Civil Action No.** |
| **v.** | x | **24-cv-00134-ECM-CWB** |
| | x | |
| **BAM TRADING SERVICES, INC. d/b/a** | x | |
| **BINANCE.US, a Delaware corporation, et al.,** | x | |
| | x | |
| **Defendants.** | x | |

_____

### PLAINTIFFS' SURREPLY TO MOTION TO TRANSFER REPLY [ECF# 36]

Pursuant to the Court's August 30, 2024 Order [ECF# 38], Plaintiffs herein now file their Surreply to Defendants' Motion to Transfer Reply [ECF# 36], limited solely to some of the arguments Defendants raise in their Reply which they have not previously raised:

### Defendants Seek Undue Delay and Do Not Present a Full Picture

1.      This lawsuit was filed on February 26, 2024 [ECF# 1].  Defendant Binance.us ("BAM") was served on March 7, 2024, and moved to extend the time to respond to the Complaint until May 16, 2024, and the Court granted that motion [ECF## 11, 14].  All parties then entered into a stipulation on scheduling.  The stipulation provided, *inter alia*, that Binance and Zhao would file a Motion to Transfer Venue, the motion would be fully briefed between May 23, 2024 and August 9, 2024, and the Defendants would not be required to respond to the Complaint until forty-five (45) days after the motion to transfer venue was decided, assuming it is denied, a date which would mean no response to the Complaint until at least some seven (7) months after the

Complaint was filed, at the earliest.  The stipulation was filed [ECF# 15] and the Court So Ordered it on May 14, 2024 [ECF# 19].

For the first time in their Reply, Defendants ask the Court to hold the motion in abeyance and defer any ruling on it until after the proposed transferee court (SDNY) has decided these same Defendants' motion to dismiss that case for lack of personal jurisdiction. [ECF# 36 at 3]. Plaintiffs object to this unilateral request, raised for the first time in a Reply brief.

At the time Defendants asked Plaintiffs to enter into the scheduling stipulation, they well knew that they would be filing a motion to dismiss arguing lack of personal jurisdiction in the SDNY case.  On March 29, 2024, these same Defendants advised the court in the SDNY case that they would be moving to dismiss based on a lack of personal jurisdiction in that court [ECF# 35-2 herein].  They then filed their motion so arguing [ECF# 35-1].

At no time was there ever a suggestion when entering into the scheduling stipulation this Court adopted or on the Motion to Transfer that this Court should defer its decision on the Motion to Transfer until the SDNY decides whether that court has personal jurisdiction over these defendants - a position that is irreconcilable with their Motion to Transfer as a matter of law.  Furthermore, while Defendants refer to their motion to dismiss in the SDNY as "fully-briefed" and to a decision on it by that court as "forthcoming" [ECF# 36 at 3, 12], that does not an accurate picture on timing.

Defendants omit from their Reply that one week prior to its filing, they reiterated their argument in the proposed transferee court (SDNY) that it lacks personal jurisdiction [ECF## 27 & 28 in 1:24-cv-00697-JGK-BCM - copy to be provided upon request].  Defendants also omit from their Reply that on August 6, 2024, the Plaintiffs in the SDNY case filed a pre-motion

letter, advising the Court that they intend to move to take jurisdictional discovery in connection with the claim by Defendants that the SDNY lacks personal jurisdiction over them [ECF# 31 in 1:24-cv-00697-JGK-BCM]. Defendants also omit that on August 8, 2024, they filed a letter response in the SDNY court adamantly arguing that the court to which it asks this Court to transfer this case so clearly lacks personal jurisdiction that no jurisdictional discovery should be permitted [ECF# 33 in 1:24-cv-00697-JGK-BCM].  On August 13, 2024, Plaintiffs in the SDNY case filed their reply letter reiterating the need and legal bases for jurisdictional discovery. [ECF# 34 in 1:24-cv-00697-JGK-BCM]. The issue is pending.

While it is possible that the SDNY court might resolve the pending motion to dismiss for lack of jurisdiction in the near future, it is also possible that the motion will not be considered until a lengthy jurisdictional discovery process is completed, extending well into the future.

