# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| NOACH NEWMAN, ADIN GESS, MAYA PARIZER, NATALIE SANANDAJI, YONI DILLER, HAGAR ALMOG, IRIS WEINSTEIN HAGGAI, ON BEHALF OF HERSELF AND AS EXECUTRIX OF THE ESTATES OF JUDY LYNNE WEINSTEIN, GAD HAGGAI, AHL HAGGAI, ORA COOPER, ROTEM COOPER, RAHM HAGGAI, ZOHAR HAGGAI, LISHAY LAVI, DAVID BROMBERG, LIOR BAR OR, ARIEL EIN-GAL, ALMOG MEIR JAN, ANDREY KOZLOV, SHLOMI ZIV, AYELET SAMERANO, on her own behalf and on behalf of YONATAN SAMERANO, TALIK GVILI, on her own behalf and on behalf of RAN GVILI, ROEE BARUCH, on his own behalf and on behalf of URIEL BARUCH, SHACHAR LEVI on his own behalf and on behalf of EITAN LEVI, and JAMES POE, on his own behalf and on behalf of LEO POE, | Case No.: 24-cv-00134-ECM-CWB **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and BINANCE HOLDINGS, LTD. d/b/a BINANCE, a foreign company, and CHANGPENG ZHAO, | |
| Defendants. | |

1

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Noach Newman, Adin Gess, Maya Parizer, Natalie Sanandaji, Yoni Diller,  Iris Weinstein Haggai, On Behalf Of Herself And As Executrix Of The Estates of Judy Lynne Weinstein and Gad Haggai, Ahl Haggai, Ora Cooper, Rotem Cooper, Rahm Haggai, Zohar Haggai, Lishay Lavi, David Bromberg, Lior Bar Or, Ariel Ein-Gal, Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano, On Her Own Behalf And On Behalf Of Yonatan Samerano, Talik Gvili, on her own behalf and on behalf of Ran Gvili, Roee Baruch, on his own behalf and on behalf of Uriel Baruch, Shachar Levi, on his own behalf and on behalf of Eitan Levi, and James Poe, on his own behalf and on behalf of Leo Poe (together "Plaintiffs"), by and through their attorneys working with the National Jewish Advocacy Center, Inc., and allege the following against Defendants Bam Trading Services Inc. d/b/a Binance.US ("BAM Trading"), Binance Holdings, Ltd. d/b/a Binance ("Binance"), and Changpeng Zhao, commonly known as CZ ("CZ") (collectively "Defendants"):

## PRELIMINARY STATEMENT

1.    This action is brought on behalf of the above-captioned Plaintiffs for injuries and damages suffered by them when, on October 7, 2023, the sovereign State of Israel was attacked by over 1,500 Hamas and Palestinian Islamic Jihad ("PIJ") terrorists and many other supposed "civilians," from the Gaza Strip, in the early

morning hours (the "October 7ᵗʰ Attack"). Hamas and PIJ are radical Islamist designated Foreign Terrorist Organizations ("FTOs") that are committed to the globalization of Islam through violent holy war. Upon their breach of the security barrier that surrounded the Gaza Strip, Hamas and PIJ engaged in an orgy of murder that included several of the Plaintiffs or their family members. Women were raped and killed *en masse*, the elderly and children were murdered in cold blood, and hundreds of young innocent civilians dancing at a peace festival were slaughtered. When the dust settled, Hamas and PIJ had killed more than 1,200 people, including 32 Americans, injured over 6,900 individuals and kidnapped some 239 innocent civilians from at least twenty-five different countries into Gaza.

2.    By this action, Plaintiffs seek damages under the United States Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331, et seq., the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, *et. seq.* and other causes of action set forth herein from Defendant Binance, a global cryptocurrency exchange, BAM Trading Services, Inc. ("BAM Trading"), Binance's United States-based cryptocurrency exchange and remittance platform and CZ, the former CEO of Binance, de facto CEO of BAM Trading, and the beneficial owner of both.

3.    The attack, which was spearheaded by Hamas but also involved smaller terrorist cells and organizations including PIJ, was complex, well-planned and multipronged. It involved multiple types of vehicles to storm checkpoints,

preliminary missile bombardments, coordinated personnel movements, multiple rockets to breach defenses, paragliders to bypass high walls, maritime equipment to invade by sea, detailed maps of Israeli military and civilian targets, surveillance of Israeli troop positions and heavy and light weaponry and ammunition. For such an attack to be successful or even contemplated, significant funding was necessary.

**Hamas and Palestinian Islamic Jihad**

4.     Since October 1997, the US Department of Treasury has designated both Hamas and PIJ as Foreign Terrorist Organizations (FTOs). They have also been listed as Specially Designated Global Terrorists (SDGTs) since October 2001.

5.     At all relevant times, Hamas, an acronym of its official name, the Islamic Resistance Movement, and PIJ were and still are, designated by the United States State department as FTOs subject to all penalties and restrictions associated therewith.

6.     Hamas and PIJ use a global financing network to funnel support for their terrorist activities from charities and friendly nations such as Iran, including by using cryptocurrencies.

7.     Hamas and PIJ are formally committed to the destruction of the State of Israel and the elimination of the Jewish people, and to achieving their objectives by violent means, including acts of terrorism. The Hamas Charter states that, among other things including the extermination of world Jewry, Hamas's very purpose is to

create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

8.    Hamas has two primary components: its political and social infrastructure; and its paramilitary and terrorist infrastructure known as the Izz al-Din al-Qassam Brigades. These two components, while officially separate, operate in tandem to further the objectives of Hamas. Money sent to one or the other components is fungible within Hamas.

9.    Consistent with the findings of both Congress and the Executive Branch, financial services and other material support provided to Hamas ultimately inures to the benefit of its criminal, terrorist functions – regardless of whether such support was ostensibly provided to support non-violent activities.

10.    PIJ is a Sunni Islamist militant group seeking to establish an Islamist Palestinian state that is committed to the destruction of Israel. It is the second-largest militant group in the Gaza Strip and the West Bank, founded in 1979 as an offshoot of the Muslim Brotherhood in Egypt. The group has drawn inspiration from the Iranian revolution and receives support from Iran, Syria, and Lebanese Hezbollah. PIJ's military wing, al-Quds Brigades, has been responsible for and has participated in many attacks on Israeli targets since the 1990s, including the October 7th, 2023, Attack.

11.    Hamas and PIJ utilize, among other things, a network of financial

platforms and cryptocurrency exchanges designed to evade United States and other nations' anti-money laundering and anti-terrorism enforcement mechanism to, among other things, recruit and train cell members and provide salaries for terrorist operatives and leadership and fund terrorist attacks and operations, including the October 7th Attack.

12. Hamas and PIJ also use violence, principally suicide bombings, shootings and rocket attacks and other threats of violence to pressure Israel to cede territory to the Palestinian people.

13. Hamas and PIJ knowingly, willfully, and unlawfully combine, conspire, collaborate and engage in numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder, terrorism financing, supporting, aiding and abetting, and conspiring with other terrorists and FTOs, and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to other designated FTOs in violation of the federal criminal code of the United States and international law.

**Iran**

14. Iran and its Iranian Revolutionary Guard Corps. ("IRGC") were instrumental in the funding of Hamas and the planning of the October 7th Attack. As

reported by The Wall Street Journal, since August 2023, the IRGC worked with Hamas to plan the October 7th Terrorist Attack at a series of meetings held in Beirut, Lebanon.

15.     According to classified documents published by the Meir Amit Intelligence and Terrorism Information Center, in the years leading up to its invasion of Israel on October 7, 2023, Hamas coordinated with Iran and FTO Hezbollah to develop a concrete plan to destroy Israel.[1]

16.     In 2019, Hamas began to emphasize coordination with Iran's Quds Force and Hezbollah under a "joint defense agreement," according to a document authored by the office of Hamas leader Yahya Sinwar. It laid out plans for a multifront war against Israel, with the ultimate goal of "liberating al-Quds [Jerusalem]."[2]

17.     Since the early 1990s, the Islamic Republic of Iran has been sponsoring Hamas with military aid, training, and financial aid. Iran has remained a key patron of Hamas, providing them with funds, weapons, and training.[3]

18.     According to an October 8, 2023,[4] *Wall Street Journal* article, Iranian security officials helped plan the October 7th Attack and gave the green light for the

---

[1] https://www.timesofisrael.com/captured-gaza-records-show-that-iran-hezbollah-plotted-with-hamas-to-destroy-israel/.
[2] *Id.*
[3] https://web.archive.org/web/20170807142212/http://iranprimer.usip.org/resource/iran-and-palestinians.
[4] Published the day after the October 7th Attack.

assault at a meeting in Beirut.[5]

19.    The *Wall Street Journal* further reported that officials from Iran's IRGC had partnered with Hamas since the previous August to prepare for the breach of Israel's borders and cited unnamed senior members of Hamas and the Lebanese group Hezbollah as saying the IRGC, during a meeting in Beirut, "gave the green light" for the attack.[6]

20.    The *Wall Street Journal* further reported on October 25, 2023, that in the weeks leading up to the October 7th Attack hundreds of the Palestinian Islamist militant group's fighters received specialized combat training in Iran and approximately 500 Hamas militants reportedly attended advanced exercises and trainings in Iran in September 2023.[7]

21.    Iran reportedly helped plan the attack, select the timing of it, trained militants, and had at least one year's advanced knowledge of it.

22.    Iran's ability to provide funds to Hamas is due in no small part to its payment platforms being used as conduits for platform-based crypto and digital remittances to Hamas from terrorist sympathizers and confederates throughout the world, including via Binance's platform.

23.    Iran has been able to transmit funds directly to Hamas in large part by

---

[5] https://www.wsj.com/world/middle-east/iran-israel-hamas-strike-planning-bbe07b2.
[6] https://www.businessinsider.com/iranian-officials-helped-hamas-plan-deadly-attack-on-israel-2023-10.
[7] https://www.wsj.com/world/middle-east/hamas-fighters-trained-in-iran-before-oct-7-attacks-e2a8dbb9.

using cryptocurrency and digital payment platforms — including Binance — which have served as key conduits for moving money from Iran and from Hamas sympathizers around the world, enabling seamless and concealed financial support for terrorist activities.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2334, as well as other related federal and state statutes, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

25.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1350, as this is a civil action brought by foreign nationals who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs as a result of torts committed in violation of 18 U.S.C. § 1956, the law of nations or of a treaty of the United States and/or international law, including but not limited to the 2000 United Nations Convention against Transnational Organized Crime (a/k/a the "Palermo Convention"). The Palermo Convention requires state parties to criminalize participation in organized criminal groups, which Hamas and PIJ have been designated, including those engaged in terrorism and related financial support networks, and to adopt measures to prevent,

investigate, and prosecute transnational crimes.

26.    Hamas and PIJ's October 7th Attack, falls within the scope of the Palermo Convention as acts of transnational organized crime, triggering the obligations and enforcement mechanisms of the treaty, as their cross-border organized violence and kidnapping supported by illicit arms trafficking, smuggling, money laundering and illegal funding networks violate the Convention.

27.    The October 7th Attack also constitutes a violation of the "law of nations," as recognized by customary international law and U.S. jurisprudence, including the international prohibitions against terrorism, targeting of civilians, and violations of international humanitarian law.

28.    The conduct alleged violates both customary international law and an international treaty of the United States. This Court has jurisdiction under the Alien Tort Statute and over Plaintiff's claims for damages resulting from these violations of international law.

29.    This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. Rule 4(k)(1)(C); Ala. R. Civ. P. Rule 4.2

30.    Pursuant to 18 U.S.C. § 2334(a) any civil action under 18 U.S.C. § section 2333 against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served or has an agent. Process in such a civil action may be served in any district

where the defendant resides, is found, or has an agent.

31.    Pursuant to § 28 U.S.C. § 1350, the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

32.    This Court also has jurisdiction pursuant to Rule 4.2(a)(2)(I).

33.    BAM Trading is registered in the State of Alabama and is required to have a registered agent in Alabama in order to do business in the state and, indeed, has a registered agent in Montgomery, Alabama.

34.    At all relevant times,  Binance and CZ fully controlled BAM Trading.

35.    BAM Trading is registered as a foreign business entity in the State of Alabama and is required to maintain a registered agent for service of process within the state; in compliance with this requirement, BAM Trading maintains a registered agent in Montgomery, Alabama. This formal registration, along with BAM Trading's ongoing business activities within the state, constitutes sufficient minimum contacts under Alabama's long-arm statute, Rule 4.2(a)(2)(I), thereby supporting the exercise of personal jurisdiction by this Court.

36.    Defendants have at all times relevant to this lawsuit solicited and conducted substantial business in the State of Alabama, and in September of 2020 promoted their entry into the Alabama market.[8]

---

[8] https://cointelegraph.com/news/binance-s-us-branch-lands-in-alabama.

11

37.     Bam Trading applied for and possesses a Money Transmission License (MT 814) issued by the Alabama Securities Commission. Upon information and belief, Binance.US has employees working out of Tuscaloosa and Huntsville, Alabama, including customer service representatives. It also does business in Alabama through third-party representatives and active solicitations.

38.     BAM Trading openly announced it is open for business in Alabama and solicits and carries on business in Alabama, including within the Middle District of Alabama.



39.     In fact, Binance.US specifically marketed its platform to Alabama residents with accompanying branding referencing Alabama's rich football tradition.



40.     Binance purposefully availed itself of the privilege of conducting

activities within Alabama, thereby invoking the benefits and protections of its laws.

*See Molex Co., LLC v. Andress*, 887 F. Supp. 2d 1189, 1202 (N.D. Ala. 2012), where

the court found sufficient minimum contacts for personal jurisdiction even though

the defendant never maintained an office or sold to clients in Alabama, as long as

the defendant purposefully availed itself of conducting activities within the state.

("Even though defendant never maintained an office in Alabama, sold to clients in

Alabama, or even set foot in Alabama, those types of direct contacts are not

necessary to satisfy constitutional concerns."); *See also Cable Home

Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 858 (11th Cir.

1990) ("In our technologically sophisticated world permitting interstate business

transactions by mail, wire and satellite signals, physical presence by the nonresident

defendant is not necessary for personal jurisdiction in the forum state.") (citations

13

omitted).

41.    Binance also maintained substantial, continuous, and systematic contacts with Alabama at all times relevant to this lawsuit, thereby warranting the exercise of long-arm jurisdiction. The Supreme Court of Alabama in *Leithead v. Banyan Corp*. held that a nonresident corporation's substantial, continuous, and systematic contacts with Alabama warranted the exercise of long-arm jurisdiction. In *Ex Parte Fidelity Bank*, 893 So.2d 1116 (Ala. 2004), the Supreme Court of Alabama held that Fidelity could not hide behind its use of third parties to facilitate accounts with Alabama residents to avoid personal jurisdiction in Alabama courts, and that although Fidelity may have never directly marketed its services to Alabama residents, Fidelity knew that the automobile dealerships and investment brokers frequently referred their customers to Fidelity. The Court therefore found that it would not be unreasonable for Fidelity, whose practice of accepting Alabama customers from third-party referrals was continuous and systematic, to anticipate facing litigation in Alabama and that therefore, Fidelity should be subject to general jurisdiction under Alabama's long-arm provision.

42.    The Court has personal jurisdiction over CZ and Binance because they each owned, managed, controlled, dominated and criminally utilized BAM Trading at all times relevant to this lawsuit, making them BAM Trading's de facto owners and executives.

14

43.     The Court has personal jurisdiction over CZ and Binance under the doctrines of alter ego and veil-piercing because they owned, dominated, and controlled BAM Trading, which functioned as a mere instrumentality of Binance's global operations. CZ and Binance used BAM Trading to unlawfully access U.S. markets while evading regulatory oversight, directing its day-to-day operations and deriving substantial benefit from its activities. Given their complete control over BAM Trading and their use of it to engage in criminal and tortious conduct, it would be inequitable to treat them as separate entities and to require Plaintiffs to litigate separately against the individuals and entities who were the true decision-makers behind BAM Trading's actions.

## THE PARTIES

**PLAINTIFFS**

44.     Plaintiff Noach Newman is an American and Israeli citizen. His brother David Yair Shalom Newman, also an American and Israeli citizen, attended the Nova Festival on October 7, 2023, and was there when Hamas terrorists swarmed the peaceful gathering. Hamas terrorists killed David as he saved his girlfriend and several other civilians. As a result, Plaintiff Noach Newman and his family have suffered and continue to suffer severe mental anguish and extreme emotional pain and suffering.

45.     Plaintiff Yoni Diller, an American and Israeli citizen, attended the Nova

Festival on October 7. He was enjoying the festivities with his friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, they sought refuge, aiding the wounded and enduring a journey fraught with horrendous life-threatening fear. Relief intertwined with sorrow as they counted the losses: four of their close friends gone amidst the hundreds of lives claimed by the merciless hands of Hamas terrorists. As a result, Yoni has suffered severe mental anguish, extreme emotional pain, and suffering.

