**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| ADIN GESS, *et al.*, | x | |
| | x | **ORAL ARGUMENT REQUESTED** |
| Plaintiffs, | x | |
| | x | Civil Action No. |
| v. | x | 24-cv-00134-ECM-CWB |
| | x | |
| BAM TRADING SERVICES, INC. d/b/a | x | |
| BINANCE.US, a Delaware corporation, *et al.,* | x | |
| | x | |
| Defendants, | x | |

_____

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Relevant Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B  Preliminary Note Regarding Judicial Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  Standard for Evaluating a Rule 12(b)(6) Motion to Dismiss . . . . . . . . . . . . . . . . . 10

    D.  Shotgun Pleadings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.    FOR ALL PURPOSES RELEVANT TO THIS LAWSUIT ALL THREE DEFENDANTS OPERATE AS ONE ENTITY AND THERE IS NO COGNIZABLE BASIS FOR CONTESTING THIS COURT'S JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.  BAM is the Alter Ego of BHL and CZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.  A Recent Settlement Agreement between BAM and the State of Alabama Includes a Stipulation to Alabama's Jurisdiction over BAM, an Admission by BAM that Defendant Zhao Continues to an Owner of BAM, and that as of November 21, 2023, Zhao was BAM's Authorized Representative**. . . . . . . . . . . . . . . . . . . . . . . 18**

    C.  BAM's U.S. and Alabama Contacts More than Satisfy the Requirements Of Specific Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    D.  Defendants Incorrectly State that Plaintiffs Have Failed to Contest that the Defendants Do Not Observe Corporate Formalities and that BAM Transacts Business with BAM on an Arm's-Length Basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    E.  Defendants Incorrectly Identify the "Relevant Time Period and Time of the Attacked Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    F.  This Case May be Easily Distinguished from *Reynolds v. Binance Holdings, Ltd.*. . . 34

    G.  BAM Functions as an Instrumentality and Cannot Evade this Court's Jurisdiction . . 35

III.   PLAINTIFFS STATE A CLAIM THAT BHL, BAM, AND CZ AIDED AND ABETTED HAMAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    A.  American Plaintiffs Have Standing to Bring an Aiding and Abetting Claim Under the ATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    B.  The ATA Provides for Broad Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

i

C.  Plaintiffs' Allegations Satisfy the Generally Aware Element of *Halberstam* . . . . . . . 65

D.  Plaintiffs' Allegations Satisfy the *Halberstam* Element of Knowingly Providing
Substantial Assistance to Hamas and PIJ**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .** 69

E.  Plaintiffs' Allegations Demonstrate Conscious and Culpable Participation, As Well As
Systematic and Pervasive Support, as Put Forth in *Twitter* . . . . . . . . . . . . . . . . . . . . . 74

IV.    PLAINTIFFS STATE A CLAIM THAT BHL, BAM, AND CZ CONSPIRED WITH
HAMAS TO PROVIDE MATERIAL SUPPORT TO HAMAS. . . . . . . . . . . . . . . . . . . . 79

V.    PLAINTIFFS HAILING FROM ISRAEL STATE A CLAIM THAT BHL, BAM, AND
CZ VIOLATED THE LAWS OF NATIONS WHICH INJURED PLAINTIFFS. . . . . . . 83

A.  Elements of an ATS Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

B.  Defining a Predicate Act Under the ATS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

C.  This Court has Subject Matter Jurisdiction to Hear Plaintiffs' ATS Claim  . . . . . . . . 87

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

VI. DISCUSSION - THE DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . 9

A.  This Case is Not Barred by *Res Judicata* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

(1) The *Rubin* Court Made Demonstrable Mistakes. . . . . . . . . . . . . . . . . . . . . . . . 10
(2) The Primary Argument Made Here Was Not Made and
Could Not Have Been Made in *Rubin*. Other Arguments Made
in the FAC Also Were Not Made in *Rubin*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B.  Defendant's Additional Arguments for Dismissal are Unavailing . . . . . . . . . . . . . . 15

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| ADIN GESS, *et al.*, | x | |
| | x | **ORAL ARGUMENT REQUESTED** |
| Plaintiffs, | x | |
| | x | Civil Action No. |
| v. | x | 24-cv-00134-ECM-CWB |
| | x | |
| BAM TRADING SERVICES, INC. d/b/a | x | |
| BINANCE.US, a Delaware corporation, *et al.,* | x | |
| | x | |
| Defendants, | x | |

_____

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

On June 20, 2025, each of the three Defendants in the above-captioned case, BAM TRADING SERVICES, INC., d/b/a BINANCE.US ("BAM"), BINANCE HOLDINGS, LTD. d/b/a BINANCE ("BHL" or "BINANCE"), and CHANGPENG ZHAO ("CZ" or "ZHAO"), filed a motion to dismiss the First Amended Complaint ("FAC") with supporting Memoranda of Law (ECF Nos. 90, 92 & 93). There is a significant amount of overlap among the respective motions and for some issues raised by a given Defendant, the Defendant expressly relies on and refers to argument provided by another Defendant. Rather than burdening the Court with three separate responses, Plaintiffs will address Defendants' arguments in this consolidated response in opposition. To the extent any argument is left unaddressed, it should not be deemed to be a concession or waiver by the Plaintiffs; rather it just reflects Plaintiffs' evaluation that no response

1

is required. Of course, Plaintiffs will be prepared to provide any additional response the Court directs.

## I.      INTRODUCTION

### A.  Relevant Background

As the Court is aware, Plaintiffs in this case are victims, in various identified capacities, of the horrific, barbaric terrorist attack on October 7, 2023. Plaintiffs have filed a detailed 115 page First Amended Complaint ("FAC") setting out the details of the attack and their injuries and the facts and law that establish the liability of these Defendants arising from their relationship with the outlawed Foreign Terrorist Organization ("FTO") Hamas and others who carried out the October 7, 2023 atrocities.  In response to the motions to dismiss filed by the Defendants, Plaintiffs rely on the allegations of their FAC (ECF No. 84) and incorporate and reassert them herein. Plaintiffs will herein address the arguments Defendants have made in support of their motions to dismiss; but to the extent any argument is not addressed herein, the Court should not take that as any kind of concession that the defense assertion has any merit nor should it be taken as any sort of waiver of any claim. All claims by Defendants are exposed as meritless by the detailed allegations in the FAC.

Let us be crystal clear from the outset: both Binance and Zhao are convicted criminals and their criminal conduct and conduct thoroughly investigated and attacked by the SEC and the Treasury Department, along with other state and federal regulators is exactly what gives rise to this lawsuit. Binance and Zhao have pled guilty to very serious crimes that put our nation in jeopardy and their conduct, as found by the regulatory agencies, includes knowingly facilitating the movement of money for Hamas and other terrorist groups, and then actively attempting to conceal the same, while even joking about it.

As the U.S. Government established in its criminal investigation and the guilty pleas entered by these Defendants, Binance and Zhao built Binance into the vastly wealthy company it has become by "targeting U.S. customers" while "refus(ing) to comply with U.S. law and their "willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through (Binance's) platform."[1]  Binance agreed to pay an historic $4 billion fine, and Zhao was sentenced to prison and was fined for his criminal conduct.  The allegations at issue in this case and which Defendants challenge in their respective motions to dismiss as not being plausible are taken *verbatim* from charging documents filed by regulatory agencies, consent decrees entered into by Defendants, and other official sources related to the already proven criminal and civilly actionable conduct, in the criminal and regulatory prosecutions of Defendants Binance and Zhao.

To the extent Defendants try to deny or minimize their connection to Alabama, they mislead the Court, both as to the direct connections through BAM and the inextricably intertwined connections among BAM, BHL, and Zhao.[2]

---

[1] Press Release, Internal Revenue Service, Binance and CEO plead guilty to federal charges in $4 billion resolution (Nov. 21, 2023), https://www.irs.gov/compliance/criminal-investigation/binance-and-ceo-plead-guilty-to-federal-charges-in-4-billion-resolution.

[2] Defendants have acknowledged that there is a provision under the Anit-Terrorism Act for nationwide service of process, and therefore personal jurisdiction in any district in the nation, once it is shown that the defendant has minimum contacts with the United States.  *See* 18 U.S.C. § 2334; *Kammona v. Onteco Corp.*, 587 Fed Appx 575, 579-80 (11th Cir. 2014).  Defendants have further made clear that they will do not and will not contest service of process (10/22/2024 Hearing Tr. At 70-71).

As alleged in the FAC filed herein, it was with great fanfare that Binance announced it was open for business in Alabama and began soliciting and taking on customers in Alabama through its U.S. arm, Defendant BAM, created by Binance and Zhao once Binance was banned from the United States [ECF NO. 84 at 11-15, citing official Government sources).  This was preceded by its successful application to the Alabama Securities Commission for a Money Transfer License and its designation of an Alabama in-state registered agent. *Id*.  To the extent Defendants this connection with BAM or the efforts to solicit and acquire business in Alabama (and they certainly do), and the Court believes this to be in any way relevant to the Motion to Dismiss, we would respectfully ask the Court to permit limited discovery on this issue.

More to the point, however, is that inextricably intertwined with this factor is, as Defendants acknowledge, whether there is suit-related conduct in Alabama. Defendants argue that there is none. That is patently untrue. Defendants misleadingly omit from their argument the allegations in the Complaint tying the case and the relevant conduct to Alabama, *see, e.g.,* ECF No. 84 at 11-15, and the allegations concerning the direct role Binance and Zhao played in deceptively creating BAM and facilitating its solicitation of business and trading in Alabama and elsewhere, once Binance was barred from doing business in the United States. *See, e.g.*, ECF No. 84 at 25-104.[3]

---

[3] *See* Press Release, Binance, Binance Announces Partnership with BAM to Launch US Exchange (June 13, 2019), https://www.binance.com/en/blog/all/binance-announces-partnership-wih-bam-to-launch-us-exchange-346119082624540672. *See also* Press Release, U.S. Securities & Exchange Commission, SEC Files 13 Charges Against Binance Entities and Founder Changpeng Zhao (updated June 5, 2023), https://www.sec.gov/newsroom/press-releases/2023-101#:~:text=Among%20other%20things%2C%20the%20SEC,on%20the%20Binance.com%20platform:

> Washington D.C., June 5, 2023 —
> The Securities and Exchange Commission today charged Binance Holdings Ltd. ("Binance"), which operates the largest crypto asset trading platform in the world, Binance.com; U.S.-based affiliate, BAM Trading Services Inc. ("BAM Trading"), which, together with Binance, operates the crypto asset trading platform, Binance.US; and their founder, Changpeng Zhao, with a variety of securities law violations.
>
> Among other things, the SEC alleges that, while Zhao and Binance publicly claimed that U.S. customers were restricted from transacting on Binance.com, Zhao and Binance in reality subverted their own controls to secretly allow high-value U.S. customers to continue trading on the Binance.com platform. Further, the SEC alleges that, while Zhao and Binance publicly claimed that Binance.US was created as a separate, independent trading platform for U.S. investors, Zhao and Binance secretly controlled the Binance.US platform's operations behind the scenes.
>
> The SEC also alleges that Zhao and Binance exercise control of the platforms' customers' assets, permitting them to

In addition to the serious allegations and proof adduced by the regulatory agencies and the U.S. Department of Justice (DOJ), a current PACER search just covering federal courts shows Binance as a party to litigation in some sixty-one cases in districts that include Alabama, Arizona, California, Florida, New York, Illinois, New Hampshire, Georgia, Kansas, Massachusetts, Washington, Maine, Kentucky, and Texas. Zhao and BAM also appear to be parties to litigation in multiple districts. That is not to mention overseas litigation.[4]

As noted earlier, Binance agreed to pay a $4 billion dollar fine, had the ability to do so, and by all accounts, notwithstanding its status as a criminal convicted of using its resources to aid and foster cybercriminals and terrorists, the company is thriving.[5] Zhao agreed to pay a $50 million fine and has been characterized by Bloomberg as perhaps the wealthiest person ever to be imprisoned in the United States.[6]

---

commingle customer assets or divert customer assets as they please, including to an entity Zhao owned and controlled called Sigma Chain. The SEC's complaint further alleges that BAM Trading and BAM Management US Holdings, Inc. ("BAM Management") misled investors about non-existent trading controls over the Binance.US platform, while Sigma Chain engaged in manipulative trading that artificially inflated the platform's trading volume. Further, the Complaint alleges that the defendants concealed the fact that it was commingling billions of dollars of investor assets and sending them to a third party, Merit Peak Limited, that is also owned by Zhao....

[4] Reuters, *Crypto exchange Binance seeks to slash size of $13 billion UK lawsuit*, ECON. TIMES (updated June 6, 2024) https://economictimes.indiatimes.com/markets/cryptocurrency/crypto-exchange-binance-seeks-to-slash-size-of-13-billion-uk-lawsuit/articleshow/110774314.cms.

[5] *See generally* "Binance News," COINTELEGRAPH, https://cointelegraph.com/tags/binance (last visited Sept. 3, 2025).

[6] *Ex Binance CEO CZ May Be the Richest Person Ever in Jail in the U.S.*, BLOOMBERG (Apr. 29, 2024), https://www.bloomberg.com/news/features/2024-04-29/ex-binance-ceo-cz-may-be-richest-person-ever-in-jail-in-us.

Finally, by way of introduction, specific responses in opposition to the Defendants' arguments are set forth herein; but the single most striking attribute of the motions to dismiss from each Defendant is the degree to which assertions are made by Defendants that are not only patently misleading or untrue, but demonstrably, for they are absolutely irreconcilable by facts established by consent decrees entered into by the Defendants with multiple regulatory agencies and admissions reflected in plea agreements entered into by Defendants BHL and CZ in other forums. Defendants in this case are represented by fine, experienced, and respected lawyers from major international law firms and Alabama law firms. This makes it that much more difficult to understand the approach Defendants have taken before this Court in their respective motions to dismiss. Details on this subject will follow below, but suffice it to say here that they relate to some of the most fundamental issues in the case, and the record belying Defendants' assertions before this Court could not be clearer.

One basic and particularly disturbing example is the following: Defendants go to great length in arguing in the motions that at all relevant time periods BAM has operated independently of BHL and Zhao and BAM challenges jurisdiction over it in Alabama. However, the truth of the matter, as reflected in the allegations brought by one federal regulatory agency after another and as reflected in consent decrees and required remedial action under the consent decrees or guilty plea agreements, is that all three Defendants have acted in all material regards, at all relevant times, as one entity controlled by Zhao, with BAM actually created to allow Zhao and Binance to circumvent legal restrictions placed on their business because of their criminal conduct and conduct otherwise unlawful. The attached exhibits from proceedings brought by the SEC and volumes more from those proceedings overwhelmingly documents the direct ties between Zhou, Binance, and BAM, including ownership, control, and management from before, during, and after

October 7, 2023, and continuing even after agreements recognizing and promising to end those ties were executed.

To the extent the Declaration of BAM Chief Operating Officer (COO) Christopher Blodgett (submitted with BAM's Motion to Dismiss, *see* ECF No. 93-1) attempts to contradict these facts and expressly denies the close connection and Zhao's direction and control of BAM, it is, quite frankly, a sanctionable disgrace that is irreconcilable with the assertions by each of the federal regulatory agencies that have investigated and prosecuted actions against BHL and Zhao, and with consent decrees entered in connection with those actions. Furthermore, it is irreconcilable with sworn testimony from BAM's former CEO, Brian Brooks attached hereto as Exhibit 5. *See also* ECF No. 84 ¶ 80. Indeed, Zhao and BHL's direct and indirect control over BAM, from their creation of BAM for deceptive and nefarious purposes through its control, is at the very heart of the regulatory actions to which Plaintiffs refer repeatedly in the FAC.

Additionally, and without any mention whatsoever in their motion papers, just recently, on May 16, 2025 (a date which preceded Defendants' motions to dismiss), BAM entered into an agreement with the State of Alabama (and other states), expressly acknowledging and agreeing, *inter alia*, that Alabama has jurisdiction over BAM and that Zhao was, even at that late date, an owner of BAM. *See* Exhibit 1.

That agreement further confirms, in truth, and contrary to Defendants' protestations to this Court that at all relevant times BAM was completely independent of BHL and Zhao, that, as of November 21, 2023, Zhao was BAM's "authorized representative" who, because of his guilty plea, was forced to sign over the CEO role at BAM to another. As a further check, the agreement entered into with Alabama requires affirmative reporting to the State if Zhao regains any "controlling influence" over BAM's management or policies. *See* Exhibit 1 at Para. 6.

Tellingly, the agreement terminates if, *inter alia*, Zhao were to relinquish his continuing ownership interest in BAM or he receives a presidential pardon for his crimes of conviction. *See* Exhibit 1 at Para. 13.  This is just one of many examples of fundamentally material documents that irreconcilably and directly undermine the truth of many basic material representations made to this Court in Defendants' motions to dismiss.  This will be demonstrated hereinbelow.

