# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |
|---|---|
| NOACH NEWMAN et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No.: 24-cv-00134-ECM-CWB |
| BAM TRADING SERVICES INC. d/b/a BINANCE.US et al., | ) **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) |

## BAM TRADING SERVICES INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION........................................................................1

II.   THE OPPOSITION'S ASSERTIONS ARE CONTRADICTED BY THE
      DOCUMENTS IT RELIES ON.................................................5

    A.    Plaintiffs Mischaracterize the May 2025 Settlement Agreement.........5

    B.    Plaintiffs Mischaracterize the Regulatory Filings...............................10

    *C.*    Plaintiffs Mischaracterize Mr. Brooks's Testimony. ..........................14

III.  THE AMENDED COMPLAINT IS PROCEDURALLY AND
      SUBSTANTIVELY DEFICIENT ................................................15

    A.    This Court Can (and Should) Consider Defendants' Citations to
        Documents That Plaintiffs Incorporated in the Amended Complaint. 15

    B.    The Amended Complaint Is a Shotgun Pleading and Should Be
        Dismissed on That Basis Alone.............................................................17

    C.    Plaintiffs Cannot Establish That BAM Is an Alter Ego for
        Jurisdictional or Liability Purposes.......................................................18

        1.    Plaintiffs Cannot Dispute that BAM Has Legitimate
            Business Operations. .......................................................19

        2.    Plaintiffs Cannot Establish the "Total Dominion and
            Control" Required to Pierce the Corporate Veil.............22

        3.    The May 2025 Settlement Agreement Does Not
            Establish Alter Ego. .......................................................28

        4.    Plaintiffs' Remaining Allegations Do Not Establish
            Total Control...................................................................30

        5.    Plaintiffs Fail to Plead Alter Ego for the Relevant Time
            Period.............................................................................32

        6.    Plaintiffs Fail to Establish that BHL and Mr. Zhao's
            Alleged "Control" of BAM Caused Their Injuries. .......34

    D.    This Court Lacks Jurisdiction over BAM. ..........................................35

        1.    Plaintiffs Do not Plead BAM Suit-Related Conduct in
            Alabama..........................................................................36

2.    The May 2025 Settlement Agreement Does Not Confer Jurisdiction in This Matter.................................39

E.    Plaintiffs Insufficiently Plead JASTA Liability Against BAM............41

1.    Plaintiffs Cannot Establish Aiding-and-Abetting Liability Under Binding Supreme Court Precedent. ......43

a.    The Opposition Does Not Alter That Plaintiffs Cannot Sufficiently Plead That BAM Provided Knowing and Substantial Assistance to any Terrorist Organization. .........................................43

b.    The Opposition Does Not Alter that Plaintiffs Cannot Sufficiently Plead Any Concrete Nexus Between BAM's Services and the Attack at Issue................................................................46

2.    Plaintiffs' Reliance on *Raanan* Is Misplaced.................48

3.    Plaintiffs Cannot Establish Conspiracy Liability Against BAM.................................................................50

F.    Plaintiffs Fail to State a Claim for Negligence/Wantonness Against BAM. ........................................................................................52

G.    Plaintiffs Fail to Establish This Court's Subject Matter Jurisdiction over Their ATS Claim. .......................................................................53

IV.    CONCLUSION ............................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aeropower, Ltd. v. Matherly*,
511 F. Supp. 2d 1139 (M.D. Ala. 2007)...........................................................37

*Almog v. Arab Bank, PLC*,
471 F. Supp. 2d 257 (E.D.N.Y. 2007)................................................................53

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .........................................................46, 47, 48, 49

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007)........................................................................................33

*Bernhardt v. Iran*,
47 F.4th 856 (D.C. Cir. 2022)..........................................................................51

*Brown v. Univ. of Ala.*,
2025 WL 1908737 (N.D. Ala. July 10, 2025) ....................................................21

*Cabello v. Fernandez-Larios*,
402 F.3d 1148 (11th Cir. 2005) ........................................................................54

*CFTC v. Zhao*,
No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023) ...........................................12, 13, 21

*City of Fairfield v. United States*,
2018 WL 2445686 (N.D. Ala. May 31, 2018) ...................................................32

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943)...................................................................................45, 46

*Doe v. Cisco Sys.*,
73 F.4th 700 (9th Cir. 2023) ............................................................................53

*Doe v. Drummond Co.*,
782 F.3d 576 (11th Cir. 2015) .........................................................................56

*ECB USA, Inc. v. Savencia, S.A.*,
2025 WL 254504 (D. Del. Jan. 16, 2025) .........................................................32

*Econ Marketing, Inc. v. Leisure Am. Resorts, Inc.*,
　664 So. 2d 869 (Ala. 1994)...............................................................................21

*Est. of Amergi v. Palestinian Auth.*,
　611 F.3d 1350 (11th Cir. 2010) .........................................................................54

*First Health, Inc. v. Blanton*,
　585 So. 2d 1331 (Ala. 1991)................................................................18, 19, 27

*Freeman v. HSBC Holdings PLC*,
　57 F.4th 66 (2d Cir. 2023) ...........................................................................50, 51

*Frye v. Ulrich GmbH & Co. KG*,
　2009 WL 801773 (M.D. Ala. Mar. 25, 2009) ...................................................41

*Gadsden v. Home Pres. Co.*,
　2004 WL 485468 (Del. Ch. Feb. 20, 2004)......................................................24

*Gilbert v. James Russell Motors, Inc.*,
　812 So. 2d 1269 (Ala. Civ. App. 2001) .......................................................19, 22

*Gonzalez v. BAM Trading Servs., Inc.*,
　2024 WL 4589791 (D.N.J. Oct. 28, 2024) ..................................................12, 39

*Griffin Indus., Inc. v. Irvin*,
　496 F.3d 1189 (11th Cir. 2007) ........................................................................16

*Halberstam v. Welch*,
　705 F.2d 472 (D.C. Cir. 1983)...............................................................43, 47, 48

*Hammer Brand, LLC v. Voro Inc.*,
　2024 WL 4803686 (M.D. Fla. Apr. 18, 2024)..................................................41

*Heriveaux v. Junior*,
　2024 WL 1433611 (11th Cir. Apr. 3, 2024).....................................................18

*Hicks v. Jackson Cnty. Comm'n*,
　990 So. 2d 904 (Ala. Civ. App. 2008).........................................................23, 25

*Honickman v. BLOM Bank SAL*,
　6 F.4th 487 (2d Cir. 2021) .........................................................................47, 48

*Horsley v. Feldt*,
    304 F.3d 1125 (11th Cir. 2002) ..........................................................16

*Jallali v. Nova Se. Univ., Inc.*,
    486 F. App'x 765 (11th Cir. 2012) ......................................................5

*Jan v. People Media Project*,
    2025 WL 1311970 (W.D. Wash. May 6, 2025) ..................................55

*Jesner v. Arab Bank, PLC*,
    584 U.S. 241 (2018)............................................................................54

*Landgarten v. York Rsch. Corp.*,
    1988 Del. Ch. LEXIS 20 (Del. Ch. Feb. 3, 1988) .............................29

*Latite Roofing & Sheet Metal, LLC v. OSHRC*,
    2021 WL 4912479 (11th Cir. Oct. 21, 2021) (per curiam) ...............35

*Licht v. Binance Holdings Ltd.*,
    2025 WL 625303 (D. Mass. Feb. 5, 2025), *report and
    recommendation adopted*, 2025 WL 624025 (D. Mass. Feb. 26,
    2025) ...................................................................................................39

*Mack v. CooperSurgical, Inc.*,
    2023 WL 2653365 (M.D. Ala. Mar. 27, 2023) ..................................39

*United States ex rel. Marsteller v. Tilton*,
    556 F. Supp. 3d 1291 (N.D. Ala. 2021)..............................................17

*McKissick v. Auto-Owners Ins. Co.*,
    429 So. 2d 1030 (Ala. 1983)...............................................................27

*Messick v. Moring*,
    514 So. 2d 892 (Ala. 1987).................................................................19

*Newman v. Associated Press*,
    758 F. Supp. 3d 1357 (S.D. Fla. 2024).........................................50, 51

*Nieves v. Insight Building Co.*,
    2020 WL 4463425 (Del. Ch. Aug. 4, 2020) .......................................21

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).....................................51

*PNC Bank, N.A. v. S. Home Builders, LLC*,
  2013 WL 5524108 (N.D. Ala. Oct. 2, 2013) ......................................................39

*Raanan v. Binance Holdings Ltd.*,
  2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) ..........................................48, 49, 52

*Reynolds v. Binance Holdings Ltd.*,
  481 F. Supp. 3d 997 (N.D. Cal. 2020).................................................................31

*S. Rsch. Inst. v. PAM Innovation Corp.*,
  2020 WL 1433151 (N.D. Ala. Mar. 24, 2020)...........................................19, 27

*SEC v. BHL*,
  No. 23-cv-1599 (May 29, 2025).....................................................10, 14, 20, 23

*Shorter Bros. v. Vectus 3, Inc.*,
  343 So. 3d 508 (Ala. 2021)..................................................................24, 32, 33

*Simmons v. Clark Equip. Credit Corp.*,
  554 So. 2d 398 (Ala. 1989)...............................................................*passim*

*Smith & Wesson Brands, Inc. v. Mexico*,
  605 U.S. 280 (2025)........................................................................44, 45, 49

*Stewart v. Bureaus Inv. Grp., LLC*,
  2015 WL 7572312 (M.D. Ala. Nov. 24, 2015) ..................................................28

*Stutts v. De Dietrich Grp.*,
  2006 WL 1867060 (E.D.N.Y. June 30, 2006)....................................................52

*In re Terrorist Attacks on Sep. 11, 2001*,
  2008 WL 7073447 (S.D.N.Y. Dec. 23, 2008) ............................................52, 53

*Ex parte Troncalli Chrysler Plymouth Dodge, Inc.*,
  876 So. 2d 459 (Ala. 2003).................................................................38

*Trs. of Arden v. Unity Constr. Co.*,
  2000 Del. Ch. LEXIS 7 (Del. Ch. Jan. 26, 2000)..............................................28

*Turner v. Williams*,
  65 F.4th 564 (11th Cir. 2023) ..................................................................5

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ....................................................................*passim*

*United States v. Campbell*,
    26 F.4th 860 (11th Cir. 2022) .........................................................17

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) .............................................................54

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ......................................................41

*Wagner v. State*,
    197 So. 3d 517 (Ala. 2015) .............................................................36

*Walden v. Fiore*,
    571 U.S. 277 (2014) ........................................................................36

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ...........................................................36

*Wallace v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) .................................................18, 20

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ......................................................18

*Wiggins v. Ellis*,
    2021 WL 535536 (N.D. Ala. Feb. 12, 2021) .................................29

*Williamson v. Watson*,
    378 So. 3d 488 (Ala. 2022) .............................................................40

*Wright v. Alan Mills, Inc.*,
    567 So. 2d 1318 (Ala. 1990) ...............................................28, 30, 31

**Statutes**

15 U.S.C. § 78t.....................................................................................27

18 U.S.C. § 2333(d)(2).........................................................................43

Bank Secrecy Act.................................................................................25

Securities Exchange Act ...........................................................................26

**Other Authorities**

17 C.F.R. § 230.405 ...............................................................................27

Fed. R. Civ. P. 4(k)(1) ............................................................................36

Fed. R. Civ. P. 4(k)(1)(C) .......................................................................35

Fed. R. Civ. P. 8 ................................................................................17, 56

Fed. R. Civ. P. 8(a)(2) .......................................................................32, 33

Fed. R. Civ. P. 12(b)(1) ...........................................................................56

Fed. R. Civ. P. 12(b)(2) .....................................................................41, 56

Fed. R. Civ. P. 12(b)(6) ...........................................................................56

## I.    INTRODUCTION

Two fundamental problems recur throughout the Opposition: first, Plaintiffs' allegations are repeatedly contradicted by the very documents they cite; second, Plaintiffs fail to articulate any concrete or coherent theory of liability against BAM. These deficiencies are compounded by the Opposition's failure to address most of the arguments raised in BAM's Memorandum in Support of its Motion to Dismiss (the "Motion" or "Mot."), further underscoring the implausibility of Plaintiffs' claims and the absence of any legal or factual basis for proceeding against BAM.

