# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

|  |  |
|---|---|
| ADIN GESS, NOACH NEWMAN, on his own and on behalf of David Yair Shalom Newman, MAYA PARIZER, NATALIE SANANDAJI, YONI DILLER, HAGAR ALMOG, LISHAY LAVI, DAVID BROMBERG, ARIEL EIN-GAL, ORA COOPER, ROTEM COOPER, on their own and on behalf of their father Amiram Cooper, ALMOG MEIR JAN, ANDREY KOZLOV, SHLOMI ZIV, AYELET SAMERANO, on her own behalf and on behalf of YONATAN SAMERANO, TALIK GVILI, on her own behalf and on behalf of RAN GVILI, ROEE BARUCH, on his own behalf and on behalf of URIEL BARUCH, and SHACHAR LEVI, on his own behalf and on behalf of EITAN LEVI, |  |
|                                        Plaintiffs, | **SECOND AMENDED COMPLAINT** |
|                           v. | Case No. 2:24-cv-134-ECM-CWB |
| BAM TRADING SERVICES, INC. d/b/a BINANCE.US, BINANCE HOLDINGS LIMITED d/b/a BINANCE, and CHANGPENG ZHAO, | **JURY TRIAL DEMANDED** |
|                                        Defendants. |  |

Plaintiffs, by and through their undersigned attorneys working with the National Jewish Advocacy Center, Inc., file this Second Amended Complaint pursuant to the Court's Order of March 11, 2026 (Doc. 127), against Defendants BAM Trading Services, Inc. d/b/a Binance.US

("BAM Trading"), Binance Holdings Limited d/b/a Binance ("Binance"), and Changpeng Zhao ("Zhao") (collectively, "Defendants"), and allege as follows:[1]

## PRELIMINARY STATEMENT

1. This action is brought by United States citizens and foreign nationals who were murdered, maimed, taken hostage, or otherwise injured in the terrorist attacks perpetrated by Hamas and Palestinian Islamic Jihad ("PIJ") in the State of Israel on October 7, 2023 (the "October 7 Attacks"), and by the estates, survivors, and heirs of such persons. Plaintiffs seek damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 18 U.S.C. § 2333(d)), and under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.

2. Defendants did not merely fail to prevent terrorists from using their platform. Defendants consciously and culpably participated in Hamas's and PIJ's wrongdoing by knowingly providing substantial financial assistance to these designated Foreign Terrorist Organizations ("FTOs") — operating a cryptocurrency exchange platform that for years served as a primary conduit for terrorist financing, while deliberately and systematically circumventing the very United States laws and regulations designed to prevent exactly this

---

[1] This Second Amended Complaint is filed in compliance with the Court's Order of March 11, 2026 (Doc. 127), which directed Plaintiffs to cure what the Court believed to be deficiencies it identified in the First Amended Complaint. Each claim is asserted in a separate count against a single defendant. Each count identifies the specific plaintiffs asserting the claim and their status to do so. Each count contains sufficient factual allegations to state a plausible claim against the designated defendant on the asserted legal theory. Footnotes in support of allegations, previously included to provide documented support for the plausibility of the allegations, have been removed, based on the Court's admonitions. In short, the Court's March 11, 2026 Order (Doc. 127) has been carefully studied, and every effort has been made to comply in every way with its directives.

result. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023) (aiding-and-abetting liability attaches where "the defendant consciously and culpably participated in a wrongful act so as to help make it succeed").

3. Defendants' conduct was not passive nonfeasance. It was affirmative misfeasance. Defendants actively evaded anti-money laundering ("AML") and counter-terrorism financing ("CFT") requirements imposed by the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–05. Defendants encouraged customers — including those flagged as associated with terrorist organizations — to circumvent compliance controls. Defendants tipped off Hamas-linked account holders that they had been flagged by third-party compliance tools. Defendants instructed personnel to check whether flagged terrorist-associated users were "VIP accounts" before taking any action, and to allow such users to withdraw their funds and leave the platform rather than freezing their assets and reporting them to authorities. Defendants created a financial ecosystem specifically designed to evade government detection and regulation — providing what might otherwise be routine financial services "in an unusual way" that enabled designated terrorist organizations to access the global financial system. *See id.* at 502 (leaving open that "the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack").

4. On November 21, 2023, Defendant Binance pled guilty to federal charges including failing to maintain an effective anti-money laundering program and willfully violating United States economic sanctions. Plea Agreement, *United States v. Binance Holdings Ltd.*, No. CR23-178RAJ (W.D. Wash. Nov. 21, 2023). Defendant Zhao separately pled guilty to

willful violations of the Bank Secrecy Act. Plea Agreement, *United States v. Changpeng Zhao*, No. CR23-179RAJ (W.D. Wash. Nov. 21, 2023). As part of these resolutions, Binance agreed to pay $4.3 billion in penalties — one of the largest such fines in the history of the United States Department of the Treasury. U.S. Dep't of the Treasury, Press Release, "U.S. Treasury Announces Largest Settlements in History with World's Largest Virtual Currency Exchange Binance for Violations of U.S. Anti-Money Laundering and Sanctions Laws" (Nov. 21, 2023).

5. The United States government found that Binance knowingly processed transactions for Hamas, PIJ, and other designated terrorist organizations, failed to file a single Suspicious Activity Report in connection with any of those transactions, and actively shielded terrorist-linked accounts from regulatory scrutiny. In the *Matter of Binance Holdings Ltd., et al.*, FinCEN Consent Order No. 2023-04, at 3–52 (Nov. 21, 2023) ("FinCEN Consent Order"). Between October 2020 and September 2023 alone, Hamas and PIJ-associated accounts executed thousands of transactions on the Binance platform with a total value of at least approximately $60 million. This knowing and substantial assistance — provided over a period of years, in deliberate circumvention of United States counter-terrorism laws, and with actual knowledge that Hamas and PIJ were transacting on the platform — directly and materially contributed to the October 7 Attacks that killed and injured Plaintiffs and their family members.

6. In addition to the $60 million in direct Hamas and PIJ transactions, Binance processed approximately $240 million in transactions with BuyCash — a Gaza-based money-services entity designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist ("SDGT") for materially assisting Hamas — and approximately $22 million in

transactions with Dubai Company for Exchange ("Dubai Co.") — a Gaza-based exchange house designated by the State of Israel as a terrorist organization because it sent tens of millions of dollars annually to Hamas's military wing, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"). Binance was responsible for 90% of all funds sent by BuyCash to cryptocurrency exchanges.

## JURISDICTION

7. This Court has subject matter jurisdiction over Plaintiffs' ATA claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and (d), which provide for jurisdiction over civil actions brought by nationals of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.

8. This Court has subject matter jurisdiction over Plaintiffs' ATS claims pursuant to 28 U.S.C. § 1350, which provides the district courts with original jurisdiction over any civil action by an alien for a tort committed in violation of the law of nations or a treaty of the United States.

9. This Court has supplemental jurisdiction over any related claims pursuant to 28 U.S.C. § 1367.

## VENUE

10. Venue is proper in this District pursuant to 18 U.S.C. § 2334(a), which provides that any civil action under 18 U.S.C. § 2333 may be instituted in the district court for any district where any defendant resides or is served or has an agent. Defendant BAM Trading possesses a Money Transmission License (MT 814) issued by the Alabama Securities Commission, maintains a registered agent in Montgomery, Alabama, and is authorized to conduct business in the State of Alabama.

11. Venue is also proper pursuant to 28 U.S.C. §§ 1391(b) and (c)(3).

## PERSONAL JURISDICTION

### A. Personal Jurisdiction over BAM Trading Services, Inc.

12. This Court has personal jurisdiction over BAM Trading pursuant to Alabama Rule of Civil Procedure 4.2 and the Due Process Clause of the Fourteenth Amendment. BAM Trading is a Delaware corporation that possesses a Money Transmission License issued by the Alabama Securities Commission, maintains a registered agent in Montgomery, Alabama, is authorized to do business in the State of Alabama, and has actively solicited and conducted substantial business with Alabama residents. Upon information and belief, BAM Trading has employees and agents working in Alabama, including customer service representatives.

13. BAM Trading's contacts with Alabama are continuous and systematic, rendering it subject to general personal jurisdiction in this District. In the alternative, this Court has specific personal jurisdiction over BAM Trading because Plaintiffs' claims arise out of or relate to BAM Trading's contacts with Alabama, including its operation of the Binance.US platform through which it solicited and served Alabama customers.

14. BAM Trading even entered into an agreement with the State of Alabama on May 26, 2025, stipulating that Alabama has jurisdiction over it. *See* Doc 99 at 18–19; *see also* Doc 99-1 at 2 ("[T]he Participating States [Alabama] have jurisdiction over BAM Trading").

### B. Personal Jurisdiction over Binance Holdings Limited

15. This Court has personal jurisdiction over Binance pursuant to Federal Rule of Civil Procedure 4(k)(2) and the Due Process Clause of the Fifth Amendment. Plaintiffs' claims arise under federal law, and Binance is not subject to the jurisdiction of the courts of general

jurisdiction of any state. Plaintiffs certify, based on the information reasonably available to them, that Binance is not subject to the jurisdiction of the courts of general jurisdiction of any state. Under Rule 4(k)(2), the relevant forum for the minimum contacts analysis is the United States as a whole. *See Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1312 (11th Cir. 2022).

16. Binance has sufficient contacts with the United States as a whole to satisfy the requirements of due process. Specifically:

(a) Between August 2017 and October 2022, Binance secretly served millions of customers located in the United States, who accounted for approximately 15 to 20 percent of Binance's transaction fees and generated billions of dollars in revenue. FinCEN Consent Order ¶¶ 18–22.

(b) Binance maintained accounts at United States banks, including the now-defunct Signature Bank in New York, through which it transferred billions of dollars via Fedwire, SWIFT, and CHIPS. Complaint ¶¶ 74–76, *SEC v. Binance Holdings Ltd., et al.*, No. 1:23-cv-01599 (D.D.C. June 5, 2023) ("SEC Complaint").

(c) Binance partnered with Paxos Trust Company, a New York limited purpose trust company, to issue a proprietary USD-backed stablecoin called "BUSD," with reserves maintained in New York. As of February 2023, over $16 billion worth of BUSD were in circulation. SEC Complaint ¶¶ 30–32.

(d) Binance's largest and most important customers included quantitative trading firms headquartered in New York and Chicago that provided critical liquidity to the

Binance.com platform. Consent Order ¶¶ 28–35, *CFTC v. Changpeng Zhao, et al.*, No. 1:23-cv-01887 (N.D. Ill. Dec. 14, 2023) ("CFTC Consent Order").

    (e) Binance pled guilty to federal criminal charges in the Western District of Washington and entered into settlements with multiple United States regulatory agencies, including FinCEN, OFAC, and the CFTC, thereby submitting to United States jurisdiction.

17. In the alternative, this Court has personal jurisdiction over Binance because Binance and BAM Trading are alter egos of one another, and Binance's contacts may be imputed to BAM Trading and vice versa. *See United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1355 (11th Cir. 2021). As alleged in detail below, Zhao and Binance secretly controlled BAM Trading's operations, BAM Trading relied on Binance's services and technology to operate, and BAM Trading was created as a sham entity designed to evade United States regulatory oversight while Binance continued to serve United States customers on its unregulated Binance.com platform. SEC Complaint ¶¶ 1–10.

18. Binance's former Chief Compliance Officer wrote to Binance's then-CFO after launching BAM Trading: "Our downside now is we cannot acknowledge US presence (even historical) on [Binance].com . . . If US regulators want to hit you for [Binance].com's sins of the past, guess what[?] you have a direct avenue in BAM [Binance.us] for them to reach/hammer you." The then-CFO responded, "[t]hat was one of the purposes of having BAM in place." FinCEN Consent Order at p. 2.

## C. Personal Jurisdiction over Changpeng Zhao

19. This Court has personal jurisdiction over Zhao pursuant to Federal Rule of Civil Procedure 4(k)(2) and the Due Process Clause of the Fifth Amendment. Zhao is Binance's primary founder, majority owner, and former Chief Executive Officer. He exercised near-total

control over Binance's strategy, operations, and finances, including the conduct giving rise to Plaintiffs' claims. Plaintiffs certify, based on the information reasonably available to them, that Zhao is not subject to the jurisdiction of the courts of general jurisdiction of any state.

20. Zhao's contacts with the United States include:

(a) Zhao personally directed Binance's scheme to retain United States customers on the Binance.com platform while evading United States regulatory oversight. FinCEN Consent Order ¶¶ 23–27; CFTC Consent Order ¶¶ 36–42.

(b) Zhao personally directed Binance employees to encourage United States VIP customers to circumvent compliance controls by submitting falsified Know Your Customer ("KYC") documentation.[2] CFTC Consent Order ¶¶ 43–50.

(c) Zhao owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York and were counterparties to transactions totaling hundreds of millions of dollars. SEC Complaint ¶¶ 38–42.

(d) Zhao pled guilty to federal criminal charges in the Western District of Washington and was ordered to remain in the United States pending sentencing, thereby submitting to United States jurisdiction. Plea Agreement, *United States v. Changpeng Zhao*, No. CR23-179RAJ (W.D. Wash. Nov. 21, 2023).