**Binance and Zhao Refuse to Accept Their Burden for Their Motion to Transfer**

2.      For the first time in their Reply, Binance and Zhao purport to address the statutory requirement that the moving party seeking a transfer must prove that the transferee court is one in which the case "might have been brought" (28 U.S.C. §1404(a)).  They argue in their Reply that this Court should use a "common-sense" approach and recognize that this case is one which "might have been brought" in the SDNY, within the meaning of §1404(a) because the SDNY plaintiffs filed the case there and because Binance.us does not object to proceeding in the SDNY [ECF# 36 at 3].  There is no legal basis for such a position.  This is not a free-for-all in which lawyers get to make up their own meaning for legal terms and these certainly are not legally cognizable bases that satisfy the statutory requirement.

"Might have been brought" is a statutory term with a precise legal definition as

commentators and the relevant case law have made crystal clear.  The fact that these elements are the moving party's legal obligation to prove also is axiomatic.  Simply put, the statutory phrase means that "the transferee court must be a proper venue and must have personal jurisdiction over the defendant without waiver by the defendant." 3 *Moore's Federal Practice – Civil* §14.40.  *See e.g.*, *Rose v. IBM*, 2024 U.S. Dist. LEXIS 47323, 2024 WL 1600324 (C.D. Cal., March 18, 2024) (Denying motion to transfer to the SDNY under both § 1404(a) and the "first to file" rule and notwithstanding defendant's consent to personal jurisdiction in the SDNY, because defendant filed to prove personal jurisdiction in the SDNY); *JBS Hair, Inc. v. Beauty Elements, Corp.*, 2022 U.S. Dist. LEXIS 94136, *2-*3, 2022 WL 1658415 (N.D. Ga., May 25, 2022) ("[T]he moving party must demonstrate that venue, personal jurisdiction, and subject matter jurisdiction would all have been proper in the proposed transferee district").[1]

Defendants' argument that this Court should hold their Motion to Transfer in abeyance and defer any ruling until the SDNY rules on their Motion to Dismiss for lack of personal

---

[1]  For the first time in their Reply, Binance and Zhao acknowledge, as they must, that ordinarily the moving party has an obligation to prove that the proposed transferee court has personal jurisdiction.  They also acknowledge that Plaintiffs have provided the Court in their Opposition with abundant, uncontradicted authority standing for that proposition [ECF# 36 at 4, referring to ECF# 35 at 7-8; see also ECF# 35 at 4-7].  However, they attempt in their Reply, for the first time, to dismiss all of the uncontradicted case law on the meaning of "might have been brought" and on the allocation of the burden on the moving party, by asserting that none of the cases involves a situation in which "a substantially similar case was filed first in another court" or where "the issue of personal jurisdiction is already being litigated in that other court." [ECF# 36 at 4].  The first assertion is just patently false as an actual reading of the cases cited by Plaintiff make clear.  The second is just a circular and absurd notion and ignores their burden.  Parties other than Binance and Zhao understand that it is irreconcilable with the burden of proving to the transferor court that the transferee court has personal jurisdiction to simultaneously and vigorously argue that the transferee court completely lacks personal jurisdiction.  No other parties would have the chutzpah to demean the acumen of a court by engaging in such arguments.  Of course, Defendants cite no authority that would relieve them of their fundamental burden under the circumstances presented here.

jurisdiction must be rejected and their Motion to Transfer must be denied.  This new proposal not only is inconsistent with the stipulation and Order on scheduling; it ignores the burden the moving party bears in proving personal jurisdiction in the transferee court.  These Defendants cannot meet their burden and should not be indulged further while simultaneously arguing in the proposed transferee court that it lacks personal jurisdiction.

The issue is quite simple.  The law requires a party moving to transfer venue to prove that the transferee court has personal jurisdiction.  It is their burden at the time they make their motion and they chose when to make their motion.  It is not a matter of whether the proposed transferee court at some point in the future decides it has personal jurisdiction; nor is it a matter of this Court having to delay proceedings before it to wait and see.  The inquiry, as every case Plaintiffs have cited makes clear, is whether in their motion the moving party proves that the transferee court has personal jurisdiction.

Binance and Zhao have argued unequivocally and strenuously, before, during, and after filing their motion to transfer herein, that the proposed transferee court, the SDNY **does not have** personal jurisdiction.  That argument by definition renders it a legal impossibility for Binance and Zhao to satisfy their burden with respect to the motion they chose to file when they chose to file it and therefore the motion to transfer must be denied out of hand now.