46.     Plaintiff Adin Gess, an American citizen who lived with his family in Kibbutz Holit, was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw his friends and community pleading for help before they were brutally murdered. Gess and the entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine.  As a result of the actions of the Hamas and PIJ terrorists that day, Gess and his family have suffered severe mental anguish, extreme emotional pain, and suffering.

47.     Plaintiff Natalie Sanandaji, an American citizen, who resides in New York, was visiting Israel in October 2023, when she made the fateful decision to

attend the Nova Festival on October 7, 2023, with some Israeli friends. When the Hamas terror attack began at the festival, Sanandaji fled by car, and then by foot for several hours, witnessing the atrocities firsthand, and running through Hamas gunfire. After approximately four hours running on foot through fields in the South of Israel, Sanandaji was saved by a good Samaritan. As a result of the Hamas terror attack, Sanandaji has suffered severe mental anguish, extreme emotional pain, and suffering.

48.    Plaintiff Maya Parizer, an American and Israeli citizen, attended the Nova Festival on October 7, 2023, as part of her birthday celebration with her boyfriend and other friends. She was enjoying the festivities with his friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, Parizer escaped by driving with her boyfriend while dodging bullets and throughout her escape,  passing dead Israeli bodies that were strewn on the side of the road  as well as disabled vehicles that had been shot up by Hamas and PIJ. Parizer ultimately found refuge in a nearby town. As a result, Parizer has suffered severe mental anguish, extreme emotional pain, and suffering.

49.    Plaintiff Hagar Almog is an Israeli citizen who lived with her family in Kibbutz Holit. She was thankfully not at home during the horrific attack but witnessed the massacre on the communal WhatsApp group and saw her friends and community pleading for help before they were brutally murdered. Almog and the

entire community were immediately evacuated from their homes, to which they have not been able to return, and will not be able to return for the foreseeable future. They have lost their belongings, their community, and their entire way of life. They live as displaced nomads now, and in constant fear of attack, both of which are factors that impact any sense of normalcy and routine. As a result of the actions of the Hamas and PIJ terrorists that day, Almog has sought professional help to deal with the trauma, severe mental anguish, extreme emotional pain, and suffering that she and her family have endured.

50.    Plaintiff Iris Weinstein Haggai is an Israeli citizen, acting on behalf of herself and as executrix of the estates of Judy Lynne Weinstein, a U.S. citizen and Gadi Haggai, a U.S. citizen, who were murdered near their Kibbutz Nir Oz home on October 7, 2023, and whose bodies were taken hostage into Gaza where they remain in terrorist custody. As a result of the actions of the Hamas and PIJ terrorists that day Judy Lynne Weinstein and Gadi Haggai were slaughtered and, as a result of these murders and Hamas' continued possession of their parents, Iris Weinstein Haggai and her siblings, Israeli citizens Zohar Hagai, Rahm Hagai, and Ahl Haggai, have suffered severe mental anguish, extreme emotional pain, and suffering.

51.    Plaintiffs Ora Cooper and Rotem Cooper's father, Amiram Cooper, was kidnapped on October 7, 2023, by Hamas and/or PIJ where his fate remains unknown. As a result of the actions of the Hamas and PIJ terrorists that day, Ora

Cooper and Rotem Cooper have suffered severe mental anguish, extreme emotional pain, and suffering.

52.    Plaintiff Iris Weinstein Haggai, a U.S. citizen, is the daughter of Judy Lynne Weinstein, a U.S. citizen and Gad Haggai, a U.S. citizen. On October 7, 2023, Hamas terrorists invaded their home in Kibbutz Nir Oz, a kibbutz in southern Israel. Iris's friends were murdered, their children were burnt alive, and her community was destroyed. At 6:50 am, Iris' mother called her terrified from the field where she and Iris' father were hiding from the terrorists. Iris's parents disappeared. For 83 agonizing days, she had no idea if her parents were alive and being tortured, or dead. The psychological terror of not knowing was unbearable. Finally, Iris and her family received unconfirmed intelligence that Hamas terrorists had likely brutally murdered her parents and stolen their bodies to use as bargaining chips. To this day, their bodies remain stolen in Hamas captivity, and Iris is still clinging to the hope that they might still be alive, as Hamas sometimes pretends that they have killed living hostages as part of their psychological torture. In fact, in  May of 2024, Hamas released information suggesting that Iris' mother may have been alive when taken to Gaza as a hostage. Hamas implied she died in an Israeli airstrike.

53.    As a result of Hamas' unspeakable acts, Iris has suffered, and continues to suffer, severe mental and emotional pain, suffering, and distress. She brings a claim on her own behalf and on behalf of her parents for the murder of her parents,

and the kidnapping of her parents' bodies, a continuing act of international terrorism that persists through this day.

54.     Plaintiffs Zohar Hagai, Rahm Hagai, and Ahl Haggai, all Israeli citizens, each bring claims on their own behalf arising from the events on October 7, 2023, when  Hamas terrorists invaded their home in Kibbutz Nir Oz, a kibbutz in southern Israel and abducted their parents whose fate was unknown for 83 agonizing days as they did not know if their parents were alive and being tortured, or dead. The psychological terror of not knowing was unbearable. They have since received unconfirmed intelligence that Hamas terrorists likely brutally murdered their parents and stole their bodies to use as bargaining chips. To this day, their bodies remain stolen in Hamas captivity, and they are still clinging to the hope that they might still be alive, as Hamas sometimes pretends that they have killed living hostages as part of their psychological torture. In fact, in May of 2024, Hamas released information suggesting that Iris' mother may have been alive when taken to Gaza as a hostage. Hamas implied she died in an Israeli airstrike.

55.     As a result of Hamas' unspeakable acts, Zohar Hagai, Rahm Hagai, and Ahl Haggai have suffered, and continue to suffer, severe mental and emotional pain, suffering, and distress.

56.     Plaintiff John Doe is a United States citizen and reservist in the Israel Defense Forces ("IDF"). In 2014, John Doe sustained injuries fighting Hamas in

Operation Protective Edge.

57.    On October 7, 2023, Doe was pursuing a law degree from Columbia Law School. Following the October 7th Attack, Doe was called up for reserve duty. Doe spent 100 consecutive days in and around Gaza fighting Hamas. During that time, he was involved in gunfights and attacks by Hamas terrorists, each an act of international terrorism and collectively an ongoing act of international terrorism. While fighting Hamas, Doe suffered mental anguish and pain and suffering. He continues to suffer from the effects of his service and continues to suffer ongoing mental and emotional trauma.

58.    Plaintiff Richard Roe is a United States citizen and a reservist in the IDF. On October 7, 2023, upon learning of the attacks against Israel, his family, and his friends, he immediately returned to serve. He was deployed to the Gaza Envelope, operating in Kfar Aza, Be'eri, and Nahal Oz, and he later participated in operations in Khan Yunis to dismantle Hamas leadership and infrastructure. Roe has felt constantly threatened and forced to defend himself, both physically and verbally. Roe brings a claim under the Antiterrorism Act against Associational Defendants for aiding and abetting Hamas' acts of international terrorism.

59.    Plaintiff Almog Meir Jan is an Israeli citizen who was kidnapped and held hostage for 246 days. He was rescued from the home of Abdallah Aljamal, a Hamas operative and spokesperson, in a daring mission by the Israel Defense Forces

(IDF).

60.    Plaintiff Andrey Kozlov is an Israeli citizen who was kidnapped and held hostage for 246 days. He was rescued from the home of Abdallah Aljamal, a Hamas operative and spokesperson, in a daring mission by the IDF.

61.    Plaintiff Shlomi Ziv, an Israeli citizen, was a member of the security team at the Nova Music Festival in southern Israel on October 7. During the attack, Shlomi remained at the festival site to fend off terrorists and evacuate people, until he himself was kidnapped and taken to Gaza. Shlomi was held hostage in Gaza for 246 days, in the home of Abdallah Aljamal, a Hamas operative and spokesperson, in a daring mission by the IDF, until he was rescued by the IDF. While held hostage, Shlomi's Hamas captors bragged about having Hamas operatives on American university campuses.

62.    Plaintiff Jane Moe, a U.S. citizen, served in the IDF before enrolling at Columbia University. On October 7, Moe's younger brother was deployed to Gaza, where he fought against Hamas for over a year and sustained injuries in battle. Moe has experienced severe emotional distress and fear due to pro-Hamas protests occurring just outside her window. These demonstrations glorify the very terrorists who had attempted to harm and kill her brother, exacerbating her emotional turmoil. Moe brings a claim under the Antiterrorism Act against Associational Defendants for aiding and abetting Hamas' acts of international terrorism.

63.    Plaintiff Ayelet Samerano, an Israeli citizen, is a mother whose life was irreversibly shattered by the atrocities of October 7. Ayelet's 21-year-old son, Yonatan Samerano, was shot and killed by a terrorist during the Hamas-led onslaught. Then, Yonatan's body was captured, tossed into the back of a vehicle, and driven to Gaza. Hamas and its allies continue to hold Yonatan's body captive today. Ayelet has suffered, and continues to suffer, mental anguish and pain and suffering. Ayelet brings a claim on her own behalf and on behalf of her son under the Alien Tort Statute for aiding and abetting the murder of her son and the kidnapping of his remains by Hamas in violation of the law of nations.

64.    Plaintiff Talik Gvili, an Israeli citizen, is the mother of Sergeant First Class Ran Gvili, a patrol officer who was attacked and killed defending Kibbutz Alumim during the October 7th Attack. Despite his injuries, Ran continued to engage his terrorist attackers, exemplifying exceptional bravery. Hamas kidnapped Ran's body and has held him hostage in Gaza ever since.

65.    Ran was officially declared deceased on January 31, 2024. His family, enduring a prolonged period of uncertainty, held onto hope until his death was confirmed. Talik brings a claim on her own behalf and on behalf of her son under the Alien Tort Statute against Associational Defendants for aiding and abetting the murder of her son and the kidnapping of his remains by Hamas in violation of the law of nations.

66.    Roee Baruch, an Israeli citizen, is the brother of Uriel Baruch a 35-year-old father of two who attended the Nova Festival on October 7, 2023. During the event, Hamas terrorists launched a brutal attack, leading to Uriel's abduction and subsequent captivity in Gaza. At first, his family, including his brother Roee, held onto hope, believing Uriel was alive. Tragically, in March 2024, the Israeli military informed them that Uriel had been killed on October 7 and that Hamas was continuing to hold his body captive in Gaza. Roee brings a claim on his own behalf and on behalf of his brother under the Alien Tort Statute for aiding and abetting the murder of his brother and the kidnapping of his remains by Hamas in violation of the law of nations.

67.    Plaintiff Schachar Levy is the son of Eitan Levy, who was a taxi driver, ferrying a client from central Israel to Kibbutz Be'eri on the Gaza border when the October 7th Attack began. Schachar called his father to warn him about rocket fire when his father was ambushed with Schachar listening over the phone. He later found out that his father was told to sit and asked to identify himself. About an hour later, the phone was still open and Shahar heard only Arabic being spoken, and then the phone was disconnected. Shortly thereafter, Schachar and a horrified nation witnessed a video where Eitan Levy, whose body was taken hostage to Gaza, was brutally lynched in the plaza of a mosque and his body abused by a celebrating crowd. The video, published on Instagram, shows his body dangling out of a half-

open trunk of a car, being driven through the streets of Gaza, while a crowd cheers and excitedly runs after the car. As a result of Hamas' unspeakable acts, Eitan Levy was murdered in a horrific and brutal fashion and his son, Schachar Levy, has suffered, and continues to suffer, severe mental and emotional pain, suffering, and distress.

68.     James Poe, an Israeli citizen, is the father of Leo Poe, who was kidnapped by Hamas terrorists from the Nova music festival on October 7. On the day of the massacre, Leo was serving as a member of the festival's security team alongside his close friends. His friends were murdered by Hamas and/or PIJ who kidnapped Leo and took him to Gaza, where he remains to this day in an ongoing act of terror. Poe brings a claim on his own behalf and on behalf of his son under the Alien Tort Statute for aiding and abetting the kidnapping of his son by Hamas in violation of the law of nations.

**DEFENDANTS**

**BAM Trading**

69.     BAM Trading is a Delaware corporation with its principal address in Miami, Florida. At one time, BAM Trading held forty-three money transmitter licenses with U.S. jurisdictions, including in Alabama. Some of these licenses have recently been terminated by state authorities as BAM Trading's ties to Binance's and CZ's criminal enterprises continue to become public.

25

70.    Increasingly, as federal enforcement actions continue to demonstrate BAM Trading's place in Binance's and CZ's unlawful and criminal ecosystem as a conduit for illicit remittances from U.S. customers to sanctioned entities and individuals, several states — including Alaska, Florida, and North Carolina — have moved to revoke or terminate BAM Trading's licenses. These enforcement actions underscore the growing recognition by state authorities that BAM Trading served as a conduit for Binance's efforts to circumvent U.S. financial regulations and compliance obligations.

71.    While BAM Trading ostensibly operated the Binance.US platform—a spot digital asset trading platform launched in 2019 and marketed as a separate, U.S.-compliant entity—it functioned in reality as a mere façade. Binance and CZ exercised control over all critical aspects of BAM Trading's operations, including its banking relationships, accounts payable and receivable, compliance infrastructure, and underlying technology. Internal Binance communications obtained by regulators confirm that CZ and his senior leadership team made key operational and strategic decisions for BAM Trading. For example, the U.S. Securities and Exchange Commission ("SEC") in its Complaint (the "SEC Complaint"),[9] in which Bam Trading is a Co-Defendant with both Binance and CZ, cites internal emails in which Binance personnel discussed circumventing U.S.

---

[9] Case 1:23-cv-01599.

regulatory oversight by directing high-value customers from BAM Trading to Binance.com.[10]

72.     The allegations in the SEC Complaint clearly portray BAM Trading's place in Binance's operations and state as follows.

> By engaging in the conduct set forth in this Complaint, Binance acted as an exchange, broker and dealer, and clearing agency for the Binance.com Platform without registering in any such capacities, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)]. Similarly, with respect to the Binance.US Platform, Binance acted together with BAM Trading as an exchange, <u>BAM Trading acted as a broker, and Binance and BAM Trading each acted as a clearing agency, without registering in any such capacities, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C.§§ 78e, 78o(a), and 78q-1(b)].</u> As a control person over Binance and BAM Trading under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], Zhao has also violated Sections 5, 15(a), and17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)] for Binance and BAM Trading's violations with respect to both Binance Platforms.[11]

73.     The Commodity Futures Trading Commission (CFTC) similarly found that CZ maintained direct access to BAM Trading's financial and compliance systems and approved expenditures and hiring decisions.[12] These facts establish that BAM Trading was not a truly independent entity, but an instrumentality through which Binance and CZ secretly operated within the United States while evading regulatory obligations and oversight.

74.     BAM Trading ostensibly operated the Binance.US Platform, a spot

---

[10] *See SEC Complaint* - Case 1:23-cv-01599 *at* ¶ 7.
[11] *Id at* 15.
[12] *See CFTC Complaint* - Case: 1:23-cv-01887 *at* ¶¶ 22, 81.

digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, which launched in 2019. In reality, the BAM Platform was controlled by Binance and CZ as was Bam Trading's banking, payables and receivables, compliance, and technological infrastructure.

75.     BAM Trading's ownership structure also reflects Binance's and CZ's dominance. BAM Trading was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CZ Holdings Limited, a British Virgin Islands company that was owned and controlled by CZ. CZ continues to own 81 percent of BAM Management.

76.     This ownership structure reflects the absolute centralization of control within Binance's broader corporate framework, directly linking CZ and Binance to BAM Management's activities and further demonstrates that BAM Management, despite its formal registration as a separate entity, was functionally an arm of Binance, directed by CZ for his own benefit and in furtherance of Binance's illegal activities in the United States.

77.     Binance's ability to access U.S. consumers for non-compliant remittances to FTOs began with its front-facing pseudo-compliant, pseudo-independent BAM Trading-operated Binanace.US platform whose employees and management were tools of Binance and CZ, and, became increasingly aware that such was the case with each passing day.

78.    Rather than operating as an independent company and platform, BAM Trading was a straw entity for Binance and CZ's global remittance enterprise for whom Hamas and PIJ were valued clients rather than prohibited sources of business. U.S.-based remittances worth millions of dollars originated with BAM Trading's promotional efforts and platform and ended with Binance's payout to FTOs which should have generated a flurry of Suspicious Activity Reports ("SARs"), a legally mandated requirement for any financial institution that has reason to suspect its services are being used to facilitate money laundering, terrorism, or other criminal conduct .