### B.  Preliminary Note Regarding Judicial Notice

Defendants' pleadings include voluminous attachments which they ask the Court to take judicial notice of and consider in support of their motions to dismiss. The Court can, of course, take judicial notice of certain kinds of records without transforming a motion to dismiss into a motion for summary judgment. *See, e.g., United States v. $15,000.00 in United States Currency,* 2025 U.S. Dist. LEXIS 124846, *3, n.4, 2025 WL 1812904 (M.D. Ala., July 1, 2025) (taking judicial notice of public records) (Marks, C.J.). However, courts must be cautious and should only take judicial notice of facts that are undisputed and relevant to the issues presented in the motion to dismiss and should not draw inferences in favor of the defendant based on extrinsic evidence. *Metropolitan Creditors' Trust v. Pricewaterhousecoopers, LLP*, 463 F.Supp.2d 1193 (E.D. Wash. 2006); *Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, 699 F. Supp.3d 1086 (D. Ore. 2023) (denying judicial notice where the defendant sought to introduce extrinsic evidence to disprove plaintiff's factual allegations); *CPI Advanced, Inc. v. Kong Byung Woo Comm. Ind. Co., Ltd*, 135 Fed. Appx. 81 (9th Cir. 2005); *Motul S.A. v. USA Wholesale Lubricant, Inc*., 686 F. Supp.3d 900 (N.D. Cal. 2023) (the court cannot take judicial notice of disputed facts in the proffered records).

Taking judicial notice of facts is "a matter of evidence law" and "a highly limited process." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). "The reason for this caution is that the taking

of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.*

Under Federal Rule of Evidence 201 (b), the Court may take judicial notice of certain facts without formal proof, but only where the fact in question is "not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Indisputability is a prerequisite" to judicial notice. *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)). "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of [issue preclusion] would be superfluous." *Id.* (quoting *Jones*, 29 F.3d at 1553) (alteration in original); *see also In re Takata Airbag Prods. Liab. Litig.,* 396 F. Supp. 3d 1101, 1128 (S.D. Fla. 2019).

As the Eleventh Circuit has explained, "[j]udicial notice of court records is ordinarily confined to determining what happened in the course of a proceeding—when a plaintiff filed a complaint, what claims were argued and adjudicated, and so on." *Kerruish v. Essex Holdings, Inc.*, 777 F. App'x 285, 293 (11th Cir. 2019). Moreover, "[i]n addressing whether a court properly takes judicial notice of the nature or substance of court filings and other legal documents, the Eleventh Circuit has distinguished between taking judicial notice of the fact that court records or court rulings *exist* versus taking judicial notice of the *truth* of matters stated within those court records or court rulings." *Auto Owners Ins. Co. v. Morris*, 191 F. Supp. 3d 1302, 1304 (N.D. Ala. 2016) (emphasis in original). Specifically, "a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Id.* (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th

9

Cir. 1994)). Consequently, "a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *Id.* (quoting *Jones*, 29 F.3d at 1553)." *Campo v. Granite Servs. Int'l, Inc.*, 584 F. Supp. 3d 1329, 1335 (N.D. Ga. 2022).

"[C]ourts may <u>not</u> take judicial notice of court records for the truth of the matters asserted in those records. *E.g., United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Legacy Ent. Grp., LLC v. Endemol USA Inc.,* 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015); *In re Takata Airbag Products Liab. Litig.,* 396 F. Supp. 3d 1101, 1129 (S.D. Fla. 2019). Instead, courts may only take judicial notice of court records for the limited purpose of establishing the fact of such litigation, the record's existence, and the record's content. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277–78 (11th Cir. 1999); *Beepot v. J.P. Morgan Chase Nat. Corp. Servs., Inc.,* 57 F. Supp. 3d 1358, 1366 (M.D. Fla. 2014) (citing *Jones*, 29 F.3d at 1553); *MB Plaza, LLC v. Wells Fargo Bank, NA*, No. 10-24241-CIV, 2011 WL 3703143, at *1 (S.D. Fla. Aug. 23, 2011); *Sprengle v. Smith Mar. Inc.*, 660 F. Supp. 3d 1337, 1351–52 (M.D. Fla. 2023).

"The Court may, however, judicially notice a public record because a document filed in another court is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (quoting *Bryant*, 187 F.3d at 1278). The effect of such judicial notice is limited, however, and, again, is taken "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Jones*, 29 F.3d at 1553 (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir. 1992))." *See also In re Takata Airbag Prods. Liab. Litig.,* 396 F. Supp. 3d 1101, 1129 (S.D. Fla. 2019).

**C.  Standard for Evaluating a Rule 12(b)(6) Motion to Dismiss**

"A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))." *See also United States v. $15,000.00 in United States Currency*, 2025 U.S. Dist. LEXIS 124846, *2, 2025 WL 1812904 (M.D. Ala., July 1, 2025) (Marks, C.J.).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (alteration in original) (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555-56. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Walsh v. Global K9 Prot. Grp., LLC*, 2023 U.S. Dist. LEXIS 65668, *3-4, 2023 WL 2958600 (M.D. Ala., April 14, 2023) (Marks, C.J.).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 679. In determining whether a claim is stated, the court "must accept the factual allegations in a complaint as true and construe them in the light most favorable to the

11

plaintiff." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017). However, "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." *Mamani v. Berzaín*, 654 F.3d 1148, 1153 (11th Cir. 2011). *Frame v. Hale*, 2025 U.S. Dist. LEXIS 151280, *7-8 (S.D. Ala., August 6, 2025). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556)." *Cook v. Liberty Mut. Ins. Co.*, 2025 U.S. Dist. LEXIS 151349 *3-*4; 2025 WL 2242762 (N.D. Ala, August 6, 2025).

"When considering a motion to dismiss, all facts set forth in the plaintiff's complaint are accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." *Arnold v. Sainvil*, 2016 U.S. Dist. LEXIS 41099, *10 (S.D. Fla. Feb. 10, 2016). Further, when considering whether dismissal is appropriate pursuant to Fed.R.Civ.P. 12(b)(6), the court must construe the allegations and draw all favorable inferences in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-1322 (11th Cir. 2012). A complaint may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Conely v. Gibson*, 355 U.S. 41, 46–47 (1957); *see also Sprint Solutions, Inc. v. Fils-Amie*, 44 F.Supp.3d 1224 (S.D. Fla. 2014) (moving party has the burden; no need for non-moving party to adduce evidence in response to a motion to dismiss).

A complaint "must be liberally construed" and "should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations." Indeed, "a well pleaded complaint will survive a motion to dismiss 'even if it appears that a recovery is very remote and unlikely.'" *Spadaro v. City of Miramar*, 855 F.Supp.2d 1317, 1328 (S.D. Fla. 2012) (quoting *Twombly*, 550 U.S. at 555-556). In short, the Eleventh Circuit "has made

it clear that 'the threshold of sufficiency to which a complaint is held at the motion-to-dismiss

stage is exceedingly low.'" *Abrams v. Ciba Specialty Chems.*, 2008 U.S. Dist. LEXIS 68897, *13-

*18 (S.D. Ala., September 10, 2008) (quoting *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881

(11th Cir. 2003)).

### D.  Shotgun Pleadings

Defendants contend that the FAC should be dismissed because it constitutes a "shotgun

pleading." *See* ECF No. 93 at 6-8. It is true that the Eleventh Circuit has written about the ills of

"shotgun pleadings*" on many occasions and, indeed, district courts within this Circuit have

echoed that criticism. See e.g., O'Donnell v. Wachovia Bank, NA*, 2010 U.S. Dist. LEXIS 34394,

*9-*10; 2010 WL 1416986 (S.D. Fla., April 7, 2010) (requiring amended complaint to cure

"shotgun pleading" deficiency).

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly

referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320

(11th Cir. 2015). Shotgun pleadings are impermissible as they "fail . . . to give the [parties]

adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at

1323. However, just because a claim incorporates preceding paragraphs or facts does not mean

the claim is      a      shotgun      pleading      that      should      be      dismissed."

*Dongguan Saienchuangke Tech. Co. v. Individuals, P'ships & Unincorporated Ass'ns Identified on*

*Schedule "A,"* 2024 U.S. Dist. LEXIS 242531, *5-6 (S.D. Fla., December 17, 2024).

However, meritless claims, like those made here, that a complaint reflects a "shotgun

pleading" regularly are abused and must be rejected.  *See, e.g., Hoefling v. City of Miami*, 811 F.3d

1271 (11th Cir. 2016) (rejecting "shotgun" pleading claim, finding it that it was "not difficult to

understand what the Defendants 'were alleged to have done and why they were liable for doing

13

it.'") (quoting *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015));

*Smith v. Beverly Hills Club Apts., LLC*, 2016 U.S. Dist. LEXIS 10180, *8-*13 (S.D. Fla. January

28, 2016) (rejecting "shotgun" pleading claim and finding that complaint adequately gives

defendants notice of the claims against them, while explaining "shotgun" claims and addressing

and distinguishing *Weiland*); *Downing v. Midland Funding, LLC*, 2016 U.S. Dist. LEXIS 3484,

*3-*12 (N.D. Ala. January 12, 2016) (rejecting "shotgun" pleading claim—even if complaint

appeared to share attributes of "shotgun" pleading—approving incorporation of allegations, and

finding allegations provide adequate notice such that defendants reasonably could file an

appropriate responsive pleading); *Wright v. Watson*, 2015 U.S. Dist. LEXIS 106786, *8-*12 (M.D.

Ga. August 13, 2015) (rejecting "shotgun" pleading claim as it was not difficult to understand what

the defendants "were alleged to have done and why they were liable for doing it."). Courts have

made clear that simply tarring a pleading with a "shotgun pleading" brush because it might have

some attributes in common with a "shotgun pleading"—like the incorporation of factual

allegations in multiple counts—must not be permitted to prevail. The overly broad application of

the "shotgun pleading" claim, as is the case with Defendants' claim here, flows from a

"misunderstanding of the term." *Garrett v. Stanton*, 2008 U.S. Dist. LEXIS 86249, 2008 WL

4701215 (S.D. Ala. October 22, 2008). As the court stated in *Garrett*:

> Defendants have repeatedly sought to tar the Complaint with
> the "shotgun pleading" brush. This contention proceeds from
> a misunderstanding of the term. A shotgun pleading is one
> which "begin[s] with a long list of general allegations, most
> of which are immaterial to most of the claims for relief. The
> general allegations are incorporated by reference into each
> count of the complaint; the complaint is followed by an
> answer that responds to each and every statement."

*Garrett*, 2008 U.S. Dist. LEXIS 86249, *31 n.15 (quoting *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir. 1998)).

The ills of shotgun pleading have been thoroughly catalogued by the Eleventh Circuit in a host of opinions on the subject. Perhaps chief among them is the inevitable propagation of unnecessarily broad discovery, with the case proceeding along aimlessly because the inclusion of numerous extraneous and immaterial allegations incorporated into every single claim for relief renders it virtually impossible to delineate reasonable discovery boundaries. *See, e.g., Davis*, 516 F.3d at 981-82; *Byrne v. Nezhat*, 261 F.3d 1075, 1129 (11th Cir. 2001); *Johnson Enterprises*, 162 F.3d at 1333. Simply put, then, the problem with a shotgun pleading is that it prevents the parties and the court from understanding what the case is really about because the pleadings are cluttered with irrelevant and unrelated facts. The consequence is that discovery becomes a fool's errand in which parties seek out evidence relating to claims whose factual parameters are so fuzzy, amorphous, and ill-defined as to be utterly indeterminate. These circumstances simply are not present in this case. All relevant facts and circumstances are set out in detail. The reader is not left guessing from the Complaint as to how Plaintiffs were wronged, what Defendants are alleged to have done, how Plaintiffs contend that defendants are liable for those acts and omissions, or how the factual allegations are possibly material to the particular causes of action asserted.

The "shotgun pleading" line of authorities is unavailing here. *See Garrett v. Stanton*, 2008 U.S. Dist. LEXIS 86249, 2008 WL 4701215 (S.D. Ala. Oct. 22, 2008); *Wright v. Watson*, 2015 U.S. Dist. LEXIS 106786; 2015 WL 4873381 (M.D. Ga, August 13, 2015) (upholding complaint over claim of "shotgun pleading" even though it contained attributes of "shotgun pleading" including the incorporation of allegations; not difficult to understand allegations as to what defendants did and why they allegedly were liable); *Downing v. Midland Funding*, 2016 U.S. Dist.

LEXIS 3484, *5-*6 (N.D. Ala. January 12, 2016) (rejecting "shotgun pleading" notwithstanding facial attributes of a "shotgun pleading" including repeated incorporation of factual allegations in multiple counts; finding that the Defendants' filing of an Answer to the similarly drafted initial complaint tends to undercut the argument that they were unable to understand the allegations against them); *Weiland v. Palm Beach County*, 792 F.3d 1313, 1321-26 (11th Cir. 2015) (reversing the dismissal of counts based on "shotgun pleading" claim, finding that the incorporation of factual allegations, rather than parceling them out and identifying the claims to which each applied, did not "materially burden" the ability to understand the facts underlying each count, emphasizing the importance of substance over form); *Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) (rejecting "shotgun" pleading claim as it was not difficult to understand what defendants were alleged to have done and why liable); *Smith v. Beverly Hills Club Apts., LLC*, 2016 U.S. Dist. LEXIS 10180, *8-*13 (S.D. Fla. January 28, 2016) (rejecting "shotgun" pleading claim and finding that complaint adequately gives defendants notice of the claims against them, while explaining "shotgun" claims and addressing and distinguishing *Weiland)*.

In the instant case, the factual allegations against each Defendant are spelled out throughout the 115-page FAC in great detail, leaving no misunderstanding whatsoever as to what is alleged in this case factually and legally as to each Defendant.  The Defendants (excluding BAM) face similar allegations in the *Raanan* case and have faced similar allegations in multiple lawsuits brought by regulatory agencies. They fully understand the allegations against them.

The fact of the matter is each material factual assertion applies to each theory of liability, and, without incorporation, the 115-page FAC would be perhaps three or four times as long in order to reassert each relevant fact separately for each count. Additionally, the separate legal theories, both the statutes involved, and the constitutional provisions involved are spelled out

16

sufficiently to allow any reasonable defendant and his lawyer to understand the factual and legal basis for the claim and certainly to a degree sufficient to ascertain the answer to any question on the subject through discovery. The allegations here are in no way "masked" or "theories for relief not provided by law" that are "calculated to confuse the enemy." *See e.g. T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520 n. 14 (11th Cir. 1985). Rather, the allegations are very specific and detailed and should be clearly understood by each Defendant and counsel. Defendants' claim that the FAC should be dismissed because it is a "shotgun pleading" must be rejected.

## II. FOR ALL PURPOSES RELEVANT TO THIS LAWSUIT ALL THREE DEFENDANTS OPERATE AS ONE ENTITY AND THERE IS NO COGNIZABLE BASIS FOR CONTESTING THIS COURT'S JURISDICTION

### A. BAM is the Alter Ego of BHL and CZ.

Throughout the FAC, Plaintiffs have plausibly alleged, with authoritative support, that Defendant BAM, d/b/a Binance.US, is the alter ago of BHL ad CZ and has operated in Alabama at all relevant times for their mutual benefit and under their control and direction (*e.g.,* ECF No. 84 ¶¶ 34-43, 69-80). Indeed, BAM was created by BHL and CZ expressly for the purpose of deception and to evade the restrictions placed on BHL and CZ by U.S. Government regulatory agencies (¶¶ 91-137). As noted above, it is beyond the pale that BAM argues its complete independence from Zhao and BHL at all times and has the audacity to attempt to support its unfathomable claims in this regard with a demonstrably false Declaration from its COO. *See* ECF No. 93-1.

Indeed, the U.S. Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission (CFTC), and DOJ have all plausibly alleged and independently established the same. *See, e.g.,* Exhibit 2 – June 15, 2023 SEC Complaint; Exhibit 3 – June 17, 2023 SEC

Consent Order; Exhibit 4 – March 8, 2024 SEC case Joint Status Report; Exhibit 5 – BAM CEO Brian Brooks deposition excerpt; Exhibit 6 - November 6, 2024, SEC case Hearing Transcript at 6-10; 13, 14, 17 (alleging continuing control of BAM); Exhibit 7 – June 28, 2024 SEC Case Memorandum and Order at 46-56 finding plausible SEC allegations that Binance, Zhao, and BAM work in concert; at 61-62 describing subterfuge in creation and use of BAM; at 62 describing allegations of Zhao's control of BAM and referring to Zhao plea agreement; at 66 finding personal jurisdiction based on Zhao's control of BAM; at 89 allowing claims Zhou controls BAM to proceed;  Exhibit 8 – March 27, 2023 CFTC Complaint ¶¶ 22; 81-89; 93; 126, showing  BAM and Binance were owned and controlled by Zhao as multiple entities created for deception; BAM partnership with Binance; Exhibit 9 – CFTC December 14, 2023 Consent Order reflecting Hamas connection and referring to Treasury Dept. Press release re: 10/7/23 Hamas atrocities; Exhibit 10 – BHL Plea Agreement Statement of Facts; Exhibit 11 – SEC Memo in Support of Emergency TRO at 27-30).[7]

**B.    A Recent Settlement Agreement between Defendant BAM and the State of Alabama Includes: a Stipulation to Alabama's Jurisdiction over BAM, an Admission by BAM that Defendant Zhao Continues to an Owner of BAM, and that as of November 21, 2023, Zhao was BAM's Authorized Representative.**

Perhaps most telling of all, a settlement agreement (the "Agreement") Plaintiffs have obtained between Defendant BAM and the State of Alabama (along with other states), dated May

---

[7] Press Release, U.S. Dep't of Treasury, Following Terrorist Attack on Israel, Treasury Sanctions Hamas Operatives and Financial Facilitators (Oct. 18, 2023), https://home.treasury.gov/news/press-releases/jy1816. *See also* Press Release, U.S. Dep't of Treasury, U.S. Treasury Announces Largest Settlements in History with World's Largest Virtual Currency Exchange Binance for Violations of U.S. Anti-Money Laundering and Sanctions Laws (Nov. 21, 2023) (settlement announcement by the Treasury Department specifically noting that the settlement included a resolution based on Binance's violations that included facilitating transactions for Hamas and other known FTOs), https://home.treasury.gov/news/press-releases/jy1925.