The Opposition, like the Amended Complaint ("AC"), continues to ignore that BAM is a distinct entity and platform from BHL and Mr. Zhao, which exclusively serves U.S. individuals and is subject (and always has been) to U.S. regulatory oversight. (Mot. at 42-43.) It is not a global platform, does not serve non-U.S. individuals, and maintains its own corporate structure, board of directors, employees, and compliance protocols. *See infra* Section III(C).

Unable to meaningfully rebut this, Plaintiffs attempt to conflate BAM with BHL and Mr. Zhao through a fundamentally flawed alter ego theory. The Opposition rests heavily on a May 2025 settlement agreement filed after Plaintiffs' Amended Complaint. (Opp. Ex. 1.) But the settlement agreement has no bearing here. Contrary to the Opposition's representations, it does not establish that Mr. Zhao ever exercised the complete dominion and control over BAM required to pierce the corporate veil.

1

Instead, the agreement simply addresses prospective restrictions on Mr. Zhao's future involvement in BAM's management, without any finding of past control or alter ego status. Nor does the agreement state that Mr. Zhao was ever BAM's CEO, or its authorized representative. *See infra* Section II(A). Plaintiffs' reliance on the agreement is contradicted by its plain language and by their own exhibits, which show that BAM has always maintained legitimate business operations, its own board, and independent compliance protocols. *See infra* Section II.

Plaintiffs also mischaracterize regulatory filings, relying on agency complaints and allegations that they attempt to cast as "findings." Notably, BAM was not a party to these regulatory actions, except for the SEC matter, which focused on whether digital assets are regulated under the securities laws, and was later voluntarily dismissed with prejudice. While the SEC initially argued that Mr. Zhao exerted some influence on BAM, it never alleged exclusive or complete control, nor did it seek to pierce BAM's corporate veil. *See infra* Section II. No regulatory agency with relevant authority, including the SEC, CFTC, FinCEN, or DOJ, has named BAM in any enforcement action related to anti-money laundering ("AML"), Know Your Customer ("KYC"), or terrorism allegations. That omission is not incidental— it is exculpatory.

Plaintiffs' Opposition is further undermined by their failure to engage with the Blodgett declaration. While they criticize it, they do not cite a single attestation that

they contend is false. Their objection to the declaration is rhetorical. The declaration establishes BAM's corporate structure, operational independence, and compliance practices. It confirms that BAM has always maintained its own articles of incorporation and bylaws, its own board of directors, independent employment decisions, and arm's-length service agreements with BHL. It also states that BAM has consistently maintained sufficient capital and paid its own operating expenses. Plaintiffs do not dispute these statements; they simply dislike that they contradict their theory. *See infra* Section III(C).

A threshold impediment to Plaintiffs' claims that the Opposition fails to rebut is that the Court lacks jurisdiction over BAM. Unable to plead any BAM-specific, suit-related conduct in Alabama, instead relying on generalized theories and enforcement materials that pertain to other entities, the Opposition again turns to the settlement agreement. But the settlement agreement does not confer jurisdiction in this matter; its terms are limited to authority to enforce the agreement and do not extend to unrelated civil litigation. *See infra* Section III(D).

Plaintiffs also fail to allege liability against BAM under JASTA, the ATS, or a negligence theory. Under binding Supreme Court precedent, JASTA liability requires conscious, culpable participation in the specific terrorist act instead of what Plaintiffs plead here, which is (at most) passive association and generalized assertions. Plaintiffs do not allege any BAM employee, transaction, or affirmative

act tied to terrorist activity, nor do they allege that BAM's platform was ever used by any foreign terrorist organization. Their attempt to impute liability to BAM based on the conduct of other entities fails as a matter of law. *See infra* Section III(E).

For the same reasons, Plaintiffs' ATS and negligence claims are deficient. Plaintiffs identify no link between BAM and the October 7 attacks, cannot allege a substantive violation of international law, and cannot overcome the ATS's presumption against extraterritoriality. *See infra* Section III(G).

As for negligence, Plaintiffs do not show that BAM owed a duty to Plaintiffs or that it proximately caused their harms. The Opposition offers no specific link between any transfers of funds on BAM's exchange and the October 7, 2023 attacks. At most, Plaintiffs allege that certain transfers that occurred on a different platform outside of BAM's control may have contributed in a nebulous capacity to the attacks, which is insufficient to establish proximate causation as to BAM. *See infra* Section III(F).

In sum, Plaintiffs' Opposition is contradicted by the documents they cite, unsupported by the Amended Complaint's allegations, and fails to allege any specific conduct by BAM that could give rise to liability. The claims against BAM should be dismissed with prejudice.

## II.    THE OPPOSITION'S ASSERTIONS ARE CONTRADICTED BY THE DOCUMENTS IT RELIES ON

Plaintiffs' Opposition relies heavily on unsupported and implausible characterizations of several documents that they incorporate in an effort to salvage their Amended Complaint. However, Plaintiffs cannot avoid the actual content of those documents. To the extent the documents contradict the allegations, controlling precedent makes clear that the documents prevail. *See Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023) ("If an exhibit attached to a complaint contradicts the allegations about the exhibit set forth in the complaint itself, the exhibit controls.").

Before addressing Plaintiffs' specific arguments, BAM addresses these issues below.

### A. Plaintiffs Mischaracterize the May 2025 Settlement Agreement.

Plaintiffs contend that the "most telling" evidence in support of their alter ego and jurisdictional positions is an agreement BAM entered with various state financial-services regulators (including the Alabama Securities Commission) in May 2025. (Opp. at 18; Opp. Ex. 1.)[1]

---

[1] Plaintiffs offer no legal basis pursuant to which the Court may consider the agreement, which was executed after Plaintiffs filed their Amended Complaint. *See Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012) ("[A] party cannot amend a complaint by attaching documents to a response to a motion to dismiss."). Their own brief lays out, over three pages, why it cannot be properly considered at this stage. Plaintiffs first assert that the agreement "confirms, in truth," their arguments. (Opp. at 7.) Then, on the three pages immediately following this assertion, they suggest that—when it comes to Defendants' exhibits and citations—the Court cannot consider judicial or regulatory records "for the truth of the matters asserted in those records." (Opp. at 8-10.) Plaintiffs give no explanation why this principle does not preclude

The settlement agreement, which followed Mr. Zhao's guilty plea and stems from state "character and fitness standards" for "persons directly or indirectly beneficially owning more than ten percent of a money transmitter licensee" (Opp. Ex. 1, at 1), simply does not say what Plaintiffs claim.

1. **Plaintiffs erroneously assert that the agreement shows that "as of November 21, 2023, Zhao was BAM's 'authorized representative' who, because of his guilty plea, was forced to sign over the CEO role at BAM to another." (Opp. at 7.)**

Both portions of this statement are incorrect and contradicted by the agreement itself: (i) the agreement states that Mr. Zhao was the authorized representative of a different and separate entity, not BAM; and (ii) the agreement does not state that Mr. Zhao ever served as BAM's CEO.

First, the settlement agreement states that Mr. Zhao was an "authorized representative of *BAM Management Company Limited*"—the parent company of BAM's parent company. (Opp. Ex. 1, at 1 (emphasis added).) BAM Management Company Limited is a separate entity, two levels removed from BAM Trading Services Inc., the defendant in this action. (*See* AC at 1.) As Plaintiffs' own exhibits demonstrate, BAM's parent company is BAM Management US Holdings Inc. (Opp. Ex. 1, at 1; Opp. Ex. 2 ¶ 28 (BAM Management Company Limited is BAM

---

consideration of the agreement (or their other exhibits) and offer no other basis justifying consideration of the agreement.

Management US Holdings' parent).)

BAM Management Company Limited—the entity identified in the settlement agreement—is an investment entity that, along with many other investors and equity holders, maintains an *indirect* beneficial-ownership interest in BAM. (Opp. Ex. 2 ¶ 28; Opp. Ex. 1, at 1 ("Zhao indirectly beneficially owns more than ten percent (10%) of BAM."); see also ECF No. 13 (BAM's Conflict Disclosure Statement).)

The agreement also does not say that Mr. Zhao has ever served as BAM's CEO or that the agreement required him to transfer that role to someone else. The agreement references a proxy "that designates Norman Reed, the Chief Executive Officer of BAM Trading, as the designated representative of BAM Management [Company Limited]." (Opp. Ex. 1, at 1.) In other words, Mr. Zhao designated Norman Reed—who was already the CEO of BAM—as the representative for the BAM Management entity. Plaintiffs either misread or misunderstand this language to say that Mr. Zhao was BAM's CEO and "was forced to sign over the CEO role" to Mr. Reed, but it plainly does not. (Opp. at 7.) Indeed, Plaintiffs' assertion—raised for the first time in the Opposition—that Mr. Zhao served as BAM's CEO contradicts their own allegations in the Amended Complaint, which assert that Catherine Coley and Brian Brooks have occupied that role. (*See* AC ¶¶ 225, 227.) Nothing in the settlement agreement or in the Opposition challenges what BAM's declaration plainly states: "Mr. Zhao has never served as the CEO (or any other officer or

employee) of BAM." (Decl. ¶ 16.)

> **2. Without citing any specific provision of the agreement, Plaintiffs state that the agreement "is filled with provisions directed at denying Mr. Zhao continuing control of BAM." (Opp. at 19.)**

The agreement makes no mention of *continuing* control of BAM by Mr. Zhao. In the agreement, BAM agreed not to permit Mr. Zhao to take on a "managerial role" at BAM in the future. (Opp. Ex. 1, at 1.) Plaintiffs likewise read into the agreement the requirement that Mr. Zhao may not "regain[]" control. (Opp. at 7.) But the agreement's language is strictly prospective, and it contains no mention or finding of any past control of BAM by Mr. Zhao.

> **3. Plaintiffs erroneously suggest that BAM consented to personal jurisdiction in this action through the settlement agreement. (Opp. at 7.)**

Plaintiffs assert that, by entering into the agreement, BAM "expressly acknowledge[d] and agree[d], *inter alia*, that Alabama has jurisdiction over BAM." (Opp. at 7.) Citing the agreement, they go so far as to suggest that BAM "has already stipulated to jurisdiction in Alabama" in this case. (Opp. at 35.) But the agreement strictly limits any concession of jurisdiction to the specific regulatory actions it resolved, not unrelated civil litigation brought by other parties. Section 1 of the agreement provides that "[p]ursuant to the licensing and supervision laws of the Participating States, the Participating States have jurisdiction over BAM Trading *as described herein* and may *enforce the terms of this Agreement*" and that "BAM

Trading acknowledges that the Participating Regulators have and maintain jurisdiction over *the underlying dispute*." (Opp. Ex. 1, ¶ 1 (emphasis added).) The agreement clearly states that none of its provisions "shall be construed as providing a private right of action to enforce" its terms, and that "[a]n enforcement action under [the] Agreement may be brought solely by the Parties hereto." (*Id.* ¶ 22.) Further, the Agreement sets out that "[n]othing contained in this Agreement shall be deemed an admission, finding, or denial of any fact, matter, liability, or thing by BAM Trading and BAM Management US except as to the *Participating Regulators*' jurisdiction and authority to enter into and enforce *this* Agreement." (*Id.* ¶ 17 (emphasis added).)

### 4. Plaintiffs insinuate that Defendants "concealed" the agreement. (Opp. at 7.)

Plaintiffs suggest that Defendants somehow improperly concealed this agreement and that they went to great lengths to "obtain[]" it. (*See* Opp. at 7, 18.) Apart from the issues identified above, which render the settlement agreement wholly irrelevant to this matter, the agreement is publicly available on the Idaho Department of Finance's website, which is presumably how Plaintiffs "obtained" it. (Opp. at 18.) Further, as explained above, because the agreement postdates Plaintiffs' Amended Complaint, it is not relevant to BAM's response to Plaintiffs' allegations raised in the Amended Complaint.

### B. Plaintiffs Mischaracterize the Regulatory Filings.

The inaccuracies in the Opposition extend beyond the settlement agreement—Plaintiffs repeatedly misstate and mischaracterize the regulatory proceedings they rely on.