---

[2] Know Your Customer ("KYC") documentation is mandatory identity verification paperwork used by financial institutions to prevent fraud and money laundering. Financial institutions must request and verify KYC documents for their customers.

(e) Zhao was a named party with "control person" liability in regulatory settlements with the CFTC. CFTC Consent Order ¶¶ 1–5.

21. In BAM Trading's agreement with Alabama stipulating to jurisdiction, BAM acknowledged that Zhao remained a beneficial owner of BAM and remained the authorizing representative of BAM Management. Doc 99 at 19; *see also* Doc 99-1 at 2–3.

22. In the alternative, Binance is Zhao's alter ego, and Binance's contacts with the United States may be imputed to Zhao for jurisdictional purposes. *See Bibby*, 987 F.3d at 1356. Zhao unilaterally controlled Binance, ignored corporate formalities, and commingled his personal assets with corporate assets. Zhao was publicly dismissive of "traditional mentalities" about corporate formalities and claimed that a formal corporate entity with a headquarters and its own bank account was unnecessary. SEC Complaint ¶¶ 43–48. Zhao was concurrently the Chairman of BAM Trading's and BAM Management's Boards of Directors until at least approximately March 2022, exerting full control over these entities in his capacity as the ultimate decision-maker. As Chairman, Zhao directly oversaw and directed the operations, strategies, and decisions of BAM Trading.

**PARTIES**

**A. Plaintiffs**

*United States Citizen Plaintiffs (ATA Claims)*

23. **Plaintiff Adin Gess** is a citizen of the United States who lived with his family in Kibbutz Holit, Israel. On October 7, 2023, Hamas terrorists attacked Kibbutz Holit. Although Gess was not at home during the attack, he witnessed the massacre of his friends and community members via the communal WhatsApp group and saw his friends and community pleading for help before they were brutally murdered. Gess and his family were immediately evacuated from their home. They lost their belongings, their community, and their entire

10

way of life. Kibbutz Holit, once a lush oasis, remains in the process of attempting to rebuild and return its community members to their homes. As a direct result of the October 7 Attacks, Gess has suffered severe mental anguish, extreme trauma, and emotional pain and suffering. Gess is a United States national who was injured in his person by reason of acts of international terrorism. Gess asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant as a principal victim.

24. **Plaintiff Noach Newman** is a citizen of the United States and the State of Israel. His brother, David Yair Shalom Newman, also a United States and Israeli citizen, attended the Nova Music Festival on October 7, 2023. Hamas terrorists killed David as he saved his girlfriend and several other civilians. David and his girlfriend got to a large metal dumpster and climbed inside with approximately 10 to 15 other people. They hid for approximately four hours. The terrorists came to the dumpster and began shooting. Only four of the people hiding in the dumpster survived. David was shot dead. As a direct result of the October 7 Attacks, Noach Newman has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Newman is a United States national who is a survivor and heir of a United States national killed by reason of acts of international terrorism, and who was also injured in his own person by reason of those same acts. Newman asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant both in his own right as a principal victim and in a representative capacity as a survivor and heir of his deceased brother.

25. **Plaintiff Maya Parizer** is a citizen of the United States and the State of Israel. She attended the Nova Music Festival on October 7, 2023, as part of her birthday celebration with her boyfriend and other friends. When Hamas terrorists attacked the festival, Parizer escaped

by driving with her boyfriend while dodging bullets on the road, passing vehicles that had been shot up by Hamas and dead Israeli bodies strewn on the side of the road. Parizer ultimately found refuge in a nearby town. As a direct result of the October 7 Attacks, Parizer has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Parizer is a United States national who was injured in her person by reason of acts of international terrorism. Parizer asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant as a principal victim.

26. **Plaintiff Natalie Sanandaji** is a citizen of the United States who resides in New York. She was visiting Israel in October 2023 and attended the Nova Music Festival on October 7, 2023, with Israeli friends. When the Hamas terror attack began at the festival, Sanandaji fled by car, and then by foot for several hours, witnessing the atrocities first-hand and running through Hamas gunfire. After approximately four hours running on foot through fields in southern Israel, Sanandaji was saved by a good Samaritan. As a direct result of the October 7 Attacks, Sanandaji has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Sanandaji is a United States national who was injured in her person by reason of acts of international terrorism. Sanandaji asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant as a principal victim.

27. **Plaintiff Yoni Diller** is a citizen of the United States and the State of Israel. He attended the Nova Music Festival on October 7, 2023. He was enjoying the festivities with his friends when the morning unfolded into a nightmare of sirens, missiles, death, and chaos. Amidst the turmoil, they sought refuge, aiding the wounded and enduring a journey fraught with life-threatening fear. Four of his close friends were killed amidst the hundreds of lives claimed by Hamas terrorists. As a direct result of the October 7 Attacks, Diller has suffered

severe mental anguish, trauma, and extreme emotional pain and suffering. Diller is a United States national who was injured in his person by reason of acts of international terrorism. Diller asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant as a principal victim.

28. **Plaintiff David Bromberg** is a citizen of the United States. He attended the Nova Music Festival on October 7, 2023. When Hamas terrorists attacked, he ran for his life until he found shelter hiding in the bushes outside Kibbutz Be'eri. After 12 hours of unimaginable fear, he and several others were rescued by a citizen and escaped under heavy fire from the terrorists. Some of his friends were killed; another was taken hostage by the terrorists. As a direct result of the October 7 Attacks, Bromberg has suffered severe trauma, mental anguish, and extreme emotional pain and suffering. Bromberg is a United States national who was injured in his person by reason of acts of international terrorism. Bromberg asserts ATA aiding-and-abetting claims under 18 U.S.C. § 2333(d)(2) against each Defendant as a principal victim.

*Foreign National Plaintiffs (ATS Claims)*

29. **Plaintiff Hagar Almog** is a citizen of the State of Israel who lived with her family in Kibbutz Holit. She witnessed the massacre of her friends and community on October 7, 2023, via the communal WhatsApp group and saw her friends and community pleading for help before they were brutally murdered. Almog and the entire community were immediately evacuated from their homes. They lost their belongings, their community, and their entire way of life. Kibbutz Holit, once a lush oasis, remains in the process of attempting to rebuild and return its community members to their homes. As a direct result of the October 7 Attacks, Almog has suffered severe mental anguish, trauma, and extreme

13

emotional pain and suffering. Almog asserts claims under the ATS, 28 U.S.C. § 1350, as an alien injured by a tort committed in violation of the law of nations, against Defendants BAM Trading (Count Seven) and Zhao (Count Eight).

30. **Plaintiff Lishay Lavi** is a citizen of the State of Israel. Her husband, Omri Miran, was kidnapped by Hamas terrorists on October 7, 2023, after they broke into the Miran home on Kibbutz Nachal Oz, in southern Israel. Hamas held Omri captive in Gaza for 738 days, ultimately releasing him on October 13, 2025. As a direct result of the October 7 Attacks, Lavi has suffered unbearable trauma, severe mental anguish, and extreme emotional pain and suffering. Lavi asserts claims under the ATS as an alien injured by a tort committed in violation of the law of nations, against Defendants BAM Trading (Count Seven) and Zhao (Count Eight).

31. **Plaintiff Ariel Ein-Gal** is a citizen of the State of Israel. On the morning of October 7, 2023, he and his friends were asleep on Zikkim Beach. They awoke to swarms of Hamas and other terrorists infiltrating the coast by boats. Ein-Gal fled from them under heavy fire and got to a shelter, where he hid for four hours. When he tried to escape in a car, he was ambushed by four terrorists, who shot dozens of rounds into his vehicle from close range. He miraculously escaped. As a direct result of the October 7 Attacks, Ein-Gal has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Ein-Gal asserts claims under the ATS as an alien injured by a tort committed in violation of the law of nations, against Defendants BAM Trading (Count Seven) and Zhao (Count Eight).

32. **Plaintiffs Ora Cooper and Rotem Cooper** are citizens of the State of Israel. Their father, Amiram Cooper, an Israeli citizen, was kidnapped on October 7, 2023, by Hamas and/or PIJ terrorists from his home. Amiram Cooper's fate remained unknown for months, leaving

14

his children in a state of prolonged psychological agony. Amiram Cooper's remains were finally returned to Israel for burial in October 2025. As a direct result of the October 7 Attacks, the kidnapping of their father, and the lengthy captivity of his remains, Ora Cooper and Rotem Cooper have each suffered severe mental anguish, extreme emotional pain, and suffering. Ora Cooper and Rotem Cooper each assert ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as aliens injured by torts committed in violation of the law of nations, including the prohibition against hostage-taking. They assert these claims on their own behalf and on behalf of their father Amiram.

33. **Plaintiff Almog Meir Jan** is a citizen of the State of Israel. On October 7, 2023, Meir Jan was kidnapped by Hamas terrorists and forcibly taken to Gaza, where he was held hostage for 246 days. He was held captive in the home of Abdallah Aljamal, a Hamas operative and spokesperson for the Hamas-controlled Al Jazeera bureau in Gaza. On June 8, 2024, Meir Jan was rescued in a daring mission by the Israel Defense Forces ("IDF"). During his nearly eight months of captivity, Meir Jan endured conditions of extreme deprivation, constant fear for his life, and psychological torture. As a direct result of the October 7 Attacks and his subsequent 246-day captivity, Meir Jan has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Meir Jan asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against hostage-taking and torture.

34. **Plaintiff Andrey Kozlov** is a citizen of the State of Israel. On October 7, 2023, Kozlov was kidnapped by Hamas terrorists and forcibly taken to Gaza, where he was held hostage for 246 days. Like Almog Meir Jan, Kozlov was held captive in the home of Abdallah

Aljamal, a Hamas operative and spokesperson. On June 8, 2024, Kozlov was rescued in the same IDF mission that freed Meir Jan. During his nearly eight months of captivity, Kozlov endured conditions of extreme deprivation, constant fear for his life, and psychological torture. As a direct result of the October 7 Attacks and his subsequent 246-day captivity, Kozlov has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Kozlov asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against hostage-taking and torture.

35. **Plaintiff Shlomi Ziv** is a citizen of the State of Israel. On October 7, 2023, Ziv was a member of the security team at the Nova Music Festival in southern Israel. During the Hamas attack on the festival, Ziv remained at the festival site to fend off terrorists and evacuate civilians, demonstrating extraordinary bravery under fire. Ziv continued his efforts until he himself was overwhelmed and kidnapped by Hamas terrorists, who forcibly took him to Gaza. Ziv was held hostage for 246 days in the home of Abdallah Aljamal, a Hamas operative and spokesperson. On June 8, 2024, Ziv was rescued in the same IDF mission that freed Almog Meir Jan and Andrey Kozlov. While held hostage, Ziv's Hamas captors bragged about having Hamas operatives on American university campuses. As a direct result of the October 7 Attacks and his subsequent 246-day captivity, Ziv has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Ziv asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against hostage-taking and torture.

16

36. **Plaintiff Ayelet Samerano** is a citizen of the State of Israel. She brings this action on her own behalf and on behalf of her son, Yonatan Samerano, an Israeli citizen. On October 7, 2023, Yonatan Samerano, age 21, was shot and killed by a Hamas terrorist during the October 7 Attacks. After murdering Yonatan, Hamas terrorists captured his body, tossed it into the back of a vehicle, and drove it to Gaza. Hamas and its allies held Yonatan's body captive in Gaza for a year and a half in an act of international terrorism. Yonatan's body was heroically recovered by the IDF in June 2025 and returned to Israel for burial. As a direct result of the murder of her son and the lengthy captivity of his remains, Ayelet Samerano has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Samerano asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against extrajudicial killing, desecration of remains, and hostage-taking.

37. **Plaintiff Talik Gvili** is a citizen of the State of Israel. She brings this action on her own behalf and on behalf of her son, Sergeant First Class Ran Gvili, an Israeli citizen. On October 7, 2023, Ran Gvili was a patrol officer who was attacked and killed by Hamas terrorists while heroically defending Kibbutz Alumim during the October 7 Attacks. Despite sustaining injuries, Ran continued to engage his terrorist attackers, exemplifying exceptional bravery. After killing Ran, Hamas terrorists kidnapped his body and transported it to Gaza, where Hamas held it captive for over two years, in an act of international terrorism. Ran was officially declared deceased on January 31, 2024. Ran's body was heroically recovered by the IDF and returned to Israel for burial in January 2026. The Gvili family, including Talik, endured a prolonged period of agonizing uncertainty,

holding onto hope that Ran might still be alive until his death was confirmed. As a direct result of the murder of her son and the lengthy captivity of his remains, Talik Gvili has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Gvili asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against extrajudicial killing, desecration of remains, and hostage-taking.

38. **Plaintiff Roee Baruch** is a citizen of the State of Israel. He brings this action on his own behalf and on behalf of his brother, Uriel Baruch, an Israeli citizen. Uriel Baruch was a 35-year-old father of two who attended the Nova Music Festival on October 7, 2023. During the Hamas attack on the festival, Uriel was abducted by Hamas terrorists and taken captive to Gaza. At first, his family, including his brother Roee, held onto hope, believing Uriel was alive. Tragically, in March 2024, the Israeli military informed the family that Uriel had been killed on October 7, 2023, and that Hamas was holding his body captive in Gaza, an act of international terrorism. Uriel's remains were finally returned to Israel on October 14, 2025. As a direct result of the murder of his brother and the lengthy captivity of his remains, Roee Baruch has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Baruch asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against extrajudicial killing, desecration of remains, and hostage-taking.