This new suggestion of deferring a ruling is apparently an alternative to the suggestion in their motion that this Court just transfer the case without regard to whether the transferee court lacks personal jurisdiction, and just let that court sort it out [ECF# 32 at 7, n.6] - an approach that has been expressly rejected.  *Hoffman v. Blaski*, 363 U.S. 335, 342 (1960). *See Durham v. LG Chem, Ltd.*, 2021 U.S. Dist. LEXIS 77393, *12-*20, 2021 WL 1573898 (N.D. Ga., 4/22/20210).

These Defendants made the decision to file their Motion to Transfer when they did, burdening Plaintiffs with filing a response to their untenable motion, knowing that they were vigorously advocating a position in the transferee court that was irreconcilable with their obligation on a motion to transfer.  They had the burden when they made their motion and their own arguments in the SDNY are directly contrary to what is required to fulfill that burden in this Court and therefore the motion must be denied now, with the case moving forward.  A decision on the pending Motion to Transfer and the burden that motion places on Binance and Zhao is not and must not be made dependent on a ruling by the SDNY whenever that is made.  Binance and Zhao have not and cannot meet their burden of proving personal jurisdiction in their proposed transferee court while they simultaneously argue in that court that it lacks personal jurisdiction. It goes well beyond any question of transparency to the fundamental merits of the motion before this Court.

### Defendants Make First-Time Assertions in Their Reply That are Untrue

3.  Binance and Zhao in their Reply make two additional assertions for the first time in their Reply which are not just untrue; they are preposterous.  They assert in their Reply that (A) Binance.us, the company Binance and Zhao created once Binance was banned from doing business in the U.S., "has nothing to do with the underlying allegations in this case." [ECF# 36 at 1] and that (B) "Plaintiffs concede Binance.US's near-irrelevance to this case at the outset of their Opposition, when they claim this lawsuit is based on the 'criminal conduct' of 'both [BHL] and Zhao' - in other words, guilty pleas by the Foreign Defendant and **not** Binance.US." [ECF#

36 at 1].[2]  Plaintiffs have not conceded any such thing at all.

These representations by Defendants with respect to Plaintiffs' allegations or "concessions" about Binance.us are directly contradicted by a reading of the Complaint [ECF# 1 at 8-15] and the Opposition [ECF# 35 at 10-11, n.9].  Binance.us is not merely some "hook" separated in any meaningful way from Binance and Zhao.  As alleged in the Complaint (and by the Securities and Exchange Commission), Binance.us is the creation of Binance and Zhao, acting in full association with them, created as their response to being barred from doing business in the U.S. because of their outrageous criminal conduct and to facilitate their illegal activity that

---

[2] In addition, Binance and Zhao drop a footnote that reads: "This claim - that the lawsuit is based on the Foreign Defendants' criminal conduct - is false." They go on to minimize their criminal conduct in support of international terrorism and Foreign Terrorist Organizations by implying that their criminal conduct at issue is limited to what they actually pled guilty to.  They complain about Plaintiffs" "irrelevant and improper attempt to argue the merits on this Motion" [ECF# 36 at 1-2, n.2].  These Defendants could not be more wrong in each of these assertions.

The lawsuit absolutely is based on their outrageous, knowing, willful, and intentional criminal conduct as comprehensively documented by the Department of Justice and the Securities and Exchange Commission, as supported by indisputable evidence obtained by those agencies, and as alleged in the Complaint herein, demonstrating the same.  Their guilty pleas do not in any way reflect the magnitude or full nature of their criminal conduct and this lawsuit is fully based on their criminal conduct, as reflected in their guilty pleas and beyond.  The fact that their agreement and ability to pay a financial penalty in excess of $4 billion in connection with their plea negotiations gave them leverage in charge bargaining does not in any way limit their criminal conduct that is at issue nor the proof Plaintiffs will be prepared to put on in support of all allegations in the Complaint (and that mirror the findings by the government agencies after a full investigation). The statement from the U.S. Treasury Department detailing the terms of their settlement with Binance and specifically noting the facilitation of money transfers by Hamas gives the Court some idea of the matter and just how misplaced are Defendants' protestations: https://home.treasury.gov/news/press-releases/jy1925

Their complaint that Plaintiffs referred to the underlying merits in the context of their Motion to Transfer is misplaced.  It was Binance and Zhao who opened the door to this.  They initiated a discussion of the merits by misrepresenting and attempting falsely to minimize their criminal conduct in their Memorandum in support of their Motion to Transfer [See e.g. ECF# 32 at 1].