79.    A "money services business" (MSB) as defined by the BSA is generally required to file a SAR no later than 30 calendar days after the initial detection by the MSB of the facts that may constitute a basis for filing a SAR.[13]

80.    Former Acting Comptroller of the Currency Brian Brooks ("Brooks") who was briefly CEO of BAM Trading for four months in 2021 before resigning. The SEC's Complaint cites testimony from Brooks that "[t]o the extent that these two liquidity providers were significant sources of liquidity, meaning that our customers couldn't, you know, clear orders without the presence of those makers on our platform, I thought that was a real problem"..."It suggested that the company was, in fact, heavily dependent on CZ, not just as a control person but also as an

---

[13] 31 C.F.R. § 1022.320(b)(3).

economic counterparty and that is problematic, so I thought we needed to look into deplatforming them." He also testified that what "became clear to me at a certain point was CZ was the CEO of BAM Trading (Binance.US), not me."[14]

**Binance**

81.    Binance, d/b/a Binance.com, is a Cayman Islands limited liability company founded and owned by CZ. It operates the Binance.com Platform, an international crypto asset trading platform. The Binance.com Platform is marketed as being available to customers in more than 100 countries. It currently offers trading in over 350 crypto assets and makes available various other investment opportunities involving crypto assets.

82.    However, Binance, the Binance Group, and Binance Holdings Limited are not registered, licensed, regulated, or otherwise authorized by the Cayman Islands Monetary Authority (CIMA) to operate a cryptocurrency exchange from or within the Cayman Islands. As stated by CIMA, Binance does not hold the necessary licenses to provide crypto asset exchange services within the jurisdiction, nor do they have any such license to operate in any state in the United States.

83.    By operating without proper authorization in the Cayman Islands, Binance avoids regulatory scrutiny, and the legal obligations imposed on exchanges in more highly regulated markets, raising serious concerns about its compliance with

---

[14] See SEC Complaint ¶ 189.

international financial laws.

84.    Binance was founded in 2017 in China but moved its servers and headquarters out of the country in advance of the Chinese government's ban on cryptocurrency trading in September 2017. By January 2018, Binance had a market capitalization of $1.3 billion. Binance's co-founder, CZ, is a Chinese-born Canadian businessman who served as Binance's CEO until November of 2023 when he was forced to step down in the wake of a multi-agency investigation into Binance and what Treasury Department Secretary Janet Yellen has described as "the largest enforcement action in Treasury's history," with the respective Financial Crimes Enforcement Network ("FINCEN") and Office of Foreign Assets Control ("OFAC") fines alone adding up to $4.3 billion.

85.    In March 2018, Binance announced its intentions to open an office in Malta after stricter regulations in Japan and China and subsequently signed a memorandum of understanding with the government of Bermuda and with the Malta Stock Exchange to develop a platform for trading security tokens. In August 2018, Binance along with other exchanges raised $32 million for a "stablecoin" project to address the volatility of cryptocurrencies.

86.    According to a March 23, 2023, Complaint by CFTC against CZ, Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services)

Holdings Limited,[15] Binance "operates the world's largest centralized digital asset exchange, through an opaque web of corporate entities, all of which are ultimately controlled by CZ, the Chief Executive Officer ("CEO") of Binance, and constitute a common enterprise called "Binance" or the "Binance ecosystem."[16]

87.    In fact, Binance, which is currently contesting the jurisdiction of the federal courts of the Southern District of New York, cynically maintains, despite the oceans of cold hard cash it receives, controls, processes, remits and pays itself from actual people and companies, that it exists only in the ether. As stated in the CFTC Complaint

> Binance purposefully obscures the identities and locations of the entities operating the trading platform. For example, Binance's customer-facing "Terms of Use," purports to be a contract between the customer and something simply called the "Binance operators," which is a term that has no concrete meaning. While Binance has maintained offices in numerous locations, including Singapore, Malta, Dubai, and Tokyo … Binance intentionally does not disclose the location of its executive offices. Instead, CZ has stated that Binance's headquarters is wherever he is located at any point in time, reflecting a deliberate approach to attempt to avoid regulation. CZ explained this strategy during a June 2019 internal meeting, stating that Binance conducts its operations through various entities incorporated in numerous jurisdictions to "keep countries clean [of violations of law]" by "not landing .com anywhere. This is the main reason .com does not land anywhere."[17]

---

[15] Binance's first Chief Compliance Officer, Samuel Lim, who served from April 2018 to at least January of 2022 is also a named defendant.

[16] CFTC Complaint at ¶ 1.

[17] CFTC Complaint at ¶ 5.

88.     Binance does not observe corporate formalities. It has no board of directors but was controlled entirely by CZ at all times materially herein. The CFTC Complaint states: "As part of [an] audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she 'need[ed] to write a fake annual MLRO report to Binance board of directors wtf.' [Chief Compliance Officer Samuel] Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, 'yea its fine I can get mgmt. to sign' off on the fake report." At around the same time as the audit, in November of 2020, the MLRO referenced "half assed" the compliance audit, and informed Lim in a chat, "I HAZ NO CONFIDENCE IN OUR GEOFENCING."

89.     Throughout 2019, Binance continued to serve "thousands of users" identified as being from sanctioned countries, including over 12,500 users who provided Iranian phone numbers. Three-quarters of the Iranian funds that passed through Binance were in a relatively low-profile cryptocurrency called Tron that gives users an option to conceal their identities. Iran has at all relevant times been the most significant sponsor of Hamas' terror operations and is on the list of sanctioned countries because payments and remittances to Iranian destinations have been used to underwrite the costs of maintaining terror networks and conducting terrorist activities such as was recently carried out by Hamas.

90.     Since its founding, Binance.com has earned billions of dollars in fees

on crypto transactions worth trillions of dollars and other services, and under CZ's control, Binance.com had become the world's largest cryptocurrency exchange by early 2018. Binance.com's rapid growth was fueled in large part by Binance.com targeting the large and lucrative U.S. crypto market and by ignoring and willfully violating numerous U.S. laws and regulations in place to protect consumers, investors, and American national security, which would have limited Binance.com's access to high-value clients in the U.S. market and slowed its growth.

**Binance's Decoy Platform**

91.    In its 2023 suit against Binance Holdings Limited, Bam Trading Services Inc., (Bam Management US Holdings ), and CZ, the SEC asserted that an owner of another crypto exchange in the U.S. advised Binance on setting up its own entity in the region and suggested two approaches, including a moderate plan to establish a second entity that would "reveal, retard, and resolve built-up enforcement tensions" while protecting the main exchange from liabilities.

92.    This scheme was not merely regulatory arbitrage; it was a calculated act of deception designed to create a false appearance of legal compliance. In reality, the bifurcation allowed Binance to continue unlawfully accessing U.S. markets, operating an unregistered securities exchange, and profiting from U.S. investors—all while fraudulently trying to evade the jurisdiction and enforcement reach of U.S. authorities.

93.    That entity conceived of by Binance to obscure its criminality and protect Binance from liability while acting as a criminal confederate became the entity known as BAM Trading.

94.    In 2019, Binance was banned in the United States on regulatory grounds. In response, Binance and other investors established BAM Trading which operated Binance.US, a separate exchange designed to comply with all applicable US federal laws while keeping its original platform for the rest of the world. Binance.US was, until recently, authorized to do business in over forty U.S. states, including Alabama.

95.    As would be discovered upon investigation by the SEC, Zhao and Binance controlled the Binance.US platform's operations behind the scenes and encouraged U.S. customers to utilize its less regulated Binance platform in lieu of the Binance.US platform which was intended to be compliant with U.S. law. In fact, upon information and belief, Binance continued and possibly still continues to allow some of its most important, high-volume U.S. users to remain on the unregistered Binance.com exchange.

96.    As uncovered by the SEC's investigation, CZ and Binance exercised covert and continuous control over the operations of the Binance.US platform, despite public representations that it operated independently in compliance with U.S. laws. Behind the scenes, Zhao and Binance deliberately directed—and in some

instances facilitated—U.S. customers' access to the unregulated Binance.com platform, thereby circumventing U.S. regulatory oversight. Upon information and belief, this unlawful access was not limited to minor users.  It included Binance's most lucrative and high-volume U.S. clients, who were knowingly retained on the Binance.com exchange in direct violation of U.S. securities and anti-money laundering laws. This misconduct may be ongoing, further illustrating Binance's willful and systemic efforts, via BAM Trading, to deceive regulators and flout U.S. law.

97.    At the direction of Zhao and other senior leaders at Binance, employees also encouraged their high-volume U.S. users to conceal their U.S. connections, including by creating new accounts that obscured their locations.

98.    This was not incidental or rogue behavior; it was a coordinated scheme, executed from the top down, to subvert U.S. regulatory restrictions and preserve Binance's access to lucrative U.S. markets. Zhao wrote privately to his employees that this was so Binance could continue to grow and that it was "better to ask for forgiveness than permission,"[18] a damning admission that reveals a corporate culture of calculated lawlessness and willful defiance of U.S. law.

99.    At all relevant times, Binance did not have protocols to flag or report

---

[18] See November 21, 2023 Plea Agreement of Changpeng Zhao [ECF# 31] in *U.S. v. Changpeng Zhao*, 23-cr-179-RAJ, Western District of Washington ¶ 9(f).

transactions for money laundering risks, and its employees were well aware that such a compliance failure would invite criminals to the platform.

100.   Binance employees were fully aware that the absence of these compliance measures would make the platform a magnet for illicit actors—including terrorists, drug traffickers, and money launderers—and yet, they deliberately chose to ignore these risks to maintain user growth and profitability. This conscious disregard of regulatory obligations was not mere negligence but part of a systemic, profit-driven policy of noncompliance and concealment.

101.   On October 28, 2020, *Forbes Magazine* staff released leaked documents showing that Binance and CZ created an elaborate corporate structure designed to intentionally deceive United States regulators and secretly profit from cryptocurrency investors located in the country. Binance officially blocks access from IP addresses located in the United States, but "potential customers would be taught how to evade geographic restrictions", *Forbes* claimed. Binance relied on U.S.-based entities and vendors and actively cultivated lucrative and commercially important "VIP" customers, including institutional customers, located in the United States.

102.   Binance, CZ, and Binance's then-chief compliance officer Samuel Lim, each knew that Binance's solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law. In

order to avoid such requirements, Binance, CZ, and Lim solicited high-value U.S. customers via BAM Trading, directed the transfer of those customers from the BAM Trading platform to the Binance platform, and then undermined Binance's own compliance program and assisted customers in bypassing Binance's own controls, thereby enabling them to remit funds to sanctioned individuals and entities including Hamas and PIJ.

103. In addition to Binance and its officers, employees, and agents instructing U.S. customers to use VPNs to obscure their locations, they also allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited and directed VIP customers to open Binance accounts under the name of newly incorporated shell companies to evade Binance's own compliance controls and U.S. regulators.

104. As stated in the CFTC action against Binance and related entities, "Binance's decision to prioritize commercial success over compliance with U.S. law has been, as Lim paraphrased Zhao's position on the matter, a 'biz decision.'" As a result of this "biz decision", Binance's own documents for the month of August 2020 show that the platform earned $63 million in fees from derivatives transactions and approximately 16% of its accounts were held by customers Binance identified as being located in the United States.

105.   Throughout this time, BAM Trading was a Binance/Zhao-operated smokescreen for Binance's other U.S.-based activities. BAM Trading was deliberately created and operated under the direction of Binance and CZ to conceal Binance's true presence and activities within the United States. Far from being an independent entity, BAM Trading served as a front to feign regulatory compliance while enabling Binance to continue illicit operations, solicit U.S. customers unlawfully, and evade federal oversight.

106.   On June 9, 2019, after the launch of Binance.US, CZ himself stated that 20% to 30% of Binance's traffic comes from the US and Binance's July 2019 Financial Reporting Package, which was emailed directly to Zhao, attributes approximately 22% of Binance's revenue for June 2019 to U.S. customers. These customers were obtained through Binance and CZ's complete dominance of BAM Trading's operations.[19]

107.   The October 28, 2020, *Forbes* report described how a "Tai Chi" document created by Harry Zhou, the co-founder of San Francisco-based exchange Koi Trading, which is backed by Binance, was presented to senior Binance executives, explaining the steps Binance had taken to evade regulators in the U.S. Tai Chi is a Chinese martial art which relies on evading and deflecting direct force and was used by Binance to describe methods of avoiding responsibility.

---

[19] https://www.binance.com/en/square/post/1217219777545.

108.    The purpose of the Tai Chi document was to maintain a U.S. customer base while reducing or evading U.S. regulatory risk. Binance initially sued *Forbes* in November 2020 over the report but dropped the lawsuit in February 2021. The story of course was correct, with BAM Trading serving Binance's criminal purposes.

109.    As such, a significant portion of the illegal activity perpetrated by Defendants leading to the funding of Hamas and PIJ took place or has a direct nexus to Defendants' activities and customers in the United States, beginning with Binance's controlled use of BAM Trading to attract U.S. customers and facilitate their circumvention of U.S. law and ending with the October 7th Attack. This began with Binance's calculated and concealed control of BAM Trading to unlawfully attract and service U.S. customers while deliberately enabling their circumvention of U.S. financial regulations. This misconduct ultimately facilitated the flow of funds to designated FTOs, culminating in the material support that enabled the October 7th Attack.

110.    At all relevant times, Binance knowingly failed to register as a money service business, willfully violated the Bank Secrecy Act by failing to implement and maintain an effective anti-money laundering program, and willfully caused violations of US economic sanctions. In internal communications with the company's money laundering reporting officer an employee allegedly remarked that regarding transactions by the designated foreign terrorist organization Hamas, "we

see the bad, but we close 2 eyes".

111.   At all relevant times, Zhao and Binance secretly controlled the Binance.US platform's operations which BAM Trading executives were aware of well before the October 7th Attack.

112.   From around January 2018 to May 2022, Binance processed 1.1 million crypto transactions worth at least $898.6 million between US customers and those who lived in Iran. In 2022, Reuters cited blockchain data as indicating that Binance has processed Iranian transactions with a value of $8 billion since 2018 despite US sanctions intended to cut Iran off from the global financial system. Almost all the funds, about $7.8 billion, flowed between Binance and Nobitex    Iran's largest crypto exchange platform – in violation of U.S. law.

113.   In a blog post in 2021, Nobitex  openly instructed clients on how to use Tron – a mid-tier token –  to trade anonymously without "endangering assets due to sanctions." Following Nobitex's guidance, many Iranian customers used VPNs to conceal their locations and continued trading on Binance as they had been doing for some time. According to the U.S. Justice Department, Binance enabled nearly $900 million in transactions between US and Iranian users, noting that it had a "significant customer base" from some sanctioned jurisdictions and was aware that Iran represented "the majority of such customers."

114.   In May 2021, Binance was placed under investigation by both the

Internal Revenue Service and the United States Department of Justice on allegations of money laundering and tax offenses.

115.   On March 1, 2023, U.S. Senators Elizabeth Warren, Chris Van Hollen, and Roger Marshall wrote a letter to Binance describing the exchange as "a hotbed of illegal financial activity that has facilitated over $10 billion in payments to criminals and sanctions evaders." The letter formally requested documents related to Binance's compliance with regulations.

116.   On March 27, 2023, the CFTC lawsuit was filed against Binance and Zhao in the United States District Court for the Northern District of Illinois, claiming willful evasion of U.S. law and the breaching of rules intended to thwart money laundering operations.

117.   In June 2023, the SEC announced it was suing Binance and Zhao on thirteen charges for alleged violations of U.S. securities rules.

118.   On November 21, 2023, Binance agreed to pay $968,618,825 to settle its potential civil liability for 1,667,153 apparent violations of multiple sanctions programs administered by OFAC.

119.   According to Binance's November 2023 Settlement Agreement with OFAC [20] (the "OFAC Settlement Agreement"), "[f]rom approximately August 2017 to October 2022" Binance "matched and executed virtual currency trades on its

---

[20] https://ofac.treasury.gov/system/files/2023-11/20231121_binance.pdf.

online exchange platform between U.S. person users and users in sanctioned jurisdictions or blocked persons." These transactions resulted in at least 1,667,153 virtual currency transactions – totaling approximately $706,068,127."

120.  The OFAC Settlement Agreement further states that although Binance took steps to project an image of compliance, including by misleading third parties about its controls, senior Binance management knew of and permitted the presence of both U.S. and sanctioned jurisdiction users on its platform, and did so despite understanding that Binance's trade matching algorithm could cause violations of OFAC-administered sanctions programs due to the presence of U.S. users on the platform. These U.S. users were obtained via BAM Trading's promotional activity and platform.

121. In addition to disregarding known sanctions risks, Binance management also took steps to undermine its own compliance function, by using its control over its U.S. affiliate to circumvent the company's own ostensible controls.

122.  The OFAC Settlement Agreement specifically found that given the trading on the Binance.com platform, amounting to $3.8 billion in transaction volume per day in 2020, the continued presence of both U.S. and sanctioned jurisdiction users through 2022, and the liquidity provided by U.S. users, the sanctions exposure Binance's senior management had identified was a "practical inevitability" and that Binance knew, or had reason to know, its platform was

routinely matching U.S. users, obtained via BAM Trading, with users from sanctioned jurisdictions over many years and at significant volumes as Binance identified the sanctioned jurisdiction users as located in Iran, Syria, North Korea, the Crimea Region of Ukraine, Cuba, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic on the basis of a "Know Your Customer" ("KYC") process and other available information, including cell phone numbers, submitted documents, and/or IP addresses.