26, 2025, includes a stipulation by BAM to Alabama jurisdiction over it. *See* Exhibit 1 at 1. Additionally, the Agreement expressly acknowledges that even as of that date, May 26, 2025, notwithstanding the various consent orders and even after his release from incarceration, Zhao remained a beneficial owner of BAM. *See* Exhibit 1 at 1. The Agreement further recites that as of November 21, 2023, a date which obviously was after the October 7, 2023 atrocities, Defendant Zhao remained the "authorized representative of BAM Management and only then, under pressure, designated someone else to serve as CEO of Defendant BAM. *See* Exhibit 1 at 1. The Agreement is filled with provisions directed at denying Zhao continuing control of BAM, notwithstanding his continued ownership interest in BAM, in order for BAM to continue to be permitted to do business in Alabama. *See* Exhibit 1. Notably, the Agreement is to be terminated, with the conditions against Zhao's renewed control of BAM to be removed if and when, among other possibilities, Zhao receives a pardon from the President of the United States in regard to his related criminal conviction. *See* Exhibit 1 ¶ 13. It is most troubling that there is no reference to this Agreement in any Defendant's motion to dismiss submission, notwithstanding the arguments put forward denying the Court's jurisdiction and the continuing Zhao connection.

While Defendants contest the jurisdiction of the Alabama courts over them, it is important to note that Binance regularly contests the jurisdiction of any U.S. court it is summoned to under the notion that its locus exists wherever CZ may be located or otherwise identifies with at any given time. This is CZ's official and unofficial position to his accountability to the jurisdictions wherein he operates and continues to operate, even after his incarceration.

In the table below, specific paragraphs of the FAC are highlighted to demonstrate how each supports the legal requirement for proving the alter ego relationship. The following is a summary of some of the factors and more than plausible allegations in the FAC prove the alter ego

relationship: Zhao is not a passive foreign investor with "zero contacts" to Alabama. The FAC alleges—and government enforcement actions confirm—that Zhao personally directed Binance's and BAM's U.S. operations:

- Zhao served as **Chairman of BAM Trading's Board** until at least March 2022, exercising day-to-day authority.

- Zhao **approved BAM expenditures**, including routine items like office furniture, and retained **signatory authority over BAM's U.S. bank accounts.**

- Zhao directly controlled BAM's **compliance, technology, and liquidity functions**, including reliance on Binance's matching engine and wallet custody systems.

- Executives testified that "CZ was the CEO of BAM, not me," confirming that BAM was merely Zhao's instrumentality. *See* ECF No. 84 ¶ 80; Exhibit 5.

These allegations establish **purposeful availment**: Zhao intentionally directed activities toward U.S. markets, profited from U.S. customers, and oversaw the very conduct that gives rise to Plaintiffs' claims (AML/KYC failures and the facilitation of terrorist remittances). That nexus is sufficient to establish specific jurisdiction.

Even if Zhao himself did not physically set foot in Alabama, the allegations establish specific jurisdiction because he purposefully availed himself of the U.S. market through BAM Trading, which solicited and served customers nationwide, including in Alabama. Zhao was no passive investor; regulatory findings by the SEC, CFTC, and DOJ confirm that he personally approved BAM's U.S. operations, dictated compliance decisions, and exercised control over even routine expenditures. Plaintiffs' ATA claims arise directly from these U.S.-directed activities— including failures in AML/KYC obligations and the facilitation of terrorist remittances—which

form the core of the alleged misconduct. *Defendants cannot concede U.S. jurisdiction for purposes of regulatory enforcement and penalties while denying that same jurisdiction when victims seek civil redress for the very conduct regulators have already sanctioned.*

In fact, the November 21, 2023, Plea Agreement with the Department of Justice specifically states that Binanace.us was a virtual currency exchange wholly owned by CZ, through BAM Trading Services, Inc. *See* Exhibit 10, Binance Plea agreement, Statement of Facts ¶5,[8] and that "[s]ome of these transactions were conducted with Binance users located in the Western District of Washington," *id.* at ¶24, thereby subjecting Binance to the jurisdiction of the federal courts there. Plaintiffs, based upon Defendants' promotional activities in the State of Alabama, believe that Defendants have similarly solicited a customer base in Alabama and are prepared to demonstrate as much through jurisdictional discovery.

Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform Thus, despite a multi-billion-dollar business with associated nationwide advertising and promotion, Defendants have consistently maintained that they enjoy a incorporeal existence whereby the only sign of their presence is the movement of massive amounts of money, including, to human traffickers, terrorists, criminal enterprises and drug cartels.

### C. BAM's Extensive U.S. and Alabama Contacts More Than Satisfy the Requirements of Specific Jurisdiction.

BAM is a Delaware corporation, headquartered in Florida, that deliberately entered the U.S. marketplace and targeted U.S. consumers, including those in Alabama. It obtained money

---

[8] BHL's plea agreement prohibits it from making any assertion that contradicts the Statement of Facts and any such contradiction is a breach of the agreement with severe consequences (Exhibit 10).

transmitter licenses across multiple states, including Alabama, specifically to onboard U.S. customers into the Binance ecosystem. Through Binance.US, BAM expressly marketed, solicited, and sold digital asset services to U.S. residents, generating millions of dollars in transactions from Alabama-linked accounts.

Nor were these contacts superficial. BAM maintained U.S. banking relationships and custodial accounts to facilitate U.S. customer transactions, and those funds were routed through Binance's broader global infrastructure. In other words, BAM purposefully availed itself of the privilege of conducting business in Alabama and across the United States, reaping substantial financial benefits from doing so.

Plaintiffs' claims arise directly out of these forum contacts. The very services BAM provided to Alabama residents—including the transmission of funds and the operation of Binance.US—are the conduits through which terror financing occurred. This is the classic case for specific jurisdiction: defendants intentionally directed business activities toward Alabama, and plaintiffs' injuries flow from those same activities.

U.S. regulators themselves have confirmed that Binance's global operations were deliberately structured to evade U.S. oversight while still servicing U.S. customers. In November 2023, DOJ announced that Binance's "willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform."[9] The U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) and Office of Foreign Assets Control (OFAC) actions the same day found that Binance failed to file required Suspicious Activity Reports on over 100,000 transactions, including those tied to Hamas' al-Qassam Brigades, Palestinian Islamic

---

[9] Press Release, U.S. Dep't of Justice, Binance and CEO Plead Guilty to Federal Charges in $4B Resolution (Nov. 21, 2023), https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

Jihad, al-Qaeda, and ISIS. FinCEN's consent order further described unreported activity involving money transmitters later designated for Hamas fundraising and other Syria-based entities connected to terrorist financing. *See* Exhibit 9.

These findings demonstrate not only that Binance's global platform was used for terrorism financing, but also that its U.S. affiliate, BAM, was integral to the scheme. BAM was incorporated in Delaware, headquartered in Florida, and expressly marketed to U.S. consumers—including those in Alabama—while presenting itself as an "independent" exchange. In reality, BAM served as a regulatory front that allowed BHL to continue accessing U.S. markets and customers, with U.S. banking, custodial accounts, and state money-transmitter licenses (including in Alabama) providing the very financial infrastructure through which illicit transactions flowed into the global Binance network.

Thus, the U.S. Government's own enforcement record supports Plaintiffs' allegations: BHL misused BAM as a vehicle to maintain U.S. customer access while shielding itself from U.S. regulators. This is precisely the kind of domination, misuse, and proximate causation that courts recognize as sufficient to establish alter-ego jurisdiction.

Defendants' characterizations regarding the allegation set out in the Amended Complaint reflect the pleading it wishes Plaintiffs filed, rather than the one before the Court. Accordingly, there is no reason to complicate matters by resorting to language-stretching or attempts to squeeze facts from anodyne broad claims. As the FAC makes clear to the point of perseveration, CZ and Binance did not so much control BAM as demonically possess it to the extent that would defy the efforts of the best exorcists.

CZ and Binance exercised such pervasive domination over BAM that its separate corporate existence was purely illusory. BAM did not simply operate in the abstract marketplace—it targeted

and onboarded Alabama residents. BAM held an Alabama money-transmitter license, marketed Binance.US to customers in the state, and facilitated millions of dollars in transactions tied to Alabama accounts. Through these activities, Alabama consumers entrusted their funds to what they believed was a regulated U.S. exchange, only to have those funds funneled into Binance's global network that U.S. regulators have since determined was used to finance terrorism, sanctions evasion, and other illicit activity.

Alabama residents were thus directly harmed: they were exposed to heightened risk of loss, misrepresentation about the safety and independence of Binance.US, and the diversion of their assets into a platform now acknowledged by DOJ and the U.S. Treasury Department to have enabled terrorist financing. Plaintiffs' claims arise precisely from these Alabama-directed contacts, making the exercise of jurisdiction both appropriate and necessary.

BHL cannot evade jurisdiction by hiding behind BAM's incorporation. Plaintiffs allege, and regulators have confirmed, that:

- BHL **created BAM as a façade** to market Binance's services in the U.S. while claiming ostensible independence.

- BHL **provided BAM's technology, liquidity, and infrastructure**, including matching engines, digital wallets, and branding.

- BHL executives — under Zhao's leadership — made **strategic and compliance decisions** for BAM and retained authority over its banking and fin

- BAM was not a genuine stand-alone company, but an instrumentality of BHL used to evade U.S. law while still accessing U.S. customers.

As BAM acknowledges, "extraordinary circumstances" justify discarding the presumption "that a corporation is a legal entity existing separately from its shareholders." This exercise of discretion is mandated where, as here, the ownership, operations, fiscal management, technology, and decision are vested in a unitary entity who leveraged that domination to commit acts tortious to Plaintiffs and therefore "may be appropriate when the corporate entity is (1) undercapitalized, (2) formed or operated with a fraudulent purpose, or (3) operated "as an instrumentality or alter ego" of its shareholders." *Shorter Brothers, Inc., et al., v. Vectus 3, Inc., et al.*, 343 So. 3d 508 (Ala. 2021) (citing *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334 (Ala. 1991)). That listing of the factors in the alternative, that is joining them with "or," establishes that a corporate veil can be pierced for *any* of the three reasons. *In re Wallis, Case No. 09-06669-BGC-7, Adv. Pro.* No. 10-00010-BGC-7 (Bankr. N.D. Ala. Mar. 31, 2011).

The FAC pleads all three:

- **Undercapitalization:** BAM could not operate without BHL's financial support and was stripped of liquidity when Zhao transferred hundreds of millions from BAM to Merit Peak and Sigma Chain.

- **Fraudulent Purpose:** BAM was formed specifically to present the illusion of a compliant U.S. entity while secretly controlled by BHL and Zhao.

- **Instrumentality:** BAM executives acknowledged they were "puppets" of BHL and Zhao, with no independent control over banking, technology, or compliance.

As such, BAM's contacts with Alabama are imputable to BHL, and the corporate veil cannot shield BHL from jurisdiction.

As the SEC has alleged, Zhao and Binance's public claim that Binance.US was created as a separate, independent trading platform for U.S. investors was a façade. In reality, Zhao and Binance secretly controlled the platform's operations behind the scenes. The SEC further alleged that Zhao and Binance exercised direct control over customer assets, commingling billions of dollars of investor funds and diverting them at will, including to entities Zhao owned and controlled such as Sigma Chain and Merit Peak Limited. At the same time, BAM Trading and BAM Management US Holdings, Inc. misled investors about supposed trading controls while Sigma Chain engaged in manipulative wash trading that artificially inflated Binance.US's trading volume. *See* Exhibit 2. These allegations underscore that BAM was no independent U.S. company, but an alter ego through which Zhao and Binance reached into U.S. markets, concealed their control, and profited from conduct that directly gives rise to Plaintiffs' claims.

As such, "[a] separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it." *Clive Samuels & Assocs., Inc. v. Retail Grp. SE, Inc.*, No. 2:06-cv-1701-JHH, 2008 WL 497494 (N.D. Ala. Feb. 1, 2008) (quoting *Co-Ex Plastics, Inc. v. AlaPak, Inc.*, 536 So.2d 37, 38 (Ala. 1988)); *see also Culp v. Econ. Mobile Homes, Inc.*, 895 So.2d 857, 859 (Ala. 2004). Personal jurisdiction may be based on an alter-ego theory when "separate corporate status is formal only" and has no "semblance of individual identity." *Southern Research Institute v. PAM Innovation Corp., No.* 2:19-cv-00798-RDP, 2020 WL 1452114 (N.D. Ala. Mar. 24, 2020); *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002); *see also Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293-94 (11th Cir. 2000).

In a proper case, when the corporate form is being used to evade personal responsibility, both state and federal courts within the State of Alabama have not been hesitant to disregard the corporate form and impose liability on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality. *See, e.g., Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396 (Ala. 2013) (citing *C.E. Development Co. v. Kitchens*, 288 Ala. 660, 264 So.2d 510 (1972)); *In re Wallis,* Case No. 09-06669-BGC-7, Adv. Pro. No. 10-00010-BGC-7 (Bankr. N.D. Ala. Mar. 31, 2011) (citing *Messick v. Morning*, 514 So.2d 892, 894 (Ala.1987)) ("The Court further holds that Karson Enterprises was conceived and/or operated for fraudulent purposes and was operated as 'an instrumentality or alter ego of an individual or entity with corporate control.' Accordingly, the Court does not recognize a separate corporate existence of Karson Enterprises because it is 'organized and controlled and its business conducted in such a manner as to make it merely an instrumentality of another.' In such instances, the corporation exists merely to evade its legal liabilities."); *see also Gilbert v. James Russell Motors, Inc*., 812 So.2d 1269, 1273 (Ala. Civ. App. 2001).

At times, a court may disregard the corporate entity and impose liability upon the controlling party. Such liability is predicated upon the rule that, when one corporation controls and dominates another corporation to the extent that the second corporation becomes the "mere instrumentality" of the first, the dominant corporation becomes liable for those debts of the subservient corporation attributable to an abuse of that control. *Kwick Set Components, Inc. v. Davidson Indus., Inc*., 411 So. 2d 134 (Ala. 1982) (quoting *Forest Hill Corp. v. Latter & Blum*, 249 Ala. 23, 27, 29 So.2d 298 (1947)) ("That is, the legal fiction of separate corporate entity should not be so extended 'as to enable the corporation to become a vehicle to evade just responsibility.'") Indeed, "The theory of separate corporate existence can properly be discarded, **even in the absence**

**of fraud, to prevent injustice or inequitable consequences.**" *Kwick Set Components,* 411 So. 2d at 135 (citing *Woods v. Commercial Contractors, Inc.,* Ala., 384 So.2d 1076 (1980)). In such instances, three conditions must be satisfied:

(1) The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

(2) The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuses of control will be presumed; and

(3) The misuse of this control must proximately cause the harm or unjust loss complained of. Blanton, 585 So.2d at 1334-35 (*quoting Messick v. Moring*, 514 So.2d 892, 894-95 (Ala.1987).

Contrary to what Defendants contend, corporate the distinct existence of corporate separateness is overwhelmingly recognized, but hardly inviolate. Where, as here, a consolidated criminal enterprise whose domination by the since-incarcerated CZ has been documented exhaustively in criminal enforcement proceedings, the facts, rather than reflexive resort to corporate separateness, controls. *Austin v. Global Connection of Am., Inc.,* No. 08-12347, 2008 WL 5206829 (11th Cir. Dec. 17, 2008) ("Given the fact-intensive nature of the veil-piercing analysis, the determination is typically one to be resolved at trial, where the trier of fact can make choices as to credibility and weight of the evidence.") *See Perry v. Household Retail Services, Inc*., 953 F. Supp. 1378, 1381 (M.D. Ala. 1996) (citations omitted). Accordingly, Defendants' brazen attempt to cast CZ's control of BAM as the benign involvement of an owner is undermined by multiple judicial and regulatory findings and not worthy of credence. The only way Defendants

can overcome Plaintiffs' specific allegations of CZ's and Binance's fraudulent use of BAM as a puppet entity, is to ignore them.

Defendants' attempt to recast CZ's control of BAM as the benign involvement of a corporate owner is not credible in light of multiple judicial and regulatory findings. Plaintiffs allege—and the record supports—that BAM was fraudulently used as a puppet entity to:

- Deceive regulators and shield BHL from liability;
- Maintain U.S. customer access to Binance's global platform while evading U.S. oversight; and
- Facilitate financial flows that ultimately funded terrorism.