### 1. Plaintiffs erroneously rely on the SEC litigation without ever acknowledging that the SEC voluntarily dismissed its claims *with prejudice*.

Plaintiffs extensively cite the SEC's 2023 lawsuit. (*See* Opp. at 4 n.3 (citing press release about filing of SEC complaint); *id.* at 6 (relying on exhibits from the SEC litigation not cited in the Amended Complaint as "overwhelming[]" evidence of alter ego); *id.* at 17-18 (relying on SEC-related exhibits); *id.* at 20 (inaccurately claiming the SEC has made regulatory "findings"); *id.* at 26 (recounting SEC "allegations"); *id.* at 31 (incorrectly calling an SEC complaint a "ruling"); *id.* at 34 (citing SEC allegations).) But that dispute concerned the SEC's efforts to reclassify certain digital assets as "securities" and did not involve allegations or claims related to terrorism or violations of AML and KYC obligations. (*See generally* Opp. Ex. 2.) In any event, not once in these repeated citations do Plaintiffs acknowledge that the SEC *voluntarily dismissed* its litigation. (*See* Joint Stip. to Dismiss & Release, *SEC v. BHL*, No. 23-cv-1599 (May 29, 2025), ECF No. 301 (dismissing the litigation with prejudice).)

### 2. Plaintiffs mistakenly argue that there have been "monumental federal findings finding CZ, Binance and BAM to be a single unified vehicle for fraud and illegality." (Opp. at 29.)

There have been no findings that BAM and its co-Defendants are a "unified" vehicle for fraud. Plaintiffs' characterizations cannot alter that BAM was neither a target nor a party to the regulatory actions Plaintiffs cite except for the now-dismissed SEC action involving claims unrelated to Plaintiffs' allegations. (Mot. at 2-3 & n.2.) This absence is telling. If BAM had truly been responsible for AML or KYC violations, had participated in transactions implicating terrorism, or had operated as the alter ego of BHL or Mr. Zhao, regulators with jurisdiction over such matters presumably would have named BAM in their enforcement actions. Yet not a single regulatory agency with relevant authority, including the CFTC, FinCEN, and DOJ, has done so. The silence from regulators with jurisdiction over these matters undermines Plaintiffs' theory that BAM played a central role in the alleged wrongdoing.

Moreover, the Amended Complaint relies heavily on agency complaints, repackaging agency *allegations*, not findings. *See also infra* Section III(C). Where these filings do mention BAM, they emphasize that BAM was designed from the outset to be a regulatory-compliant entity—not a vehicle for fraud. (*See, e.g.*, Opp. Ex. 8 (CFTC Complaint) ¶ 81 (alleging that BAM's purpose was to function as a "navy boat," not a "pirate ship"); AC ¶ 191 (citing FinCEN Consent Order for the

allegation that BAM was intended to provide U.S. regulators "a direct avenue . . . to reach/hammer").)

Plaintiffs' claim that the convictions of BHL and Mr. Zhao "crystal[lize]" the core of their argument again fails to implicate *BAM*. (Opp. at 2.) BAM was not charged or convicted in those proceedings, and the plea agreements do not allege any criminal conduct by BAM. (*See* Opp. Ex. 10 (BHL plea agreement), at 39 (establishing only that Binance.US launched in September 2019 and is a cryptocurrency exchange registered with FinCEN).)

### 3. Plaintiffs contend that Defendants' arguments are "irreconcilable with facts established by consent decrees entered into by the Defendants." (Opp. at 6.)

In its Motion, BAM argued that Plaintiffs fail to plead plausibly that BAM (a) facilitated terrorist attacks, or (b) is the alter ego of Mr. Zhao or BHL. The consent orders Plaintiffs cite do not contradict either argument. BAM was not a party to the FinCEN or CFTC consent orders—both of which addressed AML/KYC violations—and neither order alleged that terrorist-related transactions occurred on BAM's exchange. (*See generally* FinCEN Consent Order (Opp. Ex. 9); Consent Order, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023), ECF No. 80.)

Nor do these orders contain any findings that BAM was the alter ego of any other entity. The FinCEN Consent Order included a "statement of facts," which the Binance entities did not admit to, and while it references BAM's connections to

BHL, it does not assert that BAM was under BHL's complete dominion or control. (*See generally* Opp. Ex. 9.) The CFTC Consent Order did not mention BAM at all. (*See generally* Consent Order, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023), ECF No. 80.)

BAM was a party only to the SEC Consent Order (Opp. Ex. 3), which was entered to address concerns raised in the SEC's motion for a temporary restraining order regarding customer assets.[2] That order contains no findings relevant to the issues here. Instead, it directed BAM and BHL to "confirm" for "the avoidance of doubt" that BAM maintained sole possession of its customers' assets. (Opp. Ex. 3, at 1-2.)

### 4. Plaintiffs assert that Mr. Zhao's "functional[] control [of] BAM to this day" is "the stated reason for multiple states unceremoniously excluding BAM from doing business there." (Opp. at 33.)

As explained in BAM's Motion (and conceded by the Opposition, which does not address this issue), the loss of BAM's Georgia and North Dakota money transmitter licenses involved no findings that Mr. Zhao "controll[ed]" BAM. (*See* Mot. at 50-51.) Instead, it stems from statutes discussing license revocation based solely on the conviction of an individual holding a minority ownership interest in a licensee. (*Id.*) Specifically, the thresholds are 25% in North Dakota and 10% in Georgia. (*Id.*) The settlement agreement, which did not bar BAM from operating in

---

[2] Opp. Ex. 11.

any of the signatory states, was based on similar provisions and addressed comparable concerns. *See supra* pp. 5-6 (agreement referencing Mr. Zhao's "indirect[] beneficial[]" ownership of "more than ten percent" of BAM).

### C. Plaintiffs Mischaracterize Mr. Brooks's Testimony.

Plaintiffs mischaracterize Mr. Brooks's testimony by selectively quoting and removing it from context. They claim that Mr. Brooks testified that "CZ was the CEO of BAM, not [him]." (Opp. at 40, 45.)

In reality, Mr. Brooks testified that his communications with Mr. Zhao were in his capacity as "board chair [of] BAM Trading." (Opp. Ex. 5, at 74:6-11.) He further clarified that BAM did not "report" to BHL or Mr. Zhao and that BHL did not control BAM.[3] Brooks Tr. 65:6–15 (describing his communications with Mr. Zhao as "just corporate communication" and stating, "I don't regard that as reporting."), 74:10-21 ("Binance.com [did not] somehow control[] us."), *SEC v. BHL*, No. 23-cv-1599 (D.D.C. June 8, 2023), ECF No. 29-4.

Mr. Brooks also qualified his statement that "CZ was the CEO of BAM, not [him]" by explaining:

> That **wasn't because Binance.com somehow controlled us**. . . . It was more of an issue I'm Steve Ballmer and he's Bill Gates, who's really running this company, right? So it was not that oh, gee CZ's

---

[3] Conveniently, Plaintiffs chose not to attach to their Opposition the longer excerpt of Mr. Brooks's testimony that the SEC filed as a corrected exhibit in its litigation. *See SEC v. BHL*, No. 23-cv-1599 (D.D.C. June 8, 2023), ECF No. 29-4. BAM now refers the Court to this more fulsome excerpt.

> acting in a different capacity, it is more of do I have the delegation and autonomy to carry out the mission of a CEO . . . ?

(Opp. Ex. 5, at 74:19-75:4.) With the benefit of this context, Mr. Brooks's testimony does not support Plaintiffs' theory of total dominion and control, which is what is required to support their alter ego theory. Rather, it reflects his personal frustration with being "overruled" on certain strategic matters such as BAM's tech migration (*id.* at 75:24-76:1) and his perception of being overshadowed by a more prominent figure, analogous to "Steve Ballmer [to] Bill Gates," (*id.* at 74:23-25). Plaintiffs' reliance on this isolated phrase is unsurprising, but Mr. Brooks himself provides ample explanation for his turn of phrase, which plainly fails to support the level of control required to establish an alter ego relationship. *See infra* Section III(C).

*** *

The Opposition is replete with hyperbole, invective, and factual distortions. Plaintiffs should not be allowed to fill the gaps in their Amended Complaint through these tactics.

## III.   THE AMENDED COMPLAINT IS PROCEDURALLY AND SUBSTANTIVELY DEFICIENT[4]

### A. This Court Can (and Should) Consider Defendants' Citations to Documents That Plaintiffs Incorporated in the Amended Complaint.

In a three-page "preliminary note," Plaintiffs suggest that the Court must

---

[4] Plaintiffs assert that the Opposition's failure to address certain issues and arguments "should not be deemed to be a concession or waiver by the Plaintiffs" but rather "just reflects Plaintiffs'

disregard Defendants' citations to the regulatory filings extensively cited in the Amended Complaint. (Opp. at 8-10.) This argument disregards the well-established doctrine of incorporation by reference, which permits consideration of documents "central to the plaintiff's claim" and "undisputed" in their authenticity when deciding a motion to dismiss. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). The regulatory documents BAM cited in its Motion are both: Plaintiffs' Amended Complaint pulls the majority of its allegations from these documents, cites them expressly throughout, and Plaintiffs do not dispute their authenticity.[5] These filings therefore "should be considered as part of the pleadings." *Id.* Not only can the Court consider them, but where "the exhibits contradict the general and conclusory allegations of the [Amended Complaint], the exhibits [must] govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

---

evaluation that no response is required." (Opp. at 1-2.) That's incorrect. "An argument not made is waived," and disclaimers don't override that principle. *United States ex rel. Marsteller v. Tilton*, 556 F. Supp. 3d 1291, 1304 n.6 (N.D. Ala. 2021). Courts rely on parties to present issues, and may only consider forfeited ones in "extraordinary circumstances." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). Plaintiffs offer none here. They chose to respond selectively and must bear the consequences of omitting arguments despite having the opportunity and "responsibility" to raise them. *Id.*

[5] (*See, e.g.*, AC ¶¶ 73, 86-88, 104, 116, 125, 139, 141, 143, 177, 196-97, 221, 232, 247 (citing CFTC complaint); ¶¶ 137, 140, 165-166, 171-172, 175-176, 189-92, 198-200, 204 (citing FinCEN Consent Order); ¶¶ 210, 295 (BHL plea agreement); ¶¶ 98, 152, 295 (Zhao plea agreement); ¶¶ 69-70, 309-17 (referencing state enforcement actions); ¶¶ 70-73, 80, 91, 95-96, 117, 177, 187, 192, 194, 196, 223, 226-27, 228-31, 248, 282, 284, 292 (citing SEC complaint); ¶ 114 (IRS investigation); ¶¶ 114, 162, 177, 210 (DOJ); ¶¶ 118-22, 137, 214 (OFAC settlement); ¶¶ 134-35, 155 (DOJ settlement); ¶¶ 142, 144, 148, 152-53 (Treasury Department).)

**B. The Amended Complaint Is a Shotgun Pleading and Should Be Dismissed on That Basis Alone.**

Plaintiffs devote four pages to defending their pleading but fail to engage with the core of BAM's argument or the relevant precedent. The Amended Complaint violates FRCP 8, and not only because it reincorporates prior allegations into each successive cause of action, but also because it fails to specify which Defendant is alleged to have done what and obscures its substantive claims with a barrage of repetitive and contradictory assertions. (Mot. at 6-8.)

Plaintiffs offer no meaningful response to this argument, aside from asserting that Defendants should understand *these* Plaintiffs' allegations because "Defendants (*excluding BAM*) face[d] similar allegations" in other cases. (Opp. at 16 (emphasis added).) That is no answer. BAM cannot be reasonably apprised "of the claims against [it] and the grounds upon which each claim rests" by guessing which extraneous allegations Plaintiffs intend their Amended Complaint to bootstrap. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015); *see Heriveaux v. Junior*, 2024 WL 1433611, at *3 (11th Cir. Apr. 3, 2024) (dismissing complaint as a shotgun pleading where "it failed to give defendants adequate notice of the claims against them and the grounds upon which each claim rested"). Moreover, Plaintiffs concede that the referenced litigation did not involve BAM, and it therefore cannot cure the Amended Complaint's fundamental failure to

identify which specific conduct they attribute to BAM. *See Weiland*, 792 F.3d at 1323.