39. **Plaintiff Shachar Levi** is a citizen of the State of Israel. He brings this action on his own behalf and on behalf of his father, Eitan Levi, an Israeli citizen. On October 7, 2023, Eitan

18

Levi was a taxi driver who was ferrying a client from central Israel to Kibbutz Be'eri on the Gaza border when the October 7 Attacks began. Shachar called his father to warn him about rocket fire when his father was ambushed by Hamas terrorists — with Shachar listening helplessly over the phone. Shachar heard his father told to sit and asked to identify himself. About an hour later, the phone was still open and Shachar heard only Arabic being spoken, and then the phone was disconnected. Shortly thereafter, Shachar and a horrified nation witnessed a video — published on Instagram — showing Eitan's body being brutally lynched in the plaza of a mosque. The video shows his body dangling out of a half-open trunk of a car, being driven through the streets of Gaza, while a crowd cheers and excitedly runs after the car. Hamas held Eitan captive in Gaza for 739 days, in an act of international terrorism. Eitan's remains were finally returned in October 2025 for burial. As a direct result of the murder of his father, the desecration of his father's remains, and the lengthy captivity of those remains, Shachar Levi has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Levi asserts ATS claims against Defendants BAM Trading (Count Seven) and Zhao (Count Eight) as an alien injured by torts committed in violation of the law of nations, including the prohibitions against extrajudicial killing, desecration of remains, and hostage-taking.

## B. Defendants

*BAM Trading Services, Inc.*

40. Defendant BAM Trading Services, Inc. ("BAM Trading") is a Delaware corporation with its principal address in Miami, Florida. BAM Trading operates Binance.US, a spot digital asset trading platform that offers its services to United States residents. BAM Trading relies on Binance's services and technology, obtained through intercompany agreements, to operate. BAM Trading is directly or indirectly majority owned and controlled by Zhao.

19

BAM Trading possesses a Money Transmission License from the Alabama Securities Commission and openly solicits and carries on business in Alabama. SEC Complaint ¶¶ 18–25.

41. BAM Trading was created in 2019 as part of a scheme devised by Zhao and Binance to create the appearance of a separate, compliant United States exchange while secretly retaining United States customers on the unregulated Binance.com platform. As the SEC found, Zhao and Binance secretly controlled BAM Trading's operations behind the scenes. SEC Complaint ¶¶ 1–10.

42. On June 17, 2024, the Commissioner of the North Dakota Department of Financial Institutions revoked BAM Trading's money transmitter license, finding that BAM Trading had failed to comply with North Dakota laws and that its majority beneficial owner and control person, Zhao, had pled guilty to felony charges for violating United States anti-money laundering laws. The North Dakota Commissioner specifically found that BAM Trading was created as a separate legal entity from Binance.com in 2019, but shares a similar name, uses the same branding and copyrighted logos under license, engages in a similar business line, and uses Binance.com's proprietary software under license to conduct transactions. North Dakota joined Alaska, Florida, Maine, North Carolina, and Oregon, which had already taken similar actions. On August 1, 2024, BAM Trading voluntarily surrendered its Georgia money transmitter license pursuant to a Consent Order entered into with the Georgia Department of Banking and Finance. The Consent Order was entered to resolve a Notice of Intent to Revoke on the grounds that Zhao, the ultimate equitable owner of BAM Trading, had pled guilty to felony charges for violating the Bank Secrecy Act.

*Binance Holdings Limited*

43. Defendant Binance Holdings Limited ("Binance") is an entity registered in the Cayman Islands. Since at least July 2017, Binance has operated a web-based virtual currency exchange under the name Binance.com that offers trading in virtual currencies and related financial products to customers throughout the world. FinCEN Consent Order ¶¶ 1–5.

44. Binance has claimed that it has no formal corporate headquarters and refuses to disclose the location of its main Binance.com exchange. Zhao has publicly stated: "Wherever I sit is the Binance office." CFTC Complaint ¶ 4, *CFTC v. Changpeng Zhao, et al.*, No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023).

45. Despite holding itself out as a foreign exchange, Binance secretly operated in the United States between at least August 2017 and October 2022, soliciting and serving millions of United States customers. By September 2020, Binance internal documents attributed 16% of its total user base — approximately 2.51 million users — to the United States. FinCEN Consent Order ¶¶ 18–22.

46. On November 21, 2023, Binance pled guilty to federal charges of conspiracy to conduct an unlicensed money transmitting business, failing to maintain an effective anti-money laundering program, and violating the International Emergency Economic Powers Act. Binance entered into concurrent settlements with OFAC, FinCEN, and the CFTC. Disgorgement and financial penalties in aggregate required Binance to pay more than $4.3 billion.

*Changpeng Zhao*

47. Defendant Changpeng Zhao ("Zhao") is Binance's primary founder, majority owner, and former Chief Executive Officer. He is a Canadian citizen who, upon information and belief,

21

resides in the United Arab Emirates. Zhao launched Binance in 2017 and, together with a core senior management group, exercised near-total control over Binance's strategy, operations, and finances. FinCEN Consent Order ¶¶ 23–27.

48. On November 21, 2023, Zhao pled guilty to willful violations of the Bank Secrecy Act. In his plea agreement, Zhao agreed that "[s]tarting at least as early as August 2017 and continuing to at least October 2022, [he] violated the Bank Secrecy Act . . . by willfully causing [Binance] to fail to implement and maintain an effective [anti-money laundering] program." Plea Agreement ¶ 4, *United States v. Changpeng Zhao*, No. CR23-179RAJ (W.D. Wash. Nov. 21, 2023). Zhao agreed to pay a $50 million fine and was subsequently sentenced to four months in federal prison.

49. Zhao was also a named party with "control person" liability in regulatory settlements with Binance pursuant to 7 U.S.C. § 13c(b). CFTC Consent Order ¶¶ 1–5. Even after stepping down as CEO, Zhao retains an overwhelming ownership interest in Binance and, on information and belief, continues to wield significant influence over its business decisions.

50. According to the CFTC, Zhao micromanaged all aspects of Defendants' operations. In January 2021, a month in which Binance earned over $700 million in revenue, Zhao personally approved an approximately $60 expense related to office furniture. According to the SEC Complaint, Zhao's approval was required for all BAM Trading expenditures over $30,000 through at least January 30, 2020. BAM Trading regularly sought approval from Zhao and Binance concerning routine business expenditures including rent, franchise taxes, legal expenses, Amazon Web Services fees to host BAM customer data, and even an $11,000 purchase of Binance-branded hooded sweatshirts.

51. Zhao also directly or indirectly owned Merit Peak Limited ("Merit Peak"), a Cayman Islands corporation primarily engaged in over-the-counter ("OTC") transactions with institutional counterparties, as well as Sigma Chain AG ("Sigma Chain"), a Swiss-incorporated entity. Both companies were integral to Binance's global operations. Neither Merit Peak nor Sigma Chain has ever been registered with the CFTC in any capacity. These entities were utilized by Zhao to control and eventually siphon off funds held in BAM Trading accounts which were necessary for compliance.

52. Sigma Chain was an active trader on both Binance and BAM Trading Platforms and described itself as "the main market maker for Binance.com." Upon the Binance.US Platform's launch, Zhao directed that Sigma Chain be one of its first market makers. Since the Binance.US Platform began offering OTC trading, Sigma Chain has served as one of the counterparties to Binance.US Platform customers, including, at times, serving as the only counterparty.

53. Binance's back-office manager was Sigma Chain's President at the same time she also had signatory authority over BAM Trading's bank accounts.

54. Merit Peak described itself as "a proprietary firm trading with our owner's [Zhao's] self-made wealth from the digital asset business." Merit Peak was an OTC trading service provider on the Binance.com Platform and was one of the earliest market makers on the Binance.US Platform. Through Merit Peak, Zhao directed over $16 million to BAM Management to fund the Binance.US Platform's operations.

## C. Alter Ego Allegations

55. Binance, BAM Trading, and Zhao are alter egos of one another. Zhao unilaterally controlled both Binance and BAM Trading, ignored corporate formalities, and commingled

23

his personal assets with corporate assets. Zhao was publicly dismissive of "traditional mentalities" about corporate formalities and claimed that a formal corporate entity with a headquarters and its own bank account was unnecessary. SEC Complaint ¶¶ 43–48.

56. BAM Trading was created as a sham entity to evade United States regulatory oversight. Zhao and Binance secretly controlled BAM Trading's operations behind the scenes. BAM Trading relied entirely on Binance's services and technology to operate. BAM Trading's operations were directed by Zhao and Binance. BAM Trading is directly or indirectly majority owned and controlled by Zhao. SEC Complaint ¶¶ 1–10, 18–25.

57. Binance operated through a byzantine network of affiliated entities in multiple jurisdictions, all tied to Zhao as the beneficial owner. Zhao controlled more than a dozen Binance-related entities across multiple countries. Guangying "Heina" Chen, Binance's co-founder and de facto Chief Financial Officer, served as a director of at least eight key Binance companies and was a signatory for dozens of bank accounts belonging to 27 entities registered in 13 countries. SEC Complaint ¶¶ 43–48.

58. The corporate separateness of Binance, BAM Trading, and Zhao's personal assets is a fiction. Billions of dollars flowed through dozens of United States-based bank accounts owned by Binance and Zhao, including accounts at Signature Bank in New York and Silvergate Bank in California. Zhao owned and controlled multiple foreign entities that maintained accounts at Signature Bank and were counterparties to many large transfers totaling hundreds of millions of dollars. SEC Complaint ¶¶ 38–42.

59. FinCEN found that for a substantial portion of the relevant time period, BAM Trading personnel were unable to access key data about BAM Trading's own operations without

going through Binance.com personnel based in China, even when that data was needed to respond to United States regulatory requests.

60. In January 2020, BAM Trading employees started compiling a list of "shackles," i.e., functions "that require [Binance personnel's] answers, access, approval, funding," which demonstrated BAM Trading's lack of independence and knowledge as to the platform's operations. They noted, for example, BAM Trading's compliance team experiencing a "lack of respect and transparency between Asia/US teams"; the fact that BAM Trading was "not allow[ed] to expand US Financial Team domestically"; and BAM Trading's legal department needing a "[b]etter understanding" of BAM Trading's "internal controls/IT infrastructure."

61. BAM Trading's first CEO later reported to the Binance CFO that her "entire team is at their breaking point." In the ensuing months, she worked with her team to propose a plan for BAM Trading to take control of more of its operations and dubbed this effort "Project 1776." As she told another BAM Trading employee in October 2020, "Project 1776 is for our independence."

62. When the Forbes "Tai Chi" story broke, BAM Trading employees' concerns intensified. BAM Trading's CEO explained to the Binance CFO that BAM Trading employees "lost a lot of trust with the article" and "the entire team feels like they've been duped into being a puppet."

63. Binance continued to resist efforts for independence. On December 3, 2020, BAM Trading's CEO reported to the Binance CFO that BAM Trading attempted to secure day-to-day access to its clearing data from Binance's clearing personnel but that the Binance

Back Office Manager and another Binance employee "were unwilling to share their screens at all, they were like yeah you don't need to know what we do day to day."

64. Until at least December 2020, BAM Trading personnel did not have any ability to control BAM Trading's bank accounts, including accounts through which funds deposited by customers with the Binance.US Platform were held and transferred.

65. Instead, when BAM Trading opened bank accounts, Binance required that Zhao and/or the Binance Back Office Manager have signatory authority over the accounts. In November 2019, BAM Trading's CEO raised questions about this directive with the Binance CFO, noting that having a "non-US resident non-employee on the bank applications . . . will be a red flag for regulators and will open .com to US scrutiny," while also acknowledging "there is not that much separation internally" between Binance and BAM Trading.

66. BAM Trading's CEO proposed that "[w]e really only need [BAM Trading's Finance Director] on client account as that's the only account regulators will be looking at."

67. In June 2020, when a trust company alerted BAM Trading's CEO that BAM Trading's internal transfers had increased from approximately $10 million per day to $1.5 billion per day, BAM Trading's CEO had no knowledge of such transfers, was unable to verify them because she lacked appropriate account access, and had to ask Binance — a purportedly separate and distinct company — about the transfer of billions of dollars in BAM Trading's own accounts.

68. In December 2020, Binance transferred $17 million from BAM Trading's bank accounts to Merit Peak. After learning of the transfer, BAM Trading's CEO asked Binance employees about the transaction and eventually learned that the transfer related to Merit

26

Peak's trading on the Binance.US Platform. She responded, "thanks — helpful. Just had to get explanation anytime someone breaking our limits with massive withdraw[als] I have to ask — where you get that kind of money? And where is it going? . . . haha [I'm] on a wildgoose chase to make sure we have knowledge of where $17M is moving around."

69. In or about 2021, BAM Trading hired a second CEO, Brian Brooks, who was aware of concerns about the relationship between Binance and BAM Trading and conditioned acceptance of the role on being able to run BAM Trading independently of Zhao and Binance. Believing that he could accomplish this goal, he made several public statements that BAM Trading was "not an alter-ego of Binance."