is alleged in the Complaint.  These Defendants made the affirmative decision to solicit the investment business of unsuspecting Alabamians through Binance.us.  They have subjected themselves to the jurisdiction of this Court based on their own affirmative conduct.  Falsely attempting either to minimize the status and role of Binance.us or attributing any "concession" of the same to the Plaintiffs is contrary to the allegations in the Complaint and argument in the Opposition and is unsupportable.[3]

Focusing on the criminal conduct of Binance and Zhao, to the extent the Opposition does, is no concession of any kind with respect to Binance.us's role.  Binance and Zhao made the Motion to Transfer; so the Opposition focuses mainly on them.

Defendants' first-time assertion in their Reply that the choice of Alabama in this case or the fact that undersigned counsel have multiple Anti-Terrorism cases pending in multiple jurisdictions "smacks of forum-shopping" [ECF# 36 at 8] is both entirely misinformed and offensive.  There are case-specific reasons for the forum in which each of the cases has been filed and there is no reason to believe any of the five forums provides any strategic advantage to the Plaintiffs.  One would have hoped that as officers of the Court, , defense counsel would have sought to inform themselves before casting aspersions and inventing motivations.

## Conclusion

It is respectfully requested that the Court reject the first-time assertions in the Reply and deny the Motion to Transfer.

---

[3] Exhibit 1, the Government's Sentencing Memorandum in the criminal case against Binance, explains to some degree these Defendants' scheme in creating the wholly-owned Binance.us in order to conceal and facilitate their unlawful conduct.

Respectfully submitted,

/s/ David I. Schoen
David I. Schoen (ASB-0860-O42D)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(334) 395-6611
schoenlawfirm@gmail.com

Mark Goldfeder (pro hac vice pending)
National Jewish Advocacy Center, Inc.
1718 General George Patton Drive
Brentwood, TN 37027
(800) 269-9895
mark@jewishadvocacycenter.org

Ben Schlager (pro hac vice forthcoming)
Goldfeder and Terry, LLC
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
ben@goldfederterry.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2024, I caused a true and accurate copy of the foregoing to be served on all counsel of record by filing the same through this Court's ECF system.

/s/ David I. Schoen

**EXHIBIT 1**

The Honorable Richard A. Jones

1

2

3

4

5

6

7      UNITED STATES DISTRICT COURT FOR THE
       WESTERN DISTRICT OF WASHINGTON
8                    AT SEATTLE

9

10   UNITED STATES OF AMERICA,              No. CR23-178 RAJ

11                      Plaintiff,          **UNITED STATES' SENTENCING
                                            MEMORANDUM**
12          v.

13   BINANCE HOLDINGS LIMITED, d/b/a
     BINANCE.COM,
14

15                      Defendant.

16

17

18

19                          **INTRODUCTION**

20          From 2017 through at least 2022, Binance, led by its chief executive officer

21   ("CEO") and founder, Changpeng Zhao, knowingly failed to register as a money services

22   business ("MSB"), willfully violated the Bank Secrecy Act ("BSA") by failing to

23   implement and maintain an effective anti-money laundering ("AML") program, and

24   willfully caused violations of U.S. economic sanctions issued under the International

25   Emergency Economic Powers Act ("IEEPA"), in a deliberate and calculated effort to

26   profit from the U.S. market without complying with U.S. law.

27

1  On November 21, 2023, Binance entered a Rule 11(c)(1)(C) guilty plea to three

2  counts: (1) conspiracy to conduct an unlicensed money transmitting business ("MTB"), in

3  violation of 18 U.S.C. §§1960(a), 1960(b)(1)(B), and to fail to maintain an effective

4  AML program, in violation of 31 U.S.C. §§ 5318(h), 5322, 31 C.F.R. § 1022.210(a), 18

5  U.S.C. § 371; (2) conducting an unlicensed MTB, in violation of 18 U.S.C. §§ 1960(a),

6  1960(b)(1)(B), and 2; and (3) willfully causing violations of U.S. sanctions, in violation

7  of 50 U.S.C. § 1705 and 31 C.F.R. Part 560.