**CZ**

123.   CZ was the CEO of all Binance entities between 2017 and mid-2023 when they processed numerous transactions to entities and accounts associated with Hamas and other FTOs.

124.   CZ was also, concurrently, the Chairman of BAM Trading's and BAM Management's Boards of Directors until at least March 2022, exerting full control over these entities in his capacity as the ultimate decision-maker. As Chairman, CZ directly oversaw and directed the operations, strategies, and decisions of BAM Trading, which was responsible for facilitating Binance's operations in the United States. Under his leadership, BAM Trading was effectively a vehicle for Binance's global operations, ensuring that U.S. customers were onboarded to Binance's platform while circumventing U.S. laws and regulations. This structural control further solidified CZ's role in the ongoing misconduct that enabled the facilitation

of illegal transactions, including those linked to Hamas and other FTOs.

125.    CZ directly or indirectly owned Merit Peak Limited ("Merit Peak"), a Cayman Islands corporation primarily engaged in over-the-counter (OTC) transactions with institutional counterparties, as well as Sigma Chain AG ("Sigma Chain"), a Swiss-incorporated entity. Both companies were integral to Binance's global operations, with Merit Peak facilitating high-volume transactions and Sigma Chain directly supporting Binance's markets for digital asset derivatives. Through his ownership and control of these entities, CZ exerted influence over Binance's financial systems, further consolidating his role in enabling the illicit and unregulated activities of Binance, including the facilitation of financial flows to Hamas, PIJ and other designated terrorist organizations.[21]

126.    Neither Merit Peak, nor Sigma Chain have ever been registered with the CFTC in any capacity. These entities were utilized by CZ to control and eventually siphon off funds held in BAM Trading accounts which were necessary for compliance. BAM Trading's putative executives were not in any position to prevent such withdrawal, and indeed, were often not even aware of them, because it was Binance and CZ, not BAM Trading executives, that ran BAM Trading.

127.    The true authority over BAM Trading rested with Binance and CZ, who exercised complete control over the entity's operations, including the illicit diversion

---

[21] CFTC Complaint at ¶ 14.

of funds that bypassed U.S. regulations and facilitated criminal activity.

128.    Sigma Chain, CZ, and several Binance employees conducted BAM Trading's operations.

129.    Among others, Binance's back-office manager was Sigma Chain's President at the same time she also had signatory authority over BAM Trading's bank accounts. Sigma Chain was an active trader on both Binance Platforms and described itself as "the main market maker for Binance.com."[22] Upon the Binance.US Platform's launch, CZ directed that Sigma Chain be one of its first market makers.

This close relationship allowed Binance to maintain seamless, albeit illicit, operations across platforms and jurisdictions.

130.    Further, since the Binance.US Platform began offering OTC trading, Sigma Chain has served as one of the counterparties to Binance.US Platform customers, including, at times, serving as the only counterparty.

131.    CZ is Merit Peak's beneficial owner, and several Binance employees, as opposed to Merit Peak employees, conducted its operations. Merit Peak described itself as "a proprietary firm trading with our owner's [CZ's] self-made wealth from the digital asset business." Merit Peak was an OTC trading service provider on the

---

[22] https://hackernoon.com/key-entities-in-the-sec-v-binance-saga-trust-companies-sigma-chain-and-merit-peak.

Binance.com Platform and was one of the earliest market makers on the Binance.US Platform. Through Merit Peak, CZ has also directed over $16 million to BAM Management to fund the Binance.US Platform's operations.

132.   CZ in fact not only oversaw the BAM Trading platform and controlled the parties providing market making and counterparty services, but he and Binance personnel were the architects of the process whereby high value U.S.-based BAM Trading customers could transition to the Binance platform which disregarded U.S. regulatory law and directed consumers as to how to actively conceal their locations in the U.S. in order to circumvent U.S. regulators.

133.   CZ, by facilitating high-volume transactions through Binance.com and Binance.US, provided Hamas with critical financial infrastructure to receive, store, and launder donations in cryptocurrency from supporters around the world, including from U.S. users misled by BAM Trading. This financial support played a role in enabling Hamas's capacity to plan, organize, and execute attacks such as the October 7, 2023, massacre in Israel, which was funded in part through cryptocurrency flows routed via Binance.

134.   CZ's and Binance's complicity is a matter of judicial fact pursuant to the civil settlements with the Department of Justice and associated regulatory authorities which were announced in late 2023.

135.   Those settlements stipulate that Binance, under the leadership and

direction of CZ, failed to place and utilize legally required internal tools and infrastructure and thereby enabled remittances to Hamas, PIJ and other FTOs from the United States.

136.    CZ's actions and directions to customers and employees were designed to frustrate and undermine the enforcement of the Bank Secrecy Act ("BSA"), U.S. Anti-Money Laundering ("AML"), Know Your Customer ("KYC"), and other federal regulations in order to maximize profits while instructing his employees that the eventual FTO-based destinations of the funds sent via the Binance platform were not a Binance concern.

**CZ, Binance and BAM Trading: The Link Between FTOs and Their Friends**

137.    CZ served as Binance's CEO until November of 2023, when he was forced to step down in the wake of a multi-agency investigation into Binance and what Treasury Department has described as "the largest enforcement action in Treasury's history."[23] The respective Financial Crimes FinCEN and OFAC fines alone added up to $4.3 billion.

138.    CZ pled guilty to violating the Bank Secrecy Act for failing to implement an effective anti-money laundering ("AML") program at Binance. As part of the plea deal, he stepped down as CEO and agreed to pay a $50 million fine personally.

---

[23] https://home.treasury.gov/news/press-releases/jy1925.

139. According to a CFTC lawsuit filed in March of 2023 against Binance, remittances in support of Hamas via Binance date back to at least February of 2019, and Binance was found to have failed to report more than 100,000 suspicious transactions involving terrorist groups and organizations including, among others, Hamas, PIJ, Al Qaeda, and the Islamic State of Iraq and Syria.

140. Employees at Binance were engaged in a wide array of misconduct, and many were aware of the consequences of allowing millions of illegal transactions, according to the Justice Department and FinCEN. Crypto wallets at Binance were found to interact with bitcoin wallets associated with groups designated as terrorist organizations by the US and several other countries, including the Islamic State and al-Qaeda as well as the armed wing of Iran-backed Hamas and PIJ.

141. The impact of Binance's criminality was not only foreseeable but known to Binance. Internally, Binance officers, employees, and agents have acknowledged that the Binance platform has facilitated potentially illegal activities. For example, in February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering."[24] Lim's colleague

---

[24] https://www.reuters.com/markets/us/us-authorities-set-unveil-settlement-with-binance-source-2023-11-21/#:~:text=In%20February%202019%2C%20Binance's%20Lim,said%20in%20its%20March%20lawsuit.

replied: "can barely buy an AK47 with 600 bucks."[25] And with regard to certain Binance customers, Lim acknowledged in a February 2020 chat: "Like come on. They are here for crime."[26] Binance's Money Laundering Reporting Officer agreed that "we see the bad, but we close 2 eyes."[27]

142.   According to US Treasury Secretary Janet Yellen "Binance turned a blind eye to its legal obligations in the pursuit of profit. Its willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform"[28] and its trading platform was used to facilitate money to terror groups like Hamas, Al Qaeda, and the Islamic State of Iraq and Syria (ISIS).

143.   The Hamas transactions were first acknowledged in February 2019 by Binance's then-chief compliance officer Samuel Lim ("Lim"), according to a Commodity Futures Trading Commission lawsuit filed in March against the crypto exchange. The complaint, quoting the messages between Lim and his staff, noted that Lim was aware of the illegal transactions being made through its writing about certain customers on the platform: "Like come on. They are here for crime." As such, Binance and Zhao were well aware that these transactions would result in criminality

---

[25]   https://www.businessinsider.com/binance-compliance-execs-joked-about-hamas-transactions-ak-47s-cftc-2023-3.

[26]   https://fortune.com/2023/03/27/crypto-exchange-binance-crackdown-cftc-complaint-chat-messages-crime/.

[27]   https://www.ft.com/content/fff2460a-39dc-43cb-93ac-62d09e1e0e97.

[28]   https://home.treasury.gov/news/press-releases/jy1925.

and likely in murder, kidnapping, and terrorism.

144.    Financial exchanges in the U.S., including those that specialize in cryptocurrency, are required to follow strict "know your customer" laws to identify their users. The Treasury Department formally has said that Binance "willfully failed to report" more than 100,000 suspicious transactions involving a host of sanctioned groups, including Hamas' military arm, Qassam Brigades, Al Qaeda, the Islamic State terrorist group, a litany of criminal ransomware hackers and users in countries facing U.S. sanctions, including North Korea and Iran.[29]

145.    According to a press release from the Justice Department, Binance's compliance employees internally noted that the company didn't even have protocols to flag transactions that were money laundering risks.[30]

146.    Terrorists raise money in crypto donations.[31] CoinDesk reported on June 8, 2021, that Hamas' militant wing, Izz ad-Din al Qassam Brigades, had received up to $100,000 just in bitcoin (BTC) since the beginning of 2021 with a spike in donations in May of 2023 when Israel and Hamas exchanged rocket attacks.[32]

---

[29] https://home.treasury.gov/news/press-releases/jy1925.

[30] https://www.nbcnews.com/tech/tech-news/binance-ceo-steps-crypto-platform-hit-4-billion-fines-rcna126071.

[31] https://www.reuters.com/world/middle-east/new-crypto-front-emerges-israels-militant-financing-fight-2023-11-27/.

[32] https://www.coindesk.com/consensus-magazine/2023/10/11/hamas-has-raised-millions-in-crypto-donations-wsj.

147.   Binance was at the center of the transactions, according to data from the block chain analytics firms and CoinDesk's analysis.[33]

148.   According to Treasury Secretary Janet Yellen, FinCEN, OFAC, and IRS Criminal Investigation's investigation has found that "Binance was allowing illicit actors to transact freely, supporting activities from child sexual abuse to illegal narcotics to terrorism, across more than 100,000 transactions. That includes transactions associated with terrorist groups like Hamas' al-Qassam Brigades, PIJ, al-Qaida, and ISIS. Binance processed these transactions, but it never filed a single suspicious activity report.

149.   In addition, Binance and CZ have admitted that they directly or indirectly owned the various entities that collectively operate the BAM Trading and Binance Platform. CZ, along with a core senior management group, made the strategic decisions for Binance, BAM Trading and the Binance Platforms and exercised day-to-day control over their operations and finances.

150.   Lim's internal discussions with compliance colleagues illustrate that Binance has tolerated Binance customers' use of the platform to facilitate "illicit activity."

151.   The modest size of each remittance minimized Binance's risk of

---

[33] https://www.coindesk.com/consensus-magazine/2023/10/11/hamas-has-raised-millions-in-crypto-donations-wsj.

detection by U.S. enforcement agencies. Such remittances provided the necessary material support, military and tactical enablement and acquisition capacity and assets necessary for Hamas to train for and carry out terrorist activities, including the complex, multipronged and highly sophisticated attack against civilians in Israel on October 7, 2023.

152.  The deliberately modest size of each remittance processed through Binance was intended to evade detection by U.S. enforcement authorities, while cumulatively delivering substantial material support to Hamas. These funds directly enabled Hamas to acquire weapons, finance training camps, and coordinate the logistics necessary to execute the sophisticated and multi-pronged terrorist assault on Israeli civilians on October 7, 2023. According to the Wall Street Journal, Hamas and allied groups received tens of millions of dollars in cryptocurrency, much of it routed through Binance's platforms. U.S. Treasury Secretary Janet Yellen confirmed that Binance enabled more than 100,000 suspicious transactions involving terrorist organizations, including Hamas, and failed to file a single Suspicious Activity Report (SAR), despite knowledge of these transactions.[34] The Justice Department, in its 2023 settlement, concluded that Binance knowingly facilitated crypto transactions for entities in sanctioned jurisdictions, including terrorist groups, by failing to enforce required compliance controls.

---

[34] https://home.treasury.gov/news/press-releases/jy1926.

See:

- *Wall Street Journal*, "*Hamas Militants Behind Israel Attack Raised Millions in Crypto*," Oct. 10, 2023[35]
- U.S. Department of the Treasury Press Release, "*Binance Holdings Limited Agrees to Plead Guilty, Pay Over $4 Billion*," Nov. 21, 2023[36]
- U.S. Department of Justice, "*Binance and CEO Changpeng Zhao Plead Guilty to Federal Charges*," Nov. 2023[37]

153.  According to the Treasury Department, "Binance enabled a range of illicit actors to transact freely on the platform,"[38] and specifically named Hamas, Al Qaeda, PIJ and the Islamic State of Iraq and Syria as terrorist organizations that received funds through the exchange.[39]

154.  In October 2023, coinciding with the outbreak of the 2023 Israel–Hamas war, Binance and Tether were described as a source of terrorist funding by U.S. senator Cynthia Lummis and U.S. Representative French Hill, with a letter calling for the Department of Justice to crack down on the exchange.[40]

155.  On November 21, 2023, the DOJ announced that Binance has pleaded guilty to multiple criminal charges -- including violations of the Bank Secrecy Act

---

[35] https://www.wsj.com/world/middle-east/militants-behind-israel-attack-raised-millions-in-crypto-b9134b7a.

[36] https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

[37] https://www.reuters.com/markets/us/us-authorities-set-unveil-settlement-with-binance-source-2023-11-21/.

[38] https://home.treasury.gov/news/press-releases/jy1925.

[39] https://home.treasury.gov/news/press-releases/jy1925.

[40] https://cointelegraph.com/news/cynthia-lummis-charge-binance-tether-illicit-activities.

and vast money laundering schemes. Indeed, Binance pled guilty.[41]

156.  The multiyear investigation revealed that finance allowed criminal elements onto the platform, thereby enabling transactions linked to child sex abuse, narcotics and terrorist financing. The Binance platform, which accounts for about half of all crypto activity, was charged with facilitating money laundering, aiding terrorist networks, including Hamas and others, and violating sanctions on countries such as Cuba, Iran, Russia, and Syria, as well as playing a role in human and narcotics trafficking. The indictment accused Binance of conducting over $1 billion in transactions with sanctioned countries and criminal actors.

157.  Defendants' contributions to the funding of this attack cannot be overstated. Criminals utilize cryptocurrency transactions in the belief that such transactions are beyond the reach of law enforcement. However, the blockchain ledger which is comprised of chronologically and cryptographically linked segments maintains a decentralized digital record of all such transactions in perpetuity.

Defendants' contributions to the funding of the October 7th Attack were both substantial and indispensable. Criminal and terrorist actors turned to Binance's platform precisely because it facilitated cryptocurrency transactions under the false perception that such transactions were untraceable and beyond the reach of law enforcement. In reality, while cryptocurrency can obscure identity, its underlying

---

[41] https://www.justice.gov/criminal/case/united-states-v-binance-holdings-limited-dba-binancecom.

blockchain architecture—a decentralized, immutable ledger of all transactions—preserves a permanent, chronological, and cryptographically linked record of every transfer. This transparency has enabled law enforcement agencies to trace illicit activities. For instance, in March 2025, the U.S. Department of Justice announced the seizure of approximately $200,000 in cryptocurrency intended to support Hamas's terrorist activities, highlighting the role of blockchain analysis in disrupting such financing schemes.[42]

158.    The FBI reported that it had traced the seized cryptocurrency from addresses that had been used to launder more than $1.5 million in virtual currency since October 2024. According to the DOJ's warrant documents, Hamas affiliated groups had at least 17 cryptocurrency addresses used for soliciting donations that the groups would then launder through exchanges and over-the-counter brokers.

159.    Blockchain data from both private analyst entities and foreign and domestic regulators reveals that Binance processed thousands of transactions valued at nearly $60 million involving crypto wallets of Hamas, PIJ and other participants in the October 7th Attack as well as to destination addresses in Iran, a major financial supporter of Hamas and PIJ.

160.    The analysis of the data also showed that Binance processed an

---

[42] https://www.justice.gov/opa/pr/justice-department-disrupts-hamas-terrorist-financing-scheme-through-seizure-cryptocurrency.

additional $42.5 million in transactions involving wallets of Gaza-based money-services businesses including OFAC-sanctioned entities and other entities identified by Israeli intelligence as facilitators of money transfers to Hamas.

161.   These transactions frequently involved complex, multi-step processes that were intentionally designed to evade detection. They relied on a web of Binance and CZ-controlled entities to create a self-dealing, layered infrastructure that effectively laundered funds, masked transaction origins, and concealed the ultimate recipients. Through this coordinated architecture, cryptocurrency ultimately reached the wallets controlled by Hamas and Palestinian Islamic Jihad (PIJ), providing material financial support to designated FTOs in direct violation of U.S. anti-money laundering and anti-terrorism laws.

162.   Despite this knowledge, Defendants did not file a single suspicious activity report ("SAR") with FinCEN. Filing an SAR under such circumstances is mandated by law and is the bare minimum required of a regulated financial institution after it has processed a payment or remittance that it has reason to suspect is possibly implicated in money-laundering, fraud, terrorism, or other crimes. In fact, according to the United States Department of Justice, a message from one of Binance's compliance employees sent in February 2019 joked that the crypto exchange should get a banner that says: "Is washing drug money too hard these days?