Courts have long recognized that misuse exists where a parent uses a subsidiary to perpetrate fraud, evade regulation, or avoid obligations. That is exactly what Plaintiffs have pled here.

### D. Defendants Incorrectly State that Plaintiffs Have Failed to Contest that the Defendants Do Not Observe Corporate Formalities and that BAM Transacts Business with BAM on an Arm's-Length Basis.

Defendants claim that Plaintiffs put forth a "mishmash of allegations, from regulatory agency complaints." Defendants omit that these complaints resulted in the incarceration of CZ, a record-breaking financial penalty exceeding $4 billion and BAM's increasing disqualification from doing business in the U.S. This "mishmash of allegations" were substantiated, largely admitted to by Binance and CZ in their respective plea agreements. Tellingly, although Defendants claim that Plaintiffs "stretch and embellish" regulatory sources that they quote verbatim, Defendants only quibble with the reason for BAM's exclusion from the money remittance space in North Dakota and Georgia, not with the monumental federal findings finding CZ, Binance and BAM to be a single unified vehicle for fraud and illegality.

29

Defendants claim that Plaintiffs do not contest that BAM maintains legitimate business operations separate from Binance. In fact, Plaintiffs contest every bit of that notion and allege, echoing U.S. Government findings, that the entire purpose of the creation of BAM was illegitimate and that its operations were anything but separate.

Plaintiffs also contest that any of the Defendants' observed corporate formalities. Binance does not observe corporate formalities. It has no board of directors but was controlled entirely by CZ at all times materially herein. The CFTC Complaint states:

> As part of [an] audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she 'need[ed] to write a fake annual MLRO report to Binance board of directors wtf.' [Chief Compliance Officer Samuel] Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, 'yea its fine I can get mgmt. to sign' off on the fake report.

According to the CFTC Complaint, CZ has managed all aspects of both Binance.com's and Binance.US's operations, stating in part: "Zhao is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of [BAM]."

As for the factors listed by Defendants to "eviscerate" Plaintiffs claims, Plaintiffs certainly contest and refute the notion that BAM and Binance operated at arm's length. Comparing the present case—brought in the wake of several federal agencies successfully demonstrating CZ's and Binance's control over BAM—with cases where the courts were presented with the following non-exhaustive facts demonstrating CZ and Binance's total domination and control of BA, it becomes clear that all of the following factors were properly pleaded by Plaintiffs:

- CZ's and Binance's domination of BAM's board of directors,

- BAM's inability to access its own systems,

- CZ's and Binance's control over the entities BAM relied on to execute and generate trade volume including the sole counterparty for BAM's "One Click Buy Sell" and "Convert" services,

- Binance's and CZ's raiding of BAM coffers and control of its banking relationship,

- BAM executives and employees self-acknowledged "shackled" relationship to CZ, BAM executives imposed inability to run BAM independently,

- Binance's dominance of the counter-partes necessary for Binance and BAM to ensure liquidity and facilitate trades,

- The Service Level Agreements, wallet custody agreements, software licensing agreements, and other agreements between Binance and BAM Trading demonstration Binance's control over BAM's operations,

- BAM's inability to access or spend funds without CZ's preapproval.

Defendants cite *Keenan v. Matchmaker Int'l*, 1999 WL 33590522 (S.D. Ala.), but even in horizontal piercing, courts recognize it where entities are **in reality alter-egos or shells**. Plaintiffs' allegations show BAM was **not a genuine separate entity** but a façade created for BHL's benefit. That makes this case stronger than *Keenan*, where plaintiffs had no such allegations of fraudulent structuring. Moreover, Defendants' citation to *Reynolds v. Binance Holdings, Ltd.*, 481 F. Supp. 3d 997 (N.D. Cal. 2020), as well as *Guarini v. Dow*, 634 F. Sipp. 1100 (S.D. Fla 2022), and *Kuklinski v. Binance Capital Management*, 2023 WL 2788654, (S.D. Ill. April 4, 2023) are unavailing, as all of those cases were decided before FinCEN issued its consent order with Binance on November 21, 2023 and before the SEC issued its ruling on June 5, 2023. Prior to being investigated, Binance

was able to successfully deny its and CZ's domination of BAM. Today, after investigations by FinCEN, the SEC, the DOJ and the CFTC, that domination is undeniable.

### E.   Defendants Incorrectly Identify the "Relevant Time Period" and Time of the Attacked Transaction.

Defendant's reliance on *Shorter Bros v. Vectus 3, Inc*., 343 So. 3d 508 (Ala. 2021), for the notion that a show of control over a subservient entity must be at "the relevant time period" to pierce the corporate veil is fine to state the general principle. However, the court in *Shorter Bros* provided no guidance as to identifying the "relevant time period," which Defendants' failed to correctly do here. Defendants' casting the "relevant time period" of CZ's and Binance's domination of BAM as the date of the October 7, 2023 terror attacks, *see* ECF No. 93 at 41, instead of the time period in which they engaged in the remittance of funds to terrorist entities entirely misses the point.  The relevant time period and "attacked transaction" is not the penultimate bloody results of Defendants' crimes, but the days of the crimes themselves when Defendants, as a single unified, undifferentiated entity, subverted the U.S. financial and banking system to deliver money to terrorists, to Hezbollah, PIJ, and Hamas.[10] These funds armed, provisioned, and capacitated Hamas and PIJ with dollars for weapons, training and personnel to carry out, the October 7, 2023, terror attacks. This was all done with BAM as a critical cog if CZ's apparatus for moving money to prohibited destinations utilizing methods proscribed by a multitude of banking, money remittance, and suspicious activity reporting regulations governing CZ's ownership and complete control of his entities.

BAM alleges that the Amended Complaint fails to allege that CZ controlled BAM during the "relevant time period," notwithstanding that the "relevant time period" is the time leading up

---

[10] https://www.timesofisrael.com/hamas-planned-oct-7-from-before-2014-with-final-decision-made-by-5-leaders-report/

to the October 7, 2023, terror attacks when Hamas received huge sums of money via Defendants' services. Moreover, as the Amended Complaint makes clear, CZ still functionally controls BAM to this day, which is the stated reason for multiple states unceremoniously excluding BAM from doing business there.

Defendants' claims that virtually all of Plaintiffs' claims predate 2023 are not only incorrect, as CZ continues to exercise ownership control over BAM and Binance, but also irrelevant. Plaintiffs allege that Defendants were vital in Hamas arming and provisioning itself, something Defendants' employees joked about at work. That the terrorist attack that bore fruit to these efforts took place a short while after these remittances is irrelevant. Arming terrorists and building their capacity is a predicate to those terrorists carrying out attacks. It can't work in reverse or even simultaneously.

Defendants' liability flows from control and misuse they exercise at the time of *their* wrongful acts, and not the subsequent acts of the terrorists they abetted. Here, the liability-creating event is the remittance of funds to a terrorist organization. At that time, Binance, CZ, and BAM were commingled and functioned as alter egos. The later use of those funds by the terrorists does not reset the relevant time frame. Because the corporate form was abused at the moment of the transfer of funds to the terrorists that eventually carried out the October 7, 2023, terror attacks, that is the point at which the court must evaluate alter ego factors. The subsequent but incomplete separation of the Defendants at the point of the federal government's gun does not insulate them from liability for wrongful acts committed during the period of alter ego control.

Allowing BHL to hide behind BAM's corporate form would subvert both fairness and fundamental public policy. If foreign corporations were permitted to deliberately structure sham U.S. affiliates to access U.S. markets while simultaneously insulating themselves from

accountability, the entire framework of U.S. financial regulation would be rendered meaningless. Courts have consistently rejected efforts to turn the doctrine of corporate separateness into a safe harbor for fraud or misconduct.

This principle has particular force in Alabama, where public policy emphasizes protecting consumers from financial exploitation and ensuring accountability for fraudulent or deceptive conduct. BAM held an Alabama money transmitter license precisely to assure Alabama regulators and customers that it was subject to oversight and operating lawfully. Yet Defendants misused BAM's license and presence in Alabama to funnel U.S. customer funds—including those of Alabama residents—into Binance's global network, while simultaneously enabling illicit financial flows that contributed to terrorist financing.

To immunize such conduct under the guise of corporate form not only would undermine the protections Alabama law affords its citizens but also would actively reward a scheme that left Alabama consumers exposed to both financial and security risks. Equity, public policy, and Alabama precedent demand that the veil be pierced.

### F.  This Case May Be Easily Distinguished from *Reynolds v. Binance Holdings, Ltd.*

Defendants rely heavily on *Reynolds*, but that case is materially different from the present context. *See Reynolds v. Binance Holdings, Ltd.*, 481 F. Supp. 3d 997 (N.D. Cal. 2020). *Reynolds* was decided on a far thinner record, before substantial discovery or public enforcement findings were available and at a stage where plaintiffs lacked access to internal documents demonstrating BHL's control over its U.S. affiliate.

Since *Reynolds*, multiple U.S. regulators—including the **SEC**, **CFTC**, **DOJ**, and **Treasury**—have publicly alleged and documented BHL's pervasive control over BAM and its

use of BAM to facilitate transactions with U.S. customers while evading U.S. oversight. These findings confirm that BAM was not an independent entity, but rather a vehicle through which BHL directed U.S. operations and benefitted from U.S. customer activity.

This new context distinguishes *Reynolds* and demonstrates that Plaintiffs' allegations are neither speculative nor conclusory. Rather, they are corroborated by official U.S. Government findings, which provide a strong factual basis supporting the exercise of alter-ego jurisdiction.

### G.   BAM Functions as an Instrumentality and Cannot Evade This Court's Jurisdiction.

Under Alabama law, courts pierce the corporate veil when a corporation functions as the mere instrumentality of its controlling entities. The "instrumentality rule" requires showing: (1) complete domination of the corporation's finances, policy, and practices; (2) that such control was misused to commit a wrong or legal violation; and (3) that the misuse caused injury. Unlike Delaware's narrow approach, Alabama courts apply this rule with flexibility, refusing to allow formalities to shield fraudulent or inequitable conduct.

Here, BAM has already stipulated to jurisdiction in Alabama (Exhibit 1). That concession is inconsistent with its claim of independence and demonstrates that BAM itself recognizes its subservience to its parent and affiliates. A genuinely independent entity would not concede jurisdiction in a forum with which it allegedly lacks meaningful contacts.

Compounding this, BAM has lied to the Court. When a corporation misrepresents facts at the direction of its controllers, it reveals itself as nothing more than a tool of those controllers. Alabama law is clear: the corporate form may not be used as a shield for fraud, misrepresentation, or bad faith.

BAM's stipulation and misrepresentations confirm what Plaintiffs have argued from the outset—BAM is not a truly separate enterprise but an instrumentality of its controlling

shareholders. Under the instrumentality rule, the Court should disregard BAM's corporate form and hold its controllers accountable in this forum.

Based on the foregoing, below is a recapitulation of some of the First Amended Complaint's allegations juxtaposed with the relevant factors to be considered for veil-piercing. This overwhelmingly demonstrates that it certainly is warranted here.

| Excerpts From Amended Complaint | Paragraph | |
|---|---|---|
| The Court has personal jurisdiction over CZ and Binance under the doctrines of alter ego and veil-piercing <u>because they owned, dominated, and controlled BAM Trading, which functioned as a mere instrumentality of Binance's global operations.</u> CZ and Binance used BAM Trading to unlawfully access U.S. markets while evading regulatory oversight, directing its day-to-day operations and deriving substantial benefit from its activities. <u>Given their complete control over BAM Trading and their use of it to engage in criminal and tortious conduct,</u> it would be inequitable to treat them as separate entities and to require Plaintiffs to litigate separately against the individuals and entities who were the true | ¶42 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego" |

| | | |
|---|---|---|
| decision-makers behind BAM Trading's actions. | | |
| While BAM Trading ostensibly operated the Binance.US platform—a spot digital asset trading platform launched in 2019 and marketed as a separate, U.S.-compliant entity—<u>it functioned in reality as a mere façade. Binance and CZ exercised control over all critical aspects of BAM Trading's operations, including its banking relationships, accounts payable and receivable, compliance infrastructure, and underlying technology.</u> Internal Binance communications obtained by regulators confirm that CZ and his senior leadership team made key operational and strategic decisions for BAM Trading. | ¶71 | ✓ operated "as an instrumentality or alter ego" |
| The Commodity Futures Trading Commission (CFTC) similarly found that <u>CZ maintained direct access to BAM Trading's financial and compliance systems and approved expenditures and hiring decisions. These facts establish that BAM Trading was not a truly independent entity, but an instrumentality</u> through which Binance and CZ secretly operated within the United States while | ¶73 | ✓ formed or operated with a fraudulent purpose, <br><br> ✓ operated "as an instrumentality or alter ego" |

| | | |
|---|---|---|
| evading regulatory obligations and oversight. | | |
| BAM Trading ostensibly operated the Binance.US Platform, a spot digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, which launched in 2019. <u>In reality, the BAM Platform was controlled by Binance and CZ as was Bam Trading's banking, payables and receivables, compliance, and technological infrastructure</u>. | ¶74 | ✓ operated "as an instrumentality or alter ego" |
| <u>BAM Trading's ownership structure also reflects Binance's and CZ's dominance.</u> BAM Trading was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CZ Holdings Limited, a British Virgin Islands company that was owned and controlled by CZ. CZ continues to own 81 percent of BAM Management. | ¶75 | ✓ operated "as an instrumentality or alter ego |
| <u>This ownership structure reflects the absolute centralization of control within Binance's broader corporate framework, directly linking CZ and Binance to BAM Management's activities and further demonstrates that BAM</u> | ¶76 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego" |

| | | |
|---|---|---|
| <u>Management, despite its formal registration as a separate entity</u>, was functionally an arm of Binance, directed by CZ for his own benefit and in furtherance of Binance's illegal activities in the United States. | | |
| Binance's ability to access U.S. consumers for non-compliant remittances to FTOs began with its front-facing pseudo-compliant, pseudo-independent BAM Trading-operated Binanace.US platform whose employees and management were tools of Binance and CZ, and, became increasingly aware that such was the case with each passing day. | ¶77 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego" |
| <u>Rather than operating as an independent company and platform, BAM Trading was a straw entity for Binance and CZ's global remittance enterprise for whom Hamas and PIJ were valued clients rather than prohibited sources of business</u>. U.S.-based remittances worth millions of dollars originated with BAM Trading's promotional efforts and platform and ended with Binance's payout to FTOs which should have generated a flurry of Suspicious Activity Reports ("SARs"), a | ¶78 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego" |

| | | |
|---|---|---|
| legally mandated requirement for any financial institution that has reason to suspect its services are being used to facilitate money laundering, terrorism, or other criminal conduct . | | |
| Former Acting Comptroller of the Currency Brian Brooks ("Brooks") who was briefly CEO of BAM Trading for four months in 2021 before resigning. The SEC's Complaint cites testimony from Brooks that "[t]o the extent that these two liquidity providers were significant sources of liquidity, meaning that our customers couldn't, you know, clear orders without the presence of those makers on our platform, I thought that was a real problem"..."It suggested that the company was, in fact, heavily dependent on CZ, not just as a control person but also as an economic counterparty and that is problematic, so I thought we needed to look into deplatforming them." He also testified that what "became clear to me at a certain point was CZ was the CEO of BAM Trading (Binance.US), not me. | ¶80 | ✓ operated "as an instrumentality or alter ego" |
| As would be discovered upon investigation by the SEC, Zhao and Binance | ¶95 | ✓ formed or operated with a fraudulent purpose, |

| | | |
|---|---|---|
| controlled the Binance.US platform's operations behind the scenes and encouraged U.S. customers to utilize its less regulated Binance platform in lieu of the Binance.US platform which was intended to be compliant with U.S. law. In fact, upon information and belief, Binance continued and possibly still continues to allow some of its most important, high-volume U.S. users to remain on the unregistered Binance.com exchange. | | ✓ operated "as an instrumentality or alter ego" |
| As uncovered by the SEC's investigation, CZ and Binance exercised covert and continuous control over the operations of the Binance.US platform, despite public representations that it operated independently in compliance with U.S. laws. Behind the scenes, Zhao and Binance deliberately directed—and in some instances facilitated—U.S. customers' access to the unregulated Binance.com platform, thereby circumventing U.S. regulatory oversight. Upon information and belief, this unlawful access was not limited to minor users. It included Binance's most lucrative and high-volume U.S. clients, who were knowingly retained on the Binance.com exchange in | ¶96 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego" |