### C. Plaintiffs Cannot Establish That BAM Is an Alter Ego for Jurisdictional or Liability Purposes.

Stripped of its rhetoric, the Opposition's assertions amount to nothing more than a claim that Mr. Zhao, owner of BHL, is also an indirect owner and past board member of BAM, and in that capacity influenced BAM's operations (particularly in the early days). Even if accepted as true, that falls far short of the extraordinary showing of "complete control and domination" required to pierce the corporate veil on an alter ego theory. *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334-35 (Ala. 1991); *Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999). No court has found and no consent order with a regulatory agency has stated that BAM is the alter ego of any entity or individual.

The Opposition attempts to cast doubt on the statements in Mr. Blodgett's declaration. However, it does not identify any specific portion or statement of the declaration that Plaintiffs contend is false. Their only discernible objection appears to be that it undermines their alter ego theory. But this is simply a matter of applying the declaration's factual assertions to the relevant legal standards. *See infra* pp. 21, 28. Despite their inflammatory references, Plaintiffs do not dispute any specific attestations in the declaration, which clearly lay out BAM's corporate structure, operational independence, and compliance practices.

18

### 1. Plaintiffs Cannot Dispute that BAM Has Legitimate Business Operations.

Courts have repeatedly held that alter ego requires that "[t]he dominant party [had] *complete* control and domination." *Blanton*, 585 So. 2d at 1334 (emphasis added). Indeed, the Opposition admits that Alabama law requires that a corporation have "no semblance of individual identity" to justify exercising personal jurisdiction based on an alter ego theory. *S. Rsch. Inst. v. PAM Innovation Corp.*, 2020 WL 1433151, at *3 (N.D. Ala. Mar. 24, 2020) (cited by Opp. at 26). And where, as here, it is undisputed that a company maintains legitimate business operations, courts reject alter ego theories. *See Gilbert v. James Russell Motors, Inc.*, 812 So. 2d 1269, 1273-74 (Ala. Civ. App. 2001) (rejecting alter ego argument where corporation had legitimate business operations in line with its commercial purpose); *see also Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987) (requiring that the corporate structure be "used *solely* to avoid a personal liability of the owner" to justify veil-piercing (emphasis added)). The same is true under Delaware law, which demands "exclusive domination and control" and that the entity exist "for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184 (requiring that the dominated entity have no "legal or independent significance of [its] own").

Nowhere in the 1,294 pages of Plaintiffs' Opposition and supporting exhibits do Plaintiffs assert that BAM does not maintain legitimate business operations in line with its commercial purpose. To the contrary, the Amended Complaint concedes

that BAM operates as a functioning business with its own customers, bank accounts, and assets. (AC ¶¶ 130, 177, 259.) The regulatory filings Plaintiffs themselves rely on further confirm that Binance.US is a regulatory-compliant cryptocurrency exchange with bona fide operations. (*See, e.g.*, Opp. Ex. 2 ¶ 230 ("BAM Trading takes steps to verify that [its] users meet certain terms and conditions to access the Binance.US Platform . . . related to KYC review and other eligibility criteria.").) Mr. Brooks's testimony (which Plaintiffs repeatedly cite) also confirms that BAM had its own employees operating critical functions for its commercial purpose. (Brooks Tr. 50:2-51:10 (describing the decision to "hive off that group of 50 or so people and they would be allocated full-time to [BAM]"), *SEC v. BHL*, No. 23-cv-1599 (D.D.C. June 8, 2023), ECF No. 29-4.)

Mr. Blodgett's declaration likewise confirms that BAM has consistently maintained capital and financial resources since its inception in 2019 (Decl. ¶ 26), paid its own operating expenses (*id.* ¶ 27), and serviced its own debt obligations without contribution from BHL (*id.* ¶ 28).[6]

---

[6] Plaintiffs' assertion that BAM is undercapitalized and is therefore Mr. Zhao's alter ego is unsupported by both fact and law. (Opp. at 25.) As courts have recognized, "[t]he mere fact that a corporation is under-capitalized is not alone sufficient" to justify piercing the corporate veil. *Econ Marketing, Inc. v. Leisure Am. Resorts, Inc.*, 664 So. 2d 869, 870 (Ala. 1994); *see also Nieves v. Insight Building Co.*, 2020 WL 4463425, at *8 (Del. Ch. Aug. 4, 2020) ("Undercapitalization is a factor courts consider in determining whether an entity is in fact a sham."). In any event, BAM is adequately capitalized, having "consistently maintained sufficient capital and financial resources to cover its anticipated operating costs, business liabilities, and financial obligations since its launch in 2019." (Decl. ¶ 26.) Plaintiffs offer no evidence to support their contrary claim that "BAM could not operate without BHL's financial support and was stripped of liquidity when Zhao"

Plaintiffs essentially advocate for a diluted standard for piercing the corporate veil, one that would permit such relief based on allegations of mere corporate misconduct. At bottom, Plaintiffs contend that this extraordinary doctrine should apply simply because BAM might have diverted the attention of U.S. regulators. (Opp. at 17.)

But Plaintiffs' allegation that Mr. Zhao and BHL created BAM as a "façade" does not alter the undisputed record showing that BAM engaged in legitimate operations. (Opp. at 24.) Indeed, the CFTC's complaint acknowledges that BAM was intended to be a regulatory-compliant "navy boat" (Compl. ¶ 81, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1; AC ¶ 197), recognizing that BAM operated as a business. Regardless of Plaintiffs' speculation about the initial motivations regarding BAM's formation, they cannot dispute that just as in *Gilbert*, BAM "was created to buy and sell" and "operated in accordance with its intended purpose" as a functioning cryptocurrency exchange serving the U.S. market. *Gilbert*, 812 So. 2d at 1273-74. This alone is sufficient to end the Court's inquiry.

---

allegedly transferred funds from BAM to other entities (Opp. at 25), as contradicted by the fact that BAM is operating to this day. Further, this allegation is entirely absent from the Amended Complaint and cannot be raised for the first time in the Opposition. *See Brown v. Univ. of Ala.*, 2025 WL 1908737, at *1-2 (N.D. Ala. July 10, 2025).

### 2. Plaintiffs Cannot Establish the "Total Dominion and Control" Required to Pierce the Corporate Veil.

Plaintiffs cannot plausibly allege that BAM is an alter ego by mischaracterizing unrelated federal regulatory actions. Plaintiffs contend that government agencies have "plausibly alleged and independently established" that BAM is BHL's alter ego. (*See* Opp. at 17.) That is incorrect. Plaintiffs' claim rests on unadjudicated allegations, attorney argument, and a single court order decided under a statute that applies a far lower threshold of control than the demanding standard required to pierce the corporate veil under the alter ego doctrine.

Nor does the Opposition cite specific portions of these materials; instead, it offers a string cite of exhibits with no explanation, asserting in conclusory fashion that they "establish" the complete dominion piercing the corporate veil demands. (Opp. at 17-18.) In reality, most of these documents contain allegations that in any event do not address alter ego control.

Specifically, Plaintiffs rely on:

(1) The complaint in the SEC that has since been voluntarily dismissed. (Opp. Ex. 2; Stip. of Dismissal, *SEC v. Binance Holdings Ltd.*, No. 23-cv-01599 (May 29, 2025), ECF No. 301.) Because "statements by counsel in pleadings are not evidence," the complaint's allegations do not constitute "findings." *Hicks v. Jackson Cnty. Comm'n*, 990 So. 2d 904, 905 n.1 (Ala. Civ. App. 2008). And further, the SEC complaint does not allege that BAM was the alter ego of another entity or Mr. Zhao.

(2) A consent order from the same dismissed litigation that was entered as a compromise measure to address the SEC's requests concerning customer assets, *see supra* Section II(B)(3), and similarly contains no factual findings. (Opp. Ex. 3.) Nor does the consent order establish any other entity's control of BAM. Rather, its central focus is that BAM agreed to "confirm" that it maintained possession of its customers' crypto assets. (Opp. Ex. 3, at 1.)

(3) The SEC's statements in the joint status report (Opp. Ex. 4), which reflect attorney argument, not factual findings. In that report, the SEC raised concerns about BAM's compliance with discovery obligations under the referenced consent order, specifically regarding wallet software and employee-related disclosures. BAM refuted those assertions in detail. (*See id*. 15–22.) Like the consent order it relates to, the joint status report contains no findings that any other entity controlled BAM. While it references BHL's connections to BAM, those references fall short of asserting the level of dominion and control necessary to support an alter ego theory.

(4) Cherry-picked statements from the deposition transcript of BAM's former CEO concerning his tenure in 2021, which, as explained above, discusses his frustrations on being "overruled" on certain strategic decisions. *See supra* Section

23

II(B)(4)(C). Moreover, deposition testimony also does not constitute a "finding." (Opp. Ex. 5.)[7]

(5) A transcript of attorney argument at a hearing in the dismissed SEC action, reiterating the SEC's and BAM's differing arguments from the joint status report. (Opp. Ex. 6.) As an initial matter, and as Plaintiffs themselves rightly recognize, these are merely "alleg[ations]," not findings of fact. (Opp. at 18.) Further, the transcript makes clear that the SEC did not argue that BAM was BHL's alter ego. Instead, counsel for the SEC was discussing control of certain customer assets, payments to BAM by BHL affiliates, and certain administrative rights and portals to Amazon environments for Binance.US. (Ex. 6, at 6.) Even if credited, these allegations fall far short of the standard here.

(6) A complaint filed by the CFTC against Mr. Zhao and BHL, not BAM. (Opp. Ex. 8.) As with the SEC complaint, the allegations in this complaint are not themselves factual findings. *Hicks*, 990 So. 2d at 905. Moreover, Plaintiffs' citations to the CFTC complaint mainly concern Mr. Zhao's control of BHL, not BAM. (*See*

---

[7] Mr. Brooks's purported statements about liquidity providers and BAM's purported partial dependency on Mr. Zhao as an economic counterparty similarly do not rise to the level of dominion and control required here. *See Shorter Bros. v. Vectus 3, Inc.*, 343 So. 3d 508, 514 (Ala. 2021) (alter ego requires "*complete* control and domination of the subservient corporation's finances, policy and business practices so that . . . the subservient corporation had no separate mind, will, or existence of its own"); *Gadsden v. Home Pres. Co.*, 2004 WL 485468, at *5 (Del. Ch. Feb. 20, 2004) (finding undercapitalization warranting disregarding corporate status where corporation had "no assets, capital, or tools" of its own and "had no ability to perform" its promises to customers).

Opp. Ex. 8 ¶¶ 82-88 (describing Mr. Zhao's control of BHL's operations), ¶ 93 (describing an update to BHL's Terms of Use), ¶ 126 (describing Mr. Zhao's and BHL's corporate strategy relating to BHL's exchange).)

(7) A consent order between FinCEN and BHL, not BAM. (Opp. Ex. 9.) The consent order concerned BHL's compliance with the Bank Secrecy Act for transactions occurring on the Binance.com platform, which is separate from BAM's regulated U.S. exchange that exclusively serves U.S. individuals. (Decl. ¶¶ 4-9.) And as explained above, the FinCEN Consent Order references BAM's connections to BHL, but does not assert that BAM was under BHL's complete dominion or control.

(8) A plea agreement between the DOJ and BHL stating only that BAM was owned by Mr. Zhao in 2019 (Opp. Ex. 10, at 3), a fact that, even if true, is insufficient to establish that BAM is Mr. Zhao's alter ego. *See Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 400 (Ala. 1989) ("The mere fact that a party owns all or a majority of the stock of a corporation does not, of itself, destroy the separate corporate identity.").

(9) A brief from the dismissed SEC action consisting, again, of attorney argument. (Opp. Ex. 11.) Moreover, this brief made no allegations of alter ego but instead argued that Mr. Zhao could be subject to liability under the Exchange Act's lower "control person" standard. (*See id.* at 54 (arguing that Mr. Zhao met the definition of a "control person," requiring only a showing of "power to direct or

25

cause the direction of [] management and policies . . . through the ownership of voting securities, by contract, or otherwise").)