70. Upon assuming his CEO duties, however, Brooks quickly learned that Binance exerted and would not relinquish substantial control over BAM Trading. As he testified under oath, he did not "have any firsthand knowledge of exactly what [Binance] entity managed [Binance.US Platform's] servers," but he knew it "wasn't [BAM Trading]." He concluded, the "biggest risk in this company is we are highly dependent on a bunch of technology that sits in Asia."

71. Brooks tried to implement plans to migrate those functions and control of the crypto assets from Binance to BAM Trading and into the United States, but Zhao quickly overruled him, causing Brooks to resign approximately three months into his tenure. As Brooks testified, "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me." He further explained that he spent his first 80 days as CEO trying "to get these core foundational things realigned," but "was overruled on all of them" by Zhao.

72. Brooks elaborated, "All of the things that we had previously agreed and had worked on for 80 days were suddenly repudiated with no further discussion, and on that day, I realized,

27

huh, I'm not actually the one running this company, and the mission that I believe signed up for isn't the mission. And as soon as I realized that, I left." *See also* Doc 99-5 at 772 ("[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me[.]") (deposition of Brooks).

73. In the first three months of 2021, Binance transferred more than $400 million from BAM Trading's Silvergate Bank account to Merit Peak — without the knowledge of BAM Trading's own CEO. An unspecified portion of the money was subsequently sent to the Silvergate account of a Seychelles-incorporated firm called Key Vision Development Limited, another entity controlled by Zhao.

74. On June 5, 2023, Reuters reported that Binance executive Guangying Chen was authorized by Silvergate Bank to operate five bank accounts belonging to BAM Trading: "Employees at the affiliate, [BAM], had to ask Chen's team to process payments, even to cover the firm's payroll, company messages show."

75. As of May 2023, Zhao still had signatory authority over BAM Trading's account that held Binance.US Platform customers' funds.

## FACTUAL ALLEGATIONS

## I. HAMAS AND PIJ ARE DESIGNATED FOREIGN TERRORIST ORGANIZATIONS

76. Hamas emerged in 1987 during the first Palestinian uprising as an outgrowth of the Muslim Brotherhood's Palestinian branch. Hamas is committed to the destruction of the State of Israel and has launched countless terrorist attacks in pursuit of that goal. Hamas's charter calls for establishing an Islamic Palestinian state in Israel's place.

77. The United States Department of State designated Hamas as a Foreign Terrorist Organization in October 1997 pursuant to section 219 of the Immigration and Nationality

Act, 8 U.S.C. § 1189. Hamas has been continuously designated as an FTO since that date. Hamas was also designated as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224 on October 30, 2001.

78. Hamas has a "military wing" known as the Izz al-Din al-Qassam Brigades ("Qassam Brigades") that has conducted numerous terrorist attacks in both Israel and the Palestinian territories since the 1990s. The Qassam Brigades has been separately designated as a terrorist organization by the European Union, Australia, New Zealand, Egypt, and the United Kingdom.

79. PIJ is a Sunni Islamist militant group seeking to establish an Islamist Palestinian state and committed to the destruction of Israel. PIJ was founded in 1981 as an offshoot of the Muslim Brotherhood in Egypt. PIJ was designated as an FTO in October 1997 and as an SDGT under Executive Order 13224 on October 31, 2001. PIJ has been continuously designated since those dates.

80. Since at least 2018, PIJ has coordinated its attacks on Israel with Hamas and other militant groups through an umbrella organization in Gaza known as the "joint operations room." While Hamas and PIJ cooperate in their shared goal of destroying Israel, PIJ focuses exclusively on violent confrontations with Israel.

81. Both Hamas and PIJ use a global financing network to funnel support for their terrorist activities, including through the use of cryptocurrencies.

## II. THE OCTOBER 7, 2023 TERRORIST ATTACKS

*A. Commission of the Attacks by Hamas and/or PIJ*

82. On October 7, 2023 — the Jewish holiday of Simchat Torah — several thousand terrorists from Gaza, led by Hamas and including PIJ and other terrorist organizations, invaded the

State of Israel and murdered approximately 1,200 people, including at least 32 United States citizens. The attackers injured over 6,900 individuals and kidnapped approximately 251 civilians into Gaza.

83. The attack began at approximately 6:29 a.m. with a massive rocket barrage — nearly 4,000 rockets and mortars — launched from Gaza toward civilian targets in southern Israel and beyond. Simultaneously, approximately 100 remotely operated drones targeted watchtowers and surveillance systems along the border fence.

84. The ground invasion involved approximately 30 simultaneous breach points in the security fence. Trained Hamas Nukhba ("elite") commandos and regular Qassam Brigades troops crossed the border in white Toyota pick-up trucks, on motorcycles, in powered paragliders, and by sea in rigid inflatable boats. Some terrorists wore fatigues resembling Israeli army uniforms or were dressed like Israeli police. Some carried radios, zip ties to restrain hostages, and body cameras to record their atrocities.

85. The attack was complex, well-planned, and multipronged. It involved preliminary missile bombardments, coordinated ground assaults using multiple types of vehicles, paragliders to bypass border defenses, maritime equipment to invade by sea, detailed maps of Israeli military and civilian targets, surveillance of Israeli troop positions, and heavy and light weaponry. The attack required significant and sustained funding over many years.

86. Hamas terrorists attacked civilian communities in southern Israel, including kibbutzim, moshavim, and the Nova Music Festival near Kibbutz Re'im. At the Nova Music Festival alone, Hamas terrorists killed more than 350 civilians. The worst affected communities were Kibbutz Kfar Aza, Kibbutz Be'eri, and Kibbutz Nir Oz. At Be'eri, over 100 civilians were killed. At Kfar Aza, 62 were killed.

87. Hamas also took strategic control of Route 232, the main north-south highway in the Gaza Envelope, murdering nearly 300 people along a 33-mile stretch. The highway became a killing zone as Hamas set up ambushes at 37 separate locations.

88. Hamas abducted 251 hostages on October 7, 2023, into Gaza. Evidence indicates that hostage-taking was a premeditated part of the attack plan, with Hamas having prepared a manual titled "How to take captives."

89. PIJ was significantly involved in the October 7 Attacks. Starting in 2020 and continuing through September 2023, both Hamas and PIJ participated in large joint training exercises code-named the "Strong Pillar" drills. In September 2023, Hamas and PIJ started a joint operations room in Beirut, Lebanon, to organize the October 7 Attacks. PIJ and Hamas cooperated in the massive first assault wave, which included the attacks at Kibbutz Nahal Oz, the Israeli military base at Zikim, and the Kibbutz at Sufa, among many other locations.

90. The October 7 Attacks constituted acts of international terrorism as defined by 18 U.S.C. § 2331(1) because they: (a) involved violent acts dangerous to human life that violated federal and state criminal law; (b) appeared intended to intimidate or coerce civilian populations and to influence government policy by intimidation or coercion; and (c) occurred primarily outside the United States and transcended national boundaries.

91. The October 7 Attacks were committed, planned, and authorized by Hamas and PIJ — organizations that were designated as FTOs as of the date on which the attacks were committed, planned, and authorized. 18 U.S.C. § 2333(d)(2).

92. On October 7, 2023, Hamas's Al-Qassam Brigades claimed responsibility for the attack on Kibbutz Holit, posting on its Telegram channel that "Clashes continue between the Al-

Qassam Mujahideen and the occupation forces in several areas, including: the 'Sufa' site and the 'Holeit' [sic] kibbutz as part of the Battle of #Al-Aqsa_Flood."

93. On October 7, 2023, the PIJ Telegram account Saraya Pulse posted about the attack on Kibbutz Be'eri, announcing the purported "Fall of Kibbutz Bayeri at the hands of the Mujahideen of the Brigades and the Resistance." On the same day, Saraya Pulse also issued a post regarding PIJ's involvement in the terror attacks at Kibbutz Nahal Oz, stating, "The Mujahideen of Al-Saraya control a Merkava tank and a number of vehicles in the Nahal Al-Oz site . . . #Al-Aqsa_Flood."

94. At 07:34 AM on October 7, 2023, the Al-Quds Brigades (PIJ's military wing) posted a video on Telegram captioned "Al-Quds Brigades Target a Zionist Vehicle at the Nahal Oz Site."

95. On October 11, 2023, PIJ boasted on its Telegram channel that its "[e]lite companies continue clashing with enemy forces in Zikim."

96. On October 7, 2023, PIJ's Al-Quds Brigades published a statement from its spokesman Abu Hamza, stating: "We are part of this battle and our fighters are shoulder to shoulder alongside their brothers in the Qassam Brigades. Al-Qassam until victory, god willing."

97. In January 2024, a PIJ commander admitted to Israeli intelligence that he and other PIJ terrorists were sent to a 15-day sniper training course at an Iranian-controlled military base in Iran. The commander also admitted that he and other PIJ fighters received artillery and officer command training in Iran.

B. *Iran's Role in Funding Hamas and PIJ and the October 7 Attacks*

32

98. Iran and its Islamic Revolutionary Guard Corps ("IRGC") were instrumental in the funding of Hamas and PIJ and the planning of the October 7 Attacks. As reported by *The Wall Street Journal*, since August 2023, the IRGC worked with Hamas to plan the October 7 Attacks at a series of meetings held in Beirut, Lebanon.

99. According to classified documents published by the Meir Amit Intelligence and Terrorism Information Center, in the years leading up to its invasion of Israel on October 7, 2023, Hamas coordinated with Iran and Hezbollah to develop a concrete plan to destroy Israel.

100.    In 2019, Hamas began to emphasize coordination with Iran's Quds Force and Hezbollah under a "joint defense agreement," according to a document authored by the office of Hamas leader Yahya Sinwar. It laid out plans for a multifront war against Israel, with the ultimate goal of "liberating al-Quds [Jerusalem]."

101.    Since the early 1990s, the Islamic Republic of Iran has been sponsoring Hamas with military aid, training, and financial aid. Iran has remained a key patron of Hamas, providing funds, weapons, and training.

102.    According to an October 8, 2023, *Wall Street Journal* article — published the day after the October 7 Attacks — Iranian security officials helped plan the October 7 Attacks and gave the green light for the assault at a meeting in Beirut. Officials from Iran's IRGC had partnered with Hamas since the previous August to prepare for the breach of Israel's borders.

103.    The *Wall Street Journal* further reported on October 25, 2023, that in the weeks leading up to the October 7 Attacks, hundreds of Hamas fighters received specialized

combat training in Iran. Approximately 500 Hamas militants reportedly attended advanced exercises and trainings in Iran in September 2023, led by the IRGC.

104.    Iran reportedly helped plan the attack, select the timing of it, trained militants, and had at least one year's advanced knowledge of it.

105.    Iran's ability to provide funds to Hamas is due in no small part to its payment platforms being used as conduits for platform-based cryptocurrency and digital remittances to Hamas from terrorist sympathizers and confederates throughout the world — including via Binance's platform.

106.    Iran has been able to transmit funds directly to Hamas in large part by using cryptocurrency and digital payment platforms — including Binance — which have served as key conduits for moving money from Iran and from Hamas sympathizers around the world, enabling seamless and concealed financial support for terrorist activities. Sourced media reports in February 2026 indicate that Binance fired employees who exposed its funding operations with and for Iran.

## III. DEFENDANTS' CRYPTOCURRENCY EXCHANGE PLATFORM

107.    Binance holds itself out as the world's largest cryptocurrency exchange by trading volume. Between 2021 and 2022, Binance processed nearly $15 trillion in cryptocurrency trades. In 2021 and 2022, Binance reported approximately $20 billion and $12 billion in revenue, respectively. FinCEN Consent Order ¶ 6.

108.    Binance's primary online exchange is operated on the Binance.com platform, where users may trade fiat or virtual currency through a variety of arrangements, including spot, futures, derivatives, and margin trading. To use Binance, a user must open an account

and fund it by depositing assets. User funds are held in omnibus digital wallets controlled by Binance, and Binance acts as custodian of those funds. FinCEN Consent Order ¶¶ 7– 10.

109. Binance's omnibus wallet structure is critical to understanding how it facilitated terrorist financing. When a customer deposits cryptocurrency into Binance, those assets are moved into Binance-controlled omnibus wallets visible on the blockchain but owned by Binance. Thereafter, Binance can transfer value between customer accounts simply by debiting and crediting its internal ledger — these internal transfers do not appear on any public blockchain. Only when a customer withdraws funds does Binance execute a corresponding on-chain transaction, and even then, the outbound transaction is executed by a Binance-controlled omnibus wallet containing assets belonging to multiple customers, making all outgoing transactions effectively anonymous.

110. This structure made Binance an ideal vehicle for Hamas, PIJ, and other FTOs to rapidly and clandestinely move funds worth hundreds of millions of dollars to fund their terrorist operations.