8  As part of a plea agreement between Binance and the U.S. Department of Justice,

9  Criminal Division, Money Laundering and Asset Recovery Section; National Security

10  Division, Counterintelligence and Export Control Section; and U.S. Attorney's Office for

11  the Western District of Washington, the parties agreed that an appropriate sentence was a

12  criminal fine of $1,805,475,575—accounting for the pecuniary gain to the Company from

13  the offense, adjusted to take into account sentencing factors for businesses under the U.S.

14  Sentencing Guidelines, and including a twenty percent discount based on the Company's

15  partial cooperation (ECF No. 23 ¶¶ 13-14)—as well as a forfeiture of $2,510,650,588 for

16  the violations comprising Count 2 (conducting an unlicensed MTB) and Count 3

17  (violating IEEPA) (*id.* ¶¶ 15-18). The plea agreement also requires the Company to

18  maintain and enhance its compliance program, as outlined in Attachment C to the plea

19  agreement, and to agree to the appointment of an independent compliance monitor for a

20  term of at least three years, as outlined in Attachment D to the plea agreement.

21  The agreed-upon sentence of a combined financial penalty of over $4.3 billion and

22  the other obligations imposed under the plea agreement is sufficient but not greater than

23  necessary to achieve the goals of sentencing as set forth in 18 U.S.C. § 3553(a). The

24  Court should impose the agreed-upon sentence on Binance.

25

26

27

U.S. Sentencing Memorandum – 2
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**SENTENCING GUIDELINES CALCULATION**

As outlined in the plea agreement (¶ 13), the parties agree, based on the application of the U.S. Sentencing Guidelines and 18 U.S.C. § 3571(d), that the following provisions with respect to sentence of a fine apply to this case:

- A base fine of $1,612,031,763 under U.S.S.G. § 8C2.4(a)(2) (the pecuniary gain to Defendant from the offense).

- Culpability score of seven (7) points based on U.S.S.G. § 8C2.5, calculated as follows:

  o Base culpability score of five (5) points pursuant to U.S.S.G. § 8C2.5(a).

  o A four-point (4) addition because the organization had more than 1,000 employees and an individual within high-level personnel participated in, condoned, or was willfully ignorant of the offense pursuant to U.S.S.G. § 8C2.5(b)(2)(A)(i).

  o A two-point (2) reduction for cooperation and acceptance of responsibility.

- Calculation of fine range pursuant to U.S.S.G. § 8C2.6:

  o Base Fine: $1,612,031,763

  o Multiplier: 1.4 (min) / 2.8 (max)

  o Fine Range: $2,256,844,468 to $4,513,688,936

Pursuant to the plea agreement (¶ 14), the parties agree that a fine at the bottom of the applicable Sentencing Guidelines range with a twenty percent discount to reflect Defendant's partial cooperation and remediation is appropriate.

**DISCUSSION**

Binance's offenses are serious. The U.S. financial system is the global financial system of choice. It provides U.S. businesses and consumers, and the international

U.S. Sentencing Memorandum – 3
*United States v. Binance* / CR23-178 RAJ

1   marketplace, a safe, secure, and sophisticated system for innovative financial services.

2   Financial institutions, like Binance, are the gateway to the U.S. financial system for those

3   who play by the rules and those who seek to exploit them. The BSA places special

4   responsibilities on financial institutions, requiring them to implement AML programs that

5   protect the institutions themselves and the broader financial system from illicit finance

6   and criminal schemes. Binance's refusal to register as an MSB and its willful failure to

7   implement an effective AML program left Binance, its customers, and the U.S. financial

8   system vulnerable to those who seek to exploit our system for their own gain. And as a

9   result of Binance's failure to implement adequate controls in disregard of U.S. law,

10  Binance willfully caused violations of U.S. sanctions.

11      The agreed-upon sentence reflects the nature and circumstances of the offenses,

12  the history and characteristics of the defendant, and the seriousness of the offenses. It

13  promotes respect for the law and provides just punishment while affording deterrence to

14  criminal conduct.