Come to Binance, we got cake for you."[43]

163.    Filing SARs in such cases is not optional—it is the legally mandated minimum standard for any financial institution that has reason to suspect its services are being used to facilitate money laundering, terrorism, or other criminal conduct.[44] The scale and consistency of Binance's failure to report such activity reveals not mere negligence, but deliberate evasion.

164.    Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations, as well as high-risk exchanges associated with terrorist financing activity. Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and PIJ.

165.    With respect to the al-Qassam Brigades which jointly spearheaded the October 7th Attack with PIJ, FinCEN found that the al-Qassam Brigades began Convertible Virtual Currency fundraising in early 2019 with advertisements on Twitter to "Donate to Palestinian Resistance via Bitcoin."[45]

---

[43] https://www.justice.gov/archives/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-announcing-binance-and-ceo-guilty#:~:text=In%20a%20February%202019%20chat,illicit%20proceeds%20on%20its%20exchange.

[44] https://www.occ.treas.gov/topics/supervision-and-examination/bank-operations/financial-crime/suspicious-activity-reports/index-suspicious-activity-reports.html.

[45] https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf, page 46 *citing* Department of Justice, Global Disruption of Three Terror Finance Cyber-Enabled Campaigns (Aug. 13, 2020).

166.    PIJ, the other primary actor in the October 7th Attack, was also on both Binance's and FinCEN's radars. FinCEN's investigation identified dozens of former Binance users with tens of millions of dollars in transactions with an identified PIJ network. Binance failed to file an SAR with FinCEN with respect to this activity.[46]

167.    Binance also failed to file an SAR with FinCEN regarding its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising, as well as ties to al-Qaeda and ISIS.

168.    Prior to OFAC's designation of BuyCash, Binance was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file an SAR with FinCEN.

169.    As has already been established via federal enforcement actions, Defendants knowingly facilitated transfers of money to Hamas over the course of more than five years and its Chief Executive Officer, Chief Compliance Officer, compliance personnel and rank-and-file employees knew that its operations were being used to fund Hamas, as well as other FTOs.

170.    In fact, the facilitation of payments to Hamas was so ingrained at Binance that even common banter among its employees demonstrates Defendants' knowledge, both actual and constructive, that its infrastructure was being used for

---

[46] https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf at page 47.

illegal payments and remittances to FTOs.

171.    FinCEN identified hundreds of thousands of direct, randomly matched internal trades through Binance's matching engines between U.S. users and Iranian users. As noted above, FinCEN has repeatedly warned about risks associated with transactions conducted with Iran. FinCEN named Iran a jurisdiction of "primary money laundering concern" in a rulemaking finalized in 2019.

172.    FinCEN further found that Binance users effected transactions with Iranian Convertible Virtual Currency exchanges without filing SARs. Binance user wallets affected a significant volume of direct transactions with various Iranian CVC exchanges, each worth more than $2,000 and in the aggregate worth the equivalent of over half a billion dollars. The total also includes several transactions with CVC wallets associated with sanctioned entities and individuals, including: (i) EnExchanger, an Iranian entity designated for assisting the cyber actors behind the SamSam ransomware attacks; and (ii) Ahmad Khatibi Aghada, an individual associated with the sanctioned IRGC that engaged in ransomware activities. Binance failed to file SARs with FinCEN on any of these transactions, even after OFAC's designations.

173.    Binance was similarly aware of other Iran-related illicit transactions that occurred on theBinance.com platform but filed no SARs with FinCEN. For example, prior to the institution of full KYC, IranVisaCart, and other illicit actors

Case 2:24-cv-00134-ECM-CWB   Document 84   Filed 05/05/25   Page 61 of 117

maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC.

174.   Binance was made aware of these accounts and the related illicit transactions as early as 2019 and filed no SARs with FinCEN.

175.   BAM Trading was an integral part of this operation. As FinCEN noted, the necessity to have an entity that can attract high value U.S. consumers, enable the transition of those consumers to a non-compliant platform that allows for violative remittances while shielding the non-compliant entity's activities from view was "one of the purposes of having BAM in place."[47]

176.   BAM Trading was a critical component of Binance's deliberate strategy to subvert U.S. financial regulations. As FinCEN concluded, one of the central purposes of establishing BAM Trading was to serve as a front—attracting high-value U.S. customers under the false pretense of regulatory compliance, only to funnel them toward Binance's non-compliant international platform.

177.   BAM Trading's U.S. customers were critical to Binance's ability to maintain liquidity. As a result, and as determined by the SEC, the DOJ, and the CFTC, Binance considered many of these U.S. customers to be its high-volume "VIPs." Binance gave these users this moniker because these U.S.-based users were critical for Binance's ongoing operations in that they provided Binance with the

---

[47] FinCEN Consent Order at page 46.

critical liquidity it needed to efficiently, cost-effectively, and profitably process trades.

178.   In fact, BAM Trading was a Binance CZ-operated smokescreen for Binance's other U.S.-based activities.

179.   Because CZ controlled BAM Trading's business, which was largely operated by Binance employees under CZ's direction, BAM Trading became an instrument to attract U.S. clients in order to enable those clients to remit to sanctioned entities such as Hamas and the destinations in Iran.

180.   To do this, CZ and Binance exercised total fiscal, operational and technological control of BAM Trading. In fact, Binance's own Terms of Use refer to BAM as a "fiat gateway" for Binance. CZ and Binance created BAM Trading so that they could own a vehicle that qualified to be a licensed money remitter in order to do business with U.S. entities wishing to send funds to illegal destinations, including to designated FTOs.

181.   Any differentiation between BAM Trading is purely cosmetic. According to a June 10, 2023 article on Forbes.com titled *5 Most Surprising Revelations from the SEC's Binance Lawsuit*, Brooks who resigned as CEO three months after taking the job, said that "what became clear to me at a certain point was CZ was the CEO of BAM Trading, not me."

182.   BAM Trading was never an independent entity, but rather, as its own

executives and employees acknowledge, a tool of CZ and Binance in their larger global criminal enterprise.

183.    Without BAM Trading to own, control and manipulate, Binance and CZ would have no access to U.S. consumers as no compliant entity would exist for them to present in U.S. markets. Once BAM Trading reeled in a wealthy U.S. consumer, CZ and Binance, as the de-facto management of BAM Trading, provided these consumers with the ability to remit funds to OFAC-sanctioned individuals and entities. Accordingly, BAM Trading, CZ, and Binance worked in concert with no entity able to succeed without the participation of the other two.

184.    Management and ownership as between BAM and the Binance-branded U.S. entities is essentially identical and the flow of funds and operations of these entities share CZ as it sole managerial and ownership fulcrum.

185.    BAM Trading, the other Binance-branded U.S. entities, and the Binance.com platform operated by Binance Holdings functioned not as separate and distinct legal entities, but as a single, integrated enterprise unified through their common ownership, control, and operational interdependence. All were managed by CZ, who acted as the singular point of authority and control across these entities. Strategic decisions, financial flows, compliance policies (or lack thereof), and infrastructure were centralized under CZ's direction. This unity of interest and ownership, combined with a disregard for corporate separateness, justifies treating

63

these entities as a single enterprise for purposes of liability, including liability for the unlawful financing of terrorist organizations.

186.  Binance, having effectively neutered and sidelined BAM Trading's personnel from the outset, ran BAM Trading as a law-breaking confederate of Binance.

187.  Moreover, according to the SEC, BAM Trading and BAM Management touted the surveillance and controls supposedly in place to prevent manipulative trading and ensure proper compliance on the Binance.US Platform while failing to implement on the Binance.US Platform the required controls BAM promoted to consumers. In fact, BAM was the "stalking horse", at all times under the control of Binance and CZ, used to attract U.S. consumers with BAM Trading's ostensible management no more than a façade obscuring the criminal activities of Binance and CZ.[48]

188.  Binance dominated BAM Trading's remittance operation so as to enable U.S. consumers to remit money to FTO entities such as Hamas and PIJ away from the eyes of law enforcement but openly and notoriously under the eyes of Binance's faux compliance personnel.

189.  FinCEN further noted that for a substantial portion of the Relevant Time Period, BAM Trading personnel were unable to access key data about BAM

---

[48] SEC Complaint at ¶ 11, 12.

Trading's own operations without going through Binance.com personnel based in China, even when that data was needed to respond to U.S. regulatory requests.[49]

190.    FinCEN further found that correspondence between Binance senior management indicates that certain of them endorsed the "Tai Chi Presentations" whereby a puppet company would be used to conceal Binance's criminal activity.

191.    After launching BAM Trading, Binance's former Chief Compliance Officer wrote to Binance's then-CFO: "Our downside now is we cannot acknowledge US presence (even historical) on [Binance].com . . . If US regulators want to hit you for [Binance].com's sins of the past, guess what[?] you have a direct avenue in BAM [Binance.us] for them to reach/hammer you." The then-CFO responded, "[t]hat was one of the purposes of having BAM in place."[50]

192.    According to the June 23, 2023 Complaint filed by the SEC,

As one part of this plan to evade United States regulatory oversight over CZ, Binance, and the Binance.com Platform, CZ and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.us Platform. Behind the scenes, however, CZ and Binance were intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.us Platform. BAM Trading employees referred to CZ's and Binance's control of BAM Trading's operations as "shackles" that often prevented BAM Trading employees from understanding and freely conducting the business of running and operating the Binance.US

---

[49] *Id* at footnote 37.
[50] https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf at page 2.

Platform—so much so that, by November 2020, BAM Trading's then-CEO told Binance's CFO that her "entire team feels like [it had] been duped into being a puppet.[51]

193.  CZ, and numerous Binance personnel working at CZ's direction, developed and planned the launch of the Binance.US Platform. They designed and implemented all aspects of platform operations, including managing customer access, arranging fiat services with U.S. banks, establishing crypto asset wallets, developing a trading engine, and developing the platform's trade clearing and settlement functions.

194.  In fact, the SEC Complaint includes allegations that Binance "held and controlled BAM data offshore"[52], and had authority over BAM's bank accounts, expenses, and cryptocurrency assets in BAM users' accounts, and, at least through much of 2021, BAM Trading employees could not obtain certain real-time trading data for the Binance.US  Platform without CZ's personal approval.

195.  On November 21, 2023, CZ pled guilty to willful violations of the Bank Secrecy Act. CZ was also a named party with "control person" liability in regulatory settlements with Binance. CZ has since served a four-month sentence of incarceration. While no longer Binance's CEO, he retains an overwhelming ownership interest in Binance, and de facto control over the enterprise and its

---

[51] SEC Complaint at ¶ 7.
[52] SEC Complaint at ¶ 158.

operations.

196.    It was reported that CZ retained an ownership stake exceeding 80%.
This level of ownership enables him to exert significant influence over strategic
decisions, personnel, and the financial operations of Binance, and underscores that
his departure from day-to-day operations did not sever his control over the
enterprise. As part of a coordinated resolution with the DOJ, FinCEN, and OFAC,
Binance admitted that CZ exercised "significant control" over all Binance entities
and that his leadership directly contributed to years of compliance failures. CZ was
also designated a "control person" in parallel SEC and CFTC actions, confirming
his individual accountability for Binance's unlawful conduct. Although CZ stepped
down as CEO as part of the plea agreement, he retained an ownership stake reported
to be over 80%, making him the controlling shareholder. This level of equity confers
continued authority over Binance's strategic direction, board composition, and
financial operations, effectively ensuring that Binance remains under CZ's
dominion. His overwhelming ownership interest, in the wake of admitted criminal
conduct, raises grave concerns about the company's ongoing ability to function as a
lawful and independent entity.

197.    Binance and CZ, along with former executive Samuel Lin, are presently
also defendants in a civil action brought by the Commodity Futures Trading
Commission ("CFTC") on March 27, 2023, in The United States District Court for

the Northern District of Illinois for its violations of U.S. law in using BAM Trading,

which CZ dominated, to violate U.S. law. The Complaint states that

> In 2019, Zhao and BAM Trading launched Binance.US, a digital asset
> spot market trading platform that offers its services to U.S. customers.
> When he hired BAM Trading's first CEO, Zhao described Binance as
> a pirate ship and explained that he wished for Binance.US to be a navy
> boat. BAM Trading is under common ownership and control with
> Binance and continues to operate the Binance.US spot platform.
> Binance personnel, including Zhao, have dictated Binance. US's
> corporate strategy, launch, and early operations. At Zhao's direction,
> Binance.us's marketing and branding has mirrored that of
> Binance.com. BAM Trading has licensed Binance's trademarks to
> advertise in the United States. Binance.US has also relied on one of
> Binance's matching engines through a software licensing agreement.[53]

198.   In a Consent Order Imposing a Civil Monetary Penalty (the "FinCEN

Consent Order") pursuant to Binance's November 21, 2023 plea agreement with

FinCEN, the Order states that

> "Binance failed to file SARs with FinCEN on significant sums being
> transmitted to and from entities officially designated as terrorist organizations
> by the United States and United Nations, as well as high-risk exchanges
> associated with terrorist financing activity. Binance user addresses were found
> to interact with bitcoin wallets associated with the Islamic State of Iraq and
> Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and PIJ. The al-Qassam
> Brigades' CVC fundraising began in early 2019 with advertisements on
> Twitter to "Donate to Palestinian Resistance via Bitcoin."[54]

199.  FinCEN observed multiple direct bitcoin transactions worth over

$2,000 with these CVC wallets during the relevant time period. Binance received

---

[53] CFTC Complaint: March 27, 2023 at ¶ 81.
[54] FinCEN Consent Order pages 45-46.

reports from its third-party service provider in April 2019 identifying Hamas-associated transactions and filed no SARs with FinCEN. Instead, Binance's former Chief Compliance Officer attempted to influence how its third-party service provider reported on Binance's conduct.[55]

200.   FinCEN further found that BAM Trading was utilized by Binance in furtherance of its criminality stating:

> Binance.us has generally lacked autonomy from Binance in two key respects: (i)Binance.us is dependent on Binance for several business-critical services, including the provision of wallet software services, as well as various IT and software-related services (such as Binance.us's reliance on Binance.com's matching engine, risk control center, and Android/iOS mobile applications to operate); and (ii) Binance.us's board of directors has always consisted of only three individuals: Binance.us's CEO, the CEO of Binance.com, and a third director affiliated with Binance.com. This lack of independence allowed Binance's CEO to use Binance.us to facilitate activity of his proprietary trading firms: Sigma Chain AG (Sigma Chain) and Merit Peak Limited (Merit Peak).  Moreover, because Merit Peak also functioned as Binance.com's over-the-counter (OTC)trading desk, Merit Peak was able to use Binance.us as a way for Binance.com to continue to access the U.S. CVC market.

201.   Binance also failed to file an SAR with FinCEN on its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising, .

202.   Prior to OFAC's designation of BuyCash, Binance was aware of

---

[55] *Id* at 46.

extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file an SAR with FinCEN.

203.   Similarly, Binance failed to file SARs with FinCEN on transactions involving two Syria based money transmitters, primarily in 2019 and 2020. Based on public reporting, one of these Syria-based money transmitters operates a 24-hour phone line to assist clients—including Russian speaking foreign fighters—in setting up accounts on Binance. Both money transmitters' ties to terrorist financing have been widely reported for years, including ties to al-Qaeda campaigns that were the subject of a significant DOJ action unsealed in August 2020. In sum, Binance failed to file SARs with FinCEN on these transactions and or notify even one customer involved in suspicious activity. Binance's current compliance program would prohibit the users described above from remaining on the platform or removing funds.

204.   FinCEN identified hundreds of thousands of direct, randomly matched internal trades through Binance's matching engines between U.S. users and Iranian users. As noted above, FinCEN has repeatedly warned about risks associated with transactions conducted with Iran. FinCEN named Iran a jurisdiction of "primary money laundering concern" in a rulemaking finalized in 2019. Of particular concern to FinCEN is that Binance users affected transactions with Iranian CVC exchanges without filing SARs: Binance user wallets effected a significant volume of direct

transactions with various Iranian CVC exchanges, each worth more than $2,000 and in the aggregate worth the equivalent of over half a billion dollars. No SARs were filed with FinCEN.

205.   Binance was similarly aware of other Iran-related illicit transactions that occurred on the Binance.com platform but filed no SARs with FinCEN. For example, prior to the institution of full KYC, IranVisaCart, and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC.

206.   Binance was made aware of these accounts and the related illicit transactions as early as 2019 and filed no SARs with FinCEN.

207.   Binance also failed to file an SAR with FinCEN on its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising, as well as ties to al-Qaeda and ISIS.

208.   Prior to OFAC's designation of BuyCash, Binance was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file an SAR with FinCEN.