| | | |
|---|---|---|
| direct violation of U.S. securities and anti-money laundering laws. This misconduct may be ongoing, further illustrating Binance's willful and systemic efforts, via BAM Trading, to deceive regulators and flout U.S. law. | | |
| At all relevant times, Zhao and Binance secretly controlled the Binance.US platform's operations which BAM Trading executives were aware of well before the October 7th Attack. | 111 | ✓ operated "as an instrumentality or alter ego" |
| CZ was also, concurrently, the Chairman of BAM Trading's and BAM Management's Boards of Directors until at least March 2022, exerting full control over these entities in his capacity as the ultimate decision-maker. As Chairman, CZ directly oversaw and directed the operations, strategies, and decisions of BAM Trading, which was responsible for facilitating Binance's operations in the United States. Under his leadership, BAM Trading was effectively a vehicle for Binance's global operations, ensuring that U.S. customers were onboarded to Binance's platform while circumventing U.S. laws and regulations. This structural control further | ¶124 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| solidified CZ's role in the ongoing misconduct that enabled the facilitation of illegal transactions, including those linked to Hamas and other FTOs | | |
| <u>Far from being an independent entity, BAM Trading served as a front to feign regulatory compliance while enabling Binance to continue illicit operations, solicit U.S. customers unlawfully, and evade federal oversight.</u> | ¶125 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |
| Neither Merit Peak, nor Sigma Chain have ever been registered with the CFTC in any capacity. These entities were utilized by CZ to control and eventually siphon off funds held in BAM Trading accounts which were necessary for compliance. <u>BAM Trading's putative executives were not in any position to prevent such withdrawal, and indeed, were often not even aware of them, because it was Binance and CZ, not BAM Trading executives, that ran BAM Trading.</u> | ¶126 | ✓ operated "as an instrumentality or alter ego |
| The true authority over BAM Trading rested with Binance and CZ, who exercised complete control over the entity's operations, including the illicit diversion of funds that bypassed U.S. | ¶127 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| regulations and facilitated criminal activity. | | |
| <u>CZ in fact not only oversaw the BAM Trading platform and controlled the parties providing market making and counterparty services, but he and Binance personnel were the architects of the process</u> whereby high value U.S.-based BAM Trading customers could transition to the Binance platform which disregarded U.S. regulatory law and directed consumers as to how to actively conceal their locations in the U.S. in order to circumvent U.S. regulators. | ¶132 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |
| <u>In addition, Binance and CZ have admitted that they directly or indirectly owned the various entities that collectively operate the BAM Trading and Binance Platform</u>. CZ, along with a core senior management group, made the strategic decisions for Binance, BAM Trading and the Binance Platforms and exercised day-to-day control over their operations and finances. | ¶149 | ✓ operated "as an instrumentality or alter ego |
| <u>Because CZ controlled BAM Trading's business, which was largely operated by Binance employees under CZ's direction,</u> BAM Trading became an | ¶179 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| instrument to attract U.S. clients in order to enable those clients to remit to sanctioned entities such as Hamas and the destinations in Iran. | | |
| To do this, CZ and Binance exercised total fiscal, operational and technological control of BAM Trading. In fact, Binance's own Terms of Use refer to BAM as a "fiat gateway" for Binance. CZ and Binance created BAM Trading so that they could own a vehicle that qualified to be a licensed money remitter in order to do business with U.S. entities wishing to send funds to illegal destinations, including to designated FTOs. | ¶180 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |
| Any differentiation between BAM Trading is purely cosmetic. According to a June 10, 2023 article on Forbes.com titled 5 Most Surprising Revelations from the SEC's Binance Lawsuit, Brooks who resigned as CEO three months after taking the job, said that "what became clear to me at a certain point was CZ was the CEO of BAM Trading, not me." | ¶181 | ✓ operated "as an instrumentality or alter ego |
| BAM Trading was never an independent entity, but rather, as its own executives and employees acknowledge, a tool of CZ and Binance in | ¶182 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| their larger global criminal enterprise. | | |
| <u>Management and ownership as between BAM and the Binance-branded U.S. entities is essentially identical and the flow of funds and operations of these entities share CZ as it sole managerial and ownership fulcrum.</u> | ¶184 | ✓ operated "as an instrumentality or alter ego |
| <u>BAM Trading, the other Binance-branded U.S. entities, and the Binance.com platform operated by Binance Holdings functioned not as separate and distinct legal entities, but as a single, integrated enterprise unified through their common ownership, control, and operational interdependence. All were managed by CZ, who acted as the singular point of authority and control across these entities.</u> Strategic decisions, financial flows, compliance policies (or lack thereof), and infrastructure were centralized under CZ's direction. <u>This unity of interest and ownership, combined with a disregard for corporate separateness, justifies treating these entities as a single enterprise for purposes of liability, including liability for the unlawful financing of terrorist organizations.</u> | ¶185 | ✓ formed or operated with a fraudulent purpose, <br><br> ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| According to the June 23, 2023 Complaint filed by the SEC, as one part of this plan to evade United States regulatory oversight over CZ, Binance, and the Binance.com Platform, CZ and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.us Platform. <u>Behind the scenes, however, CZ and Binance were intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.us Platform. BAM Trading employees referred to CZ's and Binance's control of BAM Trading's operations as "shackles"</u> that often prevented BAM Trading employees from understanding and freely conducting the business of running and operating the Binance.US Platform—so much so that, by November 2020, <u>BAM Trading's then-CEO told Binance's CFO that her "entire team feels like [it had] been duped into being a puppet.</u> | ¶192 | ✓ formed or operated with a fraudulent purpose, <br><br> ✓ operated "as an instrumentality or alter ego |
| In fact, the SEC Complaint includes allegations that Binance | ¶194 | ✓ operated "as an instrumentality or alter ego |

47

| | | |
|---|---|---|
| "held and controlled BAM data offshore", and had authority over BAM's bank accounts, expenses, and cryptocurrency assets in BAM users' accounts, and, at least through much of 2021, BAM Trading employees could not obtain certain real-time trading data for the Binance.US Platform without CZ's personal approval. | | |
| It was reported that CZ retained an ownership stake exceeding 80%. This level of ownership enables him to exert significant influence over strategic decisions, personnel, and the financial operations of Binance, and underscores that his departure from day-to-day operations did not sever his control over the enterprise. As part of a coordinated resolution with the DOJ, FinCEN, and OFAC, Binance admitted that CZ exercised "significant control" over all Binance entities and that his leadership directly contributed to years of compliance failures. CZ was also designated a "control person" in parallel SEC and CFTC actions, confirming his individual accountability for Binance's unlawful conduct. | ¶196 | ✓ operated "as an instrumentality or alter ego |
| Binance and CZ, along with former | ¶197 | ✓ formed or operated with a fraudulent purpose, |

| | | |
|---|---|---|
| executive Samuel Lin, are presently also defendants in a civil action brought by the Commodity Futures Trading Commission ("CFTC") on March 27, 2023, in The United States District Court the Northern District of Illinois for its violations of U.S. law in using BAM Trading, which CZ dominated, to violate U.S. law. The Complaint states that in 2019, Zhao and BAM Trading launched Binance.US, a digital asset spot market trading platform that offers its services to U.S. customers. When he hired BAM Trading's first CEO, Zhao described Binance as a pirate ship and explained that he wished for Binance.US to be a navy boat. <u>BAM Trading is under common ownership and control with Binance and continues to operate the Binance.US spot platform</u>. Binance personnel, including Zhao, have dictated Binance. US's corporate strategy, launch, and early operations. At Zhao's direction, Binance.us's marketing and branding has mirrored that of Binance.com. BAM Trading has licensed Binance's trademarks to advertise in the United States. Binance.US has also relied on one of | | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| Binance's matching engines through a software licensing agreement. | | |
| FinCEN further found that BAM Trading was utilized by Binance in furtherance of its criminality stating:<br><br>Binance.us has generally lacked autonomy from Binance in two key respects: (i)Binance.us is dependent on Binance for several business-critical services, including the provision of wallet software services, as well as various IT and software-related services (such as Binance.us's reliance on Binance.com's matching engine, risk control center, and Android/iOS mobile applications to operate); and (ii) **Binance.us's board of directors has always consisted of only three individuals: Binance.us's CEO, the CEO of Binance.com, and a third director affiliated with Binance.com**. This lack of independence allowed Binance's CEO to use Binance.us to facilitate activity of his proprietary trading firms: Sigma Chain AG (Sigma Chain) and Merit Peak Limited (Merit Peak). Moreover, because Merit Peak also functioned as Binance.com's over-the-counter (OTC)trading desk, Merit Peak was able | ¶ | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| to use Binance.us as a way for Binance.com to continue to access the U.S. CVC market. | | |
| After a paragraph discussing BAM, the Amended Complaint states:<br><br><br>The Binance-affiliated platforms, including those operated by Binance's co-defendants herein, were in fact maintained and operated by a <u>murky web of corporate entities, all of which are beneficially owned and controlled by CZ. These corporations were located in different jurisdictions but were all ultimately under CZ's preponderant ownership and sole control</u>. | ¶218 | ✓ operated "as an instrumentality or alter ego |
| <u>Since inception, CZ has been BAM Management's beneficial owner, directly or indirectly owning between as much as 100 percent and approximately 81 percent of its equity</u>. CZ, in addition to being Binance's founder, beneficial owner, and CEO, was Chairman of BAM Trading's and BAM Management's Boards of Directors at least until approximately March 2022. | ¶219 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| Since its inception, CZ has been the ultimate beneficial owner of BAM Management, at times owning 100% of its equity and retaining approximately 81% ownership through at least mid-2023. In addition to his ownership, CZ exercised direct operational control over both BAM Management and BAM Trading, serving as Chairman of their Boards of Directors until at least March 2022…. <u>This pervasive overlap and financial entanglement reflect a unified enterprise structure, rendering the BAM entities mere instrumentalities of CZ and Binance</u>. | ¶220 | ✓ operated "as an instrumentality or alter ego |
| According to the CFTC Complaint, CZ has managed all aspects of both Binance's and Binance.US' operations, stating in part: "CZ is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of [BAM]." According to the SEC Complaint, BAM Trading's second CEO testified to SEC staff that the level of connection between Binance and BAM was a "problem" and that he had concluded that BAM "need[ed] to migrate the technology to full | ¶221 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| [BAM] control." As of at least BAM's second CEO's resignation in August 2021, no such transfer of control had happened. | | |
|     As BAM CEO A testified, there was "significant opacity" with respect to the Binance.US Platform's trading data, and she "did not get answers from CZ on why or how or what we would need to do to be able to bring the data over" to the United States. She "wanted custody of the data and ability to interact with the raw data in real-time, as to my directions, not waiting on someone else's approvals," but she never received it. <u>This is because she was only the nominal BAM Trading CEO, but CZ and his selected Binance minions, and no one else, ran BAM Trading</u> | ¶226 | ✓ operated "as an instrumentality or alter ego |
|     [W]hen BAM Trading opened bank accounts, Binance required that CZ and/or the Binance Back Office Manager have signatory authority over the accounts. In November 2019, BAM CEO A raised questions about this directive with the Binance CFO, noting that having a "non-US resident non-employee on the bank applications … will be a red flag for regulators and will open .com to US | ¶229 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| scrutiny," while also acknowledging "there is not that much separation internally" between Binance and BAM Trading. | | |
| In its statement, Gurbir S. Grewal, Director of the SEC's Division of Enforcement stated <u>that with respect to BAM Trading, "[g]iven that Changpeng CZ and Binance have control of the platforms' customers' assets and have been able to **commingle customer assets** or divert customer assets as they please,</u> as we have alleged, these prohibitions are essential to protecting investor assets." | ¶231 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |
| According to the CFTC Complaint, "Binance personnel, including [CZ], have dictated [BAM's] corporate strategy, launch, and early operations. At [CZ's] direction, [BAM's] marketing and branding has mirrored that of Binance.com. [BAM] has licensed Binance's trademarks to advertise in the United States. [BAM] has also relied on one of Binance's matching engines through a software licensing agreement. | ¶232 | ✓ operated "as an instrumentality or alter ego |
| As an example of Coley's powerlessness over BAM's affairs, including the prevention of | ¶233 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| Binance from reaching out in BAM's name to facilitate consumers' circumvention of OFAC rules, in the first three months of 2021, Binance transferred more than $400 million from BAM to Merit Peak Ltd, the trading firm owned and managed by CZ. | | |
|     A portion of these funds were later sent to the Silvergate Bank account of a Seychelles-incorporated firm called Key Vision Development Limited, which was another entity controlled by CZ. | ¶234 | ✓  operated "as an instrumentality or alter ego |
|     In a February 16, 2023, article on CNBC.com, the article notes that Binance enjoyed secret access to the bank account of its "purportedly independent U.S. partner", BAM Trading, over the first three months of 2021, transferred $400 million flowed from the Binance.US account at California-based Silvergate Bank to Zhao-owned, Merit Peak Ltd. | ¶235 | ✓  operated "as an instrumentality or alter ego |
|     According to the CFTC Complaint, CZ micromanaged all aspects of Defendants' operations. For example, in January 2021, a month in which Binance earned over $700 million in revenue, CZ personally approved an approximately $60 expense related to office | ¶247 | ✓  operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| furniture. Moreover, according to the SEC Complaint, CZ's approval was required for all BAM expenditures over $30,000 through at least January 30, 2020. BAM regularly sought approval from CZ and Binance concerning routine business expenditures including rent, franchise taxes, legal expenses, Amazon Web Services fees to host BAM customer data, and even an $11,000 purchase of Binance branded hooded sweatshirts. | | |
| The same day the Binance.US platform was announced, a consultant for Binance provided Binance with internal guidelines advising that: "On the U.S. launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors]. That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work." | ¶249 | ✓ formed or operated with a fraudulent purpose,<br><br>✓ operated "as an instrumentality or alter ego |
| Binance, under CZ's control, was integrally involved in managing and operating the trading functions on the Binance.US Platform. As BAM Trading's former Director of Operations testified under oath, Binance personnel were responsible for the | ¶250 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| Binance.US Platform's matching engine, APIs, and market data systems. These Binance personnel "operate independently of" BAM Trading, such that BAM Trading only "would talk to [Binance personnel] when we [were] adding a new token [for trading on the Binance.US Platform] or when there was an upgrade or if a market maker had some issue with the API." CZ gave final signoff on various decisions relating to the Binance.US Platform's trading services, including customer account opening processes, development of the front-end access, and creating a reserve to cover ACH deposits. | | |
|       Starting in or about December 2020, Binance permitted BAM Trading personnel to assume control over certain of BAM Trading's bank accounts, but as<br><br>      of May 2023, CZ still had signatory authority over BAM Trading's account that held Binance.US Platform customers' funds. | ¶258 | ✓ operated "as an instrumentality or alter ego |
|       Internal communications indicate that BAM Trading and Binance understood that Binance is the custodian of all funds with CZ controlling the flow of funds. Binance had | ¶260 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| sufficient control to manage and authorize the transfer of crypto assets, including between various omnibus wallets, without the need for any authorization from BAM Trading. | | |
| From the earliest days of the Binance.US Platform, CZ directed BAM Trading to onboard two market makers that he owned and controlled: Sigma Chain and Merit Peak. Both entities were operated by several Binance employees who worked at CZ's direction, including the Binance Back Office Manager, who, at least until December 2020, also had signatory authority over BAM Trading's U.S. Dollar accounts. | ¶267 | ✓ operated "as an instrumentality or alter ego |
| The Binance.US Platform has throughout its existence operated using Binance's matching engine software, digital wallet, clearing and settlement technology, trademarks, and related technology support and hosting environment, all of which were created, deployed, and maintained by Binance engineers and other employees at CZ's direction and input. | ¶268 | ✓ operated "as an instrumentality or alter ego |
| CZ rejected BAM CEO A's and BAM CEO B's Efforts to Give BAM | ¶280 | ✓ operated "as an instrumentality or alter ego |

| | | |
|---|---|---|
| any "Independence" from CZ and Binance. | | |
| Over time, BAM Trading's employees became increasingly dissatisfied with BAM Trading's and the Binance.US Platform's lack of independence and CZ's and Binance's exertion of substantial oversight and control over the company's day-to-day operations. | ¶281 | ✓ operated "as an instrumentality or alter ego |
| <u>While BAM CEO A was working on Project 1776</u>,[11] Forbes broke the Tai Chi Plan story, which the article described as Binance's plan "to intentionally deceive regulators and surreptitiously profit from crypto investors in the United States." The article intensified BAM Trading employees' concerns with CZ's and Binance's control over the business—demonstrating that this significant level of secret control remained. As BAM CEO A explained to the Binance CFO shortly after the article was released, BAM Trading employees "lost a lot of trust with the article" and "the entire team feels like they've been duped into being a puppet." | ¶285 | ✓ operated "as an instrumentality or alter ego |

---

[11] To free BAM from CZ and Binance

| | | |
|---|---|---|
| As BAM CEO B testified, "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me." He further explained that he spent his first 80 days as CEO trying "to get these core foundational things realigned," but "was overruled on all of them" by CZ | ¶292 | ✓ operated "as an instrumentality or alter ego |
| BAM Trading attracted U.S. consumers and, controlled by Binance and CZ, allowed its customers to transition to a non-compliant platform where, Binance knowingly facilitated the remittance of funds to FTOs engaged in terrorism with the tragic events of October 7, 2023, as a foreseeable result. | ¶307 | ✓ formed or operated with a fraudulent purpose, <br><br> ✓ operated "as an instrumentality or alter ego |
| The impact of BAM Trading's complicity in Binance's crimes via CZ's complete control over Bam Trading's operations continue to emerge. | ¶308 | ✓ formed or operated with a fraudulent purpose, <br><br> ✓ operated "as an instrumentality or alter ego |

Defendants' conduct, fraudulent from the outset, mandates the piercing of the corporate veil artificially maintained between them. Defendants did in fact act as a singly unified entity controlled by CZ through Binance and the interests of justice and equity demand that Defendants' fraudulent attempt to escape liability not be rewarded.