(10) A motion-to-dismiss order from the SEC litigation. (Opp. Ex. 7.) Even this order falls far short of establishing the level of dominion and control required to support an alter ego theory. Plaintiffs' own citations reveal as much. For example, they cite pages 46 to 56 to claim the court found "plausible SEC allegations that Binance, Zhao, and BAM work in concert." (Opp. at 18.) Yet the cited page range contains no such finding. It instead addresses whether various BHL offerings constituted investment contracts—not control. (Opp. Ex. 7, at 46-56 (no mention of control).)

Plaintiffs next cite pages 61 and 62, asserting they reflect "subterfuge in creation and use of BAM." (Opp. at 18.) In fact, that portion discusses control-person liability under the Securities Exchange Act and merely recites the SEC's allegations that Mr. Zhao exercised some degree of managerial oversight over BAM in 2020 and 2021. (Opp. Ex. 7, at 61-62.) These allegations, at most, suggest involvement in strategic decisions, not the "complete domination" required to pierce the corporate veil. *See S. Rsch. Inst.*, 2020 WL 1433151, at *3 (requiring "no semblance of individual identity" (internal quotation omitted)).

Finally, Plaintiffs cite page 89 for the conclusion that the court allowed claims based on Mr. Zhao's "controlling" BAM to proceed. (Opp. at 18.) But these claims

concerned Mr. Zhao's liability for BAM's alleged acts under 15 U.S.C. § 78t, which deals with liability for securities law violations. The statute calls for a different (and much-lower) threshold than alter ego liability. *Compare* (Opp. Ex. 7, at 59-60 (stating that 15 U.S.C. § 78t liability can attach to anyone who "cause[s] the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise" (citing 17 C.F.R. § 230.405))), *with McKissick v. Auto-Owners Ins. Co.*, 429 So. 2d 1030, 1033 (Ala. 1983) ("The fact that [a majority stakeholder] controlled his business does not make that corporation such a sham" as to accept alter ego theory.). That a different court held that the SEC's allegations plausibly met a lower standard relating to some level of influence by Mr. Zhao does not establish the "complete control and domination" Plaintiffs are required to plead here. *Blanton*, 585 So. 2d at 1334-35.

The majority of the remaining purported "findings"—in truth, mere allegations—that Plaintiffs cite discuss that BAM shared some "common ownership" with other Binance entities, that Mr. Zhao exercised some discretion over BAM's corporate operations and marketing in his capacity as a board member and part owner, and that BAM and BHL entered into trademark and software-licensing agreements. (Opp. Ex. 8 ¶ 81.) None of this—common ownership, an owner's involvement in a corporation's operations, or arm's-length transactions—rises to the level of absolute dominion or control required to pierce the corporate

27

veil. (*See* Mot. at 44-45, 47-48, 54 (citing *Stewart v. Bureaus Inv. Grp., LLC*, 2015 WL 7572312, at *11 (M.D. Ala. Nov. 24, 2015) (ownership and "advisory management" insufficient); *Simmons*, 554 So. 2d at 400 (ownership insufficient); *Wright v. Alan Mills, Inc.*, 567 So. 2d 1318, 1319 (Ala. 1990) (arm's-length transactions show corporate separateness); *Trs. of Arden v. Unity Constr. Co.*, 2000 Del. Ch. LEXIS 7, at *12 (Del. Ch. Jan. 26, 2000) (common management and ownership insufficient)).)

None of these exhibits consist of "findings" or "establish" that BAM was an alter ego of any other entity. The Opposition puts forth no plausible allegations to rebut Mr. Blodgett's declaration that establishes that BAM: has always maintained its own articles of incorporation and bylaws (Decl. ¶ 7); has always maintained its own board of directors (*id.* ¶ 15); makes independent employment decisions (*id.* ¶ 19); uses certain BHL software and licenses only pursuant to arm's-length service-level agreements (*id.* ¶ 23); has never received capital contributions from BHL (*id.* ¶ 25); has consistently maintained sufficient capital and paid its own operating expenses (*id.* ¶¶ 27-28); and does not maintain any joint bank accounts with BHL (*id.* ¶ 30).

### 3. The May 2025 Settlement Agreement Does Not Establish Alter Ego.

Nor does the May 2025 settlement agreement support Plaintiffs' alter ego theory. (*See* Opp. at 7 (arguing that the agreement "confirms" that BAM was not

separate from BHL and Mr. Zhao).) As explained above, this agreement arose from state "character and fitness" standards governing individuals' holdings, and even indirect-ownership stakes, and made no finding of past or present control. *See supra* Section II(A).

Further, Plaintiffs misstate what the agreement says. It did not state that "Zhao was BAM's 'authorized representative'" but rather showed he was the authorized representative of a different company. (*Id.*) *See supra* Section II(A)(1). That Mr. Zhao previously was the authorized representative of one of BAM's many indirect beneficial owners does not demonstrate Mr. Zhao's "control" of BAM for alter ego purposes. *See Simmons*, 554 So. 2d at 400 (majority ownership is insufficient on its own to justify veil-piercing); *Landgarten v. York Rsch. Corp.*, 1988 Del. Ch. LEXIS 20, at *12 (Del. Ch. Feb. 3, 1988) (*total* ownership is insufficient). And even if Plaintiffs had identified the correct entity, authorized-representative status still does not show alter ego. *See Wiggins v. Ellis*, 2021 WL 535536, at *7 (N.D. Ala. Feb. 12, 2021) (holding that serving as a corporation's authorized representative is insufficient on its own to establish alter ego).[8]

---

[8] Plaintiffs claim it is "notabl[e]" that the agreement will terminate if Mr. Zhao receives a pardon in connection with his criminal conviction. (Opp. at 19.) It is unclear why. It is unremarkable that an agreement predicated on the criminal conviction of an indirect beneficial owner will expire if the individual receives a pardon.

### 4. Plaintiffs' Remaining Allegations Do Not Establish Total Control.

*Allegations of Mr. Zhao's position and influence in day-to-day decisions.*

First, Plaintiffs allege that, for a period of time, Mr. Zhao served as Chairman of BAM's Board, and "micromanaged" BAM through his involvement in BAM's compliance, technology, and liquidity functions and in approving BAM's expenditures. (Opp. at 20, 55.) But the fact that Mr. Zhao had some role in BAM's operations commensurate with his corporate position does not establish that BAM was his alter ego. *See Wright*, 567 So. 2d at 1319 (owner's involvement in "day-to-day operations" insufficient to establish alter ego).

*Arm's-length transactions between BAM and BHL.* Plaintiffs' arguments that BHL and its executives provided "technology, liquidity, and infrastructure" to BAM or contributed to BAM's "strategic and compliance decisions" (Opp. at 24) are unavailing. BAM does not dispute that it entered into various business agreements with BHL addressing these areas. (*See* Decl. ¶¶ 23-24 (describing wallet-custody, software-licensing, and trademark agreements).) However, Plaintiffs' assertion that these agreements "demonstrat[e] Binance's control over BAM's operations" is contrary to the law. First, the mere existence of contracts between two companies does not transform them into alter egos, and Plaintiffs offer no evidence that these agreements were anything other than arm's-length transactions. *See Wright*, 567 So. 2d at 1319 ("arm's-length transactions made in the ordinary course

30

of business" do not support piercing the corporate veil). Indeed, the existence of arm's-length transactions weighs against a finding of alter ego. *See id.* (holding that owner writing checks on the corporation's account to herself and her son's business did not render the corporation her alter ego where they "were arm's-length transactions made in the ordinary course of business"). Moreover, the Amended Complaint concedes that BHL personnel providing these services "'operate[d] independently of' BAM Trading." (AC ¶ 250.) Courts have repeatedly rejected the notion that such "administrative" agreements are sufficient to establish alter ego status. *See Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1006-07 (N.D. Cal. 2020).

***Corporate Formalities.*** Plaintiffs contend that the Amended Complaint adequately alleges BAM's failure to observe corporate formalities—an essential factor for establishing alter ego under Alabama law. *See Simmons*, 554 So. 2d at 401 (listing factors such as failure to "observe the corporate form," maintain corporate records or bank accounts, and employ staff). However, these arguments are both unpersuasive and internally inconsistent. For example, Plaintiffs assert that "Binance," not BAM, lacks a board of directors (Opp. at 30; AC ¶ 88), yet simultaneously emphasize that Mr. Zhao served on the boards of BAM Trading and BAM Management, thereby conceding their existence (Opp. at 30; *see also* Decl. ¶ 15); *cf. City of Fairfield v. United States*, 2018 WL 2445686, at *5 (N.D. Ala.

31

May 31, 2018) (noting that a complaint with "conflicting and confusing factual assertions" may fail to meet Rule 8(a)(2)'s requirement of a short and plain statement). Plaintiffs further argue that BAM disregards corporate formalities because the CFTC alleged Mr. Zhao was "ultimately responsible for evaluating the legal and regulatory risks . . . related to the launch of [BAM]." (Opp. at 30.) Yet even if accurate, this allegation does not speak to corporate formalities as defined for alter ego purposes in cases like *Simmons* but merely reflects Mr. Zhao's involvement in BAM's formation.

### 5. Plaintiffs Fail to Plead Alter Ego for the Relevant Time Period.

The law is clear: to establish alter ego liability, Plaintiffs must make a showing of control "*at the time of the attacked transaction.*" *Shorter Bros.*, 343 So. 3d at 514 (emphasis added); *see also ECB USA, Inc. v. Savencia, S.A.*, 2025 WL 254504, at *2 (D. Del. Jan. 16, 2025) (cabining alter ego analysis to the "relevant times related to the case"). Yet, as BAM's Motion explains, the Amended Complaint fails to identify the alleged relevant period here, and the Opposition only compounds this deficiency. Nowhere in three pages of yet more rhetoric does the Opposition specify what Plaintiffs believe the relevant time period is. (Opp. at 32-34.)

The Opposition attempts to distract from this flaw by mischaracterizing BAM's argument as seeking to limit the relevant time period to "the date of the October 7, 2023 terror attacks." (Opp. at 32.) That is not BAM's position. As BAM's

Motion makes clear, alter ego status must be assessed at the time of the transactions that plausibly could have financed the October 7 attacks. (*See* Mot. at 41 (citing *Shorter Bros.*, 343 So. 3d at 514).) Plaintiffs, however, refuse to carry their burden and identify the relevant time period, instead digressing into policy arguments regarding "the entire framework of U.S. financial regulation." (Opp. at 34.)  But such policy arguments do not cure the Amended Complaint's failure to plausibly allege when the purported transactions occurred.

Plaintiffs' theory appears to be that any transaction linked to Hamas, tracing back to 2014—before BAM or even BHL existed—caused their injuries. (*See* Opp. at 32 (citing article not pled in the Amended Complaint suggesting planning for the October 7, 2023 attacks began in 2014).) This cannot satisfy even the most liberal plausibility standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (it is "a *plaintiff's* obligation to provide the grounds of his entitlement to relief") (emphasis added, quotations omitted, and alterations adopted); Fed. R. Civ. P. 8(a)(2) (requiring plaintiffs to "show[] that the pleader is entitled to relief").[9] Neither the Amended Complaint nor the Opposition provides any basis (as it is Plaintiffs' burden to do) to justify looking beyond 2023 to assess alter ego.

---

[9] If this is Plaintiffs' theory, it further underscores the proximate-cause problem affecting their alter ego theory and substantive claims. (*See* Mot. at 43-44; *see also id.* at 31, 35, 37.)

### 6. Plaintiffs Fail to Establish that BHL and Mr. Zhao's Alleged "Control" of BAM Caused Their Injuries.

The Opposition admits that in addition to complete domination, Plaintiffs must also allege that a controlling party "misused" BAM to "proximately cause" their harms. (*See* Mot. at 45, 53 (Plaintiffs must establish that BHL's or Mr. Zhao's control of BAM was used to harm *them*).) Plaintiffs still fail to identify any plausible connection between the control they allege and their injuries.