## IV. DEFENDANTS' INDEPENDENT LEGAL DUTIES UNDER UNITED STATES LAW

111. As a money services business conducting substantial business in the United States, Binance was required to comply with the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., and its implementing regulations. These requirements are mandatory legal obligations designed to prevent terrorists from accessing the United States financial system. Specifically, Binance was required to:

(a) Register with FinCEN as a money services business;

35

(b) Develop, implement, and maintain an effective AML program reasonably designed to prevent the financial institution from being used to facilitate money laundering and the financing of terrorist activities;

(c) Perform customer due diligence (KYC) to verify the identity of each customer;

(d) Monitor transactions for suspicious activity; and

(e) File Suspicious Activity Reports ("SARs") with FinCEN for any transaction that the financial institution knows, suspects, or has reason to suspect involves funds derived from illegal activity, is designed to evade BSA requirements, or has no business or apparent lawful purpose. FinCEN Consent Order ¶¶ 11–17.

112.    Binance was also required to comply with the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–05, and OFAC regulations prohibiting transactions with sanctioned countries and designated terrorist organizations. OFAC Enforcement Release, Binance Holdings, Ltd., at 1–3 (Nov. 21, 2023) ("OFAC Settlement").

113.    These legal obligations were specifically designed to prevent the precise harm that occurred here: the use of financial platforms by designated terrorist organizations to fund acts of international terrorism. Defendants' deliberate and systematic violation of these obligations is not mere "passive nonfeasance" — it is the intentional dismantling of the regulatory safeguards that Congress enacted to prevent terrorist financing. *See Raanan v. Binance Holdings Ltd.*, No. 24-cv-697, slip op. at 63 (S.D.N.Y. Feb. 25, 2025) (finding that Binance's "independent legal obligation" to implement AML controls and file SARs distinguished this case from *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)).

114.    According to Binance's November 2023 Settlement Agreement with OFAC, "[f]rom approximately August 2017 to October 2022" Binance "matched and executed virtual currency trades on its online exchange platform between U.S. person users and users in sanctioned jurisdictions or blocked persons." These transactions resulted in at least 1,667,153 virtual currency transactions — totaling approximately $706,068,127.

115.    The OFAC Settlement Agreement further states that although Binance took steps to project an image of compliance, including by misleading third parties about its controls, senior Binance management knew of and permitted the presence of both United States and sanctioned jurisdiction users on its platform, and did so despite understanding that Binance's trade matching algorithm could cause violations of OFAC-administered sanctions programs due to the presence of United States users on the platform.

116.    In addition to disregarding known sanctions risks, Binance management also took steps to undermine its own compliance function, by using its control over its United States affiliate to circumvent the company's own ostensible controls.

117.    OFAC specifically found that given the trading on the Binance.com platform, amounting to $3.8 billion in transaction volume per day in 2020, the continued presence of both United States and sanctioned jurisdiction users through 2022, and the liquidity provided by United States users, the sanctions exposure Binance's senior management had identified was a "practical inevitability."

118.    Zhao was well aware of United States regulations intended to prevent financial intermediaries such as Binance from processing transactions linked to terrorists. As OFAC underscored in its November 2023 settlement with Binance, in June 2019 Zhao told a senior Binance employee that "the U.S. has this law: you have to prevent Americans and any

terrorists from doing any transactions. In order [for America] to accomplish this, if you serve Americans or service American sanctioned countries, you have to give your data to the American regulators." Notwithstanding this knowledge, Zhao deliberately flouted United States law.

## V. DEFENDANTS' DELIBERATE AND SYSTEMATIC CIRCUMVENTION OF ANTI-TERRORISM FINANCING REGULATIONS

119.    The predicate offenses upon which Plaintiffs rely to establish that Defendants' conduct constituted violations of United States criminal law include:

(a) Failure to maintain an effective anti-money laundering program, in violation of 31 U.S.C. §§ 5318(h) and 5322;

(b) Failure to register as a money services business, in violation of 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380;

(c) Failure to file Suspicious Activity Reports, in violation of 31 U.S.C. § 5318(g) and 31 C.F.R. § 1022.320;

(d) Conducting an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960;

(e) Violations of the International Emergency Economic Powers Act, in violation of 50 U.S.C. § 1705 and 31 C.F.R. §§ 560 et seq.; and

(f) Violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201(a).

120.    Binance pled guilty to violations of (a), (d), and (e). Zhao pled guilty to violations of (a). These predicate offenses establish that Defendants' conduct touched and concerned the United States.

*A. Binance Deliberately Failed to Implement Effective AML and CFT Controls*

121.     **Conduct of Defendant Binance.** From its inception, Binance deliberately failed to implement effective AML and CFT controls. This was not negligence or oversight — it was a deliberate business decision to prioritize revenue over compliance with United States counter-terrorism laws.

122.     Prior to August 2021, Binance allowed users to open "Level 1" accounts without submitting any KYC information — requiring only an email address and password. Level 1 accounts comprised the vast majority of user accounts on Binance.com and could transact in unlimited amounts of virtual currency. FinCEN Consent Order ¶¶ 30–35. This meant that any person — including members of designated terrorist organizations — could open a Binance account and transact in unlimited amounts of cryptocurrency with complete anonymity.

123.     Even after Binance announced in August 2021 that it would require KYC information from new users, it allowed existing users — including all Level 1 accounts — to continue trading without providing KYC information until May 2022. FinCEN Consent Order ¶ 36.

124.     In August 2021, Binance launched a customer due diligence program that, by design, still contained massive gaps to allow criminal activity to take place. FinCEN Consent Order ¶ 36.

125.     Binance's compliance program was a sham. As Binance's own Chief Compliance Officer, Samuel Lim, stated in 2020 regarding Binance's customers: "Like come on. They are here for crime." FinCEN Consent Order ¶ 40. Another Binance compliance employee

wrote in February 2019 that Binance needed "a banner" stating: "is washing drug money too hard these days — come to Binance we got cake for you." FinCEN Consent Order ¶ 39.

126.     Binance's Money Laundering Reporting Officer agreed, commenting: "we see the bad, but we close 2 eyes." FinCEN Consent Order ¶ 41.

127.     FinCEN concluded in its November 2023 Consent Order that Binance's "willful failure to implement an effective [anti-money laundering] program directly led to the platform being used to process transactions related to . . . terrorist financing." FinCEN Consent Order ¶ 4.

128.     Binance is not registered, licensed, regulated, or otherwise authorized by the Cayman Islands Monetary Authority ("CIMA") to operate a cryptocurrency exchange from or within the Cayman Islands. As stated by CIMA, Binance does not hold the necessary licenses to provide crypto asset exchange services within the jurisdiction, nor does it have any such license to operate in any state in the United States.

129.     Binance does not observe corporate formalities. It has no board of directors but was controlled entirely by Zhao at all times material herein. As part of a compliance audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report to Binance board of directors wtf." Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, "yea its fine I can get mgmt. to sign" off on the fake report. At around the same time, the MLRO referenced having "half assed" the compliance audit, and informed Lim in a chat, "I HAZ NO CONFIDENCE IN OUR GEOFENCING."

130.    Binance purposefully obscures the identities and locations of the entities operating the trading platform. Binance's customer-facing "Terms of Use" purports to be a contract between the customer and something simply called the "Binance operators," which is a term that has no concrete meaning. Zhao explained this strategy during a June 2019 internal meeting, stating that Binance conducts its operations through various entities incorporated in numerous jurisdictions to "keep countries clean [of violations of law]" by "not landing .com anywhere. This is the main reason .com does not land anywhere."

*B. Binance Had Actual Knowledge That Hamas and PIJ Were Transacting on Its Platform*

131.    **Conduct of Defendant Binance.** Binance did not merely fail to detect terrorist financing on its platform. Binance had actual, contemporaneous knowledge that Hamas and PIJ were transacting on its platform and deliberately chose to do nothing — or worse, to actively shield those accounts from regulatory scrutiny.

132.    In February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." The colleague replied that one "can barely buy an AK47 with 600 bucks." FinCEN Consent Order ¶ 42.

133.    In April 2019, Binance received reports from its third-party blockchain analytics service provider specifically identifying Hamas-associated transactions on its platform. Binance did not file any SARs with FinCEN — as it was legally required to do. Instead, Lim attempted to influence how the third-party service provider reported on Binance's conduct. FinCEN Consent Order ¶ 43. This was not passive nonfeasance — it was an affirmative act to suppress evidence of terrorist financing on the platform.

41

134.     In July 2020, after a third-party service provider flagged accounts associated with ISIS and Hamas, Lim described it as "[e]xtremely dangerous for our company" and instructed compliance personnel to "[c]heck if he is a VIP account, if yes, to . . . [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him." FinCEN Consent Order ¶ 44. This instruction constituted affirmative assistance to a known Hamas-associated user: rather than freezing the account and reporting it to authorities as required by law, Binance tipped off the user, allowed the user to withdraw funds, and effectively warned the user to cover his tracks.

135.     Binance also failed to file a SAR with FinCEN on its connections to BuyCash, a Gaza-based money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising. As FinCEN found, "Prior to OFAC's designation of BuyCash, Binance was aware of extensive suspicious activity involving this entity — including connections related to terrorist organizations — but failed to file a SAR with FinCEN." FinCEN Consent Order ¶ 46.

136.     FinCEN's investigation "identified dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad] network." Binance failed to file SARs on any of this activity. FinCEN Consent Order ¶ 47.

137.     FinCEN found that "Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and the Palestine Islamic Jihad (PIJ)." FinCEN Consent Order ¶ 48.

138.     FinCEN also identified hundreds of thousands of direct, randomly matched internal trades through Binance's matching engines between United States users and

Iranian users. FinCEN named Iran a jurisdiction of "primary money laundering concern" in a rulemaking finalized in 2019.

139.     Binance user wallets effected a significant volume of direct transactions with various Iranian cryptocurrency exchanges, each worth more than $2,000 and in the aggregate worth the equivalent of over half a billion dollars. The total also includes several transactions with cryptocurrency wallets associated with sanctioned entities and individuals, including: (i) EnExchanger, an Iranian entity designated for assisting the cyber actors behind the SamSam ransomware attacks; and (ii) Ahmad Khatibi Aghada, an individual associated with the sanctioned IRGC that engaged in ransomware activities. Binance failed to file SARs with FinCEN on any of these transactions, even after OFAC's designations.

140.     Binance was similarly aware of other Iran-related illicit transactions that occurred on the Binance.com platform but filed no SARs with FinCEN. For example, prior to the institution of full KYC, IranVisaCart and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC. Binance was made aware of these accounts and the related illicit transactions as early as 2019 and filed no SARs with FinCEN.

141.     Binance also failed to file SARs with FinCEN on transactions involving two Syria-based money transmitters, primarily in 2019 and 2020. Based on public reporting, one of these Syria-based money transmitters operates a 24-hour phone line to assist clients — including Russian-speaking foreign fighters — in setting up accounts on Binance. Both money transmitters' ties to terrorist financing have been widely reported for years,

including ties to al-Qaeda campaigns that were the subject of a significant DOJ action unsealed in August 2020.

142.     Hamas specifically publicized its use of Binance. In 2019, a video on Hamas's official Qassam Brigades website instructed viewers to "create a new account on one of the trading platforms" — explicitly naming Binance — to contribute cryptocurrency to Hamas. FinCEN Consent Order ¶ 49.

*C. Binance Processed Specific Transactions for Hamas and PIJ Over a Period of Years*

143.     **Conduct of Defendant Binance.** According to FinCEN's November 2023 settlement, Binance processed numerous transactions with Hamas and other Palestinian terrorist groups between July 14, 2017, and July 30, 2023 — a period of more than six years. FinCEN Consent Order ¶ 50.

144.     Between October 2020 and September 2023, Hamas and PIJ-associated accounts executed thousands of transactions on the Binance platform with a total value of at least approximately $60 million. From October 2020 to September 2023, Hamas and PIJ wallets transferred approximately $30 million to Binance wallets. The largest of these transactions (ranging from approximately $150,000 to $200,000) were conducted from March to December 2022. From October 2020 to September 2023, Binance wallets transferred approximately $29 million to Hamas and PIJ.

145.     FinCEN found that "Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations, as well as high-risk exchanges associated with terrorist financing activity." FinCEN Consent Order ¶ 51.

146.      Israeli law enforcement identified Hamas-linked accounts on the Binance.com platform. Inquiries to Binance resulted in "numerous seizures related to the al Qassam Brigades" stretching from 2021 through at least October 2023. FinCEN Consent Order ¶ 52.

147.      Israel's National Bureau for Counter Terror Financing ("NBCTF") seized dozens of cryptocurrency addresses with tens of millions of dollars in volume controlled by entities affiliated with Hamas, including Dubai Co. for Exchange, al-Muhtadon, al-Mutahadun for Exchange, and al-Wefeq Co. for Exchange — all of which transacted through Binance. FinCEN Consent Order ¶ 53.

148.      Throughout 2019, Binance continued to serve "thousands of users" identified as being from sanctioned countries, including over 12,500 users who provided Iranian phone numbers. Three-quarters of the Iranian funds that passed through Binance were in the cryptocurrency Tron, which gives users an option to conceal their identities.

149.      From around January 2018 to May 2022, Binance processed 1.1 million crypto transactions worth at least $898.6 million between United States customers and those who lived in Iran. In 2022, Reuters cited blockchain data indicating that Binance processed Iranian transactions with a value of $8 billion since 2018 despite United States sanctions intended to cut Iran off from the global financial system. Almost all the funds, about $7.8 billion, flowed between Binance and Nobitex, Iran's largest crypto exchange platform — in violation of United States law.