15  **A.      Binance Became the Largest Cryptocurrency Exchange by Exploiting**
            **the U.S. Market While Defying U.S. Law**
16

17      From at least early 2018 through the time of the Company's plea, Binance

18  operated the world's largest cryptocurrency exchange, Binance.com. The exchange grew

19  quickly after its launch in 2017 to dominate the cryptocurrency space by targeting the

20  lucrative U.S. market, particularly high-volume customers, whom Binance gave "VIP"

21  status. Binance and its senior leaders, including Zhao, knew that serving U.S. customers

22  required Binance to follow U.S. law. Specifically, Binance was required to comply with

23  the BSA and IEEPA and to register with U.S. Department of the Treasury, Financial

24  Crimes Enforcement Network ("FinCEN") as an MSB. But Zhao and other senior

25  Binance leaders calculated that compliance with U.S. law was too expensive: Binance

26  would be required to either implement effective AML controls, including know-your-

27  customer ("KYC") measures and transaction monitoring, which would be costly and

U.S. Sentencing Memorandum – 4
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

could cause Binance to lose some customers, or offboard lucrative U.S. customers, limiting Binance's growth.

For example, Zhao, Individual 1,[1] and other senior leaders knew that Binance was required to register with FinCEN as an MSB and to implement an effective AML program that was reasonably designed to prevent Binance from being used to facilitate money laundering. An effective AML program would have included collecting identifying information about customers through KYC protocols, monitoring transactions for suspicious activity, and filing Suspicious Activity Reports ("SARs") with FinCEN. However, Binance allowed certain customers (called "Tier 1" customers) to open accounts and deposit, trade, and withdraw cryptocurrency by providing nothing more than an email address, and, as Zhao and others knew, these "Tier 1" customers comprised the majority of Binance's customers until 2022, when Binance implemented a policy requiring customers to complete KYC. For much of the relevant period, Binance did not systematically monitor transactions for suspicious activity, and Binance never filed a SAR with FinCEN.

**B.    Binance Deceived U.S. Regulators in Its Scheme to Evade U.S. Law**

The significant sentence agreed upon by the parties recognizes the nature and circumstances of the offenses and Binance's characteristics. Binance's misconduct was pervasive. As founder and CEO, Zhao built Binance as a company that attempted to operate outside the jurisdiction of any government and cultivated a culture that disregarded compliance with U.S. legal obligations. When Binance grew to the point it could no longer hide from government regulation and law enforcement, Zhao and other senior leaders developed and implemented a scheme to evade U.S. law through manipulation. While creating a public façade that Binance would play by the rules, Zhao

---

[1] *See* ECF No. 1 ¶ 5 (Information) (describing Individual 1).

U.S. Sentencing Memorandum – 5
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and other senior leaders—including Individual 1, Individual 2[2], and Individual 3[3]—developed and executed a plan to keep Binance's most lucrative U.S. customers on Binance.com to ensure Binance would continue to thrive with minimal compliance controls and a significant U.S. customer base.

By late 2018, instead of complying with U.S. law, as Binance's substantial U.S. user base required, Zhao and Binance's senior leaders developed a plan to manipulate and evade U.S. regulators while continuing to profit from the U.S. financial system. Binance engaged a consultant, who proposed various avenues through which the Company could mitigate its regulatory exposure. Presented with a range of options from the "low-risk" full compliance with U.S. law to the "high-risk" status quo, Binance did not adopt the consultant's recommendations as offered, but nonetheless chose to continue to violate U.S. law by creating a new U.S. exchange to serve U.S. customers, announcing that Binance.com would "block" U.S. persons, but secretly keeping the most profitable U.S. customers on Binance.com without taking steps to make Binance.com compliant with U.S. law.

On recorded calls in June 2019, Zhao and other Binance leaders—including Individuals 1, 2, and 3—schemed to keep Binance's most lucrative U.S. customers on the platform. As Binance's senior leaders knew and discussed, Binance.com's approximately 11,000 VIP customers accounted for 70% of its trading revenue, and approximately one-third of those VIPs were U.S. persons. Rather than lose its U.S. VIP customers, Binance's senior leaders directed employees to help them conceal and obfuscate their U.S. connections, including by creating new accounts with non-U.S. KYC information. As Zhao explained on a recorded call on June 25, 2019, Binance sought to "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision

---

[2] Information ¶ 6 (describing Individual 2).
[3] *Id.* ¶ 7 (describing Individual 3).

U.S. Sentencing Memorandum – 6
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  agencies not cause us any troubles," with the "goal" of having "U.S. users slowly turn

2  into to [sic] other users"—though Binance "cannot say this publicly, of course."