209.   Similarly, Binance failed to file SARs with FinCEN on transactions involving two Syria based money transmitters, primarily in 2019 and 2020. Based on public reporting, one of these Syria-based money transmitters operates a 24-hour phone line to assist terrorist clients in setting up accounts on Binance. Both money

transmitters' ties to terrorist financing have been widely reported for years, including ties to al-Qaeda campaigns that were the subject of a significant DOJ action unsealed in August 2020.

210.  On November 21, 2023, Binance pled guilty to Money Laundering, Unlicensed Money Transmitting, and Sanctions Violations and agreed to pay over $4 billion to resolve the Justice Department's investigation into violations related to the Bank Secrecy Act (BSA), failure to register as a money transmitting business, and the International Emergency Economic Powers Act (IEEPA).[56]

211.  Binance's guilty plea was part of coordinated resolutions with FinCEN, the Office of Foreign Assets Control (OFAC) and the CFTC.

212.  CZ also pled guilty to failing to maintain an effective anti-money laundering (AML) program, in violation of the BSA and has resigned as CEO of Binance.

213.  BAM Trading's complicity stems from its lack of any <u>credible</u> pretense of independence from Binance and CZ.  Even after Binance began to take steps to offboard U.S. users from the Binance.com platform, the company retained lucrative high volume and liquidity-providing U.S. consumers by soliciting them via the BAM Trading platform and subsequently directing them to transition to a non-complaint platform that it knew remitted funds to sanctioned individuals and destinations

---

[56] https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

including terrorist organization like Hamas and PIJ.

214.   As late as July 2020, in response to a question from a Binance employee about how to onboard a new U.S. user, the then-CCO stated, "we ask them to onboard with [Binance.]US, and then if their volume is really very big, we will push hard on [the] .com side [the Binance platform] to accept it on an exceptional basis." Thus, Binance allowed U.S. users on the BAM Platform it controlled to transact on the Binance.com platform with inadequate controls in place to prevent those users from trading with users in sanctioned countries and blocked persons, and with the knowledge that funds were being remitted to sanctioned terrorist organizations and criminals.[57]

215.   The sum total of this structure amounts to BAM Trading, Binance, and CZ, all operating under the sole and absolute control of CZ and his selected Binance personnel to remit money to terrorists with complete knowledge as to (i) that money's destination, (ii) the identities of the recipients, (iii) the terrorist purposes to which that money would be used, as frequently proclaimed by the terrorist organizations themselves, and (iv) the likely ensuing mass murder, kidnapping, carnage, broken lives, and support of violent jihadi objectives via FTOs.

216.   As the fallout from these investigations and prosecutions continues to play out, the consequences for BAM Trading continue to emerge. Several states have

---

[57] https://ofac.treasury.gov/system/files/2023-11/20231121_binance.pdf.

terminated BAM Trading's money transmitter licenses with more likely to come.

**Bam Trading– A Criminal Puppet**

217.   As previously stated, BAM Trading, according to regulators and its own employees, is a puppet company controlled by CZ and Binance. Its sole function is to enable CZ and Binance to access U.S. consumers, many of which they then transitioned to the non-compliant Binance Platform in order to remit money to entities and regions prohibited by U.S. law.

218.   The Binance-affiliated platforms, including those operated by Binance's co-defendants herein, were in fact maintained and operated by a murky web of corporate entities, all of which are beneficially owned and controlled by CZ. These corporations were located in different jurisdictions but were all ultimately under CZ's preponderant ownership and sole control.

219.   Since inception, CZ has been BAM Management's beneficial owner, directly or indirectly owning between as much as 100 percent and approximately 81 percent of its equity. CZ, in addition to being Binance's founder, beneficial owner, and CEO, was Chairman of BAM Trading's and BAM Management's Boards of Directors at least until approximately March 2022.

220.   Since its inception, CZ has been the ultimate beneficial owner of BAM Management, at times owning 100% of its equity and retaining approximately 81% ownership through at least mid-2023. In addition to his ownership, CZ exercised

direct operational control over both BAM Management and BAM Trading, serving as Chairman of their Boards of Directors until at least March 2022. CZ's concurrent roles as founder, CEO, and controlling shareholder of Binance, alongside his leadership of BAM entities, eliminated any genuine corporate separation. Under his direction, there was extensive commingling of funds, personnel, technological infrastructure, and compliance functions between Binance and BAM Trading. Banking, receivables, payables, and market-making operations were coordinated and executed across supposedly distinct entities, often through Binance-controlled intermediaries like Merit Peak and Sigma Chain. This pervasive overlap and financial entanglement reflect a unified enterprise structure, rendering the BAM entities mere instrumentalities of CZ and Binance.

221.   According to the CFTC Complaint, CZ has managed all aspects of both Binance's and Binance.US' operations, stating in part: "CZ is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of [BAM]." According to the SEC Complaint, BAM Trading's second CEO testified to SEC staff that the level of connection between Binance and BAM was a "problem" and that he had concluded that BAM "need[ed] to migrate the technology to full [BAM] control."[58] As of at least BAM's second CEO's resignation in August 2021, no such transfer of control

---

[58] CFTC Complaint at ¶ 175.

had happened.

222.   In June 2019, CZ provided $500,000 in initial funding for the Binance.US Platform, and later he periodically injected additional funds, including through his entity Merit Peak. As of July 2020, CZ had contributed over $16 million to finance the Binance.US Platform's operations, which was critical for the Binance.US Platform to meet its ongoing expenses and maintain a degree of liquidity.

223.   According to the June 23, 2023, Complaint filed by the SEC,

> As one part of this plan to evade United States regulatory oversight over CZ, Binance, and the Binance.com Platform, CZ and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.US Platform. Behind the scenes, however, CZ and Binance were intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.US Platform. BAM Trading employees referred to CZ's and Binance's control of BAM Trading's operations as "shackles" that often prevented BAM Trading employees from understanding and freely conducting the business of running and operating the Binance.US Platform—so much so that, by November 2020, BAM Trading's then-CEO told Binance's CFO that her "entire team feels like [it had] been duped into being a puppet.[59]

224.   CZ, and numerous Binance personnel working at CZ's direction developed and planned the launch of the Binance.US Platform. They designed and implemented all aspects of platform operations, including managing customer

---

[59] SEC Complaint at ¶ 7.

access, arranging fiat services with U.S. banks, establishing crypto asset wallets, developing a trading engine, and developing the platform's trade clearing and settlement functions.

225.   CZ was involved in the hiring of BAM's first CEO, identified in the SEC Complaint as BAM CEO A, and upon information and belief is Catherine Coley ("Coley") who reported to and was directed by CZ and the Binance CFO throughout her tenure from June 2019 through about March 2021. She provided weekly updates to CZ and Binance concerning BAM's operations.

226.   As BAM CEO A testified, there was "significant opacity" with respect to the Binance.US Platform's trading data, and she "did not get answers from CZ on why or how or what we would need to do to be able to bring the data over" to the United States. She "wanted custody of the data and ability to interact with the raw data in real-time, as to my directions, not waiting on someone else's approvals," but she never received it. This is because she was only the nominal BAM Trading CEO, but CZ and his selected Binance minions, and no one else, ran BAM Trading.[60]

227.   Nor did the situation change when BAM CEO A's successor, identified in the SEC Complaint as "BAM CEO B", but is upon information and belief,  Brian Brooks, assumed the role in May 2021. BAM CEO B testified to SEC staff that the "level of …connection" between Binance and BAM Trading was a "problem" and

---

[60] SEC Complaint at ¶ 159.

that he had concluded that BAM Trading "need[ed] to migrate the technology to full [BAM Trading] control." That transfer of control had not happened at least as of BAM CEO B's resignation in August 2021.[61]

**Zhao and Binance Controlled BAM Trading's Bank Accounts and Finances**

228.    Until at least December 2020, BAM Trading personnel did not have any ability to control BAM Trading's bank accounts, including accounts through which funds deposited by customers with the Binance.US Platform were held and transferred.

229.    Instead, when BAM Trading opened bank accounts, Binance required that CZ and/or the Binance Back Office Manager have signatory authority over the accounts. In November 2019, BAM CEO A raised questions about this directive with the Binance CFO, noting that having a "non-US resident non-employee on the bank applications … will be a red flag for regulators and will open .com to US scrutiny," while also acknowledging "there is not that much separation internally" between Binance and BAM Trading.[62]

230.    On or around June 10, 2023, the SEC secured emergency relief in which all the defendants in its litigation against Binance Holdings Limited, BAM Management US Holdings Inc., BAM Trading Services Inc., and CZ agreed to

---

[61] SEC Complaint *at* ¶ 160.

[62] *Id. at* 166.

repatriate to the United States assets held for the benefit of customers of the Binance.US crypto trading platform. The order from the United States District Court for the District of Columbia also prohibits defendants BAM Trading Services Inc. and BAM Management US Holdings, Inc. from spending corporate assets other than in the ordinary course of business.

231.    In its statement, Gurbir S. Grewal, Director of the SEC's Division of Enforcement stated that with respect to BAM Trading, "[g]iven that Changpeng CZ and Binance have control of the platforms' customers' assets **and have been able to commingle customer assets or divert customer assets as they please**, as we have alleged, these prohibitions are essential to protecting investor assets."[63]

232.    According to the CFTC Complaint, "Binance personnel, including [CZ], have dictated [BAM's] corporate strategy, launch, and early operations. At [CZ's] direction, [BAM's] marketing and branding has mirrored that of Binance.com. [BAM] has licensed Binance's trademarks to advertise in the United States. [BAM] has also relied on one of Binance's matching engines through a software licensing agreement."[64]

233.    As an example of Coley's powerlessness over BAM's affairs, including the prevention of Binance from reaching out in BAM's name to facilitate consumers'

---

[63] https://www.sec.gov/newsroom/press-releases/2023-110.
[64] CFTC Complaint at ¶ 81.

circumvention of OFAC rules, in the first three months of 2021, Binance transferred more than $400 million from BAM to Merit Peak Ltd, the trading firm owned and managed by CZ.

234.   A portion of these funds were later sent to the Silvergate Bank account of a Seychelles-incorporated firm called Key Vision Development Limited, which was another entity controlled by CZ.

235.   In a February 16, 2023, article on CNBC.com, the article notes that Binance enjoyed secret access to the bank account of its "purportedly independent U.S. partner", BAM Trading, over the first three months of 2021, transferred $400 million flowed from the Binance.US account at California-based Silvergate Bank to Zhao-owned, Merit Peak Ltd.[65]

236.   However, BAM Trading's public terms of use at the time said its customers' dollar deposits were held at Silvergate and a Nevada-based custodian firm called Prime Trust LLC.

237.   The Binance.US account was registered under the name of BAM Trading, the U.S. exchange's operating company, according to the records. Company messages show the transfers to Merit Peak began in late 2020.

238.   Binance.US' executives were concerned by the withdrawal because the

---

[65]   https://www.cnbc.com/2023/02/16/crypto-giant-binance-moved-400-million-from-us-partner-to-firm-managed-by-ceo-zhao.html.

transfers were taking place without their knowledge.

239.   Coley, still under the deluded belief that she ran BAM Trading, wrote to a Binance finance executive in late 2020 asking for an explanation for the transfers, calling them "unexpected" and saying, "no one mentioned them." "Where are those funds coming from?"[66] she wrote in one message.

240.   In a response to Coley, seen by Reuters, the Binance executive, Susan Li, did not explain the transfers. Li wrote that Merit Peak was a "vendor that facilitated trading" on Binance.US and also provided loans and capital injections to the American exchange.[67]

241.   Coley, who left Binance.US later in 2021, did not respond to questions from Reuters sent via her legal representatives. Li also didn't respond.

242.   No entity, including Reuters, which was actively investigating the matter, could determine what became of the $400 million. An unspecified portion of the money was subsequently sent to the Silvergate account of a Seychelles-incorporated firm called Key Vision Development Limited, according to a person with direct knowledge of the transfers.

243.   A 2021 corporate filing by another Binance unit identified CEO CZ as

---

[66] https://www.straitstimes.com/world/united-states/crypto-giant-binance-moved-535-million-from-us-partner-to-firm-managed-by-ceo-changpeng-zhao.
[67] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

a director of Key Vision. A former Silvergate executive confirmed that Key Vision held an account at Silvergate at the time.

244.    Susan Li, the Binance finance executive, had access to the Binance.US Silvergate account, however, along with several senior Binance.US employees, according to the messages and the person with direct knowledge of the transfers. In one message, a Binance.US finance manager asked Li to give another Binance.US employee authority to approve payments from the account. A 2021 Binance.US document that described the American exchange's technology architecture identified Silvergate as a payment channel controlled at the time by Binance.com.

245.    At all relevant times, Susan Li, a Binance finance executive, had full access to the BAM Trading's account at California-based Silvergate Bank.[68] On March 8, 2023, Silvergate Bank announced that it would wind down operations and liquidate.[69]

246.    On June 5, 2023, Reuters reported in an article titled *Crypto giant Binance controlled "independent" U.S. affiliate's bank accounts*, that Binance executive Guangyin Chen was authorized by Silvergate Bank to operate five bank accounts belonging to BAM: "Employees at the affiliate, [BAM], had to ask Chen's

---

[68] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

[69] Church, Steven (March 8, 2023), "Silvergate Slides on Plan to Wind Down Bank Operations and Liquidate," Bloomberg News.

team to process payments, even to cover the firm's payroll, company messages show."[70]

247.    According to the CFTC Complaint, CZ micromanaged all aspects of Defendants' operations. For example, in January 2021, a month in which Binance earned over $700 million in revenue, CZ personally approved an approximately $60 expense related to office furniture. Moreover, according to the SEC Complaint, CZ's approval was required for all BAM expenditures over $30,000 through at least January 30, 2020. BAM regularly sought approval from CZ and Binance concerning routine business expenditures including rent, franchise taxes, legal expenses, Amazon Web Services fees to host BAM customer data, and even an $11,000 purchase of Binance branded hooded sweatshirts.

248.    According to the SEC Complaint, BAM "employees referred to [CZ's] and Binance's control of [BAM's] operations as 'shackles' that often prevented [BAM] employees from understanding and freely conducting the business of running and operating the Binance.US platform – so much so that, by November 2020, [BAM's] then-CEO told Binance's CFO that her 'entire team feels like [it had] been duped into being a puppet.'"

249.    The same day the Binance.US platform was announced, a consultant

---

[70]    https://www.reuters.com/technology/crypto-giant-binance-controlled-independent-us-affiliates-bank-accounts-2023-06-05/.

for Binance provided Binance with internal guidelines advising that: "On the U.S. launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors]. That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work."[71]

250.   Binance, under CZ's control, was integrally involved in managing and operating the trading functions on the Binance.US Platform. As BAM Trading's former Director of Operations testified under oath, Binance personnel were responsible for the Binance.US Platform's matching engine, APIs, and market data systems. These Binance personnel "operate independently of" BAM Trading, such that BAM Trading only "would talk to [Binance personnel] when we [were] adding a new token [for trading on the Binance.US Platform] or when there was an upgrade or if a market maker had some issue with the API."[72] CZ gave final signoff on various decisions relating to the Binance.US Platform's trading services, including customer account opening processes, development of the front-end access, and creating a reserve to cover ACH deposits.

251.   Until at least December 2020, BAM Trading personnel did not have any ability to control BAM Trading's bank accounts, including accounts through which funds deposited by customers with the Binance.US Platform were held and

---

[71] https://www.courthousenews.com/wp-content/uploads/2023/11/binance-sec-complaint.pdf.
[72] https://hackernoon.com/how-the-binance-mothership-exerted-substantial-control-over-its-us-partner-from-the-shadows.

transferred.

252.  Instead of giving BAM Trading personnel authority over BAM Trading's bank accounts, Binance required the CEO referred to in the SEC Complaint as "BAM CEO A", but upon information and belief is Coley, to come up with an alternative to allow Binance to maintain authority over the bank accounts without eliciting regulatory scrutiny.

253.  In response, BAM CEO A proposed that "[w]e really only need [BAM Trading's Finance Director] on client account as that's the only account regulators will be looking at."[73]

254.  As a result, until at least December 2020, the Binance Back Office Manager continued to be a signatory on BAM Trading's bank accounts. And until at least July 2021, she was also a signatory on BAM Trading Trust Company B accounts that contained Binance.US Platform customers' fiat deposits.

255.  Binance's Shanghai-based finance team managed payment of BAM Trading's expenses, including by executing money transfers between bank accounts and depositing cash injections from Merit Peak when BAM Trading operating funds were low.