### III.    Plaintiffs State a Claim that BHL, BAM, and CZ Aided and Abetted Hamas.

For the reasons described below, Plaintiffs Newman; Diller; Gess; Sanandaji; Parizer; Iris Weinstein Haggai ("I.W. Haggai") (on her own behalf and on behalf of her kidnapped/murdered parents, Gad Haggai and Judy Lynne Weinstein)[12]; Zohar Haggai ("Z. Haggai"), Rahm Hagai ("R. Haggai"), and Ahl Haggai ("A. Haggai") (on their own behalf and on behalf of their kidnapped/murdered parents, Gad Haggai and Judy Lynne Weinstein); Ora Cooper ("O. Cooper"), Rotem Cooper ("R. Cooper"), Doe; Roe; and Moe ("American Plaintiffs") properly plead an aiding-and-abetting claim under the Justice Against Sponsors of Terrorism Act (JASTA), otherwise known as the amendment to the ATA that established secondary liability. It is worth noting that Defendants have been held to have plausibly aided and abetted Hamas under the ATA elsewhere for the very same conduct at issue here. *See Raanan v. Binance Holdings Ltd.*, 2025 U.S. Dist. LEXIS 33874, at *58–60 (S.D.N.Y. Feb. 25, 2025) (internal citations removed).

American Plaintiffs not only have standing but amply satisfy this Court's pleading standards under Fed.R.Civ.P. 12(b)(6), which demands "a complaint … contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Pena v. Ala. Dep't of Pub. Health*, 2025 U.S. Dist. LEXIS 140842, *3 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678). When evaluating a complaint's compliance with Rule 12(b)(6), the court is to accept the allegations in the First Amended Complaint as true and "construe them in a light most favorable to Plaintiffs." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-1322 (11th Cir. 2012). For the reasons outlined below,

---

[12] Defendant Zhao asserts in his motion that Ahl Haggai, Rahm Haggai, and Zohar Haggai "concede that they are Israeli citizens, not U.S. nationals …." (ECF No. 90 at 18).  Zhao is mistaken.  Each of the Haggai's, including these three, Iris Weinstein Haggai, and their kidnapped/murdered parents has, all relevant times held U.S. citizenship in addition to any other citizenship.  Plaintiffs Ora and Rotem Cooper also are U.S. nationals.

Defendants' Motion to Dismiss with regards to Plaintiffs' ATA aiding-and-abetting claims should be dismissed.

**A. American Plaintiffs Have Standing to Bring an Aiding-and-Abetting Claim under the ATA.**

American Plaintiffs Newman; Diller; Gess; Sanandaji; Parizer; I.W. Haggai (on her own behalf and on behalf of her kidnapped/murdered parents, Gad Haggai and Judy Lynne Weinstein); Z. Haggai, R. Hagai, and A. Haggai (on their own behalf and on behalf of their kidnapped/murdered parents, Gad Haggai and Judy Lynne Weinstein); O. Cooper, R. Cooper, Doe; Roe; and Moe all have standing to plead an aiding-and-abetting claim under the Justice Against Sponsors of Terrorism Act (JASTA). JASTA requires that the plaintiff be a "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism … or his or her estate, survivors, or heirs." Each of the American Plaintiffs is either (1) an American citizen who suffered an injury as a result of the October 7 terror attacks and the ongoing attacks from Hamas or (2) represents an American citizen who suffered an injury as a result of the October 7 terror attacks and the ongoing attacks from Hamas or (3) both. All experienced and continue to experience severe mental anguish, extreme emotional pain, and suffering. Courts regularly have held that United States nationals may recover for non-physical, emotional injuries under the ATA, even when those individuals were not physically present at the time of the terrorist attack. *See, e.g., Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 516 n.8 (S.D.N.Y. 2014) ("Courts . . . universally allow ATA claims based on the emotional distress that U.S. nationals experience as a result of the death or injury of their family members."); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004) ("mental anguish, emotional pain and suffering, and loss of society" are recognized injuries "under the plain language, as well as a commonsense interpretation, of the ATA."); *Linde v. Arab Bank, PLC*, 384

F. Supp. 2d 571, 588-89 (E.D.N.Y. 2005) (concluding that an American citizen could recover under the ATA for "various nonphysical injuries, such as emotional distress and loss of consortium, after their family members . . . became victims of acts of international terrorism").

## B.  The ATA Provides for Broad Relief.

In 2016, Congress amended the ATA and enacted the Justice Against Sponsors of Terrorism Act (JASTA) in order to establish an avenue for victims to pursue justice against those who aid and abet terrorists. In doing so, Congress sought to provide litigants "the broadest possible basis" of relief against entities that have "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Pub. L. No. 114-222, 130 Stat. 852, 853 (Sept. 28, 2016). In that vein, JASTA's aiding-and-abetting provision permits "any national of the United States … or his or her estate, survivors, or heirs" who has suffered an "injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" to bring a claim against "any person who aids and abets, by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2).  As a principal matter, aiding-and-abetting liability is intended to "reach[] persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).

JASTA's aiding-and-abetting provision, found at 18 U.S.C. § 2333(d)(2), is to be read in conjunction with the Act's original stand-alone provision, § 2333(a), which has come to be interpreted by the courts as the Act's primary liability provision. Still, subsection (a) provides the fundamental basis of *any* action under Section 2333, and as such, any claim under subsection (d) necessitates consideration of subsection (a), given subsection (d) is merely a discussion of liability. Indeed, the language of 18 U.S.C. § 2333(a) posits the elements of an ATA claim:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The most precise evaluation of an aiding-and-abetting claim demands that both subsections (a) and (d) be read together. Yet, Defendants misconstrue Plaintiffs' requisite reference to Section 2333(a) as a claim of primary liability against Defendants. Plaintiffs never make such a claim. *See* ECF No. 84 at ¶¶ 331–65. Rather, it is impossible to plead the elements of an aiding-and-abetting claim without satisfying the elements of subsection (a) first.

In that vein, a plaintiff bringing an aiding-and-abetting claim must show that (1) he possesses an injury caused by an act of international terrorism; (2) the act was carried out by a Foreign Terrorist Organization (FTO), as designated by the U.S. State Department; and (3) the defendant aided and abetted the FTO "by knowingly providing substantial assistance." *See* 18 U.S.C. §§ 2333(a), 2333(d)(2). Defendants do not dispute that the first two factors have been satisfied by American plaintiffs and instead assert that the third factor has not been met.

The Courts have a variety of mechanisms at their disposal for assessing whether a defendant has "knowingly provided substantial assistance" to an FTO. First, when passing JASTA, Congress incorporated the "legal framework" of the D.C. Circuit case *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). JASTA, § 2(a)(5). That "framework" consists of a three-part test, as put forth in *Halberstam*: (1) "the party [] the defendant aids must perform a wrongful act that causes an injury"; (2) the defendant "must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance"; and (3) the defendant must "knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477. The Court in *Halberstam* then went on to provide a variety of factors that might be considered when assessing

whether the third element of the test had been satisfied, such as "the nature of the act assisted"; the "amount of assistance" provided; whether the defendant was "present at the time" of the principal tort; the defendant's "relation to the tortious actor"; the "defendant's state of mind"; and the "duration of the assistance" provided. *Halberstam*, 705 F.2d at 488.

But the *Halberstam* framework does not mark the conclusion of the analysis. The Supreme Court in its recent case *Twitter, Inc. v. Taamneh*, held that "those elements and factors [in *Halberstam*] should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they *consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'*" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 497 (2023) (quoting *Nye & Nissen*, 336 U. S. 613, 619 (1949)) (emphasis added). The Court in *Twitter* added that a plaintiff must show a "concrete nexus" between the support provided by a defendant and the act of terrorism at issue unless a defendant "so systemically and pervasively assisted [the FTO] that defendant[] could be said to aid and abet every single [FTO] attack." *Twitter*, 598 U.S. at 501. The standard put forth in *Twitter* understandably overlaps with the *Halberstam* factors, insofar as conscious and culpable participation goes to Defendants' state of mind and the "concrete nexus" test touches about the nature of the act assisted. Regardless of the test applied to Plaintiffs' allegations, however, Plaintiffs have more than amply satisfied the pleading standards for an aiding-and-abetting claim under either test, and therefore, Defendants' Motion to Dismiss should be denied.

### C. Plaintiffs' Allegations Satisfy the Generally Aware Element of *Halberstam*.

Plaintiffs' pleading more than satisfy *Halberstam*'s general awareness requirement. In the Southern District of New York, Judge John G. Koeltl determined as much with regard to the allegations presented by the plaintiffs in *Raanan* against Defendants (excluding BAM) here:

The Amended Complaint sufficiently alleges that the defendants were generally aware that they were playing a role in international terrorism at the time when Hamas and PIJ (and their affiliates) were transacting on the Binance platform. The State Department has designated Hamas and PIJ as FTOs since 1997, and the military wings of both organizations have allegedly perpetrated numerous terrorist attacks in Israel and the Palestinian territories since the 1990s. The plaintiffs allege that Binance "built and intentionally maintained woefully inadequate internal controls, . . . created a platform on which it knew illicit actors transacted and transferred money," and "knew that it was providing services to terrorist groups such as Hamas and PIJ." The plaintiffs also allege that, from October 2020 to September 2023, Hamas and PIJ "executed thousands of transactions on Binance, with a total value of at least approximately $60 million." Id. The plaintiffs further allege that Hamas publicized its use of Binance, pointing to a 2019 video that Hamas used to solicit donations, which instructs viewers to "create a new account on one of the trading platforms," including, notably, Binance. Also in 2019, media and third parties allegedly flagged Hamas's use of the Binance platform.  In June 2021, the Wall Street Journal published an article reporting on the "surge in cryptocurrency donations [to Hamas] since the start of the armed conflict with Israel in May 2021." Considered together and viewed in the light most favorable to the plaintiffs, these allegations support a plausible inference that the defendants were generally aware that they were playing a role in Hamas's and PIJ's overall illegal activity.

*Raanan*, 2025 U.S. Dist. LEXIS 33874, at \*58–60 (internal citations removed). Again, the

allegations presented by Plaintiffs closely mirror those presented in *Raanan*, fully supporting the

contention made here that Defendants (excluding BAM) were amply aware of their role in Hamas

and PIJ's illegal terror-financing enterprise.

Plaintiffs properly alleged that Defendants were "generally aware" of their role in illegal and tortious activity when they processed transactions for affiliates of Hamas. Under *Halberstam*'s second prong, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance." *Halberstam*, 705 F.2d at 477. Aiding-and-abetting liability is not reserved just for those who provide material support directly to an FTO but also for those who do so indirectly through an intermediary, as is often the case in cases concerning financial transactions. *See, e.g., Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842, 862 (2d Cir. 2021) (bank's financial services to Hezbollah-linked clients—like enabling wire transfers, sanction circumvention, and offering "special exceptions"—can constitute material support to an FTO, even if funneled through intermediaries). In such instances, the "generally aware" prong is satisfied if "(1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is 'so closely intertwined' with the terrorist organization's illegal activities as to give rise to an inference that the defendant was generally aware of its role in the organization's terrorist activities." *Bernhardt*, 47 F.4th at 867–68 (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021)).

Defendants allege that the chats evidencing their general awareness are too far removed temporally from the October 7 terror attacks, insofar as the chats cited occurred "many years" ago. BHL MTD at 34. But Plaintiffs properly allege that Defendants assisted Hamas and PIJ in "planning" the October 7 terror attacks. ECF No. 84 at ¶¶ 327, 340–41, 343.  Terrorist organizations must recruit, train, and acquire weapons, all of which requires substantial time and coordination, often years. There is no question that planning the October 7 terror attacks took considerable time, and, in that vein, material support provided to an FTO during the planning process that precedes a terror attack is still material support for the terror attack itself (in fact, that

is probably *the* most critical time to provide support). To suggest otherwise would denigrate the very purpose of the statute.

Next, Defendants allege that Plaintiffs fail to sufficiently plead the intermediary theory of liability, insofar as Plaintiffs point only to "undefined associations" with Hamas and do not properly "identify these supposed intermediaries." BHL MTD at 36. Defendants misinterpret the term "identify" to argue that Plaintiffs must name the Hamas affiliates responsible for transferring funds to Hamas. To "identify," in this context, means merely to locate. The emphasis is not on the name of the intermediaries, but on Defendants' *knowledge* of the intermediaries' deep intertwinement with Hamas. "That knowledge component 'is designed to avoid' imposing liability on 'innocent, incidental participants.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 86 (2d Cir. 2021). The identity of the intermediaries is relevant only insofar as it may be useful for determining the intermediaries' levels of intertwinement with Hamas and the degree of knowledge Defendants had of such intertwinement.

Despite not providing a name for such intermediaries, the U.S. Government has answered both of those questions for us, and Defendants have conceded to these answers in their Consent Order with FINCEN, which provides that BHL—and by extension, its multiple alter egos—admits all factual assertions therein:

> The al-Qassam Brigades is the military wing of the Palestinian Hamas organization. Currently, the al-Qassam Brigades are listed as a terrorist organization by the United States and multiple other countries and organizations. The al-Qassam Brigades' CVC fundraising began in early 2019 with advertisements on Twitter to "Donate to Palestinian Resistance via Bitcoin." FinCEN observed multiple direct bitcoin transactions worth over $2,000 with these CVC wallets during the Relevant Time Period. *BHL received reports from its third-party service provider in April 2019 identifying Hamas-associated transactions and filed no SARs with FinCEN.* Instead, BHL's former Chief Compliance Officer

attempted to influence how its third-party service provider reported on BHL's conduct. …

BHL also failed to file a SAR with FinCEN on its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising, as well as ties to al-Qa'ida and ISIS. *Prior to OFAC's designation of BuyCash, BHL was aware of extensive suspicious activity involving this entity— including connections related to terrorist organizations—but failed to file a SAR with FinCEN.*[13]

In sum, (1) the intermediaries identified by the U.S. Government were so sufficiently connected to Hamas (and possibly even members of Hamas) that Hamas ultimately received funds from transactions processed by Defendants, and (2) Defendants, upon learning from its third-party service provider of such connections, did not take any actions to halt the transactions, bring them to the attention of relevant federal authorities, or blacklist the individuals associated with such transactions. *Cf. Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 (2d Cir. 2021) (finding that Defendants could not have known the "true nature and activities [of the FTO] from the public record at the time."). Contrary to what has been asserted by Defendants, that Plaintiffs do not provide the names of such intermediaries at the pleading stage does not absolve Defendants of their liability under Section 2333 nor does it negate the substance of Plaintiffs' claims, particularly given Defendants already have conceded to knowingly conducting transactions for Hamas affiliates. *See, e.g.,* ECF No. 84 ¶ 215.

**D. Plaintiffs' Allegations Satisfy the *Halberstam* Element of Knowingly Providing Substantial Assistance to Hamas and PIJ.**

Under *Halberstam*'s third prong, Plaintiffs must provide sufficient allegations to render it plausible that "the defendant . . . knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 477. When assessing whether this prong has been satisfied, courts are to

---

[13] Exhibit 9.

assess six different factors, as put forth in *Halberstam*: (i) the nature of the act assisted; (ii) the amount and kind of assistance; (iii) the defendants' presence at the time of the tort; (iv) the defendants' relationship to the tortious actor; (v) the defendants' state of mind; and (vi) the duration of assistance. *See Halberstam*, 705 F.2d at 483–84. "No factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021). As discussed in detail below, Plaintiffs' pleadings amply meet *Halberstam*'s requirement that Defendants knowingly provided substantial assistance to Hamas and PIJ.

### 1.  Nature of Act Assisted

This particular factor "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [intermediaries]) would be important to the nature of the injury-causing act (Hamas's terrorist attacks)." *Id*. Plaintiffs sufficiently plead that the facilitation of "high high-volume transactions through Binance.com and Binance.US, provided Hamas with critical financial infrastructure to receive, store, and launder donations in cryptocurrency from supporters around the world, including from U.S. users misled by BAM Trading." ECF No. 84 ¶ 133. These funds were critical in ensuring Hamas had the capacity to plan, coordinate, and execute the October 7 terror attacks. FTOs, by virtue of being terrorist organizations, cannot utilize traditional financial platforms to acquire funds. They must use platforms, like those hosted by Defendants, to do so.

### 2.  Amount and Kind of Assistance

Defendants read a requirement into this factor that does not, in fact, exist. At the pleading stage, contrary to Defendants' assertion, Plaintiffs do not need to allege that the funds provided to Hamas were "directly linked to the Attacks." In fact, at this stage, "Plaintiffs did not [even] need to allege the funds 'actually went to Hamas. … [I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds."