The gravamen of Plaintiffs' alter ego theory is that BAM operated as a regulatory "smokescreen" that was "designed to comply with all applicable US federal laws." (AC ¶¶ 94, 105, 178, 191.) According to Plaintiffs' own theory, any supposed deception in BAM's creation affected American regulators, not civilians in Israel. Further, Plaintiffs' theory is that BAM's internal corporate form was *not* misused. Rather, Plaintiffs allege that Mr. Zhao's supposed plan still required BAM to be a fully operational cryptocurrency exchange. (*See e.g.*, AC ¶ 193 (describing BAM's "platform operations," "customer access," "fiat services with U.S. banks," "crypto asset wallets," "trading engine," and "trade clearing and settlement functions").) The Opposition's attempt to reframe this as BHL's "misuse[]" of BAM as a vehicle to "maintain U.S. customer access" obscures what Plaintiffs actually pled. (*See* Opp. at 23.) Plaintiffs allege that despite BAM's existence, Mr. Zhao and Binance "encouraged U.S. customers to utilize its less regulated Binance platform" instead. (AC ¶ 95.) That allegation in no way connects BAM to Hamas or the

34

October 7 attacks. Because Plaintiffs do not identify any conduct by BAM relevant to the substance of their claims, Plaintiffs do not allege the required misuse of BAM. And because Plaintiffs do not allege that misuse, they cannot establish that BAM proximately caused their harm.

### D. This Court Lacks Jurisdiction over BAM.

Plaintiffs' Opposition underscores that this Court lacks personal jurisdiction over BAM. Rather than grapple with the requirement that Plaintiffs plead BAM-specific, suit-related contacts with Alabama, the Opposition conflates distinct entities (Binance.com/BHL/Mr. Zhao with BAM), relying on conduct and enforcement materials that pertain to others, not BAM.

Preliminarily, Plaintiffs fail to meaningfully address Rule 4(k)(1)(C), referencing it only in a single footnote that does not engage with BAM's arguments explaining why that provision cannot confer jurisdiction here. (*See* Opp. at 3 n.2; Mot. at 14-18.) BAM's Motion details the absence of any alleged connection between BAM's U.S. contacts and Plaintiffs' claims, citing six supporting cases, none of which the Opposition attempts to rebut. (Mot. at 14-18.) As "[a]rguments raised in a perfunctory manner, such as in a footnote, are waived," Plaintiffs should be deemed to have abandoned this theory of jurisdiction. *Latite Roofing & Sheet Metal, LLC v. OSHRC*, 2021 WL 4912479, at *1 n.1 (11th Cir. Oct. 21, 2021) (per curiam); *see Wagner v. State*, 197 So. 3d 517, 520 n.3 (Ala. 2015) ("It is well settled

that it is not the function of this [c]ourt to create legal arguments for the parties before us.").

This threshold issue aside, Plaintiffs fail to plead this Court's specific personal jurisdiction over nonresident defendant BAM because they cannot show that any of the allegations in the Amended Complaint relate to BAM's contacts with Alabama.[10]

### 1. Plaintiffs Do not Plead BAM Suit-Related Conduct in Alabama.

As Plaintiffs concede, specific personal jurisdiction, whether under Rule 4(k)(1)(C) or Alabama's long-arm provision, requires the "*suit-related conduct* [to] create a substantial connection with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added); (Opp. at 4 (acknowledging that "whether there is suit-related conduct in Alabama" is the essential issue)). "The relevant 'suit-related conduct'" by BAM here "[is] the conduct that could have subjected [it] to liability under the ATA." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016).

Yet, despite devoting over forty pages to personal jurisdiction (Opp. at 17-60),

---

[10] Plaintiffs accuse BAM of "misleadingly omit[ting]" from its Motion allegations tying the case to Alabama, including BHL's and Mr. Zhao's involvement. (Opp. at 4.) In fact, BAM directly addressed those allegations in its Motion. (*See* Mot. at 11-13, 17 n.7 (addressing AC ¶¶ 33, 35-40); *id.* at 39-52 (addressing alter ego allegations as they relate to jurisdiction).) Plaintiffs, by contrast, fail to engage with any of the cases or arguments BAM cited, setting forth an incoherent theory of personal jurisdiction, toggling between U.S. contacts, Alabama contacts, and an alter ego theory, often within the same passage.

Plaintiffs are unable to demonstrate that the required suit-related conduct by BAM gave rise to the causes of action in the Amended Complaint. (*See, e.g.*, Opp. at 20-24, 34.) Their reliance on "direct connections through BAM and the inextricably intertwined connections among BAM, BHL, and Zhao" misses the mark. (Opp. at 3; *see id.* at 3 n.2.) Plaintiffs seem to allege that Mr. Zhao's "U.S.-directed activities—including failures in AML/KYC obligations and the facilitation of terrorist remittances"—and related regulatory filings concerning BHL somehow relate to jurisdiction over BAM. (Opp. at 20; *see id.* at 21-23.) But, critically, none of the cited governmental actions attribute any compliance deficiencies to BAM. *See supra* Section II(B)(2). Nor could they. Plaintiffs themselves allege that BAM was created to comply with AML/KYC regulations, and regulatory filings confirm that BAM indeed complied with its obligations. *See supra* Sections II(B)(2), III(C)(6).

Plaintiffs' remaining arguments similarly fail to establish personal jurisdiction over BAM. They lack factual support tying BAM's conduct or transactions on its platform to Alabama or to Plaintiffs' alleged harm. *See Aeropower, Ltd. v. Matherly*, 511 F. Supp. 2d 1139, 1152 (M.D. Ala. 2007) ("[Plaintiffs] offer[] no factual allegations which support [these] conclusory allegation[s]."). Plaintiffs advance generalized theories that would require allegations of transactions (i) on BAM's platform in Alabama (ii) related to their claims. They plead neither.

For instance, Plaintiffs rely on a plea agreement entered between BHL and the

DOJ (*see* Opp. Ex. 10) to analogize jurisdiction over BHL in the Western District of Washington, based on user transactions in that district involving Iranian recipients, to BAM's alleged conduct in Alabama (Opp. at 21). But Plaintiffs do not allege that any relevant transactions on BAM's platform were conducted, much less were conducted by users *in Alabama*.[11]

Plaintiffs' conclusory claims that BAM "facilitated millions of dollars in transactions tied to Alabama accounts" (Opp. at 24) or that its services "are the conduits through which terror financing occurred" (Opp. at 22) are unsupported and fail to plead suit-related conduct by BAM. The Amended Complaint contains no allegation that any funds were transmitted from BAM's platform to a terrorist organization, let alone by an Alabama resident. (*See* Mot. at 17.)

Finally, Plaintiffs attempt to sidestep their inability to plead BAM-specific conduct by asserting that "Binance's global platform was used for terrorism financing" and that BAM "was integral to the scheme" (Opp. at 23), or that BAM's customer funds were "funnel[ed]" into Binance's global network (Opp. at 34). These claims are even further removed from any specific conduct by BAM. BAM operates

---

[11] Recognizing the absence of support for this inference—which is why it was not pleaded in the Amended Complaint—Plaintiffs instead assert that they are "prepared to demonstrate as much through jurisdictional discovery." (Opp. at 21.) That cannot salvage an entirely unsupported allegation. Jurisdictional discovery is not a substitute for pleading facts required to establish a prima facie case. Plaintiffs' request should be denied as unfounded. *See Ex parte Troncalli Chrysler Plymouth Dodge, Inc.*, 876 So. 2d 459, 468 (Ala. 2003) ("A request for jurisdictional discovery must offer the court 'more than conjecture and surmise in support of [the] jurisdictional theory.'").

a separate exchange through a different platform, Binance.US, with distinct compliance protocols. (*See* Decl. ¶¶ 13-14, 37-47.)[12]

"Accordingly, [Plaintiffs] have not shown a sufficient nexus between [BAM's] contacts with Alabama and the litigation to render the exercise of specific personal jurisdiction over [BAM] here constitutionally permissible." *Mack v. CooperSurgical, Inc.*, 2023 WL 2653365, at *4 (M.D. Ala. Mar. 27, 2023) (internal quotations omitted).[13]

## 2. The May 2025 Settlement Agreement Does Not Confer Jurisdiction in This Matter.

Plaintiffs cannot rely on the settlement agreement to establish personal jurisdiction. (*See* Opp. at 7, 35.) Plaintiffs assert that, by entering into the agreement, BAM "expressly acknowledg[ed] and agree[d], *inter alia*, that Alabama has jurisdiction over BAM." (Opp. at 7.) Citing the agreement, they go so far as to

---

[12] Plaintiffs' assertion that BAM was created for purposes of "decepti[on]" (Opp. at 4) is irrelevant to the question of whether this Court may exercise personal jurisdiction over BAM. Likewise, Plaintiffs' reference to BAM's involvement in litigation across multiple districts (Opp. at 5) is a red herring. The fact that BAM has appeared in other cases does not establish jurisdiction here. To the contrary, several federal courts have expressly held that they lack personal jurisdiction over BAM. *See, e.g.*, *Licht v. Binance Holdings Ltd.*, 2025 WL 625303, at *28, *31 (D. Mass. Feb. 5, 2025), *report and recommendation adopted*, 2025 WL 624025 (D. Mass. Feb. 26, 2025); *Gonzalez v. BAM Trading Servs., Inc.*, 2024 WL 4589791, at *8 (D.N.J. Oct. 28, 2024). Each court must independently determine whether it has personal jurisdiction over the parties before it. *See PNC Bank, N.A. v. S. Home Builders, LLC*, 2013 WL 5524108, at *3 (N.D. Ala. Oct. 2, 2013) ("It is an elementary requirement that personal jurisdiction must be established in every case before a court has power to render any judgment.").

[13] Plaintiffs' allegations regarding jurisdiction based on an alter ego theory are addressed above. *See supra* Section III(C).

suggest that BAM "has already stipulated to jurisdiction in Alabama" in this case. (Opp. at 39.) But the agreement strictly limited any concession of jurisdiction to the specific regulatory actions it resolved, not unrelated civil litigation brought by other parties. Section 1 of the Agreement provides that "[p]ursuant to the licensing and supervision laws of the Participating States, the Participating States have jurisdiction over BAM Trading *as described herein* and may *enforce the terms of this Agreement*" and that "BAM Trading acknowledges that the Participating Regulators have and maintain jurisdiction over *the underlying dispute*." (Opp. Ex. 1 ¶ 1 (emphasis added).) Further, it sets out that "[n]othing contained in this Agreement shall be deemed an admission, finding, or denial of any fact, matter, liability, or thing by BAM Trading and BAM Management US except as to the *Participating Regulators'* jurisdiction and authority to enter into and enforce *this* Agreement." (*Id.* ¶ 17 (emphasis added).)

The plain language of the agreement forecloses jurisdiction here. But notwithstanding the clear language of the agreement, even if BAM had consented to personal jurisdiction in another matter in this district, that would have no bearing on whether the Court should exercise specific personal jurisdiction here. *See Williamson v. Watson*, 378 So. 3d 488, 492 (Ala. 2022) ("A court does not acquire personal jurisdiction over a defendant in one case simply because that court has exercised jurisdiction over that defendant in a different case.").

40

Finally, the agreement cannot retroactively establish jurisdiction over this action. Plaintiffs filed their Amended Complaint on May 5, 2025, and the agreement was executed on May 16. (Opp. Ex. 1, at 8; AC at 115.) Plaintiffs "seeking the exercise of personal jurisdiction over a nonresident defendant bear[] the initial burden of *alleging in the complaint* sufficient facts to make out a prima facie case of jurisdiction," *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (emphasis added), and "contacts coming into existence after the cause of action arose are usually not relevant," *Frye v. Ulrich GmbH & Co. KG*, 2009 WL 801773, at *4 (M.D. Ala. Mar. 25, 2009). *See also Hammer Brand, LLC v. Voro Inc.*, 2024 WL 4803686, at *6 (M.D. Fla. Apr. 18, 2024) ("To comport with due process, a defendant must have had contacts with a jurisdiction before a lawsuit was filed, such that the defendant had fair warning that a lawsuit could be brought there." (collecting cases)).

Accordingly, the Court should dismiss the Amended Complaint for lack of personal jurisdiction under Rule 12(b)(2).

### E. Plaintiffs Insufficiently Plead JASTA Liability Against BAM.[14]

Like the Amended Complaint, the Opposition fails to articulate how BAM engaged in any actionable conduct under the ATA or JASTA. Plaintiffs do not allege (nor could they) that any transactions connected to the attacks at issue occurred on

---

[14] As Mr. Zhao's Reply explains, the Opposition concedes that Plaintiffs do not allege primary liability under the ATA. (Zhao Reply at Section V(B).)