150.      In a blog post in 2021, Nobitex openly instructed clients on how to use Tron to trade anonymously without "endangering assets due to sanctions." Following Nobitex's guidance, many Iranian customers used VPNs to conceal their locations and continued

trading on Binance. According to the United States Department of Justice, Binance enabled nearly $900 million in transactions between United States and Iranian users, noting that it had a "significant customer base" from some sanctioned jurisdictions and was aware that Iran represented "the majority of such customers."

*D. Specific Hamas and PIJ-Affiliated Entities That Transacted Through Binance*

151.    **BuyCash.** BuyCash is a Gaza-based money-services entity that raises funds for Hamas. BuyCash and its owner, Ahmed M.M. Alaqad, were designated by the U.S. Department of the Treasury as SDGTs on October 18, 2023, for materially assisting Hamas. From January 2019 to October 2023, BuyCash wallets transferred approximately $21 million to Binance. The largest of these transactions, ranging from $150,000 to $230,000, occurred from July to September 2023 — the months immediately preceding the October 7 Attacks. From January 2019 to October 2023, Binance transferred approximately $4 million to BuyCash wallets. A review of public blockchain data shows that Binance was responsible for 90% of all funds sent by BuyCash to cryptocurrency exchanges — the equivalent of over $250 million.

152.    **Dubai Company for Exchange ("Dubai Co.").** Dubai Co. is a Gaza-based currency exchange and money services business designated by NBCTF as a terrorist organization on March 7, 2022, because it sent tens of millions of dollars annually to Hamas's Qassam Brigades. Binance facilitated cryptocurrency transactions worth at least $22 million between Dubai Co. and Binance accounts in the years leading up to October 7, 2023. Dubai Co. received the equivalent of more than $12 million from Binance customer accounts and sent the equivalent of more than $10 million to Binance customer accounts.

153.    **Al-Mutahadun for Exchange (a/k/a Al-Markaziya).** Al-Mutahadun for Exchange is a Gaza-based money laundering network operated by the Shamlakh family. The U.S. Department of the Treasury designated the Shamlakh network on January 22, 2024 as an SDGT, finding that it had "become the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza." Al-Mutahadun controlled and operated dozens of Binance accounts under a variety of names. In February 2022, NBCTF seized 12 Binance accounts linked to Al-Mutahadun Exchange.

154.    **Gaza Now.** Gaza Now was identified by NBCTF on January 21, 2024, as an organization "affiliated with the military arm of Hamas." NBCTF seized its Binance Account No.***1732. On March 27, 2024, Gaza Now and its founder Mustafa Ayash were designated by the U.S. Treasury Department as SDGTs for being "key financial facilitators involved in fundraising for Hamas." Gaza Now operated a Hamas-affiliated Telegram channel with approximately 350,000 subscribers, which it used to disseminate Hamas propaganda and solicit cryptocurrency donations channeled through Binance's platform.

155.    Access to outside funding is the lifeline of terrorist organizations, particularly when such organizations are designated as FTOs and therefore unable to raise money openly or through traditional means. Terrorist organizations are designated as FTOs based upon the well-established premise that such FTOs' ability to terrorize their targets depends upon steady sources of revenue.

156.    Defendants not only knowingly provided Hamas and PIJ with a platform with which to illicitly accept funds from the United States in contravention of United States law, they also provided a means for them to accept funds from a worldwide network of remitters including from within Iran, the single largest sponsor of Hamas.

47

157.     Such aid is not confined to the actual remittance of money to fund Hamas's and PIJ's activities. By subverting United States law, hiding its activities, suppressing the mandatory issuance of SARs, and repeatedly revising its services and infrastructure to evade regulatory authorities, Defendants covered Hamas's and PIJ's financial tracks, thereby undermining the purpose of their designations as FTOs, making it harder for the United States government to cut off their finances and prevent future terrorist activity.

158.     Defendants provided material support in its most straightforward form to Hamas and PIJ — cash and cash equivalents which could be converted to United States dollars. This money supported Hamas and PIJ for years, enabled them to secure necessary materials and equipment, pay salaries, invest in training, underwrite their infrastructure, and provide the lifeblood necessary for them to maintain and grow their operations.

*E. Binance Actively Protected Terrorist-Linked Accounts*

159.     **Conduct of Defendant Binance.** Binance went beyond merely failing to detect terrorist financing — it actively protected terrorist-linked accounts. This affirmative conduct distinguishes Defendants' behavior from the "passive nonfeasance" that the Supreme Court found insufficient in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

160.     When Binance's compliance team identified accounts associated with Hamas and other terrorist organizations, Binance's policy was to check whether the flagged user was a "VIP account" and, if so, to allow the user to withdraw funds before offboarding, while tipping off the user that "third party compliance tools flagged him." FinCEN Consent Order ¶ 44.

161.     Binance took steps to retain known illicit actors on the platform, particularly VIP users. In July 2020, Binance's CFO wrote that compliance and investigation teams should

check a user's VIP level before offboarding them, and then Binance could "give them a new account (if they are important/VIP)" with instructions "not to go through XXX channel again." FinCEN Consent Order ¶ 45.

162.    Binance's willful failure to report hundreds of thousands of suspicious transactions "inhibited law enforcement's ability to disrupt the illicit actors" and "extensively harmed FinCEN's mission to safeguard our financial system from illicit use." FinCEN Consent Order ¶ 5.

163.    In March 2025, the United States Department of Justice announced the seizure of approximately $200,000 in cryptocurrency intended to support Hamas's terrorist activities. The FBI reported that it had traced the seized cryptocurrency from addresses that had been used to launder more than $1.5 million in virtual currency since October 2024. According to the DOJ's warrant documents, Hamas-affiliated groups had at least 17 cryptocurrency addresses used for soliciting donations that the groups would then launder through exchanges and over-the-counter brokers.

*F. Zhao Personally Directed Binance's Scheme to Evade United States Regulatory Oversight*

164.    **Conduct of Defendant Zhao.** Zhao personally directed Binance's scheme to retain United States customers on the unregulated Binance.com platform while evading United States regulatory oversight. Zhao's stated "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us." CFTC Consent Order ¶ 36.

165.    In a June 9, 2019, meeting, Zhao stated: "We don't want to lose all the VIPs which actually contribute to quite a large number of volume. So ideally we would help them facilitate registering companies or moving the trading volume offshore in some way — in

a way that we can accept without them being labeled completely U.S. to us." CFTC Consent Order ¶ 37.

166.    Zhao directed Binance to implement a plan to encourage customers to circumvent geographic blocking of United States-based IP addresses by using VPN services. Zhao also directed Binance employees to encourage certain United States-based VIP customers to circumvent KYC restrictions by submitting updated KYC information that deleted any United States nexus. CFTC Consent Order ¶¶ 43–50; OFAC Settlement at 4–5.

167.    Zhao authorized and directed Binance's strategy of purportedly "mischaracterizing" its users' locations, explaining: "[w]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not." CFTC Consent Order ¶ 38.

168.    Zhao's philosophy regarding compliance with United States law was that it was "better to ask for forgiveness than permission." FinCEN Consent Order ¶ 25.

169.    Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between United States users and users in Iran and other sanctioned countries and regions in violation of United States law. Zhao personally directed the destruction of documents related to illegal conduct. CFTC Consent Order ¶¶ 36–50.

170.    Zhao's own Chief Compliance Officer told colleagues that "Cz [Zhao] doesn't see a need" to impose AML standards on Binance.com. FinCEN Consent Order ¶ 27. Zhao's deputy head of compliance acknowledged that "[Zhao] keeps saying that compliance is here to make Binance APPEAR compliant."

50

*G. BAM Trading's Role in the Scheme*

171.    **Conduct of Defendant BAM Trading.** BAM Trading was created in 2019 as part of Zhao's and Binance's scheme to evade United States regulatory oversight. BAM Trading operates Binance.US, which was held out as the exclusive platform on which United States persons could trade on Binance. SEC Complaint ¶¶ 1–10.

172.    In reality, Binance.US was a smokescreen. As the SEC found, Zhao and Binance secretly controlled BAM Trading's operations behind the scenes and permitted United States customers to continue using the unregulated Binance.com platform. Binance's Chief Compliance Officer explained: "[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means." SEC Complaint ¶ 6; FinCEN Consent Order ¶ 26.

173.    BAM Trading relied on Binance's services and technology to operate, and BAM Trading's operations were directed by Zhao and Binance. BAM Trading is directly or indirectly majority owned and controlled by Zhao. SEC Complaint ¶¶ 18–25.

174.    By serving as the purportedly compliant United States face of Binance's global operations, BAM Trading facilitated Binance's ability to continue operating its unregulated platform — including processing transactions for Hamas and PIJ — while evading United States regulatory scrutiny. BAM Trading's role was essential to the scheme: without a purportedly compliant United States entity, Binance would have faced immediate regulatory action that would have disrupted its ability to serve United States customers and, critically, its ability to process transactions for terrorist organizations.

## VI. CONNECTION BETWEEN DEFENDANTS' CONDUCT AND PLAINTIFFS' INJURIES

175.    Defendants' knowing provision of financial services to Hamas and PIJ was a substantial factor in enabling the October 7 Attacks. Hamas and PIJ are designated FTOs that depend on clandestine funding to recruit, train, equip, and deploy terrorists. Defendants provided Hamas and PIJ with a platform to receive and transfer funds, to engage in cryptocurrency trading, and to access the global financial system — all in violation of United States law.

176.    The assistance Defendants provided was not incidental or de minimis. Between October 2020 and September 2023, Hamas and PIJ-associated accounts executed thousands of transactions on the Binance platform with a total value of at least approximately $60 million. This assistance continued through September 2023 — just weeks before the October 7 Attacks. The temporal proximity between Defendants' ongoing assistance and the attacks supports the inference that Defendants' assistance was a substantial factor in enabling the attacks.

177.    Defendants' assistance was qualitatively substantial as well as quantitatively substantial. Defendants did not merely process routine transactions for Hamas and PIJ. Defendants deliberately circumvented the regulatory safeguards designed to prevent terrorist financing, actively shielded terrorist-linked accounts from regulatory scrutiny, tipped off flagged users, and created a financial ecosystem specifically designed to evade government detection. This affirmative misfeasance — providing routine financial services "in an unusual way" — made Defendants' assistance qualitatively different from the passive provision of generally available services. *See Raanan*, slip op. at 64–65 (finding that Binance "provided services that might otherwise be considered routine —

cryptocurrency transaction services — in an 'unusual way' — designed to evade government detection and regulation").

178.    Without Defendants' knowing facilitation of terrorist financing, Hamas and PIJ would have been significantly less able to fund the complex, multipronged attack that killed and injured Plaintiffs and their family members on October 7, 2023. The October 7 Attacks required significant and sustained funding over many years. Defendants' platform was a primary conduit for that funding.

179.    The October 7 Attacks, and Plaintiffs' injuries in those attacks, were foreseeable results of Defendants' knowing provision of substantial financial assistance to Hamas and PIJ. Defendants knew that Hamas and PIJ were designated terrorist organizations that had killed hundreds of United States and Israeli citizens. Defendants knew that clandestine funding was essential to Hamas's and PIJ's ability to carry out terrorist attacks. Defendants knew that their platform was being used to facilitate that funding. A large-scale terrorist attack by Hamas and PIJ was a foreseeable risk of Defendants' conduct. *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022), vacated and remanded, 601 U.S. 234 (2024), reinstated in relevant part on remand, No. 20-5340, slip op. (D.C. Cir. Jan. 23, 2026) (holding that aiding-and-abetting liability does not require tracing specific dollars to specific attacks; a temporally and geographically circumscribed set of attacks suffices).

## VII. SPECIFIC INJURIES TO EACH PLAINTIFF

180.    **Plaintiff Adin Gess** (U.S. citizen — principal victim): Gess and his family were displaced from Kibbutz Holit as a direct result of the October 7 Attacks. They have lost their belongings, their community, and their way of life. Gess has suffered severe mental anguish, extreme trauma, and emotional pain and suffering. Gess asserts ATA aiding-and-

abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao (Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six).

181. **Plaintiff Noach Newman** (U.S. citizen — principal victim and survivor/heir): Newman's brother David was murdered by Hamas terrorists at the Nova Music Festival on October 7, 2023. Newman has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Newman asserts ATA aiding-and-abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao (Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six), both in his own right as a principal victim and in a representative capacity as a survivor and heir of his brother David, a United States national killed by acts of international terrorism.

182. **Plaintiff Maya Parizer** (U.S. citizen — principal victim): Parizer was present at the Nova Music Festival during the October 7 Attacks and narrowly escaped death. She has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Parizer asserts ATA aiding-and-abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao (Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six).

183. **Plaintiff Natalie Sanandaji** (U.S. citizen — principal victim): Sanandaji was present at the Nova Music Festival during the October 7 Attacks and fled on foot for approximately four hours through Hamas gunfire. She has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Sanandaji asserts ATA aiding-and-abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao

(Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six).

184.     **Plaintiff Yoni Diller** (U.S. citizen — principal victim): Diller was present at the Nova Music Festival during the October 7 Attacks. Four of his close friends were killed. He has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Diller asserts ATA aiding-and-abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao (Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six).