3       Binance's plan worked: Binance maintained a substantial base of lucrative U.S.

4  customers even after launching the new U.S. exchange Binance.US. Zhao acknowledged

5  that his motive was profit, telling senior leaders in September 2019: "If we blocked US

6  users from day 1, Binance will be not [sic] as big as we are today. We would also not

7  have had any US revenue we had for the last 2 years. And further, we would not have had

8  additional revenue resulted from the network effect." Zhao admitted these actions were

9  wrong, saying it was "better to ask for forgiveness than permission." Indeed, one year

10  after purportedly blocking U.S. users, in September 2020, Binance still had more than 2.5

11  million U.S. customers, more than from any other country. To continue to conceal these

12  connections, the following month, Binance removed the United States label from its

13  internal report and recategorized U.S. users with the label "UNKWN." In October 2020,

14  according to the internal monthly report, "UNKWN" users represented approximately

15  17% of Binance's registered user base. And according to Binance's own transaction data,

16  U.S. users conducted trillions of dollars in transactions on Binance.com between August

17  2017 and October 2022 that generated approximately $1,612,031,763 in profit for

18  Binance.

19      **C.**    **Binance's Criminal Acts Allowed Illicit Actors to Exploit the Exchange**

20       Due in part to Binance's failure to implement an effective AML program, illicit

21  actors used Binance's exchange in various ways, including operating mixing services that

22  obfuscated the source and ownership of cryptocurrency; transacting illicit proceeds from

23  ransomware variants; and moving proceeds of darknet market transactions, exchange

24  hacks, and various internet-related scams. For example, between August 2017 and April

25  2022, there were direct transfers of approximately $106 million in bitcoin to Binance.com

26  wallets from Hydra, a popular Russian darknet marketplace frequently used by criminals

27

U.S. Sentencing Memorandum – 7
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   that facilitated the sale of illegal goods and services. These transfers occurred over time

2   to a relatively small number of unique addresses, which indicates "cash out" activity by

3   repeat Hydra users, such as vendors selling illicit goods or services. Similarly, from

4   February 2018 to May 2019, Binance processed more than $275 million in deposits and

5   more than $273 million in withdrawals from BestMixer—one of the largest

6   cryptocurrency mixers in the world until it was shut down by Dutch authorities in May

7   2019.

8        Additionally, Binance's failure to implement an effective AML program left

9   Binance's customers vulnerable to sanctions violations. Zhao and other Binance senior

10   leaders knew that Binance served customers in the United States and in jurisdictions

11   subject to comprehensive U.S. sanctions; that U.S. sanctions laws generally prohibited

12   U.S. persons from transacting with persons in jurisdictions subject to comprehensive U.S.

13   sanctions; that Binance's proprietary "matching engine" would necessarily cause U.S.

14   persons to transact with persons in jurisdictions subject to comprehensive U.S. sanctions;

15   and that Binance did not have controls in place to prevent such violations of U.S. law—

16   because Binance chose not to collect KYC information from most of its user base or

17   implement effective blocks based on internet protocol ("IP") address.

18        Because Binance chose not to implement comprehensive controls blocking

19   transactions that violated U.S. sanctions, between in or about January 2018 through May

20   2022, Binance caused at least 1.1 million transactions in violation of IEEPA between

21   customers in the United States and customers ordinarily resident in Iran, with an

22   aggregate transaction value of at least $898,618,825. And Binance caused millions more

23   in trades between U.S. customers and customers in in other comprehensively sanctioned

24   jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and

25   Luhansk.

26

27

U.S. Sentencing Memorandum – 8
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**D.    The Proposed Sentence Appropriately Holds Binance Accountable for Its Criminal Acts and Achieves the Goals of Sentencing**

Binance committed serious crimes in a deliberate scheme to grow as quickly as possible. A significant sentence is warranted for these violations.  The proposed sentence is appropriate, holds Binance accountable for its criminal acts, and provides necessary deterrence to other criminal actors. The recommended sentence includes a criminal fine of $1,805,475,575 and a forfeiture of $2,510,650,588 for a financial penalty of more than $4.3 billion, the largest penalty imposed against an MSB in the Department's history and one commensurate with the severity of Binance's criminal conduct.

This sentence is also warranted in light of Binance's other agreements as part of the plea. Binance has admitted its criminal acts, accepted responsibility, and agreed to cooperate with the government, remediate and enhance its compliance program and adopt an independent compliance monitor. Zhao is also no longer Binance's CEO, and the Company barred him from any present or future involvement in operating or managing Binance's business.