256.  Given its control over BAM Trading's bank accounts, Binance's

---

[73] https://hackernoon.com/how-the-binance-mothership-exerted-substantial-control-over-its-us-partner-from-the-shadows.

finance team was also able to make substantial fund transfers without BAM Trading's knowledge. For example, in June 2020, when Trust Company B alerted BAM CEO A that BAM Trading's internal transfers had increased from approximately $10 million per day to $1.5 billion per day, BAM CEO A had no knowledge of such transfers, was unable to verify them because she lacked appropriate account access, and, as a result, had to ask Binance (a purportedly separate and distinct company) about the transfer of billions of dollars in BAM Trading's own accounts.[74]

257.   Similarly, in December 2020, Binance transferred $17 million from BAM Trading's bank accounts to Merit Peak. After learning of the transfer, BAM CEO A asked Binance employees about the transaction and eventually learned that the transfer related to Merit Peak's trading on the Binance.US Platform. BAM CEO A responded, "thanks – helpful. Just had to get explanation anytime someone breaking our limits with massive withdraw[als] I have to ask – where you get that kind of money? And where is it going? . . . haha [I'm] on a wildgoose chase to make sure we have knowledge of where $17M is moving around."[75]

258.   Starting in or about December 2020, Binance permitted BAM Trading personnel to assume control over certain of BAM Trading's bank accounts, but as

---

[74] https://hackernoon.com/how-the-binance-mothership-exerted-substantial-control-over-its-us-partner-from-the-shadows.

[75] https://www.theverge.com/2023/6/5/23749596/sec-binance-lawsuit-crypto-exchange-allegations.

of May 2023, CZ still had signatory authority over BAM Trading's account that held Binance.US Platform customers' funds.

259.   In addition to controlling BAM Trading bank accounts that held customer funds, at least through December 2022, Binance was the designated custodian for crypto assets deposited, held, traded, and/or accrued on the Binance.US Platform.

260.   Internal communications indicate that BAM Trading and Binance understood that Binance is the custodian of all funds with CZ controlling the flow of funds. Binance had sufficient control to manage and authorize the transfer of crypto assets, including between various omnibus wallets, without the need for any authorization from BAM Trading.

261.   During this time, BAM Trading was trading crypto assets, and almost all the employees working on clearing and settlement for spot trading on the Binance.US Platform were in fact Binance employees located outside of the United States, primarily in Shanghai.

262.   At least as of the beginning of June 2023, these crypto assets are not all within the exclusive custody and control of BAM Trading personnel within the United States. This custody arrangement and lack of controls pose substantial risk to U.S. customers. Binance.US Platform customers have no agreement with either BAM Trading or Binance relating to the custody of crypto assets that they deposit

and store through the Binance.US Platform. Customers are provided little, if any, information about the digital wallets where these crypto assets are held or about how their crypto assets are stored, secured, and transferred. Indeed, BAM Trading and Binance have not disclosed Binance's responsibilities and ongoing involvement in the custody and control of these crypto assets or their participation in the Binance.US Platform's staking-as-a-service program and custody and control of crypto assets that are staked or accrued as part of that investment program.

263.   This arrangement has given and continues to give CZ and Binance free reign to handle billions of dollars of crypto assets that customers have deposited, held, traded, and/or accrued on the Binance.US Platform with no oversight or controls to ensure that the assets are properly secured.

264.   BAM Trading, Binance, and CZ were well aware that Binance's custody and control over fiat and crypto assets deposited, held, traded, and/or accrued on the Binance.US Platform created significant risks for Binance.US Platform investors. Indeed, in a May 2, 2020, letter to BAM Management's board, the firm that audited BAM Trading's financial statements (the "Audit Firm") identified for the company numerous internal control deficiencies, including that an employee from Binance is the approver on BAM Trading's bank account and recommended handing over that role to someone at BAM Trading.

265.   The following year, the Audit Firm continued to identify significant

weaknesses in controls with respect to custody of digital assets. On May 20, 2022, in its third letter identifying weakness for the company, the Audit Firm found that BAM Trading did "not have much visibility into on-chain activity related to its own exchange but is dependent on a Binance-designated .COM custodian to tell them the addresses holding the assets, or other relevant metrics."[76]

266.   That Audit Firm did not continue its engagement after November 2022. BAM's new auditor stated in BAM Trading's audited financials for the year ending December 31, 2022, that Binance remained the custodian of all of BAM Trading's crypto assets, including crypto assets deposited, held, traded, and/or accrued by customers, until at least December 2022. As of at least June 3, 2023, Binance continues to participate in the custody and control of BAM Trading.

267.   From the earliest days of the Binance.US Platform, CZ directed BAM Trading to onboard two market makers that he owned and controlled: Sigma Chain and Merit Peak. Both entities were operated by several Binance employees who worked at CZ's direction, including the Binance Back Office Manager, who, at least until December 2020, also had signatory authority over BAM Trading's U.S. Dollar accounts.

268.   The Binance.US Platform has throughout its existence operated using

---

[76] https://hackernoon.com/how-the-binance-mothership-exerted-substantial-control-over-its-us-partner-from-the-shadows.

Binance's matching engine software, digital wallet, clearing and settlement technology, trademarks, and related technology support and hosting environment, all of which were created, deployed, and maintained by Binance engineers and other employees at CZ's direction and input.

269.   CZ is Sigma Chain's beneficial owner, and several Binance employees conducted its operations.

270.   Among others, Binance's back-office manager ("Binance Back Office Manager") was Sigma Chain's President at the same time she also had signatory authority over BAM Trading's bank accounts. Sigma Chain was an active trader on both Binance and BAM Trading Platforms and described itself as "the main market maker for Binance.com." Upon the Binance.US Platform's launch, CZ directed that Sigma Chain be one of its first market makers.

271.   Further, since the Binance.US Platform began offering OTC trading and its Convert Trading and OneClick Buy Sell ("OCBS") Services to customers, Sigma Chain has served as one of the counterparties to Binance.US Platform customers, including, at times, serving as the only counterparty.

272.   CZ is Merit Peak's beneficial owner, and several Binance employees conducted its operations. It has described itself as "a proprietary firm trading without owner's [CZ's] self-made wealth from the digital asset business." Merit Peak was an OTC trading service provider on the Binance.com Platform and was one of the

earliest market makers on the Binance.US Platform. Through Merit Peak, CZ has also directed over $16 million to BAM Management to fund the Binance.US Platform's operations

273.    BAM Trading's relationships with Sigma Chain and Merit Peak aligned with the Tai Chi Plan strategy to rely upon "trusted" market makers for the U.S.-based crypto platform.

274.    As CZ characterized it, Sigma Chain needed to be a market maker on the Binance.US platform because it was Binance's "own" market maker, compared to those an "arm['s] length away."

275.    Merit Peak and Sigma Chain were active traders on the Binance.US Platform.

276.    Merit Peak traded on it at least from November 15, 2019, to June 10, 2021. Until at least April 2022, Sigma Chain was a frequent spot trader on the Binance.US Platform, and it also continues to serve as a counterparty for certain OTC trading, and the Convert and OCBS services on the Binance.US Platform.

277.    Indeed, BAM CEO B expressed concerns to CZ about Merit Peak's and Sigma Chain's activity on the Binance.US Platform. As he testified under oath, "To the extent that these two liquidity providers were significant sources of liquidity, meaning that our customers couldn't, you know, clear orders without the presence of those makers on our platform, I thought that was a real problem. It suggested that

the company was, in fact, heavily dependent on CZ, not just as a control person but also as an economic counterparty and that is problematic, so I thought we needed to look into deplatforming them."[77]

278.   BAM Trading's relationships with Sigma Chain and Merit Peak aligned with the Tai Chi Plan strategy to rely upon "trusted" market makers for the U.S.-based crypto platform.

279.   As CZ characterized it, Sigma Chain needed to be a market maker on the Binance.US platform because it was Binance's "own" market maker, compared to those an "arm['s] length away."

280.   CZ rejected BAM CEO A's and BAM CEO B's Efforts to Give BAM any "Independence" from CZ and Binance.

281.   Over time, BAM Trading's employees became increasingly dissatisfied with BAM Trading's and the Binance.US Platform's lack of independence and CZ's and Binance's exertion of substantial oversight and control over the company's day-to-day operations.

282.   In January 2020, BAM Trading employees started compiling a list of "shackles," i.e., functions "that require [Binance personnel's] answers, access, approval, funding," which demonstrated BAM Trading's lack of independence and knowledge as to the platform's operations. They noted, for example, BAM Trading's

---

[77] https://www.theverge.com/2023/6/5/23749596/sec-binance-lawsuit-crypto-exchange-allegations.

compliance team experiencing a "lack of respect and transparency between Asia/US teams"; the fact that BAM Trading was "not allow[ed] to expand US Financial Team domestically"; and BAM Trading's legal department needing a "[b]etter understanding" of BAM Trading's "internal controls/IT infrastructure."[78]

283.   BAM CEO A later reported to the Binance CFO that her "entire team is at their breaking point." The Binance CFO later remarked that "getting our independence takes time."

284.   In the ensuing months, BAM CEO A worked with her team to propose a plan for BAM Trading to take control of more of its operations. and dubbed this effort "Project 1776." As she told another BAM Trading employee in October 2020, "Project 1776 is for our independence."[79]

285.   While BAM CEO A was working on Project 1776, Forbes broke the Tai Chi Plan story, which the article described as Binance's plan "to intentionally deceive regulators and surreptitiously profit from crypto investors in the United States."

286.   The article intensified BAM Trading employees' concerns with CZ's and Binance's control over the business—demonstrating that this significant level of secret control remained. As BAM CEO A explained to the Binance CFO shortly

---

[78] SEC Complaint at ¶ 194.
[79] SEC Complaint at ¶ 197.

after the article was released, BAM Trading employees "lost a lot of trust with the article" and "the entire team feels like they've been duped into being a puppet."

287.    Binance, however, continued to resist efforts for independence. For example, on December 3, 2020, BAM CEO A reported to the Binance CFO that BAM Trading attempted to secure day-to-day and access of its clearing data from Binance's clearing personnel but that the Binance Back Office Manager and another Binance employee "were unwilling to share their screens at all, they were like yeah you don't need to know what we do day to day."

288.    On or around March 2021, CZ decided to replace BAM CEO A with BAM CEO B, who formally assumed his position by May 2021.

289.    When hired, BAM CEO B was aware of concerns about the relationship between Binance and BAM Trading and conditioned acceptance of the role on being able to run BAM Trading independently of CZ and Binance. Believing that he could accomplish this goal, BAM CEO B made several public statements that BAM Trading was "not an alter-ego of Binance."

290.    Upon assuming his CEO duties, however, BAM CEO B quickly learned that Binance, in fact, exerted and would not relinquish substantial control over BAM Trading and the operation of the Binance.US Platform. As he testified under oath, BAM CEO B did not "have any firsthand knowledge of exactly what [Binance] entity managed [Binance.US Platform's]servers," but he knew it "wasn't [BAM

Trading]." Similarly, he also testified that the matching engine was "presumably owned and administered by some [Binance] entity, but I have no idea which one, and then there's other servers doing other functions." He concluded, the "biggest risk in this company is we are highly dependent on a bunch of technology that sits in Asia."

291.   BAM CEO B tried to implement plans to migrate those functions and control of the crypto assets from Binance to BAM Trading and into the United States, but CZ quickly overruled him, causing BAM CEO B to resign approximately three months into his tenure.

292.   As BAM CEO B testified, "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me."[80] He further explained that he spent his first 80 days as CEO trying "to get these core foundational things realigned," but "was overruled on all of them" by CZ.[81]

293.   BAM CEO B elaborated, "All of the things that we had previously agreed and had worked on for 80 days were suddenly repudiated with no further discussion, and on that day, I realized, huh, I'm not actually the one running this company, and the mission that I believe Signed up for isn't the mission. And as soon

---

[80] https://blockworks.co/news/cz-ceo-bam-trading.
[81] SEC Complaint at 205.

as I realized that, I left."[82]

294.    Binance specifically admits in its November 21, 2023, Plea Agreement with the Department of Justice in the Western District of Washington that Binance and CZ, as well as other individuals, willfully failed to register as a money services business, violated the Bank Secrecy Act, and willfully caused violations of U.S. economic sanctions policy pursuant to the International Emergency Economic Powers Act ("IEEPA") in the United States in a manner designed to evade oversight while facilitating billions of dollars in transactions.

295.    As part of Binance's deal to plead guilty, CZ stepped down as CEO with a $50 million fine. The US Department of Justice, Treasury, and the Commodity Futures Trading Commission have imposed a record $4.4 billion fine on Binance, finding that it enabled the laundering of substantial sums of illicit money worldwide. Binance further agreed to maintain an effective anti-money laundering program and CZ has agreed to resign as part of his plea deal. The company has also agreed to enter into a number of anti-money laundering and sanctions compliance programs and retain an independent monitor for the next three years.

296.    In a February 16, 2023, article on CNBC.com, the article notes that Binance enjoyed secret access to the bank account of its "purportedly independent

---

[82] https://cryptonews.com/news/former-binance-us-ceo-brian-brooks-says-cz-was-charge-of-exchange-not-him/

U.S. partner", BAM Trading, over the first three months of 2021, and transferred $400 million from the Binance.US account at California-based Silvergate Bank to CZ-owned, Merit Peak Ltd. [83]

297.  BAM Trading's public terms of use at the time said its customers' dollar deposits were held at Silvergate and a Nevada-based custodian firm called Prime Trust LLC. Prime Trust made $650 million in wire transfer deposits into the Binance.US account during the quarter, the bank records show.[84]

298.  The Binance.US account was registered under the name of BAM Trading, the U.S. exchange's operating company, according to the records. Company messages show the transfers to Merit Peak began in late 2020.[85]

299.  Binance.US' executives were concerned by the outflows because the transfers were taking place without their knowledge, according to messages reviewed by Reuters. The CEO of Binance.US at the time, Catherine Coley, wrote to a Binance finance executive in late 2020 asking for an explanation for the transfers, calling them "unexpected" and saying "no one mentioned them." "Where are those funds coming from?" she wrote in one message.[86]

---

[83] https://www.cnbc.com/2023/02/16/crypto-giant-binance-moved-400-million-from-us-partner-to-firm-managed-by-ceo-CZ.html.

[84] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

[85] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

[86] https://www.straitstimes.com/world/united-states/crypto-giant-binance-moved-535-million-from-us-partner-to-firm-managed-by-ceo-changpeng-zhao.

300.   In a response to Coley, seen by Reuters, the Binance executive, Susan Li, did not explain the transfers. Li wrote that Merit Peak was a "vendor that facilitated trading" on Binance.US and also provided loans and capital injections to the American exchange.[87]

301.   Reuters was unable to trace what became of the $400 million. An unspecified portion of the money was subsequently sent to the Silvergate account of a Seychelles-incorporated firm called Key Vision Development Limited, according to a person with direct knowledge of the transfers. A 2021 corporate filing by another Binance unit identified CEO CZ as a director of Key Vision. A former Silvergate executive confirmed that Key Vision held an account at Silvergate at the time.[88]

302.   The money transfers demonstrate that the global Binance exchange, which is not licensed to operate in the United States, controlled the finances of Binance.US, despite maintaining that the American entity is entirely independent and operates as its "US partner."

303.   The transfers to Merit Peak took place on the bank's proprietary Silvergate Exchange Network (SEN), which Binance.US joined in November 2020, to serve its corporate clients. SEN allows these clients to transfer dollars between their accounts at the bank. Silvergate's investor prospectus says SEN transfers are

---

[87] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

[88] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

"push only," which means they must be authorized by the account's controller.

304.   The former Silvergate executive told Reuters the movement of funds from a company account without approval of that firm's management would be a breach of the bank's compliance rules. Silvergate's prospectus says "multiple steps are required to create, authorize and approve a SEN transfer." The Silvergate spokesperson didn't address the transfers in their response to Reuters.

305.   Over the January-March 2021 quarter, the Binance.US account received $1.3 billion in SEN transfers from corporate clients trading on Binance.US, along with the $650 million in wire transfer deposits from Prime Trust.

306.   Merit Peak was incorporated in the British Virgin Islands in January 2019. That December, CZ signed a purchase agreement for Merit Peak to invest $1 million into Binance.US operator BAM Trading's holding company in return for a portion of the holding company's preferred shares. The agreement identified CZ as Merit Peak's "Manager."[89]

307.   BAM Trading attracted U.S. consumers and, controlled by Binance and CZ, allowed its customers to transition to a non-compliant platform where, Binance knowingly facilitated the remittance of funds to FTOs engaged in terrorism with the tragic events of October 7, 2023, as a foreseeable result.

---

[89] https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

308.   The impact of BAM Trading's complicity in Binance's crimes via CZ's complete control over Bam Trading's operations continue to emerge.

309.   On June 17, 2024, the Commissioner of the North Dakota Department of Financial Institutions revoked the money transmitter license of BAM Trading, which is required to lawfully engage in the business of money transmission. A license is required under North Dakota Century Code Chapter 13-09.1.   The Commissioner found that BAM Trading Services, Inc. has failed to comply with North Dakota laws.

310.   Additionally, the Commissioner found that the majority beneficial owner and control person, CZ, has pled guilty to felony charges for violating the U.S. anti-money laundering laws.

311.   In its announcement, the North Dakota Department of Financial Institutions noted that it was joining Alaska, Florida, Maine, North Carolina, and Oregon, who had already taken similar actions to revoke or deny the renewal of BAM Trading Services' Money Transmission License.[90]

312.   In its accompanying order, the North Dakota Department of Financial Institutions found that

- Bam Trading has "Binance.US" listed as its registered trade name with the North Dakota Secretary of State;
- Bam Trading applied for, and was subsequently issued, a money transmitter license from the Department to conduct money transmission

---

[90] https://www.nd.gov/dfi/news/revocation-notice-bam-trading-services-inc-dba-binanceus.

services in the state of North Dakota and engaged in the business of money transmission services in North Dakota using the tradename Binance.US.