*Honickman*, 6 F.4th at 500. Instead, "[f]actual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice." *Id*. Because Plaintiffs properly allege that Defendants had a general awareness of their customers' FTO affiliations, this factor weighs in Plaintiffs' favor. *See Kaplan v. Lebanese Bank, SAL*, 999 F.3d 842, 865 (2d Cir. 2021).

According to both the U.S. Justice Department and FinCEN, Defendants knew that they were interacting with bitcoin wallets associated with FTOs like Hamas and PIJ, two of the primary terrorist organizations responsible for the October 7 terror attacks. *See* ECF No. 84 ¶¶ 137–43.  For example, in February 2019, after receiving information "regarding HAMAS transactions" on BHL, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." ECF No. 84 ¶ 141. Lim's colleague replied: "can barely buy an AK47 with 600 bucks." ECF No. 84 ¶ 141. And with regard to certain BHL customers, Lim acknowledged in a February 2020 chat: "Like come on. They are here for crime." ECF No. 84 ¶ 141. BHL's Money Laundering Reporting Officer agreed that "we see the bad, but we close 2 eyes." ECF No. 84 ¶ 141.

Still, even if the Court were to assess the amount of funds processed by Defendants on behalf of Hamas affiliates, the Court would find that Plaintiffs pleaded sufficient facts to indicate that Defendants processed ample funds for Hamas. According to former U.S. Treasury Secretary Janet Yellen, BHL processed up to 100,000 suspicious transactions, including transactions associated with terrorist groups like Hamas, PIJ, al-Qaeda, and ISIS. ECF No. 84 ¶ 144. For instance, just in the first half of 2021 alone, Hamas's militant wing Izz ad-Din al Qassam Brigades received up to $100,000 in bitcoin, with a surge during the Hamas-Israel rocket exchange in May. ECF No. 84 ¶ 146. According to various data sources, Defendants were at the center of those

transactions. ECF No. 84 ¶ 147. Furthermore, "[A] court might also apply a proportionality test to particularly bad or opprobrious acts, i.e., a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Halberstam*, 705 F.2d at 484 n.13. October 7, the deadliest day for the Jewish people since the Holocaust, was particularly monstrous. Therefore, even several hundreds of thousands of dollars at minimum would more than satisfy this factor.

### 3.    Defendants' Relationship to the Tortious Actor

In assessing this factor, courts are to conduct "an evaluation of how attenuated the relationship is between the defendant and the FTO." *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 U.S. Dist. LEXIS 233172, at *31 (E.D.N.Y. Dec. 29, 2022). To the extent that Defendants processed transactions for affiliates of Hamas (if not *members* of Hamas), it was clear that Defendants recognized they were doing so and willingly turned a blind eye to the activities of their illegal customers. Defendants argue that they gave no "special treatment" to Hamas, when, in fact, they did. Defendants purposely *refused* to file a single suspicious activity report ("SAR") with FinCEN, as mandated by law and is the bar minimum required of a regulated financial institution after it has processed a payment or remittance that it has reason to suspect is possibly implicated in money-laundering, fraud, terrorism, or other crimes. ECF No. 84 ¶ 152. *See Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842, 862 (2d Cir. 2021) (bank's financial services to Hezbollah-linked clients—like enabling wire transfers, sanction circumvention, and offering "special exceptions"—can constitute material support to an FTO, even if funneled through intermediaries).

In other words, upon learning of their customers' connections with Hamas and PIJ, BHL flouted its own protocol and that of the entire financial industry to process transactions worth millions of dollars for the terrorist affiliates. ECF No. 84 ¶¶ 78, 148, 152–53, 162–64, 166–69,

72

172, 201–09. That is inherently special treatment. *C.f. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023) ("[T]here are no allegations that [Twitter] treated ISIS any differently from anyone else. Rather, [Twitter's] relationship with ISIS and its supporters appears to have been the same as [its] relationship with [its] billion-plus other users: arm's length, passive, and largely indifferent."). Defendants were not merely offering their "routine" services to FTO affiliates, as Defendant CZ alleges. They were offering an entirely non-routine set of services (and we know so, because those services were found to be illegal by the U.S. Government). It is doubtful Defendants would like to argue that their illegal behavior is, in fact, the protocol they engage in with all customers.

### 4. *Defendants' State of Mind*

As noted prior, at the pleading stage of a JASTA claim, "Because there is rarely direct evidence of a defendant's mental state, the fact finder often must draw inferences from circumstantial evidence." *Bernhardt v. Islamic Republic of Iran,* 47 F.4th 856, 867 (D.C. Cir. 2022). Therefore, "[A] complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (*quoting Connecticut National Bank v. Fluor Corp*., 808 F.2d 957, 962 (2d Cir. 1987)). Plaintiffs have amply pleaded allegations concerning the extent of Defendants' knowledge, including admissions in writing from Defendants that they knew they were processing transactions for terrorist affiliates and were willing to violate both internal and industry protocol to do so. *See, e.g.*, ECF No. 84 ¶¶ 153, 162–64

#### 5. *Duration of Assistance*

Plaintiffs allege assistance to Hamas for at least five years, as has been previously established via federal enforcement actions. That is an ample amount of time. Under *Halberstam*, "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Halberstam*, 705 F.2d at 484. Half a decade is more than a sufficient period of time to establish a genuine relationship with FTO affiliates.

### E. Plaintiffs' Allegations Demonstrate Conscious and Culpable Participation, As Well As Systematic and Pervasive Support, as Put Forth in *Twitter*.

In addition to satisfying the *Halberstam* test for knowingly providing substantial support, Plaintiffs' allegations equally meet the standard put forth in *Twitter*, which demands that the pleadings plausibly allege Defendants consciously and culpably participated in an FTO's terrorism scheme. It is worth noting here that Judge Koeltl—in the parallel case *Raanan* cited above—found that the plaintiffs' pleadings, very similar to the ones pleaded here, more than met the *Twitter* standard.[14]

"Both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (quoting *Nye & Nissen*, 336 U. S. at 619 (1949)). Therefore, the *Halberstam* factors

---

[14] Judge Koeltl's analysis of the conscious and culpable participation on the part of Defendants focused on the *Twitter* standard rather than the third prong of the *Halberstam* test. *See Raanan*, 2025 U.S. Dist. LEXIS 33874, at *60–69.

are instrumental in determining whether the *Twitter* standard of conscious and culpable participation has been satisfied. In *Twitter,* the Supreme Court found Twitter's lack of "special treatment or words of encouragement" for ISIS dispositive in indicating that Twitter did not culpably associate itself with ISIS's acts of terror: Twitter's aid was "passive" and "agnostic" insofar as it boasts billions of users and did not discriminate in its treatment of ISIS. *Twitter*, 598 U.S. at 500. As described prior, Defendants treated their customers-cum-FTO-affiliates in a wholly special manner, jettisoning traditional protocols normally employed to ensure compliance with federal law and developing illegal workarounds to facilitate the unlawful transactions at issue. *See, e.g.*, ECF No. 84 ¶¶ 78, 148, 152–53, 162–64, 166–69, 172, 201–09.

Judge Koeltl, opining on allegations very similar to the ones presented here, noted that unlike the defendants in *Twitter*, the defendants in *Raanan*—the same Defendants as the ones identified here—had "an independent duty to act," which they did not observe.

> The Amended Complaint includes ample allegations that United States laws and regulations required Binance to implement robust anti-money laundering programs, perform due diligence on its customers, and file SARs with regulators flagging suspected illicit activity, all to prevent terrorists from accessing the United States financial system through the Binance exchange.

*Raanan*, 2025 U.S. Dist. LEXIS 33874, at *61–62. Similar to what Plaintiffs have argued here, Judge Koeltl noted the *Raanan* plaintiffs had "alleged that the defendants provided services that might otherwise be considered routine—cryptocurrency transaction services—in an 'unusual way'—designed to evade government detection and regulation." *Id.* at 64–65. Those behaviors resulted in the "widespread, intentional circumvention of anti-terror financing regulations," *Id.* at 68, thereby amounting to conscious and culpable participation. *See also King v. Habib Bank Ltd.*, 2022 U.S. Dist. LEXIS (S.D.N.Y. 2022) (finding plaintiffs plausibly alleged an aiding and abetting

claim under JASTA after suing a bank for flouting anti-money laundering requirements and providing banking services to a terrorist organization); *Bonacasa v. Standard Chartered PLC*, 2023 U.S. Dist. LEXIS 192964, at \*10 (S.D.N.Y. Oct. 27, 2023) (finding plaintiffs plausibly alleged an aiding and abetting claim under JASTA after suing a bank that provided "specialized, individualized financial services" to a company known to supply al-Qaeda with materials used to make explosive devices).

Defendants, particularly CZ, argue that Plaintiffs fail to demonstrate "an affirmative act that Defendants undertook with the intent of facilitating the Attacks." *See* CZ MTD at 27, BAM MTD at 21, BHL MTD at 34; *Twitter*, 598 U.S. at 490. But this is not an accurate representation of the holding put forth in *Twitter*. Rather, the language of "affirmative act" was part of the Court's dicta when discussing *criminal* liability for aiding and abetting. The Court ultimately turned to *Halberstam* when attempting to define the contours of aiding and abetting liability in tort law, reiterating that knowing and substantial assistance was the gold standard. *Id.* at 490–91. In *Halberstam*, as soon as Defendants agreed to participate in an "unlawful course of action"— namely, funneling thousands and thousands of dollars to terrorist affiliates— Defendants rendered themselves liable for the "reasonably foreseeable consequence[s] of the scheme," which includes acts of terror. *Halberstam*, 705 F.2d at 487. Furthermore, even if the criminal standard were to be applied here, the "affirmative acts" by Defendants would be the skirting federal regulations *with regard to these particular clients* and operating an American shell company with direct oversight from abroad to facilitate this scheme. *See, e.g.,* ECF No. 84 ¶¶ 78, 148, 152–53, 162–64, 166–69, 172, 201–09, 217, 286.  Indeed, either hiding suspicious transactions from federal oversight is part of Defendants' routine business conduct (which would be a strange position to argue) or it is an unusual course of action taken by Defendants to aid FTO affiliates in their terrorism enterprises,

in which case it more than amply satisfies the "affirmative act" requirement that Defendants have misread into the civil case law.

Defendants make much of the Supreme Court's holding in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, arguing that Plaintiffs have failed to demonstrate that Defendants "intend[ed] to facilitate [the] commission [of Hamas's crimes]." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291; *see* BHL MTD at 24–26; CZ MTD at 24–26.  But Plaintiffs have shown just that. The crux of the Supreme Court's reasoning in *Smith & Wesson Brands* is that a defendant's intent to aid and abet is to be primarily gleaned from any special treatment afforded by the defendant to the principal. In communicating this test, the Supreme Court cites a prior case, *Direct Sales Co. v. United States*, in which the Court had found a mail-order pharmacy, Direct Sales, had aided and abetted a smalltown doctor's narcotics distribution ring by providing him with special promotions and engaging in high-pressure sales methods. *See generally Direct Sales Co. v. United States,* 319 U. S. 703 (1943). Direct Sales' tactics "showed that Direct Sales not only knew and acquiesced in Tate's illicit enterprise, but joined both mind and hand with him to make its accomplishment possible." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 293 (2025) (internal quotation marks and alterations removed). Here, as the district court in *Raanan* noted, Plaintiffs have pleaded a systematic series of tactics on the part of Defendants to ensure the completion of fund transfers to FTOs, including operating a shell company in the United States and refusing to report any suspicious transactions. *See, e.g.*, ECF No. 84 ¶¶ 78, 103, 105, 148, 152–53, 162–64, 166–69, 172, 201–09. This is precisely how entities seeking to ensure the financing of the FTOs would behave.

Defendants also argue that Plaintiffs fail to show a concrete nexus between specifically the October 7 terror attacks and Defendants conduct, and therefore, Plaintiffs' claims must fail. This

is, again, incorrect. ECF No. 92 ("BHL MTD") at 26, ECF No. 90 ("CZ MTD") at 27, ECF No. 93 ("BAM MTD") at 16–17. There is perhaps nothing more concrete in nature than facilitating the transfer of millions of dollars to an FTO prior to its largest mass attack against a civilian population. Hamas depends upon subversive actors like Defendants. But for such actors' willingness to engage in illicit fund transfers, Hamas and PIJ would not have been able to carry out the atrocities of the October 7 terror attacks.

Still, "[A] close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, but even more remote support can still constitute aiding and abetting in the right case." *Twitter*, 598 U.S. at 496.  Even more relevant for our analysis here is the fact that systematic, routine assistance over a long period of time lessens the degree to which a plaintiff must tie the support provided to the specific terror attack at issue. Indeed, "In appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise—as in *Halberstam* itself." *Twitter*, 598 U.S. at 496. *Over five years*, Defendants here processed transactions worth millions of dollars and assisted FTO affiliates in avoiding federal oversight by purposely refusing to enforce required compliance controls that otherwise would have brought scrutiny to such transactions. This type of systematic, routine, and unflinching support to an enterprise over a longer period of time was precisely the support contemplated by the Supreme Court in *Twitter*. Ensuring that the copious funds were directed specifically to the October 7, 2023, terror attacks when the support is so systematic is not required. As the Court previously has acknowledged in the context of terrorism financing, "[m]oney is fungible." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). As stated by the court in *Raanan*, "While a close nexus between the defendants' alleged assistance and the attacks is lacking, the defendants'

alleged widespread, intentional circumvention of anti-terror financing regulations, considered with the defendants' purported knowledge that Hamas and PIJ were transacting on the Binance platform, support the inference that the defendants' assistance was knowing." *Raanan*, 2025 U.S. Dist. LEXIS 33874, at *68.

The support provided by Defendants is sharply akin to that provided by Linda Hamilton in *Halberstam*. Hamilton lived with Bernard Welch for five years, during which time Welch committed over 120 burglaries and laundered the proceeds through their shared household. Hamilton kept the books, handled finances, and helped type up inventories of stolen goods, yet claimed she didn't know Welch was committing burglaries (despite the "influx of wealth"). Still, she was held liable for the eventual murder of Michael Halberstam that occurred during one of Welch's burglaries because his murder was a "reasonably foreseeable consequence" of the scheme. *See Halberstam*, 705 F.2d at 487.

As Judge Koeltl noted in *Raanan*, "the Amended Complaint's allegations capture the 'essence' of aiding-and-abetting liability: that Binance and Zhao 'consciously and culpably participated' in Hamas's and PIJ's wrongdoing." *Raanan,* 2025 U.S. Dist. LEXIS 33874, at *68. For all of the reasons provided above, the allegations presented by Plaintiffs more than sufficiently demonstrate conscious and culpable participation, as put forth in *Twitter*, and therefore, Defendants' Motion to Dismiss should be dismissed.

## IV. Plaintiffs State a Claim that BHL, BAM, and CZ Conspired with Hamas to Provide Material Support to Hamas.

Under Section 2333(d), anyone "who conspires with the person who committed such an act of international terrorism" may be held liable. 18 U.S.C. § 2333(d)(2). A plaintiff alleging a conspiracy under Section 2333(d) must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by

an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477. Plaintiffs here properly allege each element in the Complaint. *See* ECF No. 84 ¶¶ 318–330. Therefore, Defendants' Motion to Dismiss with regards to Plaintiffs' ATA conspiracy claim should be dismissed.

Within the JASTA context, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam*, 705 F.2d at 477. Notably, "[T]he word 'directly' is absent from JASTA. The text of the statute plainly provides that liability may be asserted as to any person . . . who conspires with the person who committed such an act of international terrorism,' without requiring a direct connection between the Banks and terrorist attackers." *Freeman ex rel. Est. Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 77 (2d Cir. 2023). In instances lacking an admission of an agreement, "an agreement between conspirators must generally be inferred from circumstantial evidence revealing a common intent." *Id.* at 480. d.  "So long as the defendant and the 'person'—which can include an entity or association — carrying out the act of international terrorism are part of a common conspiracy, there is nothing in the text or structure of JASTA requiring that they meet, communicate, or interact for the defendant to be held liable for his coconspirator's actions." *Freeman ex rel. Est. Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 77-78 (2d Cir. 2023). In fact, "The defendant need not know the identities of all of the other conspirators." *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990). This flexible understanding is what allows for Defendants to be held liable for conspiratorial conduct, even if they communicated with FTOs through intermediaries. *Freeman*, 57 F.4th 66, 78-79 ("[B]y ignoring JASTA's text and black-letter conspiracy law, the Concurrence's narrow construction would

absolve terrorist facilitators from liability as long as they interact with terrorist perpetrators through an intermediary. That result would be a drastic distortion of JASTA.").

Here, Plaintiffs have presented evidence of Defendants *discussing* their agreement to process transactions for terrorist affiliates amongst each other. As BHL's Money Laundering Reporting Officer stated, "[W]e see the bad, but we close 2 eyes." ECF No. 84 ¶¶ 110, 141. In February 2019, after receiving information "regarding HAMAS transactions" on BHL, BHL's Chief Compliance Officer Samuel Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering," to which Lim's colleague responded, "can barely buy an AK47 with 600 bucks." ECF No. 84 ¶ 141. The evidence presented by Plaintiffs provides a window into the arrangement—or agreement—Defendants had with the various terrorist affiliates for whom they processed countless transactions. Given Defendant CZ "micromanaged" the operations of Defendants BAM and BHL, it would be impossible for such an extensive and long-term arrangement to have emerged between Defendants and FTO affiliates without CZ's knowledge and approval. ECF No. 84 ¶ 247.