BAM's U.S.-only platform. Indeed, across twenty-two pages of liability discussion, BAM is mentioned only four times, and even then only in passing—twice to be expressly excluded from the collective "Defendants." (Opp. at 65-66.)

Plaintiffs do not identify a single BAM employee, transaction, or affirmative act tied to terrorist activity. Nor do they allege that BAM's platform was ever used by any foreign terrorist organization. (Mot. at 21-25.) These omissions are not mere technicalities; they fundamentally undermine Plaintiffs' claims.

Under binding Supreme Court precedent, liability under the ATA and JASTA demands more than generalized assertions or passive association. It requires conscious, culpable participation in the specific terrorist act. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023) ("[T]he defendant has to take some 'affirmative act' 'with the intent of facilitating the offense's commission.'").

Plaintiffs' threadbare allegations against BAM, devoid of any factual support, cannot withstand scrutiny under the rigorous standards governing JASTA liability. Their attempt to impute liability to BAM based on the conduct of other entities, without alleging any BAM-specific conduct, fails as a matter of law. (Mot. at 18-25.)[15]

---

[15] BAM joins BHL and Mr. Zhao's arguments that the non-U.S.-national Plaintiffs lack standing to bring ATA and JASTA claims, and that the nonexclusive Israeli-national Plaintiffs lack standing to bring claims under the ATS. (*See* Zhao Reply at Sections V(B)(1), V(C)(1); BHL Reply at Section III.)

### 1. Plaintiffs Cannot Establish Aiding-and-Abetting Liability Under Binding Supreme Court Precedent.

The Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471, distilled aiding-and-abetting liability under the *Halberstam* framework and 18 U.S.C. § 2333(d)(2) to require that a defendant provide both (1) knowing and (2) substantial assistance to the primary tortfeasor. *See id.* at 491. Plaintiffs' Opposition underscores their inability to satisfy either prong. As the Court explained, aiding-and-abetting liability rests on a "conceptual core" that "has animated [the doctrine] for centuries: that the defendant consciously and culpably participate[d] in a wrongful act so as to help make it succeed." *Id.* at 493 (internal quotations omitted). The Amended Complaint fails to plead that BAM had the requisite knowledge or provided substantial assistance, and the Opposition does not remedy this deficiency.

### a. The Opposition Does Not Alter That Plaintiffs Cannot Sufficiently Plead That BAM Provided Knowing and Substantial Assistance to Any Terrorist Organization.

Absent any allegations of BAM-specific conduct, Plaintiffs cannot sufficiently plead that BAM provided knowing and substantial assistance to any terrorist organization. The Opposition offers only a single conclusory assertion pertaining to purported conduct by BAM: that the "facilitation of '[high]-volume transactions through Binance.com and Binance.US'" provided terrorist organizations with "critical financial infrastructure" to transact in cryptocurrencies. (Opp. at 70 (citing AC ¶ 133).) This claim collapses under scrutiny. BAM operates a distinct, regulated

43

U.S. exchange—Binance.US—that exclusively serves U.S. individuals and is entirely separate from Binance.com. (Decl. ¶¶ 9-14.) Plaintiffs do not allege that Hamas or any foreign terrorist organization ever used BAM's platform, nor do they identify any mechanism by which BAM's U.S.-only transactions could have been routed to or from Hamas-linked accounts.

At most, the Opposition presents BAM as passively enabling other parties to engage in wrongdoing. But aiding-and-abetting liability requires an "affirmative act with the intent of facilitating the offense's commission," not passive nonfeasance. *Twitter*, 598 U.S. at 490 (internal citations omitted); *see also Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025) ("[R]outine and general activity that happens on occasion to assist in a crime—in essence, 'incidentally'—is unlikely to count as aiding and abetting."); *id.* at 297 ("[P]assive nonfeasance . . . [is] rarely the stuff of aiding-and-abetting liability.").

Plaintiffs' assertion that an "affirmative act" is not required for aiding-and-abetting liability (Opp. at 76-77) directly contradicts binding Supreme Court precedent. *See Smith & Wesson*, 605 U.S. at 291-92 ("To aid and abet a crime, a person must take an affirmative act in furtherance of that offense"; "aiding and abetting usually requires misfeasance rather than nonfeasance."); *see also Twitter*, 597 U.S. at 492 ("[O]ur legal system generally does not impose liability for mere omissions, inactions, or nonfeasance[.]"). Their contention that the discussion of

44

requiring an "affirmative act" in *Twitter* was "dicta" and only applies to criminal aiding and abetting is misguided. (Opp. at 76-77.) *Twitter* states that "the defendant has to take some 'affirmative act' 'with the intent of facilitating the offense's commission.'" 598 U.S. at 491 (citation omitted). Although the Court references a criminal case in discussing this principle, it immediately clarifies that "[s]imilar principles and concerns have shaped the aiding-and-abetting doctrine in tort law, with numerous cases directly employing them to help articulate the standard for tortious aiding and abetting." *Id.* (collecting cases). Accordingly, the "affirmative act" requirement is not limited to criminal liability but is a fundamental element of aiding and abetting in both criminal and civil contexts.[16]

Plaintiffs further attempt to evade *Twitter* and *Smith & Wesson* by asserting that "Defendants" provided "special treatment" to terrorist actors. (Opp. at 77.) Yet the Amended Complaint does not identify any instance in which BAM deviated from its standard procedures to benefit Hamas or any other terrorist group. In fact, Plaintiffs' theory with respect to BAM emphasizes its compliance with U.S. laws and regulatory requirements or frames the alleged "wrongdoing" as a purportedly strategic decision by Mr. Zhao or BHL to launch a fully compliant platform to serve

---

[16] Ironically, Plaintiffs rely on an inapposite criminal case cited by *Smith & Wesson*, asserting that they "have pleaded a systematic series of tactics on the part of Defendants to ensure the completion of fund transfers to FTOs." (Opp. at 77 (citing *Direct Sales Co. v. United States*, 319 U.S. 703 (1943)).)

U.S. customers, again highlighting BAM's own lack of wrongdoing. (Mot. at 18-19; *see also* AC ¶¶ 105, 178, 191.) The Supreme Court in *Twitter* found the absence of "special treatment" dispositive, and it compels the same result here. 598 U.S. at 498.[17]

> **b.** **The Opposition Does Not Alter that Plaintiffs Cannot Sufficiently Plead Any Concrete Nexus Between BAM's Services and the Attack at Issue.**

The Opposition likewise does not remedy the Amended Complaint's failure to allege any concrete "definable nexus between [BAM's] assistance and th[e] attack" at issue here. *Id.* at 501, 503 (warning that absent concrete nexus, defendants would be deemed to aid and abet all acts by the terrorist group). The Opposition's allegation that "[t]here is perhaps nothing more concrete in nature than facilitating the transfer of millions of dollars to an FTO" (Opp. at 78) is conclusory and insufficient. *See Ashley*, 144 F.4th at 435 ("labels and conclusions . . . or naked assertions devoid of further factual enhancement" are insufficient to plausibly allege

---

[17] Plaintiffs' reliance on *Direct Sales* here is misplaced. (Opp. at 77.) As in *Ashley*, "*Direct Sales* illustrates what is lacking in Plaintiffs' theory of liability." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 442 (2d Cir. 2025). In *Direct Sales*, the Supreme Court upheld a narcotics supplier's conviction where the seller directly fueled a physician's illegal distribution through abnormal, sustained volume, high-pressure sales methods, large discounts and unit listings, affirmative reorder encouragement, and continued supply after government warnings— conduct the court characterized as "informed and interested cooperation" with a stake in the venture. *Direct Sales Co. v. United States*, 319 U.S. 703, 706-15 (1943). As *Ashley* explained, "[t]he pharmacy's tactics and 'prolonged cooperation' to supply the doctor demonstrated not only that the pharmacy knew and acquiesced to the doctor's 'illicit enterprise' but also that it 'join[ed] both mind and hand with him to make its accomplishment possible.'" 144 F.4th at 442. As in *Ashley*, this conduct is a far cry from the allegations against BAM here.

a discernible nexus (quotations and citation omitted)).

*Ashley* is instructive. In *Ashley*, the Second Circuit rejected ATA claims even where the defendants were alleged to have knowingly permitted and actively engaged in illegal activity, including "custom build[ing]" and "operating" "money laundering schemes" known to fund terrorism. *See id.* at 430–31, 444. The court emphasized that allegations must offer a "discernable nexus between the money laundering and the attacks committed against [p]laintiffs," rather than merely asserting that the defendant assisted the terrorist organization's activities in general. *Id.* at 444 (citation omitted). Here, Plaintiffs' allegations (or lack thereof) against BAM fall far short of this standard. The Opposition repeatedly references large amounts allegedly processed by "Defendants" for Hamas, but Plaintiffs never identify any BAM customer or any transaction processed on BAM's platform connected to the attacks or to Hamas.

Without again being able to tie any transactions to BAM or any transactions by any Defendant connected to the attack at issue, Plaintiffs posit that "money is fungible" and thus a specific nexus to the attacks "is not required." (Opp. at 78.) This theory has been repeatedly rejected by courts, including in cases Plaintiffs rely on. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 498 (2d Cir. 2021) (rejecting "[p]laintiffs' attempt to equate the *Halberstam* foreseeability standard with the 'fungibility' theory"), *cited in* Opp. at 67, 69-71. More recently, the court in *Ashley*

47

similarly addressed and "rejected the notion that *Halberstam* allows aiding-and-abetting liability to attach based on such a 'fungibility theory.'" 144 F.4th at 444 (citation omitted). Adopting such a theory would "displace the aiding-and-abetting standard with the standard for criminal material support . . . [and] evade *Halberstam*'s foreseeability standard." *Honickman*, 6 F.4th at 499; *see Ashley*, 144 F.4th at 444.

Plaintiffs "offer[] no discernable nexus" between conduct by BAM and the attacks committed against Plaintiffs, and their claims fail for that reason. *See Twitter*, 598 U.S. at 501, 503; *Ashley*, 144 F.4th at 444.[18]

### 2.  Plaintiffs' Reliance on *Raanan* Is Misplaced.

Plaintiffs' repeated reliance on *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025), *reconsideration denied*, 1:24-cv-697, (S.D.N.Y. Apr. 23, 2025) ECF No. 70, to establish aiding-and-abetting liability is misplaced. Plaintiffs assert that the Southern District of New York "found that the plaintiffs' pleadings, very similar to the ones pleaded [by Plaintiffs], more than met the *Twitter* standard." (Opp. at 74.) This is problematic for several reasons. First, by Plaintiffs'

---

[18] Because Plaintiffs cannot adequately plead knowing and substantial assistance, their aiding-and-abetting claims fail regardless of whether they can allege general awareness. *Ashley*, 144 F.4th at 440 (knowledge "of one's role in terrorist activities by itself is insufficient"). In any event, Plaintiffs have not plausibly alleged any facts establishing that BAM was "generally aware" of any role in terrorist financing, as required by *Halberstam*. *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983); (*see* Mot. at 23-24). "[F]ormulaic recitation[s] of the elements of [a claim]" such as that BAM had "full knowledge, or what should have been full knowledge, that its operations were being put to illegal use" (AC ¶ 323), do not carry that burden. *Ashley*, 144 F.4th at 435.

admission, BAM was not a party to *Raanan*. (Opp. at 65-66.) The sufficiency of the allegations in *Raanan* rested on allegations regarding alleged facilitation of purportedly suspicious transactions on a foreign exchange. *See* 2025 WL 605594, at *2. In contrast, the Amended Complaint does not allege that BAM engaged in any such conduct—there are no allegations that BAM's platform was used by Hamas or any terrorist group, nor that BAM provided any knowing or substantial assistance to the attacks at issue. Any attempt by Plaintiffs to analogize BAM's position to that of the defendants in *Raanan* ignores these critical distinctions and the heightened legal standards now required.