185.     **Plaintiff David Bromberg** (U.S. citizen — principal victim): Bromberg was present at the Nova Music Festival during the October 7 Attacks and hid for 12 hours before being rescued under heavy fire. Some of his friends were killed; another was taken hostage. He has suffered severe trauma, mental anguish, and extreme emotional pain and suffering. Bromberg asserts ATA aiding-and-abetting claims against BAM Trading (Count One), Binance (Count Two), and Zhao (Count Three), and ATA conspiracy claims against BAM Trading (Count Four), Binance (Count Five), and Zhao (Count Six).

186.     **Plaintiff Hagar Almog** (Israeli citizen — ATS): Almog witnessed the massacre at Kibbutz Holit on October 7, 2023, and was displaced from her home. She has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Almog asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

187.     **Plaintiff Lishay Lavi** (Israeli citizen — ATS): Lavi's husband Omri was kidnapped by Hamas terrorists on October 7, 2023 and released after 738 days on October 13, 2025. She has suffered unbearable trauma, severe mental anguish, and extreme

emotional pain and suffering. Lavi asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

188.    **Plaintiff Ariel Ein-Gal** (Israeli citizen — ATS): Ein-Gal was attacked by Hamas terrorists at Zikkim Beach on October 7, 2023, and narrowly escaped death. He has suffered severe mental anguish, trauma, and extreme emotional pain and suffering. Ein-Gal asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

189.    **Plaintiffs Ora Cooper and Rotem Cooper** (Israeli citizens — ATS): The Coopers' father Amiram Cooper was kidnapped by Hamas terrorists on October 7, 2023. Amiram Cooper's remains were returned to Israel on October 30, 2025, after which his family was finally able to bury him. Plaintiffs Cooper have suffered severe mental anguish, extreme emotional pain, and suffering. Amiram was kidnapped and murdered.  Ora Cooper and Rotem Cooper each assert ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight) on their own behalf and on behalf of their father, Amiram.

190.    **Plaintiff Almog Meir Jan** (Israeli citizen — ATS): Meir Jan was kidnapped by Hamas terrorists on October 7, 2023, and held hostage in Gaza for 246 days before being rescued by the IDF on June 8, 2024. He has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Meir Jan asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

191.    **Plaintiff Andrey Kozlov** (Israeli citizen — ATS): Kozlov was kidnapped by Hamas terrorists on October 7, 2023, and held hostage in Gaza for 246 days before being rescued by the IDF on June 8, 2024. He has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Kozlov asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

192.      **Plaintiff Shlomi Ziv** (Israeli citizen — ATS): Ziv was a member of the Nova Music Festival security team who was kidnapped by Hamas terrorists on October 7, 2023, after heroically defending festival-goers. He was held hostage in Gaza for 246 days before being rescued by the IDF on June 8, 2024. He has suffered severe physical injuries, mental anguish, trauma, and extreme emotional pain and suffering. Ziv asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

193.      **Plaintiff Ayelet Samerano** (Israeli citizen — ATS, on own behalf and on behalf of Yonatan Samerano): Samerano's 21-year-old son Yonatan was shot and killed by Hamas terrorists on October 7, 2023. His body was captured and taken to Gaza, until it was heroically recovered by the IDF in June 2025 and returned to Israel for burial. She has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Samerano asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

194.      **Plaintiff Talik Gvili** (Israeli citizen — ATS, on own behalf and on behalf of Ran Gvili): Gvili's son, Sergeant First Class Ran Gvili, was killed by Hamas terrorists while defending Kibbutz Alumim on October 7, 2023. His body was kidnapped and held in Gaza for over two years. Ran was officially declared deceased on January 31, 2024. Ran's body was only recovered for burial in January 2026. Talik Gvili has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Gvili asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

195.      **Plaintiff Roee Baruch** (Israeli citizen — ATS, on own behalf and on behalf of Uriel Baruch): Baruch's brother Uriel, a 35-year-old father of two, was abducted from the Nova Music Festival on October 7, 2023. In March 2024, the family learned Uriel was

killed on October 7. Uriel's remains were only returned for burial in Israel in October 2025. He has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Baruch asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

196.     **Plaintiff Shachar Levi** (Israeli citizen — ATS, on own behalf and on behalf of Eitan Levi): Levi's father Eitan was murdered by Hamas terrorists on October 7, 2023, while Shachar listened helplessly over the phone. Eitan's body was brutally lynched in a mosque plaza in Gaza, with video of the desecration published on Instagram. Eitan's body was only returned for burial in October 2025. Shachar Levi has suffered, and continues to suffer, severe mental anguish, extreme emotional pain, and suffering. Levi asserts ATS claims against BAM Trading (Count Seven) and Zhao (Count Eight).

## CLAIMS FOR RELIEF

## COUNT ONE

## AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM

## IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (By U.S. Citizen Plaintiffs Against Defendant BAM Trading Services, Inc.)

197.     Plaintiffs Adin Gess, Noach Newman (on his behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg, reallege and incorporate by reference the factual allegations set forth above.

198.     Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism, as set forth in the individual plaintiff allegations above.

199.     Hamas and PIJ were designated FTOs at the time they committed, planned, and authorized the October 7 Attacks that injured and/or killed Plaintiffs or their family members. 18 U.S.C. § 2333(d)(2).

200.     The October 7 Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1).

201.     **General Awareness.** BAM Trading was generally aware of its role as part of an overall illegal activity — namely, the scheme to evade United States regulatory oversight while enabling Binance to continue processing transactions for designated terrorist organizations. BAM Trading knew that Hamas and PIJ were designated FTOs that engaged in acts of international terrorism. BAM Trading knew or was willfully blind to the fact that Binance was processing transactions for Hamas and PIJ on the unregulated Binance.com platform. BAM Trading's role in the scheme — serving as the purportedly compliant United States face of Binance's global operations — was designed to enable Binance to continue this activity while evading United States regulatory scrutiny.

202.     **Knowing and Substantial Assistance.** BAM Trading knowingly provided substantial assistance to Hamas and PIJ by:

(a) Providing Binance with a mechanism to maintain access to United States customers and the United States financial system by serving as the purportedly compliant United States entity through which Binance could continue to operate;

(b) Actively holding itself out to United States regulators as the exclusive means by which United States persons could access Binance's services, while knowing or being willfully blind to the fact that Binance was simultaneously serving millions of United

States customers — and designated terrorist organizations — on the unregulated Binance.com platform;

(c) Relying on Binance's services and technology while knowing or being willfully blind to Binance's facilitation of terrorist financing;

(d) Participating in the scheme to create the false appearance of regulatory compliance while United States customers and designated terrorist organizations continued to transact on the unregulated Binance.com platform; and

(e) Enabling Binance to avoid the immediate regulatory action that would have disrupted Binance's ability to process transactions for Hamas and PIJ.

203.     BAM Trading's substantial assistance was a substantial factor in causing Plaintiffs' injuries. The October 7 Attacks, and Plaintiffs' injuries in those attacks, were foreseeable results of BAM Trading's substantial assistance to Hamas and PIJ.

204.     BAM Trading is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

## COUNT TWO

## AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM

## IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (By U.S. Citizen Plaintiffs Against Defendant Binance Holdings Limited)

205.     Plaintiffs Adin Gess, Noach Newman (on his own behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and

David Bromberg reallege and incorporate by reference the factual allegations set forth above.

206.     Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism.

207.     Hamas and PIJ were designated FTOs at the time they committed, planned, and authorized the October 7 Attacks. 18 U.S.C. § 2333(d)(2). The October 7 Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1).

208.     **General Awareness.** Binance was generally aware of its role in Hamas's and PIJ's overall terrorist activities. Binance's senior executives discussed "HAMAS transactions" in internal communications as early as February 2019. FinCEN Consent Order ¶ 42. Binance received specific reports from third-party blockchain analytics providers identifying Hamas-associated transactions in April 2019 and July 2020. FinCEN Consent Order ¶¶ 43–44. Hamas publicly named Binance in a 2019 fundraising video on its official Qassam Brigades website. FinCEN Consent Order ¶ 49. Media outlets reported on Hamas's use of cryptocurrency platforms, including Binance, beginning in 2019. Binance knew it was playing a role in Hamas's and PIJ's overall illegal activity.

209.     **Knowing and Substantial Assistance.** Binance knowingly provided substantial assistance to Hamas and PIJ. Binance's assistance was not passive nonfeasance — it was affirmative misfeasance. Binance provided routine financial services in an unusual and dangerous way — deliberately circumventing the regulatory safeguards designed to prevent terrorist financing, actively shielding terrorist-linked accounts from regulatory

scrutiny, and creating a financial ecosystem specifically designed to evade government detection. Binance's specific conduct constituting substantial assistance includes:

(a) Processing thousands of cryptocurrency transactions for Hamas, PIJ, and their agents between July 14, 2017, and July 30, 2023, with a total value of at least approximately $60 million between October 2020 and September 2023 alone;

(b) Maintaining accounts and hosting transactions involving cryptocurrency wallets for the benefit of Hamas, PIJ, and their front organizations, including BuyCash (approximately $240 million in transactions), Dubai Co. (approximately $22 million), and Al-Mutahadun for Exchange;

(c) Providing Hamas and PIJ with access to the global financial system and United States dollar-denominated liquidity;

(d) Deliberately and systematically failing to implement effective AML and CFT controls despite knowing that terrorists were transacting on its platform;

(e) Failing to file SARs with FinCEN on transactions involving Hamas and PIJ despite actual knowledge of those transactions, thereby depriving United States law enforcement of the information needed to disrupt Hamas's and PIJ's financing networks;

(f) Actively shielding Hamas- and PIJ-linked accounts from regulatory scrutiny by tipping off flagged users, allowing them to withdraw funds, and advising them on how to avoid future detection;

(g) Attempting to influence how third-party blockchain analytics providers reported on Hamas-associated transactions on the platform;

(h) Providing known illicit actors with new accounts and instructions on how to avoid detection after their original accounts were flagged;

(i) Concealing the presence of Hamas and PIJ on its platform from United States regulators; and

(j) Deliberately circumventing KYC requirements by allowing users to open accounts with no identity verification, grandfathering anonymous accounts, and encouraging customers to submit falsified KYC documentation.

210.    Binance had an independent legal duty under the BSA, IEEPA, and OFAC regulations to detect, report, and prevent terrorist financing on its platform. Binance's deliberate violation of these duties — duties specifically designed to prevent the precise harm that occurred here — supports the inference that Binance's assistance was knowing and substantial.

211.    Binance's substantial assistance was a significant factor in causing Plaintiffs' injuries. The October 7 Attacks, and Plaintiffs' injuries in those attacks, were foreseeable results of Binance's knowing provision of substantial financial assistance to Hamas and PIJ. Binance's assistance continued through September 2023 — just weeks before the October 7 Attacks — and the $60 million in Hamas/PIJ-associated transactions processed during this period was "substantial by any metric." See Raanan, slip op. at 70.

212.    Binance is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

63

## COUNT THREE

## AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM

## IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (By U.S. Citizen Plaintiffs Against Defendant Changpeng Zhao)

213.    Plaintiffs Adin Gess, Noach Newman (on his own behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg reallege and incorporate by reference the factual allegations set forth above.

214.    Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism.

215.    Hamas and PIJ were designated FTOs at the time they committed, planned, and authorized the October 7 Attacks. 18 U.S.C. § 2333(d)(2). The October 7 Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1).

216.    **General Awareness.** Zhao was generally aware of his role in Hamas's and PIJ's overall terrorist activities. As Binance's primary founder, majority owner, and CEO, Zhao exercised near-total control over Binance's strategy, operations, and finances. Zhao's own Chief Compliance Officer told colleagues that "Cz [Zhao] doesn't see a need" to impose AML standards on Binance.com. FinCEN Consent Order ¶ 27. Zhao knew that Binance's failure to implement effective AML controls would result in the platform being used for terrorist financing. Zhao personally directed the scheme to evade United States regulatory oversight that enabled Hamas and PIJ to transact on the platform without detection.

217. **Knowing and Substantial Assistance.** Zhao knowingly provided substantial assistance to Hamas and PIJ. Zhao's assistance was not passive nonfeasance — it was affirmative misfeasance. Zhao personally directed the dismantling of the compliance infrastructure that would have detected and prevented terrorist financing on the Binance platform. Zhao's specific conduct constituting substantial assistance includes:

(a) Personally directing Binance's deliberate failure to implement effective AML and CFT controls, knowing that this failure would result in the platform being used for terrorist financing;

(b) Personally directing the scheme to retain United States customers on the unregulated Binance.com platform while evading United States regulatory oversight, thereby ensuring that the platform remained available to Hamas and PIJ;

(c) Personally directing Binance employees to encourage customers to circumvent compliance controls, including by using VPN services and submitting falsified KYC documentation;

(d) Personally authorizing the retention of VIP customers — including those flagged for illicit activity — on the platform;

(e) Personally directing the destruction of documents related to illegal conduct;

(f) Personally directing the creation of BAM Trading as a sham entity designed to create the false appearance of regulatory compliance; and

(g) As Binance's majority owner and CEO, exercising near-total control over the operations that resulted in Binance knowingly processing transactions for Hamas and PIJ.