The significant financial penalty proposed in the plea agreement, combined with the cooperation and remediation imposed by the agreement, is a just punishment that appropriately reflects the nature, circumstances, and seriousness of Binance's violations and affords adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2). Binance profited from the U.S. financial system without playing by its rules and, as a result, criminals used the exchange to move hundreds of millions of dollars of stolen funds and illicit proceeds. Binance's CEO acknowledged that the strategy of operating in the "grey zone" worked for Binance—the exchange became the largest in the world by serving U.S. customers while skirting U.S. law. While the ultimate "network effect" that Binance enjoyed from serving U.S. customers is unquantifiable, the proposed penalty would ensure Binance does not retain its profit from the U.S. market and additionally punish Binance commensurate with its misconduct, reflecting the seriousness of the offense.

U.S. Sentencing Memorandum – 9
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The proposed penalty is consistent with other penalties imposed on large financial

2    institutions in prosecutions by the government, where the criminal conduct of those

3    defendants threatened the integrity of the U.S. financial system. For example, in 2015,

4    BNP Paribas S.A. ("BNPP"), a global financial institution headquartered in France, pled

5    guilty to conspiring to violate IEEPA and the Trading with the Enemy Act by processing

6    nearly $9 billion in transactions through the U.S. financial system on behalf of Sudanese,

7    Iranian, and Cuban entities subject to U.S. economic sanctions. BNPP agreed to pay total

8    financial penalties of $8.9736 billion, including forfeiture of $8.8336 billion—reflecting

9    the value of the sanctions-violative transactions that BNPP processed—and a fine of $140

10   million. In 2019, UniCredit Bank ("UCB") AG, a financial institution headquartered in

11   Germany, pled guilty to conspiring to violate IEEPA and to defraud the United States by

12   processing $316 million of transactions through the U.S. financial system on behalf of an

13   entity designated as a weapons of mass destruction proliferator and other Iranian entities

14   subject to U.S. economic sanctions. UCB AG agreed to forfeit $316,545,816 and pay a

15   fine of $468,350,000. In 2022, Danske Bank A/S, a global financial institution

16   headquartered in Denmark, pled guilty to defrauding U.S. banks regarding its AML

17   program and certain high-risk customers and agreed to forfeit $2 billion. And in 2018,

18   Rabobank National Association (Rabobank), forfeited $368,701,259 as part of a guilty

19   plea to concealing deficiencies in its AML program from its regulator, a sum that

20   reflected illicit funds processed through the bank without adequate BSA/AML review. In

21   those cases, the financial institutions forfeited the full transaction value of the violative

22   transactions, as Binance has agreed to do here.

23   Finally, but critically, the agreed-upon sentence will promote specific and general

24   deterrence. As part of its plea agreement, Binance has agreed to take substantial measures

25   to ensure its ongoing compliance with U.S. law. And the significant sentence agreed to

26   here demonstrates to other financial institutions that may seek to break the law under the

27

U.S. Sentencing Memorandum – 10
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

guise of "innovation" that there will be serious consequences for their criminal actions.

In sum, given the nature and seriousness of Binance's misconduct—it was intentional and led by senior executives, with hundreds of millions of dollars of collateral consequences—the over $4.3 billion financial penalty proposed in the plea agreement is appropriate.

## RECOMMENDATION

Balancing the 18 U.S.C. § 3553(a) factors, the Court should sentence Binance in accordance with the plea agreement to a criminal fine of $1,805,475,575 and a forfeiture of $2,510,650,588.

February 16, 2024

Respectfully submitted,

MARGARET A. MOESER
Acting Chief

TESSA M. GORMAN
United States Attorney

*s/ Kevin G. Mosley*
KEVIN G. MOSLEY
ELIZABETH R. CARR
Trial Attorneys
Money Laundering and Asset
Recovery Section
Criminal Division
U.S. Department of Justice

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
performing the duties of Chief

*s/ Beau D. Barnes*
BEAU D. BARNES
ALEX WHARTON
Trial Attorneys
Counterintelligence and Export
Control Section
National Security Division
U.S. Department of Justice

*s/ Michael Dion*
MICHAEL DION
JONAS LERMAN
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970
michael.dion@usdoj.gov
jonas.lerman@usdoj.gov

U.S. Sentencing Memorandum – 11
*United States v. Binance* / CR23-178 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970