- Bam Trading was created as a separate legal entity from Binance.com in 2019, but Bam Trading shares a similar name to Binance.com, uses the same branding and copyrighted logos under license as Binance.com, engages in a similar business line as Binance.com, and uses Binance.com's proprietary software under license to conduct transactions for Binance.US.

- On or about November 21, 2023, in the case of United States of America v. Binance Holdings Limited, d/b/a Binance.com, No. 23-178RAJ, Binance.com pled guilty to numerous crimes, including the International Emergency Economic Powers Act and was sanctioned for the violations.

- Bam Trading is indirectly owned by Changpeng CZ ("CZ"), who exercised control over Bam Trading as outlined in N.D.C.C § 13-09.1-01(7).

- CZ is also the majority owner of Binance.com.

- On or about November 21, 2023, in the case of United States of America v. Changpeng CZ, No. CR23-17RAJ, CZ pled guilty to numerous crimes.

- While exercising control over Bam Trading, CZ plead guilty to an anti-money laundering violation: Failure to maintain an effective anti-money laundering program. Therefore, CZ failed to meet the character and general fitness standards required.

- Bam Trading has committed violations of the Money Transmitters Act under N.D.C.C. §§ 13-09.1-15, 13-09.1-16, 13-09.1-34, and 13-09.1-36.

- Pursuant to N.D.C.C. § 13-09.1-15(1), the Commissioner found that Bam Trading does not continue to meet the qualifications or satisfy requirements that may apply to an applicant for a new money transmitter license.

- The Commissioner further found that pursuant to N.D.C.C. § 13-09.1-15(2), Bam Trading has not met at all times the requirements set forth in section 13-09.1-34.

- Pursuant to N.D.C.C §§ 13-09.1-15(1) and 13-09.1-36, the conduct meets the criteria to revoke a license.

- The Order was issued in the public interest and for the protection of

money transmitter customers.[91]

313.   On August 1, 2024, BAM Trading voluntarily surrendered its Georgia money transmitter license pursuant to the terms of a Consent Order entered into with the Georgia Department of Banking and Finance.

314.   The Consent Order was entered to resolve a Notice of Intent to Revoke Money Transmitter License issued to BAM Trading on the grounds that the ultimate equitable owner of BAM Trading, Changpeng CZ, pled guilty to the felony offense of violating and causing a financial institution to violate the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., thereby placing CZ in violation of 31 U.S.C. §§ 5318(h), 5322(b), 5322(c), and 5322(3), 18 U.S.C. § 2, and 31 C.F.R. § 1022.210.[92]

317.   Under the terms of the Consent Order, BAM Trading terminated its money transmission services in Georgia. Additionally, BAM Trading will no longer onboard new Georgia users to the BAM Trading platform, and all Georgia users with a balance of $0 will be prevented from conducting any activity on the platform.[93]

## AIDING & ABETTING

318.   Access to outside funding is the lifeline of terrorist organizations, particularly when such organizations are designated as FTOs and therefore unable to raise money openly or through traditional means such as routine remittances,

---

[91] https://www.nd.gov/dfi/sites/www/files/documents/Orders/Order%20-%20Revocation%20Notice%20of%20Right%20to%20Request%20Hearing.pdf.
[92] https://dbf.georgia.gov/press-releases/2024-08-01/voluntarily-surrenders-georgia-license.
[93] *Id.*

fundraisers, payments for goods and services and donations.

319.    Terrorist organizations are designated as FTOs based upon the well-established premise that such FTOs' ability to terrorize their targets depends upon steady sources of revenue.

320.    Defendants not only <u>knowingly</u> provided Hamas and PIJ with a platform with which to illicitly accept funds from the United States in contravention of U.S. law, it also provided a means for them to accept funds from a worldwide network of remitters including from within Iran, the single largest sponsor of Hamas.

321.    Binance, which was at all times controlled by CZ, engaged in prodigious remittances of funds to OFAC-sanctioned individuals and entities while BAM Trading, controlled by Binance and CZ, promoted its platform in the U.S. and allowed Binance to dominate its business and transaction high-value customers from its platform to the Binance Platform.

322.    For most of the relevant period, BAM Trading's nominal executives were well aware that their company's operations were controlled by CZ and Binance with a high likelihood, almost a certainty, of illegality and irregularity.

323.    Defendants moreover discussed, planned and collaborated to continue processing transactions that they knew to be illegal, and Binance advised BAM Trading's customers as to how to avoid their own AML and U.S. regulations governing money laundering and terrorist financing while BAM Trading knowingly

witnessed the outflows of billions of dollars with the full knowledge, or what should have been full knowledge, that its operations were being put to illegal use.

324.    Such aid is not confined to the actual remittance of money to fund Hamas' and PIJ's activities. By subverting U.S. law, hiding its activities, suppressing the mandatory issuance of SAR's and repeatedly revising its services and infrastructure to evade regulatory authorities, Binance and the other Defendants in fact covered Hamas' and PIJ's financial tracks, thereby undermining the purpose of their designations as FTOs, making it harder for the U.S. government to cut off their finances and prevent future terrorist activity. Moreover, BAM Trading adhered to the impetus for which it was created, retarding and obscuring the ability of law enforcement to regulate and maintain visibility into a muti-billion-dollar money distribution operation on behalf of child slavers, drug cartels, terrorists and human traffickers.

325.    The result of this critical logistical and financial aid was borne out in the sophisticated October 7, 2023, attack on civilians in Israel by Hamas and PIJ which required highly expensive land, seaborne and airborne equipment and weaponry, extensive recruitment, training, and tactical coordination.

326.    Hamas and PIJ are in fact, trained, well-equipped, well- provisioned and funded, murderous and ruthless terrorist organizations, thanks to the deliberate and knowing facilitation by Defendants of Hamas' and PIJ's network of funding.

## MATERIAL SUPPORT

327.   Defendants provided material support in its most straightforward form to Hamas and PIJ – cash and cash equivalents which could be converted to U.S. Dollars. Binance and CZ, in full control of BAM Trading, directed and enabled U.S.-based customers to remit money to FTOs, including Hamas and PIJ, thereby providing the funds and materials necessary for the October 7th Attack. This money, moreover, supported Hamas and PIJ for years, enabled them to secure necessary materials and equipment, pay salaries, invest in training, underwrite their infrastructure and provide the lifeblood necessary for them to maintain and grow their operations. This material support has already been unequivocally proven by successive regulatory investigations over several years as well as by the self-congratulatory correspondence from within and among Defendants' employees who were aware that they were vital cogs in Hamas', PIJ's as well as other terrorist and criminal networks.

328.   For most of the relevant period, BAM Trading's nominal executives were well aware that their company's operations were controlled by CZ and Binance with a high likelihood, almost a certainty, of illegality and irregularity.

BAM Trading was therefore made a defendant in the SEC Complaint which included Binance and CZ.

329.   Defendants moreover discussed, planned and collaborated to continue

105

processing transactions that they knew to be illegal, and Binance advised BAM Trading's customers as to how to avoid their own AML and U.S. regulations governing money laundering and terrorist financing while BAM Trading knowingly witnessed the outflows of billions of dollars with the full knowledge, or what should have been full knowledge, that its operations were being put to illegal use..

330. Defendants violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, Defendants are liable pursuant to 18 U.S.C. § 2333 to the Plaintiffs, who were injured by reason of acts of international terrorism by those Defendants funded.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(A) AND (D)

331. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

332. Hamas emerged in 1987 during the first Palestinian uprising, or

intifada, as an outgrowth of the Muslim Brotherhood's Palestinian branch. The group is committed to armed resistance against Israel and the creation of an Islamic Palestinian state in Israel's place. PIJ seeks to establish an Islamist Palestinian state and is committed to the destruction of Israel. It was founded in 1979 and is the second-largest militant group in the Gaza Strip and the West Bank,

333.   Hamas has been the de facto governing body in the Gaza Strip since 2007, when it ousted the Palestinian Authority from power. Hamas and PIJ use improvised explosive devices, short-range and long-range rockets and mortars, small arms, kidnapping operations, rocket-propelled grenades, man-portable air defense systems, antitank missiles, and unmanned aircraft systems in attacks against Israeli military forces and civilians, as well as against dissenting groups in Gaza. The groups also use cyber espionage and computer network exploitation operations as well as a vast array of media vehicles for propaganda and messaging purposes.

334.   The US State Department designated Hamas as a foreign terrorist organization in October 1997 in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

335.   The US Department of State designated PIJ as a Foreign Terrorist Organization in 1997 and designated its Secretary General Ziyad al-Nakhalah as a

Specially Designated Global Terrorist in 2014.

336.   Hamas and PIJ have committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

337.   These activities committed, planned, or authorized by Hamas and PIJ appear to have been, and were intended to: (a) intimidate or coerce the civilian populations of Israel, the United States, and other countries; (b) influence the policy of the Governments of Israel, the United States and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of Israel, the United States and other countries by mass destruction, assassination, or kidnapping.

338.   These activities committed, planned, or authorized by Hamas and PIJ occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

339.   Plaintiffs have been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by Hamas and PIJ.

340.   Defendants knowingly provided substantial financial assistance to

108

Hamas and PIJ, and aided one another in doing so, and thus aided and abetted them in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiffs.

341.  By aiding and abetting Hamas and PIJ in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## <u>SECOND CLAIM FOR RELIEF</u>

## **LIABILITY FOR CONSPIRING IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(A) AND (D)**

342.  Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

343.  By knowingly conspiring with Hamas and PIJ to facilitate its operations and in furtherance of their committing, planning, or authorizing acts of international terrorism, including acts that caused the Plaintiffs to be injured in his or her person and property, and aiding one another in doing so, the Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's

fees.

## THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

344.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

345.    Without the material support of the Defendants, Hamas and PIJ would have been far less able to recruit, train, equip and deploy their armed terrorist forces against civilians in Israel including Plaintiffs.

346.    By committing violations of 18 U.S.C. § 2339A that have caused the Plaintiffs to be injured in his or her person, business or property, and aiding one another in doing so,  Defendants are liable pursuant to 18 U.S.C. § 2333 for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## FOURTH CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

347.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

348.    Defendants' violation of 18 U.S.C. § 2339B proximately caused the damages to Plaintiffs described herein.

349.    By knowingly (or with willful blindness) providing material support to designated FTOs, and aiding one another in doing so, the Defendants are therefore civilly liable for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### LIABILITY UNDER  28 U.S.C. § 1350 FOR AIDING AND ABETTING AND PROVISION OF MATERIAL SUPPORT IN FURTHERANCE OF VIOLATIONS OF THE LAW OF NATIONS OR A TREATY OF THE UNITED STATES

350.    Plaintiffs repeats and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

351.    Defendants' violation of 18 U.S.C. § 2333(A) AND (D), 18 U.S.C. § 2339A, 18 U.S.C. § 2333, 18 U.S.C. § 2339B(a)(1), and 18 U.S.C. § 2333(a) constituted a violation of United States law as well as international treaties to which the United States is subject.

352.    Defendants are also liable under aiding and abetting liability under Articles 2.5(a)and Article 2.5(c)(ii) because Hamas and PIJ committed acts prohibited by the International Convention for the Suppression of the Financing of Terrorism, which recognizes aiding and abetting liability, and Defendants participated in those acts as accomplices (Article 2.5(a)).

353.    The "law of nations," or international law, universally prohibits acts of

terrorism such as those Hamas perpetrated on and after October 7, including kidnapping and imprisoning civilian hostages, attacking civilian populations, and holding human remains to use as bargaining chips. For example, since the Nuremberg trials and the aftermath of World War II, it has been universally recognized that it is unacceptable to murder, rape, torture, imprison, deport, enslave, or exterminate a civilian population. The Nuremberg trials also recognized that persecution based on political, racial or religious reasons violated international law.

354.    Additionally, the Rome Statute of the International Criminal Court ("Rome Statute"), an international treaty adopted in 1998 and signed by 123 countries, prohibits certain crimes against humanity that are committed against a civilian population in a systematic way, including murder, extermination, enslavement, deportation or forcible transfer of population, torture, rape, and persecution against an identifiable group.

355.    Article 34 of the Fourth Geneva Convention prohibits the taking of hostages. Additionally, the Rome Statute states that the taking of hostages is a war crime.

356.    As a consequence of such violation, Defendants, together and individually, have caused damage to the Plaintiffs and are therefore civilly liable to Plaintiffs for their injuries for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's

fees, pursuant to the Alien Tort Statute.

## SIXTH CLAIM FOR RELIEF

## NEGLIGENCE/WANTONESS

357.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

358.   At all relevant times, Defendants knowingly or recklessly provided material support or resources to a Foreign Terrorist Organization ("FTO") in violation of the Anti-Terrorism Act, 18 U.S.C. §§ 2333 and 2339A–B.

359.   Defendants' conduct, including but not limited to knowingly aiding, abetting, or conspiring with the FTO and/or its affiliates, was negligent and created a foreseeable and unreasonable risk of physical harm and emotional injury to civilians, including the Plaintiffs.

360.   As a direct and proximate result of Defendants' provision of material support and resources to the FTO, a terrorist act occurred on or about October 7, 2023, causing death, injury, and widespread emotional trauma to the victims and their families.

361.   Plaintiffs were physically present in the zone of danger created by the terrorist attack and/or had a close familial relationship with direct victims of the attack. As a direct result, Plaintiffs suffered severe physical injury, emotional harm, distress, including but not limited to anxiety, depression, grief, and post-traumatic

stress disorder.

362.   Defendants knew or should have known that providing material support to an FTO—an organization whose stated and well-known purpose includes the targeting of civilians—would foreseeably result in emotional harm to individuals either directly affected by or closely connected to victims of terrorist attacks. Defendants negligently and wantonly exposed innocent third parties including Plaintiffs to physical injury and emotional harm.

363.   As a direct and proximate result of the negligence and/or wantonness of Defendants, Plaintiffs have suffered mental and physical injuries

364.   The emotional distress suffered by Plaintiffs was serious and verifiable and is supported by medical and psychological evidence.

365.   Defendants' actions were a substantial factor in causing Plaintiffs' emotional injuries, and the harm suffered was the natural and probable consequence of Defendants' negligent conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)    Enter judgment against Defendants and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(b)    Enter judgment against the Defendants and in favor of each Plaintiff who is a United States citizen for treble damages pursuant to 18 U.S.C. § 2333;

114

(c)     Enter judgment against the Defendants and in favor of each Plaintiff who is a United States citizen for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

(d)     Enter an Order declaring that the Defendants have violated, and may be continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.;

(e)     Enter judgment against the Defendants and in favor of each Plaintiff who is a foreign-born citizen for treble damages pursuant to 28 U.S.C. § 1350;

(f)     Enter judgment against the Defendants and in favor of each Plaintiff who is a foreign-born citizen for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 28 U.S.C. § 1350, and

(g)     Grant such other and further relief as justice requires.

<u>Plaintiffs Demand a Trial by Jury on All Claims So Triable.</u>

Dated: May 5, 2025

Respectfully submitted,

_____
David I. Schoen (ASB-0860-O42D)
Schoen Law Firm, LLC
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(334) 395-6611
schoenlawfirm@gmail.com

Mark Goldfeder (pro hac vice forthcoming)

115

National Jewish Advocacy Center, Inc.
3 Times Square
New York, NY 10036 (800) 269-9895
mark@jewishadvocacycenter.org

Ben Schlager (pro hac vice forthcoming)
Goldfeder, Schlager & Beck, LLC
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
ben@goldfederterry.com

Anat Beck (pro hac vice forthcoming)
Goldfeder, Schlager & Beck, LLC
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
*Attorneys for Plaintiffs Noach
Newman, Adin Gess, Maya
Parizer, Natalie Sanandaji,
Yoni Diller, Hagar Almog, Iris
Weinstein Haggai, On Behalf
Of Herself and as Executrix Of
The Estates of Judy Lynne
Weinstein, Gad Haggai, Ahl
Haggai, Ora Cooper, Rotem
Cooper, Rahm Haggai, Zohar
Haggai, Lishay Lavi, David
Bromberg, Lior Bar Or, Ariel
Ein-Gal, Almog Meir Jan,
Andrey Kozlov, Shlomi Ziv,
Shachar Levi  on his own
behalf and on behalf of Eitan
Levi, Ayelet Samerano, on her
own behalf and on behalf of
Yonatan Samerano, Talik Gvili,
on her own behalf and on
behalf of Ran Gvili, Roee
Baruch, on his own behalf and
on behalf of Uriel Baruch, and*

116

*James Poe, on his own behalf
and on behalf of Leo Poe,*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused a true and correct copy of the foregoing First

Amended Complaint on all counsel of record by filing the same through this

Court's ECF system on this 5th day of May, 2025.

<u>/s/ David I. Schoen</u>

117