Defendants argue that the object of the conspiracy for a conspiracy claim under JASTA must be "an agreement to commit acts of terror," but that is incorrect. *See* BHL MTD at 37–38, BAM MTD at 27, CZ MTD at 29–30. The shared objective is the material support of terrorism, ECF No. 84 343, of which acts of terrorism are a foreseeable result. *See, e.g., Freeman v. HSBC Holdings PLC, 413 F. Supp. 3d 67, 86* (E.D.N.Y. 2018) ("Plaintiffs must allege facts from which it can be reasonably inferred that Defendants joined a conspiracy that had as its object the provision of material support"); *Shaffer v. Deutsche Bank AG,* 2017 U.S. Dist. LEXIS 220198*, 2017 WL 8786497, at *5 ("For [plaintiffs'] claim to be viable under the ATA, the object of the participants' conspiracy must be to provide material support for terrorism."); *Bernhardt v. Islamic Republic of*

*Iran,* 47 F.4th 856, 873 ("Bernhardt's allegations similarly do not support an inference that HSBC evaded sanctions with the object of funding terrorism."). As articulated in *Halberstam*, Linda Hamilton had no intention of murdering Michael Halberstam when she provided systematic assistance to Bernard Welch for his burglary enterprise for five years. Yet, "Welch's murder of Halberstam was a reasonably foreseeable consequence of the scheme and that fact is a sufficient basis for imposing tort liability on Hamilton according to the law on civil conspiracy." *Halberstam*, 705 F.2d at 487 (internal quotation marks and citations removed). The same is true here. Defendants conspired with FTO affiliates to provide systematic support for terrorism for half a decade, such that the October 7 terror attacks were a tragic and foreseeable consequence of such a prolonged scheme.

Finally, even if the Court were to determine that the object of the conspiracy must be the "common goal of committing terrorism," Plaintiffs have sufficiently pleaded such. In addition to Defendants understanding their role as financiers of terrorists, Defendants, unlike banks traditionally accused of conspiracy under Section 2333(d), took a variety of measures to facilitate the illegal transactions at issue to ensure that the affiliates of the FTOs received their funds, including purposely hiding the illicit nature of the exchanges from the U.S. Government. When supporting such FTOs, Defendants spoke in the most callous of fashions, despite terrorism being an obvious and foreseeable consequence of providing substantial assistance to an FTO. ECF No. 84 ¶¶ 110, 141. At the pleading stage, these facts are the very type of circumstantial evidence that support the plausible conclusion that Defendants shared the common goal of committing terrorism.

Lastly, the goal of providing support for terrorism and committing terrorism would appear to be a distinction without a difference, insofar as acts of terror are an entirely foreseeable consequence of providing support for terrorism: indeed, it would be difficult to locate a defendant

who knowingly provides substantial assistance to terrorists, jokes about doing so, and develops methods to skirt federal regulations, but has done so without adopting the intention of committing acts of terror and is, in fact, somehow opposed to acts of terror. Demanding Plaintiffs locate such a distinction at the pleading stage would be unwarranted. *Bernhardt*, 47 F.4th at 867 (D.C. Cir. 2022) ("Because there is rarely direct evidence of a defendant's mental state, the fact finder often must draw inferences from circumstantial evidence.").

### V. Plaintiffs Hailing from Israel State a Claim that BHL, BAM, and CZ Violated the Laws of Nations Which Injured Plaintiffs.

The Plaintiffs with Israeli citizenship ("Israeli Plaintiffs") properly plead an ATS claim against Defendants, particularly given neither of Defendants' arguments regarding subject matter jurisdiction under the ATS is availing. Therefore, Defendants' Motion to Dismiss with regard to Plaintiffs' ATS claim should be denied.

### A. Elements of an ATS Claim

Under the ATS, "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. "On its face, the statute specifies that, to state a claim, plaintiffs must be 'aliens,' claiming damages for a 'tort only,' resulting from a violation 'of the law of nations' or of 'a treaty of the United States.'" *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 242 (2d Cir. 2003) (citations omitted). The ATS is "strictly jurisdictional" in nature and does not define what qualifies as a predicate act for asserting jurisdiction. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 713–14 (2004).

Israeli Plaintiffs have satisfied all three elements: (i) Maya Parizer, Hagar Almog, Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano, Talik Gvili, Roee Baruch, and James Poe

are exclusively Israeli citizens, ECF No. 84 ¶¶ 49, 59–61, 63–64, 66, 68; thus, they are aliens; (ii) Plaintiffs have a variety of injuries they obtained through several different torts that occurred due to Defendants' violations of international law, ECF No. 84 ¶¶ 49, 54, 59–61, 63–64, 66, 68, 330, 356; and (iii) the actions of Defendants undoubtedly constitute predicate acts under the ATS, insofar as those acts amount to violations of the "law of nations," as recognized by U.S. federal courts.

### B.   Defining a Predicate Act under the ATS

A variety of acts committed by Hamas and PIJ on October 7, 2023, would constitute violations of the law of nations, as recognized in U.S. federal courts. Courts regularly rely, *inter alia*, on both the Rome Statute of the International Criminal Court ("Rome Statute") and the Charter of the International Military Tribunal at Nuremburg after World War II (the "London Charter") for informing their understanding of what constitutes crimes against humanity. *See, e.g., Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 275 (E.D.N.Y. 2007) (Rome Statute); *United States v. Yousef*, 327 F.3d 56, 83, 105 n.40 (2d Cir. 1995) (London Charter).

Here, Plaintiffs properly pleaded that Hamas committed crimes against humanity, and crimes against humanity constitute violations of the law of nations in U.S. federal court for the purposes of establishing a claim under the ATS. ECF No. 84 ¶¶ 353–54; *see Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 213 (2d Cir. 2016). Systematic attacks against a civilian population with the intention of expelling them from the territory are crimes against humanity. *See id.* ("Plaintiffs have alleged systematic rocket attacks against the Jewish civilian population in Israel, committed with the intent to exterminate or expel them from the territory. These allegations adequately plead acts of genocide and crimes against humanity."). That is precisely what Hamas and PIJ did on October 7, 2023, and, in turn, what accounts for Plaintiffs' injuries.

But our analysis does not end there. "Aiding and abetting is a theory of liability recognized by customary international law." *Licci,* 834 F.3d at 213. Therefore, "defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (internal quotation marks omitted).

In *Doe v. Cisco Systems*, the Ninth Circuit adopted the "global consensus" that the "actus reus of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation." *See Doe v. Cisco Systems*, 73 F.4th 700 (9th Cir. 2023). At all relevant times, Defendants provided practical and significant assistance to Hamas, PIJ, and other bad actors by facilitating millions of dollars-worth of transactions for the organizations, granting them access to funds that they otherwise would have been foreclosed from accessing. ECF No. 84 ¶¶ 78, 105, 110, 148, 152–53, 162–64, 166–69, 172, 201–09. At this stage, Plaintiffs adequately plead that Defendants did so with the purpose of facilitating Hamas and PIJ's crimes on October 7, with one BHL employee noting to BHL's Chief Compliance Officer that you "can barely buy an AK47 with 600 bucks." ECF No. 84 141. No actions by Defendants suggest remorse, but instead, active participation in the terrorism enterprise.

Those who have provided a fraction of the financial support to Hamas that Defendants have provided here have been found at the pleading stage to have plausibly aided and abetted Hamas under the ATS. In *Jan v. People Media Project*, a district court in Washington determined that it was plausible an American charity violated the ATS when it was public knowledge that its employee was a Hamas operative, and yet the American charity continued to employ him after

October 7, 2023. The operative in question had been holding three Israeli hostages—kidnapped during the October 7 terror attacks—in his home, who, upon release, brought suit against the Hamas operative's American employer. There, the district court determined "'it is not necessary that the aider or abettor know the precise crime that was intended and was in fact committed—if the accused is aware that one of a number of crimes will probably be committed, and one of those crimes is committed,' the *mens rea* standard is satisfied." *Jan v. People Media Project*, 2025 U.S. Dist. LEXIS 86499, at *16, 2025 WL 1311970 (W.D. Wash., May 6, 2025) (quoting *Cisco,* 73 F.4th at 734).

Plaintiffs also argue here that, in addition to aiding and abetting Hamas and PIJ's crimes against humanity, Defendants also violated the laws of nations when they aided and abetted the financing of Hamas and PIJ's terrorism, thereby serving as another possible predicate act for the Court to exercise jurisdiction under the ATS. The International Convention for the Suppression of the Financing of Terrorism (the "Financing Convention") is a key international treaty adopted by the United Nations in 1999 that requires states to, *inter alia*, criminalize the aiding and abetting of terrorism. According to the Financing Convention, a person aids and abets terrorism if that person contributes to the commission of the offense either with the knowledge of the group's intention to commit an offense or with the aim of furthering the criminal activity. *See* International Convention for the Suppression of the Financing of Terrorism, art. 2.5(c)(ii), Dec. 9, 1999.

Defendant BAM cites *In re Chiquita Brands Int.l* for the proposition that the Financing Convention does not establish universal customary international law. 792 F. Supp.2d 1301, 1318 (S.D. Fla. 2011). BAM MTD at 57. But this citation is misplaced and inapplicable here—the Financing Convention was not customary international law in 2002, which is when the acts at issue in *Chiquita Brands* occurred. 792 F. Supp.2d at 1319 (observing that in 2002, only 26 countries

(14%) had ratified the Financing Convention). The court in *Chiquita Brands* determined that the number of parties to the Financing Convention *in 2002* did not "constitute the 'overwhelming majority' necessary to establish a widely accepted norm of international law prohibiting financial support for terrorism at the time of Chiquita's purported wrongful acts." *Id*. However, membership to the Financing Convention has grown dramatically. A total of 190 states are parties to the Financing Convention, firmly establishing it as a norm of international law.[15] Indeed, in 2018, a court found that, at 80% membership, an overwhelming majority of nations had become parties to the Financing Convention. *Nahl v. Jaoude*, 354 F. Supp. 3d 489, 500 (S.D.N.Y. 2018) *overruled on other grounds* 968 F.3d 173 (2d Cir. 2020). Based on the degree to which criminalizing aiding and abetting terrorism has become an international law norm, Plaintiffs argue that it should be recognized as such here for the purposes of Plaintiffs' ATS claims.

Lastly, the Geneva Convention (IV) prohibits hostage taking as a war crime. *See* Geneva Convention (IV), art. 34 (1949). War crimes are readily recognized by U.S. federal courts as actionable under the ATS. *See generally Kadic v. Koradzic*, 70 F.3d 232 (2d Cir. 1995). Even independently of the Geneva Convention (IV), kidnapping has been recognized as a predicate act under the ATS. *See Jan v. People's Media Project,* 2025 LEXIS 86499, at \*24–26 (W.D. Wash. May 6, 2025).

### C.  This Court Has Subject Matter Jurisdiction to Hear Plaintiffs' ATS Claim.

Defendant BHL claims that because BHL is a Cayman Islands Company, this Court does not have subject matter jurisdiction over BHL. Perhaps, if BHL were actually independent from BAM Trading, a Delaware corporation, it would be inappropriate for the Court to exercise subject

---

[15]  International Convention for the Suppression of the Financing of Terrorism,  NUCLEAR ENERGY AGENCY, https://www.oecd-nea.org/jcms/pl_29142/international-convention-for-the-suppression-of-the-financing-of-terrorism-terrorist-financing-convention (last visited Sept. 3, 2025).

matter jurisdiction here. But BHL is not. Rather, CZ and BHL used BAM Trading to unlawfully access U.S. markets while evading regulatory oversight, directing its day-to-day operations for a significant period of time and deriving substantial benefit from its activities. ECF No. 84 ¶¶ 43, 149, 196, 281, 287. Given their complete control over BAM Trading and their use of it to engage in criminal and tortious conduct, it would be inequitable to treat them as separate entities and to require Plaintiffs to litigate separately against the individuals and entities who were the true decision-makers behind BAM Trading's actions. Since inception, CZ has been BAM Management's beneficial owner, directly or indirectly owning between as much as 100 percent and approximately 81 percent of its equity. CZ, in addition to being BHL's founder, beneficial owner, and CEO, was Chairman of BAM Trading's and BAM Management's Boards of Directors at least until approximately March 2022. CZ micromanaged all aspects of Defendants BAM and BHL's operations. *See* ECF No. 84 ¶¶ 219–250.

While the Supreme Court in *Jesner* cited "serious foreign policy consequences" that might be triggered by exercising federal jurisdiction over foreign corporations under the ATS, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 272 (2018), here, we have a foreign corporation availing itself of a U.S. instrumentality in order to circumvent the U.S. regulatory environment and conduct illegal transactions. BHL, under the leadership and direction of CZ, failed to place and utilize legally required internal tools and infrastructure and thereby enabled remittances to Hamas, PIJ and other FTOs *from the United States*. Ironically, to *abstain* from exercising jurisdiction would invoke *domestic* policy concerns.

Defendants also claim that Plaintiffs' claims fail to overcome the presumption against extraterritoriality. BHL MTD at 41, BAM MTD at 58–59, CZ MTD at 31. "[E]ven where the claims touch and concern the territory of the United States, they must do so with sufficient force

to displace the presumption against extraterritorial application." *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 124-125 (2013). Here, a significant portion of the illegal activity perpetrated by Defendants leading to the funding of Hamas and PIJ took place or has a direct nexus to Defendants' activities and customers in the United States, beginning with BHL's controlled use of BAM Trading to attract U.S. customers and facilitate their circumvention of U.S. law. ECF No. 84 ¶¶ 109, 110, 217. Again, Defendants enabled remittances to Hamas, PIJ and other FTOs *from the United States*. The only reason the presumption has any life in the current instance is because BHL, in violation of U.S. law, took a variety of steps to *avoid* U.S. oversight—it knowingly failed to register as a money service business in the United States, willfully violated the Bank Secrecy Act by failing to implement and maintain an effective anti-money laundering program, and willfully caused violations of U.S. economic sanctions. ECF No. 84 ¶ 110. To reward such behavior by refusing to exercise jurisdiction would turn the ATS on its head.

**VI.    Plaintiffs Have Stated a Claim for Negligence/Wantonness.**

Defendants claim Plaintiffs have not stated a claim for negligence/wantonness under Alabama law. *See* BHL MTD at 41; CZ MTD at 45–48; BAM MTD at 45–52.

Under Alabama law, "[t]o establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Harris v. Reverse Mortg. Solutions Inc.*, 800 Fed. Appx. 708, 712 (11th Cir. 2020) (quoting *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015)). "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty." *Id.*

Plaintiffs have established a duty owed by Defendants to the general public, including Plaintiffs. As stated succinctly by the district court in *Raanan*, the Defendants had "an independent duty to

act" with regard to the financing of terrorist activity. The First Amended Complaint includes ample allegations that United States laws and regulations required Binance to implement robust anti-money laundering programs, perform due diligence on its customers, and file SARs with regulators flagging suspected illicit activity, all to prevent terrorists from accessing the United States financial system through the Binance exchange. *Raanan*, 2025 U.S. Dist. LEXIS 33874, at *61–62. With regards to the FTOs at issue, Defendants entirely shirked their duties and callously acknowledged doing so.

With regard to causation, under Alabama law, "[p]roximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Gooden v. City of Talladega*, 966 So. 2d 232, 239 (Ala. 2007). Given funding is so elemental to a terrorist organization, Plaintiffs have sufficiently alleged that Defendants were the proximate cause of Plaintiffs' injuries, insofar as the October 7 terror attacks were a natural and foreseeable consequence of Defendants' elaborate efforts to fund such attacks and that without such funding, Hamas and PIJ would have been unable to carry out their attacks on such a massive and pervasive scale. Furthermore, Defendants undoubtedly acted with "reckless indifference" to the very foreseeable consequences, their employees on several occasions making shameless macabre jokes in relation to the support provided. ECF No. 84 ¶¶ 110, 141. For these reasons, Plaintiffs have properly alleged both a negligence and wantonness claim under Alabama state law.

## Conclusion

Based on all of the foregoing, it is respectfully submitted that the Motions to Dismiss must be denied.

Respectfully submitted,

/s/ David I. Schoen

David I. Schoen (ASB-0860-O42D)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(334) 395-6611
schoenlawfirm@gmail.com

Mark Goldfeder (pro hac vice pending)
National Jewish Advocacy Center, Inc.
1718 General George Patton Drive
Brentwood, TN 37027
(800) 269-9895
mark@jewishadvocacycenter.org

Ben Schlager (pro hac vice forthcoming)
Goldfeder and Terry, LLC
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
ben@goldfederterry.com

Erielle  Azerrad (pro hac vice forthcoming)
National Jewish Advocacy Center, Inc.
3 Times Square
New York, NY  10036
(332) 278-1100
ErielleA@NJAClaw.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September, 2025, I caused a true and accurate copy of the foregoing to be served on all counsel of record by filing the same through this Court's ECF system.

/s/ David I. Schoen