Further, *Raanan* was decided—and reconsideration denied—before binding precedent from the Supreme Court clarified and emphasized *Twitter*'s principles. First, as explained in the Motion, in *Smith & Wesson*, the Supreme Court emphasized that aiding-and-abetting liability requires a defendant to take an "affirmative act in furtherance" of the specific terrorist offense and to "conscious[ly] and culpab[ly] participat[e]" in the crime, not merely provide routine or passive services. 605 U.S. at 291 (citations omitted). In *Ashley*, the Second Circuit reinforced the necessity of a concrete nexus between the defendant's conduct and the specific act of terrorism. *See* 144 F.4th at 445, 448. These decisions postdate *Raanan* and diminish its precedential value, particularly where the allegations against BAM fall far short of the conduct at issue in *Raanan*.

49

### 3. Plaintiffs Cannot Establish Conspiracy Liability Against BAM.

Plaintiffs' conspiracy claim fares no better. They fail to allege any specific conduct by BAM, let alone establish the most basic element of conspiracy: an "agreement between BAM and any terrorist group." (Mot. at 26-27); *see also Newman v. Associated Press*, 758 F. Supp. 3d 1357, 1375 (S.D. Fla. 2024) (plaintiffs must "plausibly allege [an] agreement to commit an act of international terrorism").

First, as is pervasive throughout the Opposition, Plaintiffs put forth no specific allegations as to BAM. (*See, e.g.*, Opp. at 81.) For instance, Plaintiffs allege that "Defendants *discussing* their agreement to process transactions for terrorist affiliates amongst each other . . . provides a window into the arrangement—or agreement— Defendants had with various terrorist affiliates," but those alleged discussions involved employees of BHL, not BAM. (*Id.* (describing statements by "BHL's Money Laundering Reporting Officer" and "BHL's Chief Compliance Officer" in AC ¶¶ 110, 141).) Moreover, Plaintiffs do not allege that Hamas (or any intermediary acting on its behalf) participated in, received, or was even aware of these conversations. At most, the allegations reflect intracompany discussions between BHL employees, not BAM employees. *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 78 (2d Cir. 2023) ("[I]t is impossible in the nature of things for a man to conspire with himself, since one necessarily conspires *with* other people." (emphasis in original) (quotations and citation omitted)). For the same reason, the vague

50

allegation that Mr. Zhao "micromanaged" BAM's operations—i.e., by allegedly selecting office furniture (Opp. at 20)—does not raise a plausible inference of an agreement with terrorists. (Opp. at 81.)

Similarly, Plaintiffs have not plausibly alleged (and cannot plausibly allege) that BAM shared the necessary "common intent" with Hamas and was "pursuing the same object." (Mot. at 27-28); *see also Freeman*, 57 F.4th at 79-80. The Amended Complaint is devoid of any allegations that BAM shared Hamas's goal of attacking Israeli or American civilians. *See Freeman*, 57 F.4th at 79-80 (finding no "common intent" where plaintiffs failed to "plead that the [b]anks intended to kill or injure U.S. service members in Iraq, or that the terrorist groups agreed to help the [b]anks and Iranian entities evade U.S. sanctions"). Plaintiffs' assertion that Defendants intended to evade BSA and AML requirements is not only contradicted by the record as to BAM but also does not establish an intent to "pursue the object" of atrocious terrorist acts. *See O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) (holding "alleg[ations] that Defendants conspired . . . to defeat the economic sanctions imposed by the U.S. government" insufficient to allege conspiracy liability under JASTA).

Notably, a different court has already rejected the same claim for conspiracy under JASTA brought by the same Plaintiffs for the very reason that they failed to sufficiently plead that the defendants "reach[ed] an agreement" to "carry out any

scheme of international terrorism." *Newman v. Assoc. Press*, 758 F. Supp. 3d 1357, 1374 (S.D. Fla. Dec. 10, 2024) (holding that plaintiffs may "theorize" that the defendant had a "tacit understanding" with Hamas affiliates to "further [its] propaganda" but that is insufficient to allege that the defendant was "'pursuing the same object' as Hamas" (citing *Bernhardt v. Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022))).

Accordingly, Plaintiffs' conspiracy claim against BAM fails as a matter of law.

### F. Plaintiffs Fail to State a Claim for Negligence/Wantonness Against BAM.

As explained in the Motion, the Amended Complaint fails to plead that BAM owed Plaintiffs a duty or that it proximately caused their harms. (*See* Mot. at 32-38.) The Opposition offers almost nothing to aid these deficient allegations.

As to duty, Plaintiffs argue that they have established that Defendants owed a duty "to the general public" stemming from U.S. laws requiring AML programs. (*See* Opp. at 89-90.) This argument falls short, as Plaintiffs do not show, as required, that BAM "owed not merely a general duty of care to society." *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *15 (E.D.N.Y. June 30, 2006).[19]

As to proximate cause, Plaintiffs' Opposition asserts without support that the

---

[19] Plaintiffs cite *Raanan v. Binance Holdings Ltd.* to support their theory that BAM had "an independent duty to act." (Opp. at 89-90.) But the *Raanan* court was discussing duty in the context of JASTA, not a negligence claim. 2025 WL 605594, at *24 (S.D.N.Y. Feb. 25, 2025).

attacks were the "foreseeable" result of "Defendants'" actions. (Opp. at 90.) This theory of proximate cause has already been rejected. In *In re Terrorist Attacks on Sep. 11, 2001*, for example, the court held that allegations of bank defendants' noncompliance with AML laws did not establish liability for the September 11 attacks, because the possibility that processed transactions "might eventually find their way to terrorists through a series of unrelated transfers" was not reasonably foreseeable as a matter of law. 2008 WL 7073447, at *5 (S.D.N.Y. Dec. 23, 2008). Plaintiffs do not identify any specific link between any transfers of funds on BAM's exchange and the October 7, 2023 attacks. At most, Plaintiffs allege that certain transfers that occurred on a different platform outside BAM's control may have contributed in a nebulous capacity to the attacks. That is insufficient to establish proximate causation as to BAM. Plaintiffs' negligence and wantonness claims should thus be dismissed.

### G. Plaintiffs Fail to Establish This Court's Subject Matter Jurisdiction over Their ATS Claim.

Plaintiffs' Opposition fails to cure the fundamental deficiencies in their ATS claim. (Opp. at 84-87.) As with their Amended Complaint, Plaintiffs identify no link between BAM and the October 7 attacks. Without such a connection, they cannot allege a substantive violation of international law or overcome the ATS's presumption against extraterritoriality. Even setting that aside, the Opposition fails to grapple with precedent that forecloses ATS claims based on the international-law

sources Plaintiffs invoke.

First, Plaintiffs rely on the Rome Statute, citing *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). (Opp. at 84.) But in doing so, they ignore the Ninth Circuit's recent holding that cautioned that "the Rome Statute, as other circuits have acknowledged, and as its own text makes clear, is *not* customary international law." *Doe v. Cisco Sys.*, 73 F.4th 700, 732 (9th Cir. 2023) (citations omitted); (Mot. at 57).

Second, Plaintiffs cite *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), to argue that the London Charter supports their claim. But *Yousef* was a criminal case, not an ATS action, and it emphasized the absence of "an international consensus on the definition of terrorism or even its proscription." *Id.* at 106.

Third, Plaintiffs invoke the International Convention for the Suppression of the Financing of Terrorism, claiming it has become a norm of international law. (Opp. at 87.) Yet, the Supreme Court in *Jesner v. Arab Bank, PLC*, rejected that view, holding that "[t]he Convention neither requires nor authorizes courts, without congressional authorization, to displace detailed regulatory regimes [governing terrorist financing] by allowing common-law actions under the ATS." 584 U.S. 241, 262 (2018).

Fourth, Plaintiffs cite the Geneva Conventions, disregarding Eleventh Circuit precedent that "a violation of the Geneva Conventions does not establish a violation

of the law of nations, which is required to maintain jurisdiction under the ATS." *Est. of Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1363 (11th Cir. 2010).

To the extent Plaintiffs rely on a theory that BAM aided and abetted "crimes against humanity" (Opp. at 84-85), that argument fails for the same reasons their JASTA claims do. The ATS requires that BAM "substantially assisted" the underlying acts with knowledge of their wrongful nature. *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158-59 (11th Cir. 2005). Plaintiffs allege neither. They identify no transactions on BAM's exchange that financed the October 7 attacks, nor any knowledge on BAM's part of terrorist-linked activity. *See supra* Section III(E)(1)(b).

The out-of-circuit case Plaintiffs rely on underscores what is missing here. (Opp. at 85-86.) In *Jan v. People Media Project*, a district court permitted aiding-and-abetting claims under the ATS to proceed where the plaintiffs identified direct payments *from the defendants* to an alleged terrorist they employed as a journalist, and communications by *those defendants* evidencing knowledge of terrorist ties. 2025 WL 1311970, at *1307-08 (W.D. Wash. May 6, 2025). Plaintiffs make no similar showing here. As in their ATA claims, Plaintiffs allege that "Defendants provided practical and significant assistance to Hamas [and] PIJ," citing allegations

that primarily concern a different defendant.[20] (Opp. at 85.) The only allegations referencing BAM—its promotional efforts and supposed role as a regulatory "smokescreen"—do not establish substantial assistance or knowledge. (AC ¶¶ 105, 178; *see* Mot. at 25 nn.11-12.) Nor do allegations that BAM acted "with the purpose of facilitating" attacks, which cite communications by BHL employees, not BAM. (Opp. at 85 (citing AC ¶ 141).)

Finally, Plaintiffs cannot overcome the ATS's presumption against extraterritoriality. *See Doe v. Drummond Co.*, 782 F.3d 576, 582 (11th Cir. 2015). To do so, they must allege "extensive or specific" conduct in the United States directed at the October 7 attacks. *See id.* at 598-99. Plaintiffs instead offer vague claims that BAM attracted U.S. customers who may have later used BHL's platform. (Opp. at 89.) Plaintiffs identify no conduct by BAM directed at the attacks, nor any link between BAM's customers and terrorist financing. Nor does the allegation that BHL violated U.S. financial regulations or sanctions laws identify any domestic conduct by BAM directed at the attacks. (*See id.* (citing AC ¶ 110).) The Eleventh Circuit has

---

[20] (*See* AC ¶ 110 (allegations concerning "Binance's" compliance with financial regulations), ¶ 148 (statements about "Binance" transactions and reporting), ¶¶ 152-53 (transactions "processed through Binance"), ¶¶ 163-64 (allegations about "Binance"), ¶¶ 166-68 (allegations about "Binance"), ¶ 172 (transactions involving "Binance" users), ¶¶ 201-09 (allegations about "Binance").) The handful of cited allegations that refer to "Defendants" generally cite regulatory actions or allegations that neither involved BAM nor concerned its AML or KYC compliance. (*See* AC ¶ 162 (alleging that "Defendants" failed to file suspicious activity reports with FinCEN), ¶ 169 (alleging that "federal enforcement actions" have "established" that Defendants "knowingly facilitated transfer of money to Hamas").)

56

rejected ATS jurisdiction in cases with far-closer connections. For example, in *Drummond*, the court rejected the plaintiffs' allegations identifying domestic "decisions to engage with" or "agree[ments] to fund" the perpetrators of war crimes and extrajudicial killings. 782 F.3d at 598. Plaintiffs allege far less here, and their ATS claim must be dismissed.

## IV.    CONCLUSION

For the reasons stated above, the Court should dismiss the claims against BAM with prejudice pursuant to Federal Rules of Civil Procedure 8, 12(b)(1), 12(b)(2), and 12(b)(6).

Dated: October 9, 2025                          Respectfully submitted,

/s/ Daniel Tramel Stabile
Daniel Tramel Stabile (*pro hac vice*)
Thania (Athanasia) Charmani (*pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-4659
DStabile@winston.com
ACharmani@winston.com

/s/ Kenneth D. Sansom
Kenneth D. Sansom (SAN 047)
Michael T. Sansbury (SAN 054)
**SPOTSWOOD SANSOM & SANSBURY LLC**
Financial Center
505 20th St. North, Suite 700
Birmingham, AL 35203-3329
Tel.: (205) 986-3620
Fax: (205) 986-3639

ksansom@spotswood.com
msansbury@spotswood.com

*Attorneys for Defendant BAM Trading
Services Inc. d/b/a Binance.US*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 9, 2025, a true and correct copy of the foregoing document was served via the Court's ECF filing system on all counsel of record.

*/s/ Kenneth D. Sansom*
OF COUNSEL