218.     Zhao's substantial assistance was a substantial factor in causing Plaintiffs' injuries. The October 7 Attacks, and Plaintiffs' injuries in those attacks, were foreseeable results of Zhao's knowing provision of substantial assistance to Hamas and PIJ through his control of Binance.

219.     Zhao is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

## COUNT FOUR

## CONSPIRACY IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM

## IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (By U.S. Citizen Plaintiffs Against Defendant BAM Trading Services, Inc.)

220.     Plaintiffs Adin Gess, Noach Newman (on his own behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg reallege and incorporate by reference the factual allegations set forth above.

221.     Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism.

222.     Hamas and PIJ were designated FTOs at the time they committed, planned, and authorized the October 7 Attacks. 18 U.S.C. § 2333(d)(2). The October 7 Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1).

66

223.    BAM Trading conspired with Binance and Zhao and Hamas, PIJ, Iran, and others to facilitate the operations of Hamas and PIJ in furtherance of their committing, planning, or authorizing acts of international terrorism, including the October 7 atrocities. The conspiracy consisted of an agreement among BAM Trading, Binance, and Zhao, and the other co-conspirators to create the false appearance of regulatory compliance through the Binance.US platform while secretly retaining United States customers on the unregulated Binance.com platform, thereby enabling Binance to continue processing transactions for Hamas and PIJ while evading United States regulatory scrutiny. The "Tai Chi" plan — a written plan presented to senior Binance executives — specifically contemplated creating a puppet United States entity to shield Binance from liability.

224.    In furtherance of this conspiracy, BAM Trading committed the following overt acts, in addition to knowingly and intentionally using its platform to move money and otherwise act on behalf of the FTOs and Iran, as described above:

(a) Operating the Binance.US platform as the purportedly compliant United States face of Binance's global operations;

(b) Entering into intercompany agreements with Binance to rely on Binance's services and technology;

(c) Holding itself out to United States regulators as the exclusive means by which United States persons could access Binance's services; and

(d) Enabling Binance to avoid immediate regulatory action that would have disrupted its ability to process transactions for Hamas and PIJ.

225.    BAM Trading is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

## COUNT FIVE

## CONSPIRACY IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

## (By U.S. Citizen Plaintiffs Against Defendant Binance Holdings Limited)

226.    Plaintiffs Adin Gess, Noach Newman (on his own behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg reallege and incorporate by reference the factual allegations set forth above.

227.    Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism.

228.    Hamas and PIJ were designated FTOs. The October 7 Attacks were acts of international terrorism.

229.    Binance conspired with BAM Trading and Zhao, Hamas, PIJ, Iran, and others to facilitate the operations of Hamas and PIJ, in preparation for and in connection with the October 7 atrocities and otherwise. In furtherance of this conspiracy, Binance committed the following overt acts, in addition to knowingly and intentionally using its platform to move money and otherwise act on behalf of the FTOs and Iran, as described above:

68

(a) Processing thousands of cryptocurrency transactions for Hamas and PIJ over a period of more than six years;

(b) Failing to file SARs with FinCEN on transactions involving Hamas and PIJ;

(c) Actively shielding terrorist-linked accounts from regulatory scrutiny;

(d) Directing BAM Trading's operations behind the scenes;

(e) Deliberately circumventing AML and CFT requirements;

(f) Attempting to influence how third-party blockchain analytics providers reported on Hamas-associated transactions; and

(g) Concealing the presence of Hamas and PIJ on its platform from United States regulators.

230.    Binance is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

## COUNT SIX

## CONSPIRACY IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

### (By U.S. Citizen Plaintiffs Against Defendant Changpeng Zhao)

231.    Plaintiffs Adin Gess, Noach Newman (on his own behalf and on behalf of his brother David Yair Shalom Newman), Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg reallege and incorporate by reference the factual allegations set forth above.

69

232. Each Plaintiff who asserts this Count is a national of the United States who was injured in his or her person by reason of acts of international terrorism, or who is a survivor or heir of a United States national killed by reason of acts of international terrorism.

233. Hamas and PIJ were designated FTOs. The October 7 Attacks were acts of international terrorism.

234. Zhao conspired with Binance and BAM Trading, Hamas, PIJ, Iran, and others to facilitate the operations of Hamas and PIJ in furtherance of their committing, planning, or authorizing acts of international terrorism, including the October 7 atrocities. Zhao personally directed and orchestrated the conspiracy.

235. In furtherance of this conspiracy, Zhao committed the following overt acts, in addition to knowingly and intentionally using its platforms to move money and otherwise act on behalf of the FTOs and Iran, as described above:

(a) Personally directing Binance's failure to implement effective AML controls;

(b) Personally directing the scheme to retain United States customers on the unregulated platform;

(c) Personally directing Binance employees to encourage customers to circumvent compliance controls;

(d) Personally authorizing the retention of VIP customers flagged for illicit activity;

(e) Personally directing the creation of BAM Trading as a sham entity;

(f) Personally directing the destruction of documents related to illegal conduct; and

(g) Personally directing the strategy of mischaracterizing United States users' locations to evade regulatory oversight.

236.     Zhao is therefore liable to Plaintiffs Adin Gess, Noach Newman, Maya Parizer, Natalie Sanandaji, Yoni Diller, and David Bromberg for damages in an amount to be determined at trial, treble damages pursuant to 18 U.S.C. § 2333(a), and the costs of this suit, including attorneys' fees.

## COUNT SEVEN

### VIOLATION OF THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

### (By Foreign National Plaintiffs Against Defendant BAM Trading Services, Inc.)

237.     Plaintiffs Hagar Almog, Lishay Lavi, Ariel Ein-Gal, Ora Cooper and Rotem Cooper (on their own behalf and on behalf of their father Amiram Cooper), Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano (on her own behalf and on behalf of Yonatan Samerano), Talik Gvili (on her own behalf and on behalf of Ran Gvili), Roee Baruch (on his own behalf and on behalf of Uriel Baruch), and Shachar Levi (on his own behalf and on behalf of Eitan Levi) reallege and incorporate by reference the factual allegations set forth above.

238.     Each Plaintiff who asserts this Count is an alien who was injured by a tort committed in violation of the law of nations.

239.     The October 7 Attacks constituted violations of the law of nations, including but not limited to prohibitions against terrorism, extrajudicial killing, torture, hostage-taking, and desecration of remains. These prohibitions are specific, universal, and obligatory norms of international law.

240.    Plaintiffs Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ora Cooper, and Rotem Cooper (on their own behalf and on behalf of their father Amiram) allege that the October 7 Attacks included hostage-taking in violation of Article 34 of the Fourth Geneva Convention and Article 8(2)(a)(viii) of the Rome Statute.

241.    Plaintiffs Ayelet Samerano (on behalf of Yonatan Samerano), Talik Gvili (on behalf of Ran Gvili), Roee Baruch (on behalf of Uriel Baruch), Shachar Levi (on behalf of Eitan Levi), and Ora and Rotem Cooper (on their own behalf and on behalf of their father Amiram) allege that the October 7 Attacks included extrajudicial killing in violation of customary international law and the International Covenant on Civil and Political Rights.

242.    Plaintiffs Ayelet Samerano (on behalf of Yonatan Samerano), Talik Gvili (on behalf of Ran Gvili), Roee Baruch (on behalf of Uriel Baruch), Shachar Levi (on behalf of Eitan Levi), and Ora and Rotem Cooper (on their own behalf and on behalf of their father Amiram)  allege that the October 7 Attacks included desecration of remains and outrages upon personal dignity in violation of Article 8(2)(b)(xxi) of the Rome Statute and customary international humanitarian law.

243.    Plaintiffs Almog Meir Jan, Andrey Kozlov, and Shlomi Ziv allege that their captivity included torture and cruel treatment in violation of Common Article 3 of the Geneva Conventions and the Convention Against Torture.

244.    BAM Trading aided and abetted these violations of the law of nations by knowingly providing substantial assistance to Hamas and PIJ as set forth in Count One above.

245.    BAM Trading is a domestic corporation. The relevant conduct — BAM Trading's operation of the Binance.US platform in the United States, its participation in the scheme

to evade United States regulatory oversight, its reliance on Binance's services and technology, and its active role in holding itself out to United States regulators as the exclusive means by which United States persons could access Binance's services — occurred in the United States.

246.    As a direct and proximate result of BAM Trading's conduct, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

247.    BAM Trading is therefore liable to Plaintiffs Hagar Almog, Lishay Lavi, Ariel Ein-Gal, Ora Cooper, Rotem Cooper, Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano, Talik Gvili, Roee Baruch, and Shachar Levi in each of their capacities for damages in an amount to be determined at trial, and the costs of this suit, including attorneys' fees.

## COUNT EIGHT

### VIOLATION OF THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

### (By Foreign National Plaintiffs Against Defendant Changpeng Zhao)

248.    Plaintiffs Hagar Almog, Lishay Lavi, Ariel Ein-Gal, Ora Cooper and Rotem Cooper (on their own behalf and on behalf of their father Amiram Cooper), Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano (on her own behalf and on behalf of Yonatan Samerano), Talik Gvili (on her own behalf and on behalf of Ran Gvili), Roee Baruch (on his own behalf and on behalf of Uriel Baruch), and Shachar Levi (on his own behalf and on behalf of Eitan Levi) reallege and incorporate by reference the factual allegations set forth above.

249.    Each Plaintiff who asserts this Count is an alien who was injured by a tort committed in violation of the law of nations.

250.      The October 7 Attacks constituted violations of the law of nations.

251.      Plaintiffs Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ora Cooper and Rotem Cooper (on their own behalf and on behalf of their father Amiram) allege that the October 7 Attacks included hostage-taking in violation of Article 34 of the Fourth Geneva Convention and Article 8(2)(a)(viii) of the Rome Statute.

252.      Plaintiffs Ayelet Samerano (on behalf of Yonatan Samerano), Talik Gvili (on behalf of Ran Gvili), Roee Baruch (on behalf of Uriel Baruch), Shachar Levi (on behalf of Eitan Levi), and Ora and Rotem Cooper (on their own behalf and on behalf of their father Amiram) allege that the October 7 Attacks included extrajudicial killing in violation of customary international law and the International Covenant on Civil and Political Rights.

253.      Plaintiffs Ayelet Samerano (on behalf of Yonatan Samerano), Talik Gvili (on behalf of Ran Gvili), Roee Baruch (on behalf of Uriel Baruch), Shachar Levi (on behalf of Eitan Levi), and Ora and Rotem Cooper (on their own behalf and on behalf of their father Amiram) allege that the October 7 Attacks included desecration of remains and outrages upon personal dignity in violation of Article 8(2)(b)(xxi) of the Rome Statute and customary international humanitarian law.

254.      Plaintiffs Almog Meir Jan, Andrey Kozlov, and Shlomi Ziv allege that their captivity included torture and cruel treatment in violation of Common Article 3 of the Geneva Conventions and the Convention Against Torture.

255.      Zhao aided and abetted these violations of the law of nations by knowingly providing substantial assistance to Hamas and PIJ as set forth in Count Three above.

74

256.    Zhao is a natural person. The relevant conduct — Zhao's direction of Binance's operations from and through the United States, including his use of United States bank accounts through entities he owned and controlled, his direction of United States-based employees and operations, his personal direction of the scheme to evade United States regulatory oversight, his guilty plea to United States federal criminal charges, and his sentencing in the United States — touched and concerned the United States with sufficient force to displace the presumption against extraterritorial application of the ATS.

257.    As a direct and proximate result of Zhao's conduct, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

258.    Zhao is therefore liable to Plaintiffs Hagar Almog, Lishay Lavi, Ariel Ein-Gal, Ora Cooper, Rotem Cooper, Almog Meir Jan, Andrey Kozlov, Shlomi Ziv, Ayelet Samerano, Talik Gvili, Roee Baruch, and Shachar Levi in each of their capacities for damages in an amount to be determined at trial, and the costs of this suit, including attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants and in favor of Plaintiffs as follows:

As to Counts One through Six (ATA/JASTA Claims):

(a) Compensatory damages against each Defendant in amounts to be determined at trial;

(b) Treble damages against each Defendant pursuant to 18 U.S.C. § 2333(a);

(c) Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, against each Defendant pursuant to 18 U.S.C. § 2333(a);

As to Counts Seven and Eight (ATS Claims):

75

(d) Compensatory damages against Defendants BAM Trading and Zhao in amounts to be determined at trial;

(e) Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, against Defendants BAM Trading and Zhao;

As to All Counts:

(f) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

(g) Such other and further relief as justice requires.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 10, 2026

Respectfully submitted,

/s/ *David I. Schoen*
David I. Schoen (ASB-0860-042D)
Schoen Law Firm, LLC
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(917) 941-7952
schoenlawfirm@gmail.com

Mark Goldfeder (admitted *pro hac vice*)
Ben Schlager (admitted *pro hac vice*)
National Jewish Advocacy Center (NJAC)
1954 Airport Road Suite 1196
Atlanta, GA 30341
(332) 278-1100
mark@njaclaw.org
ben@njaclaw.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of the foregoing Second Amended Complaint on all counsel of record by filing the same on this Court's ECF system on this 10th day of April, 2026.

/s/ David I. Schoen